Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
Center for Biological Diversity
1212 Broadway Suite 800
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WISHTOYO FOUNDATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEBRA HAALAND, Secretary of the U.S. Department of the Interior; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; BRUCE HESSON, Pacific Regional Director, Bureau of Safety and Environmental Enforcement, <br><br> *Defendants*. | Case No. 2:24-cv-05459 <br><br> **COMPLAINT FOR DECLARATORY AND OTHER RELIEF** <br><br> **(National Environmental Policy Act, 42 U.S.C. §§ 4321–4347; Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356c, 1801–1866; Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706)** |

**INTRODUCTION**

1.      For nearly a decade, the federal government has extended the terms of ExxonMobil Corporations's oil and gas leases in federal waters off California's coast without conducting the meaningful reviews required by law. Specifically, Defendants Secretary of the U.S. Department of the Interior, the Bureau of Safety and Environmental Enforcement, and the Bureau's Pacific Regional Supervisor (collectively, BSEE) failed to comply with the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356c, 1801–1866, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, 701–706, in authorizing extensions of ExxonMobil's offshore oil and gas leases on the Pacific Outer Continental Shelf.

2.      In May 2015, ExxonMobil shut down its oil and gas operations in the Santa Barbara Channel (in what is known as the Santa Ynez Unit) after a corroded onshore pipeline ruptured and spilled what is now believed to be more than 460,000 gallons of oil. The Plains All American Pipeline carried oil that ExxonMobil produced at its three platforms in the Santa Ynez Unit. The spill killed hundreds of birds and marine mammals, including dolphins and sea lions.

3.      Every year since, while operations remain shut down, BSEE has authorized extensions of the 16 offshore oil and gas leases in the Santa Ynez Unit. BSEE approved the latest extension on November 14, 2023.

4.      Without these extensions, each of the leases would have expired and ExxonMobil would have been required to permanently cease its oil and gas operations, plug its wells, and decommission its other infrastructure.

5.      Extending the leases for the Santa Ynez Unit prolongs the existence of aging oil and gas infrastructure, increasing the risks of oil spills and other accidents. Extending the leases for the Santa Ynez Unit also prolongs drilling off California and all the harms that come along with it.

6.      As relevant here, to approve the lease extensions, BSEE had to first determine that granting the extensions "is in the National interest." 30 C.F.R. § 250.180(e). BSEE also had to comply with NEPA. 42 U.S.C. § 4322(C). BSEE did not properly comply with either requirement.

7.      First, BSEE's national interest determination failed to consider several highly relevant factors. For example, the agency ignored evidence demonstrating that extending ExxonMobil's leases is antithetical to the national interest in addressing the climate crisis, promoting public health and environmental justice, recovering endangered species, and otherwise protecting the environment given the numerous harms inherent in offshore oil and gas drilling.

8.      Second, BSEE failed to conduct any environmental review under NEPA of the environmental impacts of extending ExxonMobil's leases. Instead, BSEE deemed the lease extensions categorically excluded from NEPA and determined that no extraordinary circumstances exist that would make application of the categorical exclusion inappropriate. In doing so, BSEE ignored the numerous harms that prolonging oil and gas activity off California perpetuates, including increased risk of oil spills and other accidents from decades-old infrastructure.

9.      Accordingly, Plaintiffs Center for Biological Diversity and Wishtoyo Foundation request an order from the Court declaring that BSEE's November 2023

approval of the lease extensions violates OCSLA, NEPA, and the APA; vacating the November 2023 lease extensions; and prohibiting BSEE from issuing any future lease extensions for the Santa Ynez Unit unless and until BSEE complies with the law.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises pursuant to the laws of the United States. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because some of the Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

12.     Assignment to the Western Division of this Court is proper under General Order No. 24-04, Section I.B.1.a(1)(b).

## PARTIES

### Plaintiffs

13.     Plaintiff Center for Biological Diversity (the Center) is a national, non-profit conservation organization that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission also includes protecting air quality, water quality, and public health. The Center has over 79,000 members worldwide, including thousands in California. The Center brings this action on behalf of its members.

14.     The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine

mammals, sea turtles, and fish are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the California coastal environment from offshore oil and gas drilling activity.

15.     The Center's members regularly visit California beaches and waters—including the Gaviota coast; the Santa Barbara Channel and its islands; and the waters near offshore platforms in the Santa Ynez Unit—for vocational and recreational activities such as swimming, surfing, kayaking, hiking, fishing, diving, camping, viewing and studying wildlife, and photography. The Center's members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. The Center's members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

16.     Plaintiff Wishtoyo Foundation (Wishtoyo) is a Native-led California nonprofit public-interest organization with over 700 members primarily composed of Chumash Native Americans and residents of Santa Barbara, Ventura, and Los Angeles counties. Wishtoyo's mission is to preserve, protect, and restore Chumash culture, the culture of indigenous peoples, and the environment all peoples depend upon. The organization uses education, outreach, cultural programs, scientific study, restoration projects, advocacy, and legal action to attain this mission. Chumash tribes, bands, and clans have a long history of interaction with the marine waters of the Pacific Ocean and the Santa Barbara Channel, from Morro Bay to Malibu and out to and around the Channel Islands. Chumash peoples rely upon

these lands and waters and their natural cultural resources to support and maintain Chumash traditional practices, ways of life, and ancestral connections. Wishtoyo's members use these lands and waters for ceremonial purposes; to connect with and celebrate their ancestors and cultural heritage; to gather natural cultural resources; and for educational purposes, recreational use, wildlife viewing, scientific study, and environmental monitoring. Wishtoyo's members intend to continue these uses as permitted.

17.     Since time immemorial, marine, and terrestrial species have played an important role in the culture and lifeways of Chumash maritime tribes, bands, and clans. Wishtoyo's Chumash members continue to have a strong cultural and spiritual interest in the protection of species. Wishtoyo's Chumash members navigate on tomols (Chumash plank canoes) and by other means through the Santa Barbara Channel, where encountering marine species is essential to their connection with their ancestors and provides them with a spiritual echo through time and connection to the planet as they traverse between the Channel Islands (the origin of the Chumash Peoples) and the mainland. The existence and abundance of species and habitat are also critical to the maintenance of Wishtoyo's Chumash members' cultural practices, lifeways, and ceremony.

18.     Offshore oil and gas drilling activities degrade these habitats and threaten wildlife and the coastal environment. It also threatens Wishtoyo's Chumash members' ability to continue their traditional, educational, recreational, and environmental practices, ways of life, and ancestral connections. For example, offshore oil and gas activities cause oil spills. Oil spills have a wide array of lethal and sublethal impacts on marine species, both immediate and long term. Official

reports document that the 2015 Plains All American Pipeline spill killed at least 558 birds and 232 mammals, including 19 dolphins (which many Chumash people consider relatives and ancestors) and 94 sea lions. The spill impacted a wide variety of nearshore fish species, including surfperch and grunion, which were spawning when the spill occurred. The actual number of birds killed is likely to be four times the number of birds recovered. The spill also impacted a variety of coastal habitats including kelp wrack, feather boa kelp, surfgrass, and eelgrass. Additionally, the spill prevented Chumash people from participating in the annual tomol voyage across the Santa Barbara Channel to Limu, Chumash homeland in the Santa Barbara Channel Islands, and the tomol village visits up and down the coast. And an October 2021 oil spill from a pipeline connected to Platform Elly off Huntington Beach killed or injured at least 124 birds and mammals.

19. The risk of oil spills exists from both active and inactive oil and gas wells and other infrastructure. Inactive infrastructure can become badly damaged in storms, as evidenced by the oil spill from an abandoned Taylor Energy platform in the Gulf of Mexico following Hurricane Katrina that leaked oil for 15 years.

20. Offshore drilling activities also increase air pollution that is harmful to public health and discharge wastewater that contaminates the ocean with pollutants that are toxic to marine species. It also requires the shipment of equipment to oil platforms, thereby increasing port and ship traffic, which in turn increase ocean noise and the risk of vessel strikes of whales and other animals.

21. Extending the leases for the Santa Ynez Unit prolongs the existence of the three aging drilling platforms in the Unit (Platforms Harmony, Heritage, and Hondo) and their associated wells and other infrastructure, increasing the risks of

1  oil spills. Extending the leases for the Santa Ynez Unit extends oil and gas activity

2  off California, and all the harmful environmental impacts such activity causes.

3      22.    Extending the leases for the Santa Ynez Unit degrades Plaintiffs'

4  members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of the

5  Santa Barbara coast and waters. It harms water quality and wildlife that they study

6  and observe, decreasing their spiritual and cultural experiences and their ability to

7  view species that are impacted by offshore drilling activities or abandon the area

8  because of these activities.

9      23.    For example, one Center member who lives in Santa Barbara

10  regularly recreates in the area, including in coastal areas and waters near offshore

11  oil platforms. He regularly surfs in places like Rincon and Sands Beach near Santa

12  Barbara, Naples on the Gaviota Coast, Jalama Beach near Point Conception, and

13  Oxnard Shores and Silver Strand in Ventura. He goes as often as possible,

14  generally twice a week. He also hikes, sails, and scuba dives on and around the

15  Channel Islands. While on these trips he enjoys looking for and observing wildlife

16  in the area, including fur seals, blue whales, humpback whales, black abalone, and

17  other animals. He derives aesthetic, emotional, and physical benefits from these

18  activities that are essential to his well-being. Noise pollution, water pollution,

19  vessel strikes, oil spills, and other impacts from oil and gas drilling disturb and

20  harm the animals he enjoys and is interested in seeing and make it less likely he

21  can see these animals in the future. Oil spills that close beaches or ocean waters

22  impede his ability to enjoy recreational activities.

23      24.    The above-described aesthetic, recreational, professional, spiritual,

24  and other interests have been, are being, and will continue to be adversely affected

and irreparably injured by BSEE's failure to comply with OCSLA and NEPA. BSEE's authorization of extensions of offshore oil and gas leases for the Santa Ynez Unit without proper review of the related impacts on the environment means that BSEE is failing to adequately protect California's ocean and coastal environment, including already imperiled wildlife, and is exposing these resources to increased risk of harm.

25.   In addition, Plaintiffs' members are suffering procedural and informational injuries resulting from BSEE's failure to conduct environmental review on the effects of extending the oil and gas leases for the Santa Ynez Unit.

26.   Plaintiffs' members have no adequate remedy at law and the requested relief is proper. Relief in this case would ensure BSEE prepares a proper national interest determination under OCSLA and an environmental assessment or environmental impact statement under NEPA to analyze the impacts of extending offshore oil and gas leases. The requested relief could result in additional information, process, mitigation, and oversight of offshore drilling that would better protect the ocean and imperiled wildlife and alleviate the injuries of Plaintiffs' members. An order declaring BSEE's actions unlawful, vacating BSEE's authorization of the lease extensions for the Santa Ynez Unit, and prohibiting future extensions unless and until BSEE complies with OCSLA and NEPA would redress the injuries of Plaintiffs' members.

## Defendants

27.   Defendant Debra Haaland is the Secretary of the U.S. Department of the Interior and is sued in her official capacity. The Department of the Interior is responsible for managing and overseeing the development of oil and gas resources

on the outer continental shelf. Secretary Haaland is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Department of the Interior and its bureaus comply with all applicable laws and regulations, including OCSLA, NEPA, and the APA.

28.     Defendant Bureau of Safety and Environmental Enforcement is a federal agency within the Department of the Interior. The Bureau of Safety and Environmental Enforcement is charged with permitting drilling in federal waters and ensuring such activities comply with safety and environmental regulations.

29.     Bruce Hesson is the Regional Director of the Pacific Region of the Bureau of Safety and Environmental Enforcement and is sued in his official capacity. Mr. Hesson has responsibility for implementing and fulfilling the Bureau's duties under OCSLA and NEPA.

## STATUTORY BACKGROUND

## **Outer Continental Shelf Lands Act**

30.     OCSLA establishes a framework under which the Secretary of the Interior may lease areas of the outer continental shelf for purposes of exploring and developing the oil and gas deposits of the outer continental shelf submerged lands. 43 U.S.C. §§ 1331–1356c, 1801–1866. The outer continental shelf generally begins three miles from shore—the outer boundary of most state waters—and extends seaward to the limits of federal jurisdiction. *Id*. § 1331(a).

31.     OCSLA specifically requires that oil production be "subject to environmental safeguards" and balanced "with protection of the human, marine, and coastal environments." *Id*. §§ 1332(3), 1802(2).

32.     There are four separate stages to developing an offshore oil well: "(1) formulation of a 5-year leasing plan …; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). Each of these "stage[s] involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the [outer continental shelf]." *Id.*

33.     At the second stage, the Secretary holds lease sales and can grant offshore oil and gas leases. 43 U.S.C. § 1337(a)(1). An oil and gas lease "entitle[s] the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. *Id*. § 1337(b)(4).

34.     Generally, leases are for an initial period of five years, *id*. § 1337(b)(2)(A), "and as long after such initial period as oil or gas is produced from the area in paying quantities," *id*. § 1337(b)(2).

35.     OCSLA authorizes the Secretary to "prescribe such rules and regulations as may be necessary" to manage oil and gas activities, including for the protection of natural resources. *Id.* § 1334(a). OCSLA specifies that such "regulations shall, as of their effective date, apply to all operations conducted under a lease." *Id*.

36.     OCSLA also specifies that the Secretary's regulations regarding offshore oil and gas leasing must provide for "the suspension or temporary prohibition of any operation or activity, including production" in certain circumstances, including "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life) … or to the marine, coastal, or human environment." *Id.* § 1334(a)(1).

37. The Secretary has delegated its responsibilities under OCSLA to two bureaus within the Department of the Interior. The Bureau of Ocean Energy Management is responsible for managing leasing, exploration, development, and production of oil and gas resources on the outer continental shelf. 30 C.F.R. § 550.101. The Bureau of Safety and Environmental Enforcement is responsible for enacting and enforcing safety and environmental standards under OCSLA, as well as issuing drilling permits. *Id*. § 250.101. The Bureau of Safety and Environmental Enforcement is also responsible for approving lease extensions. *Id*. § 250.180(e).

38. Under the regulations and as relevant here, a lease will expire at the end of the initial five years unless production is occurring in paying quantities. *Id*. § 250.180(a)(2). If production ceases on a lease that has continued beyond its primary term, the lease will expire unless production resumes or BSEE approves a suspension of operations or suspension of production within a year after production ceases. *Id*. § 250.180(d).

39. BSEE can also allow an operator more than a year to resume operations, but only when BSEE determines that "the longer period is in the National interest, and it conserves resources, prevents waste, or protects correlative rights." *Id*. § 250.180(e).

40. A suspension or request for additional time to resume operations "extend[s] the term of a lease … equal to the length of time the suspension is in effect." *Id*. § 250.169(a). Accordingly, such actions "represent a significant decision to extend the life of oil … production off of California's coast, with all of

the far reaching effects and perils that go along with offshore oil production." *California v. Norton*, 311 F.3d 1162, 1173 (9th Cir. 2002).

41.    Once a lease expires, BSEE regulations require an oil and gas company to "permanently plug all wells … within 1 year after the lease terminates." 30 C.F.R. § 250.1710. An oil and gas company must also "remove all platforms and other facilities within 1 year after the lease" expires unless the company "receive[s] approval to maintain the structure to conduct other activities." *Id*. § 250.1725(a).

### National Environmental Policy Act

42.    NEPA is our nation's charter for environmental protection. NEPA seeks to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

43.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions before acting. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted). In this way, NEPA ensures that federal agencies "will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that such information "will be made available to the larger [public] audience that may also play a role in both the decisionmaking process and the implementation of th[e] decision." *Id*. at 349.

44.    To this end, NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for any "major Federal action[] significantly

affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A "major federal action" is defined as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

45.    An EIS must describe the "reasonably foreseeable environmental effects of the proposed agency action." *Id.* § 4332(2)(C)(i). An EIS must also examine "a reasonable range of alternatives to the proposed agency action," including the alternative of not taking the underlying proposed action. *Id.* § 4332(C)(iii).

46.    To determine whether the impacts of a proposed action are significant enough to warrant preparation of an EIS, the agency may prepare a preliminary environmental inquiry known as an environmental assessment. *See* 40 C.F.R. § 1501.5 (2023).[1] An agency must include in its environmental assessment "sufficient evidence and analysis for determining whether to prepare" an EIS, and must determine if an EIS is necessary or, if not, issue a "finding of no significant impact." *Id.* § 1501.5(c)(1). The environmental assessment must evaluate alternatives to the proposed action and "the environmental impacts of the proposed action and alternatives." *Id.* § 1501.5(c)(2). An agency must prepare an EIS if substantial questions are raised whether a project *may* have a significant effect upon the environment.

---

[1] The Council on Environmental Quality issues regulations implementing NEPA that are "binding on all Federal agencies." 40 C.F.R. § 1500.3(a). Those regulations have undergone various amendments in recent years. *See, e.g.*, 85 Fed. Reg. 43,304 (July 16, 2020); 89 Fed. Reg. 35,442 (May 1, 2024). For purposes of this Complaint, Plaintiffs cite the NEPA regulations as they existed at the time BSEE approved its most recent lease extension.

47.     The only circumstances in which an agency need not prepare an EIS or environmental assessment for a major federal action is when the action is "categorically excluded" from NEPA review. *Id.* § 1501.4. Categorical exclusions are intended for small, insignificant, and routine actions and can only be invoked for actions "that normally do not have a significant effect on the human environment." *Id.* § 1501.4(a).

48.     The Department of the Interior has a categorical exclusion for the issuance of lease extensions. U.S. Dep't of the Interior, *Departmental Manual*, 516 DM § 15.4(C)(7) (effective May 27, 2004).

49.     In determining whether to rely on an existing categorical exclusion, an agency must analyze whether "extraordinary circumstances" exist that preclude the use of the categorical exclusion and require the preparation of an EIS or environmental assessment. 40 C.F.R. § 1507.3(e)(2)(ii); *see also* 43 C.F.R. § 46.205(c).

50.     The Department of the Interior's NEPA regulations state that "[e]xtraordinary circumstances … exist for individual actions within categorical exclusions that may meet any of the criteria listed" in the regulations that, if present, preclude categorically excluding a proposed action from NEPA analysis. 43 C.F.R. § 46.215. Those criteria include whether a proposed action may "[h]ave significant impacts on public health or safety[;] … natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; … migratory birds;" and species protected under the Endangered Species Act. *Id.* The criteria also include whether a proposed action has "highly controversial environmental effects[;] … a direct relationship to other actions with

individually insignificant but cumulatively significant environmental effects[;] …
a disproportionately high and adverse effect on low income or minority
populations;" or if it "[l]imit[s] access to and ceremonial use of Indian sacred sites
on Federal lands by Indian religious practitioners or significantly adversely affect
the physical integrity of such sacred sites." *Id.*

51.     According to BSEE, if a proposed action triggers a "yes" answer to
any of the criteria, then it must prepare an EIS or environmental assessment prior
to implementation of the proposed action.

### Administrative Procedure Act

52.     The APA governs judicial review of federal agency actions. 5 U.S.C.
§§ 701–706. Under the APA, courts "shall … hold unlawful and set aside agency
action, findings, and conclusions found to be arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law" or made "without observance
of procedure required by law." *Id*. § 706(2)(A), (D).

### FACTUAL BACKGROUND

### Oil and Gas Leasing in the Santa Ynez Unit off California

53.     There are currently 30 active oil and gas leases and 23 platforms on
the Pacific Outer Continental Shelf from which drilling and extraction activities
occur or have occurred. Twenty-two of these platforms are production platforms,
while one is a processing platform. Eight platforms are located on expired leases.

54.     Most of the active oil and gas leases are organized into units. The Santa Ynez Unit is in the Santa Barbara Channel. The Unit consists of 16 leases: OCS-P 0180, 0181, 0182, 0183, 0187, 0188, 0189, 0190, 0191, 0192, 0193, 0194, 0195, 0326, 0329, and 0461. The federal government issued the leases between 1968 and 1982. The leases all had an initial term of five years.



*The Santa Ynez Unit. Map: Bureau of Ocean Energy Management*

1   55.   Oil and gas production has occurred under these leases from Platform

2   Harmony, Platform Heritage, and Platform Hondo. Platform Harmony was

3   installed in June 1989 and first production began in December 1993. Platform

4   Heritage was installed in October 1989 and first production began in December

5   1993. Platform Hondo was installed in June 1976 and first production began in

6   April 1981.

7

8

9

10

11

12

13

14

15

16

17



18   *Platform Hondo. Photo: Bureau of Ocean Energy Management*

19

20   56.   Until just recently, ExxonMobil owned and operated all three

21   platforms. ExxonMobil's development plan for the Santa Ynez Unit stated that

22   recovery of the oil and gas reserves in the Unit "will take place over a period of

23   approximately 25 to 35 years." As first production from the Unit began in 1981,

24   production should have ceased by 2016.

57.     Sable Offshore Corporation, LLC is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit.

58.     This change of ownership follows a May 20, 2015, oil spill from the Plains All American Pipeline, which ruptured and spilled what is now believed to be up to 460,000 gallons of oil on the Santa Barbara Coast. The oil spill closed beaches and killed wildlife.



*Oil spilled onto Refugio Beach. Photo: U.S. Coast Guard*

59.     The pipeline transported oil from seven offshore oil and gas platforms to refineries. The broken pipeline shut down production at all seven of those offshore platforms. Operators of four of the seven platforms announced plans to decommission the platforms. ExxonMobil did not.

60.     Instead, in 2015, ExxonMobil requested an additional year to resume operations, and BSEE approved that request. Year after year since then, BSEE has extended the Santa Ynez Unit leases. Most recently, on November 14, 2023, BSEE approved a lease extension through December 13, 2024.

61.     Nearly a decade has passed since Platforms Harmony, Heritage, and Hondo shut down, and the leases have not produced oil since then. Absent BSEE's extensions, all 16 leases would have all expired. Upon expiration of the leases, all the wells would need to be permanently plugged and other infrastructure removed within one year.

### The Risks of Prolonged Oil and Gas Activity at the Santa Ynez Unit

62.     Extending the Santa Ynez Unit leases prolongs reliance on aging infrastructure and offshore oil and gas production. Both create additional harmful environmental effects.

63.     For example, the lease extensions increase the risk of oil spills. That risk exists from both the inactive wells during the suspension period and from production activities when they resume. Oil spills can lead to closures of beaches and commercial and recreational fisheries. Oil spills also harm wildlife in numerous ways. Oil can coat animals' fur, feathers, or skin—impairing their insulation, water repellency, or breathing. For example, oil spills are deadly to sea otters whose oiled furry coats cause hypothermia. Animals can also ingest and inhale oil, causing poisoning and death, organ damage, or respiratory problems. Moreover, oil can contaminate the water column and the seafloor where prey species live, causing indirect effects on wildlife by reducing their key food sources.

64.     Exposure to crude oil also adversely affects fish at all stages. Early-

life stages of fish are particularly sensitive to the effects of toxic oil components such as polycyclic aromatic hydrocarbons, which can cause larval deformation and death. Adult fish exposed to oil can suffer from reduced growth, enlarged liver, changes in heart and respiration rates, fin erosion, and reproductive impairment. Additionally, fish and sharks are at risk from lethal coating of their gills with oil and declines in and contamination of their food sources. Exposure to crude oil has also been linked to long-term population effects in fish. A study based on 25 years of research demonstrated that embryonic salmon and herring exposed to very low levels of crude oil can develop heart defects that impede their later survival.

65.     Threatened and endangered species such as western snowy plovers, California least tern, blue and humpback whales, leatherback sea turtles, and the tidewater goby are susceptible to exposure to oil from the Santa Ynez Unit.

66.     Offshore oil and gas infrastructure is typically designed for a 20- to 30-year life. Prior to the 2015 oil spill, drilling had been occurring at the Santa Ynez Unit since 1981, and the last platforms were installed in 1989. The oil and gas infrastructure in the Santa Ynez Unit is beyond its intended lifespan.

67.     The age of the oil and gas infrastructure in the Santa Ynez Unit increases the risk of oil spills and other accidents. For example, the Plains All American Pipeline that ruptured in 2015 was built in 1987. The environmental analysis that the Bureau of Land Management and California State Lands Commission prepared in 1985 for the construction and operation of the pipeline acknowledged that spills happen and determined that the risk of a spill would more than double as the pipeline aged from 20 to 40 years.

68.     According to scientists, aging poses risks of corrosion, erosion, and

fatigue stress to subsea pipelines. These impacts accelerate over time and can act synergistically to increase the rate of crack propagation. Marine environments are especially known to produce significant corrosion on steel surfaces, and when a steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to 15 percent. One offshore pipeline study found that after 20 years, the annual probability of pipeline failure increases rapidly, equating to a probability of failure of 10 percent to 100 percent per year. Another study covering 1996 to 2010 found that accident incident rates, including spills, increased significantly with the age of infrastructure.

69.     Older wells can also lead to oil spills or other accidents. For example, one study found that 30 percent of offshore oil wells in the Gulf of Mexico experienced well casing damage in the first five years after drilling, and damage increased over time to 50 percent after 20 years. Another study determined about five percent of oil and gas wells leak immediately, 50 percent leak after 15 years, and 60 percent leak after 30 years.

70.     Federal records show that the Santa Ynez Unit already has experienced problems. Before it shut down, federal inspectors on May 1, 2015, found "numerous corrosion issues" and components out of compliance on Platform Hondo. Just three weeks before that, they also found corrosion, five failed gas detectors, and "leakage rates higher than the maximum allowable" on that platform's Well H-12U. Platforms Harmony, Heritage, and Hondo had early-2015 gas leaks that required their crews to gather for safety reasons, including an incident on Platform Heritage the morning of May 19, 2015. Platform Hondo also had a gas leak on April 27, 2015, and Platform Harmony had one on March 29,

2015. A federal inspection of Platform Harmony on Aug. 27, 2015, found corrosion and electrical issues throughout the platform.

71.     Oil and gas activity off California has also entailed the use of well stimulation treatments such as hydraulic fracturing ("fracking") and acidizing. These practices cause significantly worse impacts to the environment and public health than conventional offshore oil and gas production. The harmful impacts from well stimulation treatments include the discharge of toxic wastewater; the emission of hazardous air pollutants; and increased risk of earthquakes and oil spills, among other harms. ExxonMobil has previously stated it will likely need to use well stimulation treatments to restart its platforms in the Santa Ynez Unit.

72.     Oil and gas drilling activity also releases harmful air pollutants like fine particulate matter and volatile organic compounds (VOCs). VOCs emitted during drilling activity can include the "BTEX compounds"—benzene, toluene, ethyl benzene, and xylene—which are designated as hazardous air pollutants. *See* 42 U.S.C. § 7412(b). Many of these VOCs are associated with serious short-term and long-term effects to the respiratory, nervous, and circulatory systems. Additionally, VOCs create ground-level ozone, or smog, which can contribute to asthma, premature death, stroke, heart attack, and low birth weight. Benzene is also a known carcinogen and has been detected in people living within a 10-mile radius of oil wells where fracking has occurred.

73.     Oil and gas drilling also includes the discharge of drilling muds and cuttings, produced wastewater, and well treatment and workover fluids. The federal government permits Platforms Harmony, Heritage, and Hondo to discharge more than 33.76 million gallons of produced wastewater into the ocean each year.

These discharges can contain toxic chemicals like benzene, heavy metals, and radioactive materials.

74.     Prolonged drilling at the Santa Ynez Unit also increases vessel traffic through, for example, the servicing of platforms and wells and transporting materials. This increases the risk of vessel strikes of various endangered animals, including several species of whales found in the area. Vessel strikes can kill or injure large whales and other animals by causing blunt force trauma, resulting in fractures, hemorrhage, and/or blood clots. Direct propeller strikes can result in fatal blood loss, lacerations, and/or amputations. Vessel collisions are a leading threat to large whales off the U.S. West Coast.

75.     Oil and gas drilling exacerbates climate change, which is already causing more intense storms, droughts, and wildfires; sea level rise; a higher risk of extinction for many species; and numerous other harms. Scientists have determined that each barrel of federal California oil left in the ground would equate to roughly half a barrel reduction in net oil consumption, with associated reductions in greenhouse gas emissions. Before it shut down in 2015, the onshore facility that processed oil and gas from the Santa Ynez Unit was Santa Barbara County's largest source of greenhouse gas emissions. It contributed 55 percent of Santa Barbara County's total greenhouse gas emissions.

### BSEE's Lease Extensions Fail to Consider Relevant Factors

76.     On November 19, 2015, ExxonMobil sought its first request following the Plains All American Pipeline spill for an extension under 30 C.F.R. § 250.180(e) of all 16 of its oil and gas leases in the Santa Ynez Unit. BSEE approved the lease extensions on December 10, 2015. ExxonMobil has applied for,

and BSEE has granted, lease extensions for its leases in the Santa Ynez Unit every year since. ExxonMobil submitted its most recent application on October 19, 2023, and BSEE granted it on November 14, 2023. The current approval expires at midnight on December 31, 2024.

77.     In granting the most recent extension in November 2023, BSEE described the proposed action as "[p]er 30 CFR 250.180(e), ExxonMobil is requesting an additional 365 days beyond the original 180 (and subsequent 365-day extensions) afforded by 30 CFR 250.180(d) to resume operations on their leases that have continued beyond their primary term."

78.     In granting the most recent extension in November 2023, as with the extensions before it, BSEE determined that "approving ExxonMobil's request is in the National interest." In reaching this conclusion, BSEE determined that "[t]he continued development of these proven reserves from established infrastructure would help meet the Nation's energy needs without the impacts associated with new infrastructure installations or exploration and development of unproven fields." It also asserted that "[c]ontinued production would likewise benefit taxpayers through the continued revenue streams derived from production, including royalties and direct and indirect tax revenue to the Federal Government."

79.     In determining that granting the extension would be in the national interest, BSEE did not consider any of the environmental harms (described above) that come with prolonging offshore oil and gas production off California. BSEE did not consider any harms associated with the continued presence of and reliance on aging infrastructure. BSEE also did not consider that ExxonMobil has previously stated that it anticipates using well stimulation treatments to restart its

platforms in the Santa Ynez Unit.

80.    In granting the most recent extension in November 2023, BSEE also acknowledged that resumption of activities is possible, stating that if the ruptured pipeline is replaced or its restart is approved before the lease extension expires, "then ExxonMobil will have 60 calendar days … to restore production from the Santa Ynez Unit."

81.    In granting the most recent extension in November 2023, as with the extensions before it, BSEE relied on a categorical exclusion under NEPA. As a result, BSEE did not prepare either an EIS or an environmental assessment to examine the environmental effects of its action extending the leases.

82.    BSEE determined that no extraordinary circumstances exist that would make reliance on the categorical exclusion improper.

83.    BSEE concluded that there should be no impacts on public health or safety as "there will be no active oil and gas operations during the approved extension period."

84.    BSEE concluded that there should be no impacts on "natural resources, unique geographic characteristics, or ecologically significant or critical areas" because the extension would "allow active oil and gas operations to remain idled during the approved extension period." BSEE also stated it "will oversee adherence to a preservation plan for safe and environmentally protective maintenance and oversight."

85.    BSEE concluded that there are no controversial environmental effects because the agency's "action involves approving an extension of suspension of operations during which active oil and gas operations will be idled and the

facilities maintained pursuant to preservation plans to ensure safety and environmental protection."

86.    BSEE concluded that there would be no cumulatively significant effects in the event production is ultimately restored because such effects "have already been examined through prior NEPA analyses" and the extension "represents a temporary suspension in those previously examined activities."

87.    BSEE concluded that the extension would have no significant impacts on species listed under the Endangered Species Act and would not "limit access to and ceremonial uses of Indian sacred sites on Federal lands."

88.    The available information indicates that there are numerous significant environmental effects of BSEE's extensions of the Santa Ynez Unit leases. BSEE's conclusion that there are no extraordinary circumstances is incorrect and unsupported.

89.    Prior to BSEE's issuance of the November 2023 lease extensions, the Center sent BSEE a letter, in February 2023, urging the agency to consider the environmental harms from approving further lease extensions and conduct comprehensive NEPA review. BSEE did not do so. It did not respond to the letter.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Violation of OCSLA and the APA: Unlawful National Interest Determination**

90.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 89 of this Complaint.

91.    OCSLA requires that offshore oil and gas activity be "subject to environmental safeguards" and balanced "with protection of the human, marine,

and coastal environments." 43 U.S.C. §§ 1332(3), 1802(2).

92.    OCSLA sets initial lease terms of five years, and leases last as long as they are producing oil and gas in paying quantities. *Id*. § 1337(b)(2). Non-producing leases are supposed to expire, and the oil and gas infrastructure used to produce from those leases generally must be decommissioned within one year of lease expiration. 30 C.F.R. §§ 250.180(a)(2), 250.1710, 250.1725(a).

93.    If production ceases on a lease that has continued beyond its primary term, the lease will expire unless production resumes or BSEE approves a suspension of operations or production before the end of the year after production ceases. *Id*. § 250.180(d). BSEE can also allow an operator more than a year to resume operations, but only when BSEE determines that "the longer period is in the National interest, and it conserves resources, prevents waste, or protects correlative rights." *Id*. § 250.180(e).

94.    BSEE's November 2023 determination that the lease extensions for the Santa Ynez Unit are in the national interest failed to consider relevant factors. BSEE looked only at the purported benefits of issuing the lease extensions so that ExxonMobil could resume production without considering any of the environmental harms from doing so. BSEE did not consider, for example, the risks of oil spills from aging infrastructure, the future use of well stimulations at the Santa Ynez Unit, or the climate impacts that would result from restarting drilling operations at the Santa Ynez Unit.

95.    BSEE's November 2023 issuance of the lease extensions for the Santa Ynez Unit violates OCSLA and its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under

the APA. 5 U.S.C. §706(2)(A).

## Second Claim for Relief

**Violation of NEPA and the APA: Unlawful Use of Categorical Exclusion**

96.     Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 89 of this Complaint.

97.     NEPA requires all federal agencies, including BSEE, to take a "hard look" at the direct, indirect, and cumulative effects of proposed major federal actions and at alternatives that could reduce or eliminate those environmental impacts. 42 U.S.C. § 4332(2)(C)(i)–(iii); 40 C.F.R. § 1502.16. An agency can take the requisite hard look at a major federal action by preparing an environmental assessment or an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.5.

98.     BSEE's approval of extensions for the offshore oil and gas leases in the Santa Ynez Unit constitutes a major federal action.

99.     Yet, in approving the extensions in November 2023, BSEE failed to take a hard look at the environmental effects of extending these federal offshore oil and gas leases. BSEE did not prepare an EIS or environmental assessment on the lease extensions. Instead, BSEE relied on a categorical exclusion. In doing so, BSEE failed to consider the direct, indirect, and cumulative effects of the lease extensions and failed to consider a reasonable range of alternative to its action.

100.    BSEE's reliance on a categorical exclusion in issuing the November 2023 lease extensions for the Santa Ynez Unit is arbitrary and violates NEPA. BSEE failed to consider important aspects of the action. BSEE failed to consider the significant environmental impacts of leaving non-producing infrastructure in place; and of oil spills, water pollution, air pollution, and other harms associated

1  with prolonging offshore drilling from aging infrastructure.

2      101.   BSEE failed to consider relevant factors and reached conclusions

3  contrary to the evidence before the agency in determining no extraordinary

4  circumstances apply. As one example, BSEE determined that "[a]ny cumulative

5  effects from ongoing future production, in the event that production is ultimately

6  restored, have already been examined through prior NEPA analyses." But BSEE

7  has never examined the cumulative effects of oil and gas production activities off

8  California. As another example, BSEE determined there would be no adverse

9  impacts to public health, ecologically critical areas, cultural resources, access to

10  sacred sites, or endangered and threatened species because oil and gas activity

11  would be idle during the extension period. But BSEE acknowledged in approving

12  the lease extension that production could resume during the extension period.

13      102.   BSEE's consideration of the impacts to public health, ecologically

14  critical areas, cultural resources, access to sacred sites, threatened and endangered

15  species, and other factors in its extraordinary circumstances review looked only at

16  the potential impacts during the suspension of operations—not the impacts of

17  active oil and gas production. In contrast, both ExxonMobil's lease extension

18  applications and BSEE's national interest determination only considered and relied

19  on the purported benefits of production.

20      103.   BSEE's reliance on a categorical exclusion to approve the November

21  2023 lease extensions and its extraordinary circumstances review violate NEPA, its

22  implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or

23  otherwise not in accordance with law" under the APA. 5 U.S.C. §706(2)(A).

24  BSEE's failure to prepare an EIS or environmental assessment on the lease

Complaint for Declaratory and Other Relief                                    29

extensions violates NEPA, its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and made "without observance of procedure required by law" under the APA. *Id.* § 706(2)(A), (D).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

1. Declare that BSEE's November 2023 approval of lease extensions for the Santa Ynez Unit violates OCSLA, its implementing regulations, and the APA;

2. Declare that BSEE's November 2023 approval of lease extensions for the Santa Ynez Unit violate NEPA, its implementing regulations, and the APA;

3. Vacate and remand the November 2023 lease extensions for the Santa Ynez Unit;

4. Prohibit BSEE from authorizing additional lease extensions for the Santa Ynez Unit unless and until it complies with OCSLA, NEPA, and the APA;

5. Award Plaintiffs their costs of this action, including reasonable attorneys' fees; and

6. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 27th day of June 2024,

*/s/ Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150

Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7108
Fax: (510) 844-7150

Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7100
Fax: (510) 844-7150

*Attorneys for Plaintiffs*