Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
Center for Biological Diversity
1212 Broadway Suite 800
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WISHTOYO FOUNDATION,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>DEBRA HAALAND, Secretary of the U.S. Department of the Interior; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; BRUCE HESSON, Pacific Regional Director, Bureau of Safety and Environmental Enforcement,<br><br>    *Defendants*,<br><br>SABLE OFFSHORE CORP.,<br><br>    *Intervenor-Defendant.* | Case No. 2:24-cv-05459-MWC-MAA<br><br>**FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF**<br><br>**(National Environmental Policy Act, 42 U.S.C. §§ 4321–4347; Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356c, 1801–1866; Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706)** |

# INTRODUCTION

1.      ~~For nearly a decade,~~Plaintiffs Center for Biological Diversity and Wishtoyo Foundation (Plaintiffs) challenge the federal government's ~~has extended the terms of ExxonMobil Corporations's~~failure to conduct the meaningful reviews required by law in managing and permitting oil and gas ~~leases~~activity in federal waters off California's coast ~~without conducting the meaningful reviews required by law~~. Specifically, Defendants Secretary of the U.S. Department of the Interior, the Bureau of Safety and Environmental Enforcement, and the Bureau's Pacific Regional Supervisor (collectively, BSEE) failed to comply with the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356c, 1801–1866, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, 701–706, in authorizing extensions of ExxonMobil's offshore oil and gas leases on the Pacific Outer Continental Shelf. BSEE also failed to examine the environmental impacts of issuing permits to perforate oil wells and restart production at three drilling platforms in the Santa Barbara Channel (in what is known as the Santa Ynez Unit), in violation of NEPA and the APA.

2.      In May 2015, ExxonMobil shut down its oil and gas operations in the Santa ~~Barbara Channel (in what is known as the Santa~~ Ynez Unit~~)~~ after a corroded onshore pipeline ruptured and spilled what is now believed to be more than 46<u>5</u>0,000 gallons of oil. The ~~Plains All American~~ pipeline carried oil that ExxonMobil produced at ~~its three platforms in~~ the Santa Ynez Unit. The spill

1   killed hundreds of birds and marine mammals, including dolphins and sea lions,

2   and closed beaches and fisheries along the coast.

3       3.      Every year since, wWhile operations remain shut down, BSEE has

4   authorized extensions of the 16 offshore oil and gas leases in the Santa Ynez Unit.

5   BSEE approved the latest extension on November 14, 2023.

6       4.      Without these extensions, each of the leases would have expired and

7   ExxonMobil would have been required to permanently cease its oil and gas

8   operations, plug its wells, and decommission its other infrastructure.

9       5.      Extending the leases for the Santa Ynez Unit prolongs the existence of

10  aging oil and gas infrastructure, increasing the risks of oil spills and other

11  accidents. Extending the leases for the Santa Ynez Unit also prolongs drilling off

12  California and all the harms that come along with it.

13      6.      As relevant here, to approve the lease extensions, BSEE had to first

14  determine that granting the extensions "is in the National interest." 30 C.F.R.

15  § 250.180(e). BSEE also had to comply with NEPA. 42 U.S.C. § 4322(4332(2)(C).

16  BSEE did not properly comply with either requirement.

17      7.      First, BSEE's national interest determination failed to consider several

18  highly relevant factors. For example, the agency ignored evidence demonstrating

19  that extending ExxonMobil's leases is antithetical to the national interest in

20  addressing the climate crisis, promoting public health and environmental justice,

21  recovering endangered species, and otherwise protecting the environment given the

22  numerous harms inherent in offshore oil and gas drilling.

23      8.      Second, BSEE failed to conduct any environmental review under

24  NEPA of the environmental impacts of extending ExxonMobil's leases. Instead,

1  BSEE deemed the lease extensions categorically excluded from NEPA and

2  determined that no extraordinary circumstances exist that would make application

3  of the categorical exclusion inappropriate. In doing so, BSEE ignored the

4  numerous harms that prolonging oil and gas activity off California perpetuates,

5  including increased risk of oil spills and other accidents from decades-old

6  infrastructure.

7      9.    Making matters worse, BSEE recently issued two permits that

8  facilitate the restart of oil and gas production at the Santa Ynez Unit. Sable

9  Offshore Corp. (Sable)—which acquired the Santa Ynez Unit leases and associated

10  infrastructure from ExxonMobil in February 2024—submitted the permit

11  applications on September 19, 2024, and BSEE issued the permits on September

12  25, 2024, just four business days later. The primary purpose of the permits is to

13  enhance production by allowing the perforation of two wells, which enables the

14  flow of oil and gas.

15      10.    In authorizing these permits, BSEE had to comply with NEPA. 42

16  U.S.C. § 4332(2)(C). It did not.

17      11.    Instead, BSEE fast-tracked issuance of the permits by relying on an

18  inapplicable categorical exclusion under NEPA and an environmental impact

19  statement on oil and gas development and production at the Santa Ynez Unit

20  prepared in 1984, more than 40 years ago.

21      12.    BSEE's reliance on a categorical exclusion to issue the permits is

22  arbitrary. The categorical exclusion cannot reasonably be interpreted to apply to

23  authorizing the resumption of offshore oil and gas activity from old infrastructure

24  that has been shut down for nearly a decade due to a massive oil spill. Moreover,

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                    3

1    BSEE also failed to consider relevant factors in determining no extraordinary

2    circumstances exist, including the numerous harms from restarting offshore oil and

3    gas production and the use of corroded pipelines and other infrastructure.

4        13.    Additionally, BSEE violated NEPA by failing to supplement any prior

5    environmental analysis on oil and gas development and production at the Santa

6    Ynez Unit despite a slew of new information that leaves prior analyses woefully

7    outdated and inadequate. Since the 1984 NEPA analysis, offshore drilling

8    platforms and other infrastructure have outlived their intended lifespans, new

9    drilling technologies have resulted in unexamined environmental harms, and oil

10    spills have affected local communities and ecosystems.

11        9.14.  Accordingly, Plaintiffs ~~Center for Biological Diversity and Wishtoyo~~

12    ~~Foundation~~ request an order from the Court declaring that BSEE's November 2023

13    approval of the lease extensions violates OCSLA, NEPA, and the APA; and that

14    BSEE's approval of the September 2024 well perforation permits and failure to

15    supplement its prior NEPA analysis violates NEPA and the APA. Plaintiffs also

16    seek an order vacating the November 2023 lease extensions~~; and~~ and the two well

17    perforation permits; and an order prohibiting BSEE from issuing any future lease

18    extensions or approving any future development and production permit

19    applications for the Santa Ynez Unit unless and until BSEE complies with the law.

20        15.    Only with the new, comprehensive analyses required by law can

21    BSEE be fully informed about how to best manage offshore oil and gas activity at

22    the Santa Ynez Unit. And until BSEE completes the relevant analyses, the public

23    will continue to be left in the dark about the full environmental impacts of

24    restarting oil and gas operations in the area.

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                    4

## JURISDICTION AND VENUE

~~10.~~16. The Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises pursuant to the laws of the United States. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

~~11.~~17. Venue is proper in this Court under 28 U.S.C. § 1391(e) because some of the Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

~~12.~~18. Assignment to the Western Division of this Court is proper under General Order No. 24-04, Section I.B.1.a(1)(b).

## PARTIES

### Plaintiffs

~~13.~~19. Plaintiff Center for Biological Diversity (the Center) is a national, non-profit conservation organization that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission also includes protecting air quality, water quality, and public health. The Center has over 79,000 members worldwide, including thousands in California. The Center brings this action on behalf of its members.

~~14.~~20. The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, sea turtles, and fish are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices.

In pursuit of this mission, the Center has been actively involved in protecting the California coastal environment from offshore oil and gas drilling activity.

15.21. The Center's members regularly visit California beaches and waters—including the Gaviota coast; the Santa Barbara Channel and its islands; and the waters near offshore platforms in the Santa Ynez Unit—for vocational and recreational activities such as swimming, surfing, kayaking, hiking, fishing, diving, camping, viewing and studying wildlife, and photography. The Center's members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. The Center's members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

16.22. Plaintiff Wishtoyo Foundation (Wishtoyo) is a Native-led California nonprofit public-interest organization with over 700 members primarily composed of Chumash Native Americans and residents of Santa Barbara, Ventura, and Los Angeles counties. Wishtoyo's mission is to preserve, protect, and restore Chumash culture, the culture of indigenous peoples, and the environment all peoples depend upon. The organization uses education, outreach, cultural programs, scientific study, restoration projects, advocacy, and legal action to attain this mission. Chumash tribes, bands, and clans have a long history of interaction with the marine waters of the Pacific Ocean and the Santa Barbara Channel, from Morro Bay to Malibu and out to and around the Channel Islands. Chumash peoples rely upon these lands and waters and their natural cultural resources to support and maintain Chumash traditional practices, ways of life, and ancestral connections. Wishtoyo's members use these lands and waters for ceremonial purposes; to connect with and

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                                6

1  celebrate their ancestors and cultural heritage; to gather natural cultural resources;

2  and for educational purposes, recreational use, wildlife viewing, scientific study,

3  and environmental monitoring. Wishtoyo's members intend to continue these uses

4  as permitted.

5      17.23. Since time immemorial, marine, and terrestrial species have played an

6  important role in the culture and lifeways of Chumash maritime tribes, bands, and

7  clans. Wishtoyo's Chumash members continue to have a strong cultural and

8  spiritual interest in the protection of species. Wishtoyo's Chumash members

9  navigate on tomols (Chumash plank canoes) and by other means through the Santa

10  Barbara Channel, where encountering marine species is essential to their

11  connection with their ancestors and provides them with a spiritual echo through

12  time and connection to the planet as they traverse between the Channel Islands (the

13  origin of the Chumash Peoples) and the mainland. The existence and abundance of

14  species and habitat are also critical to the maintenance of Wishtoyo's Chumash

15  members' cultural practices, lifeways, and ceremony.

16      18.24. Offshore oil and gas drilling activities degrade these habitats and

17  threaten wildlife and the coastal environment. It Offshore drilling also threatens

18  Wishtoyo's Chumash members' ability to continue their traditional, educational,

19  recreational, and environmental practices, ways of life, and ancestral connections.

20  For example, offshore oil and gas activities cause oil spills. Oil spills have a wide

21  array of lethal and sublethal impacts on marine species, both immediate and long

22  term. Official reports document that the 2015 Plains All American Pipelineoil spill

23  killed at least 558 birds and 232 mammals, including 19 dolphins (which many

24  Chumash people consider relatives and ancestors) and 94 sea lions. The spill

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                              7

impacted a wide variety of nearshore fish species, including surfperch and grunion, which were spawning when the spill occurred. The actual number of birds killed is likely to be four times the number of birds recovered. The spill also impacted a variety of coastal habitats including kelp wrack, feather boa kelp, surfgrass, and eelgrass. Additionally, the spill prevented Chumash people from participating in the annual tomol voyage across the Santa Barbara Channel to Limu, Chumash homeland in the Santa Barbara Channel Islands, and the tomol village visits up and down the coast. And an October 2021 oil spill from a pipeline connected to Platform Elly off Huntington Beach killed or injured at least 124 birds and mammals.

19.25. The risk of oil spills exists from both active and inactive oil and gas wells and other infrastructure. Inactive infrastructure can become badly damaged in storms, as evidenced by the oil spill from an abandoned Taylor Energy platform in the Gulf of Mexico following Hurricane Katrina that leaked oil for 15 years.

20.26. Offshore drilling activities also increase air pollution that is harmful to public health and discharge wastewater that contaminates the ocean with pollutants that are toxic to marine species. It Offshore drilling also requires the shipment of equipment to oil platforms, thereby increasing port and ship traffic, which in turn increase ocean noise and the risk of vessel strikes of whales and other animals.

21.27. Extending the leases for the Santa Ynez Unit prolongs the existence of the three aging drilling platforms in the Unit (Platforms Harmony, Heritage, and Hondo) and their associated wells and other infrastructure, increasing the risks of oil spills. Extending the leases for the Santa Ynez Unit extends oil and gas activity off California, and all the harmful environmental impacts such activity causes.

28.     Approving well perforation permits for the Santa Ynez Unit facilitates a restart of offshore oil and gas activities, including transiting service vessels, well work, drilling, and production. It risks accidents such as oil spills, restarts platforms and pipelines that have been shut down, increases air and water pollution, and prolongs offshore oil and gas activities in the Santa Barbara Channel. These activities have direct, indirect, and cumulative environmental harms that injure Plaintiffs' interests.

22.29. Extending the leases for, approving the well perforation permits, and restarting production at the Santa Ynez Unit degrades Plaintiffs' members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of the Santa Barbara coast and waters. It harms water quality and wildlife that they study and observe, decreasing their spiritual and cultural experiences and their ability to view species that are impacted by offshore drilling activities or abandon the area because of these activities.

23.30. For example, one Center member who lives in Santa Barbara regularly recreates in the area, including in coastal areas and waters near offshore oil platforms. He regularly surfs in places like Rincon and Sands Beach near Santa Barbara, Naples on the Gaviota Coast, Jalama Beach near Point Conception, and Oxnard Shores and Silver Strand in Ventura. He goes as often as possible, generally twice a week. He also hikes, sails, and scuba dives on and around the Channel Islands. While on these trips he enjoys looking for and observing wildlife in the area, including fur seals, blue whales, humpback whales, black abalone, and other animals. He derives aesthetic, emotional, and physical benefits from these activities that are essential to his well-being. Noise pollution, water pollution,

1    vessel strikes, oil spills, and other impacts from oil and gas drilling disturb and

2    harm the animals he enjoys and is interested in seeing and make it less likely he

3    can see these animals in the future. Oil spills that close beaches or ocean waters

4    impede his ability to enjoy recreational activities.

5        24.31. The above-described aesthetic, recreational, professional, spiritual,

6    and other interests have been, are being, and will continue to be adversely affected

7    and irreparably injured by BSEE's failure to comply with OCSLA and NEPA.

8    BSEE's authorization of extensions of offshore oil and gas leases and well

9    perforation permits for the Santa Ynez Unit without proper review of the related

10   impacts on the environment means that BSEE is failing to adequately protect

11   California's ocean and coastal environment, including already imperiled wildlife,

12   and is exposing these resources to increased risk of harm.

13       25.32. In addition, Plaintiffs' members are suffering procedural and

14   informational injuries resulting from BSEE's failure to conduct environmental

15   review on the effects of extending the oil and gas leases for, approving well

16   perforation permits, and restarting oil and gas operations at the Santa Ynez Unit.

17       26.33. Plaintiffs' members have no adequate remedy at law and the requested

18   relief is proper. Relief in this case would ensure BSEE prepares a proper national

19   interest determination under OCSLA and an environmental assessment or

20   environmental impact statement under NEPA to analyze the impacts of extending

21   offshore oil and gas leasesproduction at the Santa Ynez Unit. The requested relief

22   could result in additional information, process, mitigation, and oversight of

23   offshore drilling that would better protect the ocean and imperiled wildlife and

24   alleviate the injuries of Plaintiffs' members. An order declaring BSEE's actions

1 unlawful, vacating BSEE's authorization of the lease extensions and well

2 perforation permits for the Santa Ynez Unit, and prohibiting future extensions and

3 development and production permit approvals unless and until BSEE complies

4 with OCSLA and NEPA would redress the injuries of Plaintiffs' members.

### Defendants

6     27.34. Defendant Debra Haaland is the Secretary of the U.S. Department of

7 the Interior and is sued in her official capacity. The Department of the Interior is

8 responsible for managing and overseeing the development of oil and gas resources

9 on the outer continental shelf. Secretary Haaland is the official ultimately

10 responsible under federal law for ensuring that the actions and management

11 decisions of the Department of the Interior and its bureaus comply with all

12 applicable laws and regulations, including OCSLA, NEPA, and the APA.

13     28.35. Defendant Bureau of Safety and Environmental Enforcement is a

14 federal agency within the Department of the Interior. The Bureau of Safety and

15 Environmental Enforcement is charged with permitting drilling in federal waters

16 and ensuring such activities comply with safety and environmental regulations.

17     29.36. Bruce Hesson is the Regional Director of the Pacific Region of the

18 Bureau of Safety and Environmental Enforcement and is sued in his official

19 capacity. Mr. Hesson has responsibility for implementing and fulfilling the

20 Bureau's duties under OCSLA and NEPA.

### STATUTORY BACKGROUND

### Outer Continental Shelf Lands Act

23     30.37. OCSLA establishes a framework under which the Secretary of the

24 Interior may lease areas of the outer continental shelf for purposes of exploring and

developing the oil and gas deposits of the outer continental shelf submerged lands. 43 U.S.C. §§ 1331–1356c, 1801–1866. The outer continental shelf generally begins three miles from shore—the outer boundary of most state waters—and extends seaward to the limits of federal jurisdiction. *Id*. § 1331(a).

31.38. OCSLA specifically requires that oil production be "subject to environmental safeguards" and balanced "with protection of the human, marine, and coastal environments." *Id*. §§ 1332(3), 1802(2).

32.39. There are four separate stages to developing an offshore oil well: "(1) formulation of a 5-year leasing plan …; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). Each of these "stage[s] involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the [outer continental shelf]." *Id*.

33.40. At the second stage, the Secretary holds lease sales and can grant offshore oil and gas leases. 43 U.S.C. § 1337(a)(1). An oil and gas lease "entitle[s] the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. *Id*. § 1337(b)(4).

34.41. Generally, leases are for an initial period of five years, *id*. § 1337(b)(2)(A), "and as long after such initial period as oil or gas is produced from the area in paying quantities," *id*. § 1337(b)(2).

35.42. OCSLA authorizes the Secretary to "prescribe such rules and regulations as may be necessary" to manage oil and gas activities, including for the protection of natural resources. *Id*. § 1334(a). OCSLA specifies that such

1    "regulations shall, as of their effective date, apply to all operations conducted

2    under a lease." *Id*.

3        ~~36.~~43. OCSLA also specifies that the Secretary's regulations regarding

4    offshore oil and gas leasing must provide for "the suspension or temporary

5    prohibition of any operation or activity, including production" in certain

6    circumstances, including "if there is a threat of serious, irreparable, or immediate

7    harm or damage to life (including fish and other aquatic life) … or to the marine,

8    coastal, or human environment." *Id*. § 1334(a)(1).

9        ~~37.~~44. The Secretary has delegated ~~its~~her responsibilities under OCSLA to

10   two bureaus within the Department of the Interior. The Bureau of Ocean Energy

11   Management is responsible for managing leasing, exploration, development, and

12   production of oil and gas resources on the outer continental shelf. 30 C.F.R.

13   § 550.101. The Bureau of Safety and Environmental Enforcement is responsible

14   for enacting and enforcing safety and environmental standards under OCSLA, as

15   well as issuing drilling permits. *Id*. § 250.101. The Bureau of Safety and

16   Environmental Enforcement is also responsible for approving lease extensions. *Id*.

17   § 250.180(e).

18       ~~38.~~45. Under the regulations and as relevant here, a lease will expire at the

19   end of the initial five years unless production is occurring in paying quantities. *Id*.

20   § 250.180(a)(2). If production ceases on a lease that has continued beyond its

21   primary term, the lease will expire unless production resumes or BSEE approves a

22   suspension of operations or suspension of production within a year after production

23   ceases. *Id*. § 250.180(d).

24

1   ~~39.~~46. BSEE can also allow an operator more than a year to resume

2   operations, but only when BSEE determines that "the longer period is in the

3   National interest, and it conserves resources, prevents waste, or protects correlative

4   rights." *Id*. § 250.180(e).

5       ~~40.~~47. A suspension or request for additional time to resume operations

6   "extend[s] the term of a lease … equal to the length of time the suspension is in

7   effect." *Id.* § 250.169(a). Accordingly, such actions "represent a significant

8   decision to extend the life of oil … production off of California's coast, with all of

9   the far reaching effects and perils that go along with offshore oil production."

10  *California v. Norton*, 311 F.3d 1162, 1173 (9th Cir. 2002).

11      ~~41.~~48. Once a lease expires, BSEE regulations require an oil and gas

12  company to "permanently plug all wells … within 1 year after the lease

13  terminates." 30 C.F.R. § 250.1710. An oil and gas company must also "remove all

14  platforms and other facilities within 1 year after the lease" expires unless the

15  company "receive[s] approval to maintain the structure to conduct other activities."

16  *Id*. § 250.1725(a).

17                    **National Environmental Policy Act**

18      ~~42.~~49. NEPA is our nation's charter for environmental protection. NEPA

19  seeks to (1) "prevent or eliminate damage to the environment and biosphere," (2)

20  "stimulate the health and welfare" of all people, and (3) "encourage productive and

21  enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C.

22  § 4321.

23      ~~43.~~50. NEPA requires federal agencies to take a "hard look" at the

24  environmental consequences of their actions before acting. *Robertson v. Methow*

1  *Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted). In this way,

2  NEPA ensures that federal agencies "will have available, and will carefully

3  consider, detailed information concerning significant environmental impacts" and

4  that such information "will be made available to the larger [public] audience that

5  may also play a role in both the decisionmaking process and the implementation of

6  th[e] decision." *Id*. at 349.

7      ~~44.~~51. To this end, NEPA requires federal agencies to prepare a detailed

8  environmental impact statement (EIS) for any "major Federal action[] significantly

9  affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A

10 "major federal action" is defined as "an action that the agency carrying out such

11 action determines is subject to substantial Federal control and responsibility." *Id*.

12 § 4336e(10)(A).

13     ~~45.~~52. An EIS must describe the "reasonably foreseeable environmental

14 effects of the proposed agency action." *Id*. § 4332(2)(C)(i). An EIS must also

15 examine "a reasonable range of alternatives to the proposed agency action,"

16 including the alternative of not taking the underlying proposed action. *Id*.

17 § 4332(2)(C)(iii).

18     ~~46.~~53. To determine whether the impacts of a proposed action are significant

19 enough to warrant preparation of an EIS, the agency may prepare a preliminary

20 environmental inquiry known as an environmental assessment. *See* 40 C.F.R.

21

22

23

24

1   § 1501.5 (2023).[1] An agency must include in its environmental assessment

2   "sufficient evidence and analysis for determining whether to prepare" an EIS, and

3   must determine if an EIS is necessary or, if not, issue a "finding of no significant

4   impact." *Id*. § 1501.5(c)(1). The environmental assessment must evaluate

5   alternatives to the proposed action and "the environmental

6   impacts"[e]nvironmental effects of the proposed action and alternatives." *Id*.

7   § 1501.5(c)(2). An agency must prepare an EIS if substantial questions are raised

8   whether a project *may* have a significant effect upon the environment.

9       47.54. The only circumstances in which an agency need not prepare an EIS

10  or environmental assessment for a major federal action is when the action is

11  "categorically excluded" from NEPA review. *Id*. § 1501.4. Categorical exclusions

12  are intended for small, insignificant, and routine actions and can only be invoked

13  for actions "that normally do not have a significant effect on the human

14  environment." *Id*. § 1501.4(a).

15

16

17

18  _____

[1] The Council on Environmental Quality issues regulations implementing NEPA
19  that are "binding on all Federal agencies." 40 C.F.R. § 1500.3(a). Those
    regulations have undergone various amendments in recent years. *See, e.g.*, 85 Fed.
20  Reg. 43,304 (July 16, 2020); 89 Fed. Reg. 35,442 (May 1, 2024). For purposes of
    this Complaint, Plaintiffs cite the NEPA regulations as they existed at the time
21  BSEE approved its most recent lease extension. The most recent regulatory
    amendments issued in 2024 and "apply to any NEPA process begun after July 1,
22  2024." 40 C.F.R. § 1506.12. While courts review agency actions under the
    regulations in place at the time of the agency's decision, none of the amendments
23  affect Plaintiffs' claims and the regulatory language cited in Plaintiffs' original
    Complaint remains largely unchanged, and did not change in substance. As such,
24  Plaintiffs cite the regulations as they currently exist.

1    48.55. The Department of the Interior has a categorical exclusion for the

2    issuance of lease extensions. U.S. Dep't of the Interior, *Departmental Manual*, 516

3    DM § 15.4(C)(7) (effective May 27, 2004).

4    56.    The Department of the Interior has another categorical exclusion for

5    approving an "Application for Permit to Drill (APD)" for an offshore oil and gas

6    well "when said well and appropriate mitigation measures are described in an

7    approved exploration plan [or] development plan." 516 DM § 15.4(C)(12). The

8    Department of the Interior also has a categorical exclusion for the approval of

9    "Sundry Notices and Reports on Wells." 516 DM § 15.4(C)(14).

10    57.    To invoke a categorical exclusion, the exclusion must cover the

11    relevant action at issue. 40 C.F.R. § 1501.4(b). The Department of the Interior's

12    NEPA regulations state that "[i]f a proposed action does not meet the criteria for

13    any of the listed … categorical exclusions, then the proposed action must be

14    analyzed in an environmental assessment or environmental impact statement." 43

15    C.F.R. § 46.205(a).

16    49.58. In determining whether to rely on an existing categorical exclusion, an

17    agency must analyze whether "extraordinary circumstances" exist that preclude the

18    use of the categorical exclusion and require the preparation of an EIS or

19    environmental assessment. 40 C.F.R. § 1507.3(e)(2)(ii1501.4(b); *see also* 43

20    C.F.R. § 46.205(c).

21    50.59. The Department of the Interior's NEPA regulations state that

22    "[e]xtraordinary circumstances … exist for individual actions within categorical

23    exclusions that may meet any of the criteria listed" in the regulations that, if

24    present, preclude categorically excluding a proposed action from NEPA analysis.

43 C.F.R. § 46.215. Those criteria include whether a proposed action may "[h]ave significant impacts on public health or safety[;] … natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; … migratory birds;" and species protected under the Endangered Species Act. *Id.* The criteria also include whether a proposed action has "highly controversial environmental effects[;] … a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects[;] … a disproportionately high and adverse effect on low income or minority populations;" or if it "[l]imit[s] access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites." *Id.*

51.60. According to BSEE, if a proposed action triggers a "yes" answer to any of the criteria, then it must prepare an EIS or environmental assessment prior to implementation of the proposed action.

61.    An agency's NEPA obligations do not end with the issuance of an EIS, environmental assessment and finding of no significant impact, or reliance on a categorical exclusion. An agency may only rely on a prior programmatic environmental document older than five years "so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid." 42 U.S.C. § 4336b(2).

62.    Agencies are required to prepare a supplemental NEPA analysis "if a major Federal action is incomplete or ongoing, and (i) [t]he agency makes substantial changes to the proposed action that are relevant to environmental

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                                    18

1  concerns; or (ii) [t]here are substantial new circumstances or information about the

2  significance of adverse effects that bear on the analysis." 40 C.F.R. § 1502.9(d)(1).

3  An agency also has the discretion to prepare a supplemental EIS when it

4  "determines that the purposes of [NEPA] will be furthered by doing so." *Id*.

5  § 1502.9(d)(2).

6  **Administrative Procedure Act**

7  52.63.The APA governs judicial review of federal agency actions. 5 U.S.C.

8  §§ 701–706. Under the APA, courts "shall … hold unlawful and set aside agency

9  action, findings, and conclusions found to be arbitrary, capricious, an abuse of

10  discretion, or otherwise not in accordance with law" or made "without observance

11  of procedure required by law." *Id*. § 706(2)(A), (D).

12  64.    Under the APA, a person may also seek judicial review to "compel

13  agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

14  **FACTUAL BACKGROUND**

15  **Oil and Gas Leasing in the Santa Ynez Unit off California**

16  53.65.There are currently 30 active oil and gas leases and 23 platforms on

17  the Pacific Outer Continental Shelf from which drilling and extraction activities

18  occur or have occurred. Twenty-two of these platforms are production platforms,

19  while one is a processing platform. Eight platforms are located on expired leases.

20

21

22

23

24

1    ~~54.~~66. Most of the active oil and gas leases are organized into units. The

2    Santa Ynez Unit is in the Santa Barbara Channel. The Unit consists of 16 leases:

3    OCS-P 0180, 0181, 0182, 0183, 0187, 0188, 0189, 0190, 0191, 0192, 0193, 0194,

4    0195, 0326, 0329, and 0461. The federal government issued the leases between

5    1968 and 1982. The leases all had an initial term of five years.



*The Santa Ynez Unit. Map: Bureau of Ocean Energy Management*

1    ~~55.~~67. Oil and gas production has occurred under these leases from Platform

2    Harmony, Platform Heritage, and Platform Hondo. Platform Harmony was

3    installed in June 1989 and first production began in December 1993. Platform

4    Heritage was installed in October 1989 and first production began in December

5    1993. Platform Hondo was installed in June 1976 and first production began in

6    April 1981.

7

8

9

10

11

12

13    

14

15

16

17

18    *Platform Hondo. Photo: Bureau of Ocean Energy Management*

19

20    ~~56.~~68. Until just recently, ExxonMobil owned and operated all three

21    platforms. ExxonMobil's development plan for the Santa Ynez Unit stated that

22    recovery of the oil and gas reserves in the Unit "will take place over a period of

23    approximately 25 to 35 years." As first production from the Unit began in 1981,

24    production should have ceased by 2016.

57.69. Sable Offshore Corporation, LLC is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit.

58.70. This change of ownership follows a May 20, 2015, oil spill from the Plains All American Pipeline (now owned by Sable), which ruptured and spilled what is now believed to be more than up to 4650,000 gallons of oil on the Santa Barbara Coast. The oil spill closed beaches and killed wildlife.

71.    Federal regulators determined that the lack of effective protection against external corrosion, notably the pipeline's ineffective cathodic protection system, caused the spill. Water had entered the insulated pipeline's compromised coating (tape wrap over insulation), which thwarted the cathodic protection system's ability to prevent corrosion of the pipeline. The regulators stated that corrosion cannot be prevented on insulated lines where the coating system has been compromised.



First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA

*Oil spilled onto Refugio Beach. Photo: U.S. Coast Guard*

59.72. The pipeline transported oil from seven offshore oil and gas platforms to refineries. The broken pipeline shut down production at all seven of those offshore platforms. Operators of four of the seven platforms announced plans to decommission the platforms. ExxonMobil did not.

60.73. Instead, in 2015, ExxonMobil requested an additional year to resume operations, and BSEE approved that request. Year after year since then, BSEE has extended the Santa Ynez Unit leases. Most recently, on November 14, 2023, BSEE approved a lease extension through December 13, 2024.

61.74. Nearly a decade has passed since Platforms Harmony, Heritage, and Hondo shut down, and the leases have not produced oil since then. Absent BSEE's extensions, all 16 leases would have all expired. Upon expiration of the leases, all the wells would need to be permanently plugged and other infrastructure removed within one year.

### **Restarting Offshore Oil and Gas Activities at the Santa Ynez Unit**

75.    In February 2024, Sable acquired the Santa Ynez Unit leases, along with its associated drilling platforms, offshore and onshore pipelines, and onshore processing facilities. Sable financed the purchase with a loan from the former owner, ExxonMobil.

76.    Sable notified investors that the risks of offshore oil and gas production at the Santa Ynez Unit are heightened because most of the equipment has been "shut-in," meaning operations have been halted, since 2015.

77.     Sable plans to restart oil production, including transport, from the Santa Ynez Unit using the same onshore pipeline system that ruptured in 2015. It decided not to replace the original pipelines. Sable applied for a state waiver from certain pipeline safety requirements because of the limited effectiveness on these pipelines of the otherwise required cathodic protection systems that prevent pipeline corrosion.

78.     The hasty efforts to restart operations have largely evaded public processes and meaningful environmental review by state or federal regulators.

79.     Offshore, Sable has pursued well-work permits (by submitting Applications for Permits to Modify or APMs) to perforate two wells, the primary purpose of which is to "[e]nhance [p]roduction." To perforate a well, a hole is punched into its steel and cement casing to cause oil and gas to flow into the well. Typically, a perforating gun is used to carry and detonate explosives to create a channel for the oil and gas to flow from the reservoir into the well. Perforating the wells that have been shut down since 2015 is a necessary step toward restarting production at the offshore oil and gas platforms in the Santa Ynez Unit.

80.     Within one day of receiving the permit applications, BSEE concluded that the well-perforating activities were categorically excluded from environmental analysis under NEPA pursuant to 516 DM § 15.4(C)(12), which covers some approvals of Applications for Permits to Drill. *See* 516 DM § 15.4(C)(12). BSEE also determined that there were no extraordinary circumstances that render a categorical exclusion inappropriate.

81.     Even assuming the cited categorical exclusion applied to these circumstances, the categorical exclusion reviews did not consider the rare situation

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                             24

1   of restarting the Santa Ynez Unit after being shut down for nearly a decade due to

2   a massive oil spill.

3         82.    BSEE approved the two permit applications from Sable on September

4   25, 2024, within four business days of receiving them.

5         83.    Onshore, Sable has undertaken construction work on the Santa Ynez

6   Unit pipeline system that ruptured in 2015, including installing valves, excavation

7   work, vegetation removal, grading and widening roads, and other activities. On

8   September 27, 2024, the California Coastal Commission issued a Notice of

9   Violation to Sable for unpermitted development in the coastal zone. Subsequently,

10  development activities continued in the coastal zone, and on October 4, 2024, the

11  Commission sent a letter of its intent to issue a cease-and-desist order if necessary

12  to halt project work. On November 12, 2024, the Commission's Executive Director

13  issued a Cease and Desist Order that cited safety and environmental risks of the

14  unpermitted development activities and ordered Sable to stabilize and restore sites

15  to prevent further damage to coastal resources.

16        84.    Sable recently told its investors that it expects to restart production

17  from the Santa Ynez Unit in the first quarter of 2025.

18  **The Risks of Prolonged Oil and Gas Activity at the Santa Ynez Unit**

19        62.85. Extending the Santa Ynez Unit leases, approving well perforation

20  permits, and restarting oil and gas activities prolongs reliance on aging

21  infrastructure and offshore oil and gas production. Both create additional harmful

22  environmental effects.

23        63.86. For example, the lease extensions and well perforation permits

24  increase the risk of oil spills. That risk exists from both the inactive wells during

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                              25

1  the suspension period and from production activities when they resume. Oil spills

2  can lead to closures of beaches and commercial and recreational fisheries. Oil

3  spills also harm wildlife in numerous ways. Oil can coat animals' fur, feathers, or

4  skin—impairing their insulation, water repellency, or breathing. For example, oil

5  spills are deadly to sea otters whose oiled furry coats cause hypothermia. Animals

6  can also ingest and inhale oil, causing poisoning and death, organ damage, or

7  respiratory problems. Moreover, oil can contaminate the water column and the

8  seafloor where prey species live, causing indirect effects on wildlife by reducing

9  their key food sources.

10  64.87. Exposure to crude oil also adversely affects fish at all stages. Early-

11  life stages of fish are particularly sensitive to the effects of toxic oil components

12  such as polycyclic aromatic hydrocarbons, which can cause larval deformation and

13  death. Adult fish exposed to oil can suffer from reduced growth, enlarged liver,

14  changes in heart and respiration rates, fin erosion, and reproductive impairment.

15  Additionally, fish and sharks are at risk from lethal coating of their gills with oil

16  and declines in and contamination of their food sources. Exposure to crude oil has

17  also been linked to long-term population effects in fish. A study based on 25 years

18  of research demonstrated that embryonic salmon and herring exposed to very low

19  levels of crude oil can develop heart defects that impede their later survival.

20  65.88. Threatened and endangered species such as western snowy plovers,

21  California least tern, blue and humpback whales, leatherback sea turtles, and the

22  tidewater goby are susceptible to exposure to oil from the Santa Ynez Unit.

23  66.89. Offshore oil and gas infrastructure is typically designed for a 20- to

24  30-year life. Prior to the 2015 oil spill, drilling had been occurring at the Santa

1    Ynez Unit since 1981, and the last platforms were installed in 1989. The oil and

2    gas infrastructure in the Santa Ynez Unit is beyond its intended lifespan.

3        67.90. The age of the oil and gas infrastructure in the Santa Ynez Unit

4    increases the risk of oil spills and other accidents. For example, the Plains All

5    American Pipeline that ruptured in 2015 was built in 1987. The environmental

6    analysis that the Bureau of Land Management and California State Lands

7    Commission prepared in 1985 for the construction and operation of the pipeline

8    acknowledged that spills happen and determined that the risk of a spill would more

9    than double as the pipeline aged from 20 to 40 years.

10       68.91. According to scientists, aging poses risks of corrosion, erosion, and

11   fatigue stress to subsea pipelines. These impacts accelerate over time and can act

12   synergistically to increase the rate of crack propagation. Marine environments are

13   especially known to produce significant corrosion on steel surfaces, and when a

14   steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to

15   15 percent. One offshore pipeline study found that after 20 years, the annual

16   probability of pipeline failure increases rapidly, equating to a probability of failure

17   of 10 percent to 100 percent per year. Another study covering 1996 to 2010 found

18   that accident incident rates, including spills, increased significantly with the age of

19   infrastructure.

20       69.92. Older wells can also lead to oil spills or other accidents. For example,

21   one study found that 30 percent of offshore oil wells in the Gulf of Mexico

22   experienced well casing damage in the first five years after drilling, and damage

23   increased over time to 50 percent after 20 years. Another study determined about

24

1  five percent of oil and gas wells leak immediately, 50 percent leak after 15 years,

2  and 60 percent leak after 30 years.

3      70.93. Federal records show that the Santa Ynez Unit already has

4  experienced problems. Before it shut down, federal inspectors on May 1, 2015,

5  found "numerous corrosion issues" and components out of compliance on Platform

6  Hondo. Just three weeks before that, they also found corrosion, five failed gas

7  detectors, and "leakage rates higher than the maximum allowable" on that

8  platform's Well H-12U. Platforms Harmony, Heritage, and Hondo had early-2015

9  gas leaks that required their crews to gather for safety reasons, including an

10 incident on Platform Heritage the morning of May 19, 2015. Platform Hondo also

11 had a gas leak on April 27, 2015, and Platform Harmony had one on March 29,

12 2015. A federal inspection of Platform Harmony on Aug. 27, 2015, found

13 corrosion and electrical issues throughout the platform.

14     71.94. Oil and gas activity off California has also entailed the use of well

15 stimulation treatments such as hydraulic fracturing ("fracking") and acidizing.

16 These practices cause significantly worse impacts to the environment and public

17 health than conventional offshore oil and gas production. The harmful impacts

18 from well stimulation treatments include the discharge of toxic wastewater; the

19 emission of hazardous air pollutants; and increased risk of earthquakes and oil

20 spills, among other harms. ExxonMobil has previously stated it will likely need to

21 use well stimulation treatments to restart its platforms in the Santa Ynez Unit.

22     72.95. Oil and gas drilling activity also releases harmful air pollutants like

23 fine particulate matter and volatile organic compounds (VOCs). VOCs emitted

24 during drilling activity can include the "BTEX compounds"—benzene, toluene,

1  ethyl benzene, and xylene—which are designated as hazardous air pollutants. *See*

2  42 U.S.C. § 7412(b). Many of these VOCs are associated with serious short-term

3  and long-term effects to the respiratory, nervous, and circulatory systems.

4  Additionally, VOCs create ground-level ozone, or smog, which can contribute to

5  asthma, premature death, stroke, heart attack, and low birth weight. Benzene is also

6  a known carcinogen and has been detected in people living within a 10-mile radius

7  of oil wells where fracking has occurred.

8      73.96. Oil and gas drilling also includes the discharge of drilling muds and

9  cuttings, produced wastewater, and well treatment and workover fluids. The

10  federal government permits Platforms Harmony, Heritage, and Hondo to discharge

11  more than 33.76 million gallons of produced wastewater into the ocean each year.

12  These discharges can contain toxic chemicals like benzene, heavy metals, and

13  radioactive materials.

14      74.97. Prolonged drilling at the Santa Ynez Unit also increases vessel traffic

15  through, for example, the servicing of platforms and wells and transporting

16  materials. This increases the risk of vessel strikes of various endangered animals,

17  including several species of whales found in the area. Vessel strikes can kill or

18  injure large whales and other animals by causing blunt force trauma, resulting in

19  fractures, hemorrhage, and/or blood clots. Direct propeller strikes can result in fatal

20  blood loss, lacerations, and/or amputations. Vessel collisions are a leading threat to

21  large whales off the U.S. West Coast.

22      75.98. Oil and gas drilling exacerbates climate change, which is already

23  causing more intense storms, droughts, and wildfires; sea level rise; a higher risk of

24  extinction for many species; and numerous other harms. Scientists have determined

1  that each barrel of federal California oil left in the ground would equate to roughly

2  half a barrel reduction in net oil consumption, with associated reductions in

3  greenhouse gas emissions. Before it shut down in 2015, the onshore facility that

4  processed oil and gas from the Santa Ynez Unit was Santa Barbara County's

5  largest source of greenhouse gas emissions. It contributed 55 percent of Santa

6  Barbara County's total greenhouse gas emissions.

7  **BSEE's Lease Extensions Fail to Consider Relevant Factors**

8  76.99. On November 19, 2015, ExxonMobil sought its first request following

9  the Plains All American Pipeline spill for an extension under 30 C.F.R.

10  § 250.180(e) of all 16 of its oil and gas leases in the Santa Ynez Unit. BSEE

11  approved the lease extensions on December 10, 2015. ExxonMobil has applied for,

12  and BSEE has granted, lease extensions for its leases in the Santa Ynez Unit every

13  year since. ExxonMobil submitted its most recent application on October 19, 2023,

14  and BSEE granted it on November 14, 2023. The current approval expires at

15  midnight on December 31 13, 2024.

16  77.100.    In granting the most recent extension in November 2023, BSEE

17  described the proposed action as "[p]er 30 CFR 250.180(e), ExxonMobil is

18  requesting an additional 365 days beyond the original 180 (and subsequent 365-

19  day extensions) afforded by 30 CFR 250.180(d) to resume operations on their

20  leases that have continued beyond their primary term."

21  78.101.    In granting the most recent extension in November 2023, as

22  with the extensions before it, BSEE determined that "approving ExxonMobil's

23  request is in the National interest." In reaching this conclusion, BSEE determined

24  that "[t]he continued development of these proven reserves from established

1    infrastructure would help meet the Nation's energy needs without the impacts

2    associated with new infrastructure installations or exploration and development of

3    unproven fields." It also asserted that "[c]ontinued production would likewise

4    benefit taxpayers through the continued revenue streams derived from production,

5    including royalties and direct and indirect tax revenue to the Federal Government."

6        79.102.    In determining that granting the extension would be in the

7    national interest, BSEE did not consider any of the environmental harms

8    (described above) that come with prolonging offshore oil and gas production off

9    California. BSEE did not consider any harms associated with the continued

10   presence of and reliance on aging infrastructure. BSEE also did not consider that

11   ExxonMobil has previously stated that it anticipates using well stimulation

12   treatments to restart its platforms in the Santa Ynez Unit.

13       80.103.    In granting the most recent extension in November 2023, BSEE

14   also acknowledged that resumption of activities is possible, stating that if the

15   ruptured pipeline is replaced or its restart is approved before the lease extension

16   expires, "then ExxonMobil will have 60 calendar days … to restore production

17   from the Santa Ynez Unit."

18       81.104.    In granting the most recent extension in November 2023, as

19   with the extensions before it, BSEE relied on a categorical exclusion under NEPA.

20   As a result, BSEE did not prepare either an EIS or an environmental assessment to

21   examine the environmental effects of its action extending the leases.

22       82.105.    BSEE determined that no extraordinary circumstances exist that

23   would make reliance on the categorical exclusion improper.

24

83.106.    BSEE concluded that there should be no impacts on public health or safety as "there will be no active oil and gas operations during the approved extension period."

84.107.    BSEE concluded that there should be no impacts on "natural resources, unique geographic characteristics, or ecologically significant or critical areas" because the extension would "allow active oil and gas operations to remain idled during the approved extension period." BSEE also stated it "will oversee adherence to a preservation plan for safe and environmentally protective maintenance and oversight."

85.108.    BSEE concluded that there are no controversial environmental effects because the agency's "action involves approving an extension of suspension of operations during which active oil and gas operations will be idled and the facilities maintained pursuant to preservation plans to ensure safety and environmental protection."

86.109.    BSEE concluded that there would be no cumulatively significant effects in the event production is ultimately restored because such effects "have already been examined through prior NEPA analyses" and the extension "represents a temporary suspension in those previously examined activities."

87.110.    BSEE concluded that the extension would have no significant impacts on species listed under the Endangered Species Act and would not "limit access to and ceremonial uses of Indian sacred sites on Federal lands."

88.111.    The available information indicates that there are numerous significant environmental effects of BSEE's extensions of the Santa Ynez Unit

1  leases. BSEE's conclusion that there are no extraordinary circumstances is

2  incorrect and unsupported.

3      89.112.        Prior to BSEE's issuance of the November 2023 lease

4  extensions, the Center sent BSEE a letter, in February 2023, urging the agency to

5  consider the environmental harms from approving further lease extensions and

6  conduct comprehensive NEPA review. BSEE did not do so. It did not respond to

7  the letter.

8          **BSEE's Approvals of Applications for Permits to**
9          **Modify Fail to Consider Relevant Factors**

10      113.    On September 19, 2024, Sable submitted two Applications for Permits

11  to Modify, or APMs, for well HE028 and well HE023. According to the permits,

12  they are to "enhance production."

13      114.    The wells have been shut-in, meaning closed down, since 2015. The

14  permits authorize Sable to perforate the wells. Typically for this operation, a

15  perforating gun is lowered into the well to the depth of the oil and gas reservoir.

16  The gun fires a powerful explosive charge that blasts a hole, or holes, in the steel

17  casing and cement, sometimes up to several feet into the surrounding rock

18  formation. The holes allow oil and gas to flow into the well.

19      115.    BSEE's approvals were major federal actions subject to NEPA's

20  environmental review requirements. BSEE should have prepared an environmental

21  assessment or environmental impact statement for the approval of the APMs.

22  Instead, BSEE determined that its actions were categorically excluded from further

23  NEPA review.

24

116.   On September 20, 2024, BSEE issued a NEPA Categorical Exclusion Review for each of the permits. It determined that each permit approval was categorically excluded from further NEPA analysis under 516 DM § 15.4(C)(12). The categorical exclusion BSEE invoked applies to approvals of Applications for Permits to Drill (or APDs) that meet certain conditions "when said well and appropriate mitigation measures are described in an approved exploration, development plan, production plan, or Development Operations Coordination Document." 516 DM § 15.4(C)(12).

117.   BSEE determined that reperforating and adding new perforations to the wells were "normal well-reworking operations" considered and evaluated in the original 1982 development and production plans.

118.   None of the development and production plans adequately describe the well perforating work that facilitates the restart of the Santa Ynez Unit. The plans have no applicable mitigation measures for restarting oil and gas production after a nearly decade-long shutdown. 516 DM § 15.4(C)(12).

119.   BSEE invoked a categorical exclusion that does not cover the permitted activities. Its approvals of Sable's APMs are not eligible for coverage under a categorical exclusion because (1) they did not approve Applications for Permits to Drill, (2) the restart activities are not adequately described in the development and production plans, and (3) there are not appropriate mitigation measures for the well perforation and restart activities.

120.   There is no applicable categorical exclusion that can be invoked for these applications for permits to modify. Additionally, there are exceptional circumstances that make a categorical exclusion inapplicable.

121.   BSEE, in its categorical exclusion review for each permit, determined that no extraordinary circumstances were found that would counsel against application of a categorical exclusion for perforating wells HE023 and HE028.

122.   BSEE concluded the activities would have no significant impacts on public health or safety. It stated that "activities such as the proposal have little to no risk of a blowout which could result in an oil spill."

123.   BSEE concluded the permits would have no significant effects on natural or cultural resources, despite the proximity of the wells to the Chumash Heritage National Marine Sanctuary.

124.   BSEE concluded the permits have no highly controversial effects.

125.   BSEE concluded the permits have no uncertain or potentially significant environmental effects or involve unique or unknown environmental risks. It further acknowledged that while an oil spill is the greatest risk, such risk "is low" and that any effects of an oil spill that may occur are well documented and have been evaluated in previous environmental reviews.

126.   BSEE concluded the permits would have no significant impacts on listed threatened or endangered species or their critical habitat.

127.   BSEE concluded the permits would not have significant cumulative environmental effects.

128.   BSEE concluded the permits would not limit access to and ceremonial use of Indian sacred sites.

129.   The available information indicates there are numerous significant environmental effects of BSEE's approvals of the well perforation permits that

facilitate the restart of the Santa Ynez Unit. BSEE's conclusions that there are no extraordinary circumstances are incorrect and unsupported.

### No Existing NEPA Analysis Examines New Information and New Circumstances of Oil and Gas Activities at the Santa Ynez Unit

130.   No NEPA analysis has described the effects of the 2015 oil spill or the effects of restarting the Santa Ynez Unit after nearly ten years.

131.   No comprehensive examination of the environmental effects of federal oil and gas activities in the Santa Barbara Channel has been conducted in 50 years. In 1975, the Department of the Interior prepared an EIS for "Oil and Gas Development in the Santa Barbara Channel, Outer Continental Shelf off California." The 1975 Santa Barbara Channel EIS contemplates the "normal life of a platform" as 15 to 25 years.

132.   The development and production plans for the Santa Ynez Unit were originally prepared over 40 years ago, in 1982. The Department of the Interior issued an EIS for the Santa Ynez Unit development and production plans in 1984.

133.   In approving the well perforation permits, BSEE relied on the 1984 Santa Ynez Unit EIS. BSEE concluded that the potential environmental impacts of the permits were consistent with those considered and analyzed in that forty-year-old EIS.

134.   More recent environmental assessments on changes to the Santa Ynez Unit infrastructure have not examined the risks and harms from restarting oil and gas production or prolonged development and production activities. One assessment, completed in 2014, covered a cable-laying project and concluded it

would have no significant impacts on the environment. A more recent assessment, completed in 2021, was for the installation of new "anode sleds," and it concluded the installation would have no significant impacts.

135.   There is significant new information that has not been analyzed in any previous NEPA document. For example, the onshore Santa Ynez Unit pipeline system experienced a catastrophic oil spill in 2015 that released as much as 450,000 gallons of oil. In addition to killing hundreds of birds and marine mammals, the spill damaged 1,500 acres of shoreline and 2,200 acres of subtidal habitat. The spill also closed fisheries and likely killed a wide variety of nearshore fish, including surfperch and grunion, which were spawning when the spill occurred.

136.   There is new information that external pipeline corrosion caused that oil spill, due to the pipeline's design, environment, operating conditions, and ineffective cathodic protection system. Sable plans to restart the same pipeline.

137.   New analyses by Sable indicate that a worst-case spill from the pipeline could be over 1.7 million gallons, even after pipeline repairs and the installation of valves.

138.   The infrastructure at the Santa Ynez Unit has aged significantly: two of the three platforms were constructed more than 35 years ago and one (Hondo) was constructed nearly 50 years ago. The development plans and associated environmental analysis estimated recovery of the oil and gas reserves in the Santa Ynez Unit "will take place over a period of approximately 25 to 35 years." As first production from the Unit began in 1981, production should have ceased by 2016.

139.   Restarting the Santa Ynez Unit will increase oil production, which also causes greater-than-evaluated air and water pollution. The Santa Ynez Unit has already produced more oil and gas than was contemplated in the development and production plans. ExxonMobil planned for 300 to 400 million barrels of oil and 600 to 700 billion cubic feet of natural gas, and BSEE reports ExxonMobil has already produced more than 507.4 million barrels of oil and over 963.1 billion cubic feet of natural gas.

140.   New drilling techniques that ExxonMobil used, and that Sable indicates it plans to use, also render prior environmental analyses of oil and gas production the Santa Ynez Unit outdated, including extended reach drilling. For example, in 2010, ExxonMobil used extended reach drilling to drill one of the world's longest wells to increase production from Platform Heritage.

141.   Additionally, in October 2024, coastal Santa Barbara was designated a National Marine Sanctuary because of its importance to Chumash heritage and culture. The Santa Ynez Unit is adjacent to this newly designated sanctuary, the offshore pipelines traverse it, and a restart will adversely affect its cultural and environmental values.

142.   There is also significant new information about air emissions from the Santa Ynez Unit. The original development plan and NEPA documents relied on design features to minimize fugitive emissions, including essentially eliminating VOC pollution. New information indicates that there are significant fugitive emissions at the Santa Ynez Unit and, according to ExxonMobil, the emissions are "next to impossible to totally prevent." The Santa Ynez Unit's Las Flores Canyon

processing facility was Santa Barbara County's largest source of VOC emissions and other air pollutants before the shutdown.

143.   The prior NEPA documents do not analyze the harms from greenhouse gas emissions from the Santa Ynez Unit, including new information demonstrating how drilling off California contributes to global greenhouse gas emissions.

144.   Since the 1984 EIS, there are newly listed and reclassified species and newly designated critical habitat under the Endangered Species Act—and the environmental impacts of offshore oil and gas activities on these species and critical habitat have yet to be examined under NEPA. Humpback whales, formerly globally listed, are now protected as distinct population segments with newly designated critical habitat. The populations off Santa Barbara are among the most imperiled. Black and white abalone, Guadalupe fur seal, oceanic white tip shark, tidewater goby, western snowy plover, and California tiger salamander were all listed after 1984. Leatherback sea turtles were reclassified from threatened to endangered because of their high risk of extinction. One of the world's most endangered whales, North Pacific right whales, have been more frequently sighted off Southern California since the prior NEPA reviews.

145.   BSEE's permitting of oil and gas activities at the Santa Ynez Unit is ongoing and incomplete, meaning it has a continuing duty to ensure these activities fully comply with NEPA. For example, Sable has indicated to investors that it plans to restart oil and gas production at the Santa Ynez Unit in 2025; BSEE has issued permits that facilitate such a restart; and BSEE will continue to issue approvals for oil and gas operations at the Santa Ynez Unit.

146.   On information and belief, BSEE continues to rely on the 1975 Santa Barbara Channel EIS and 1984 Santa Ynez Unit EIS in approving and managing oil and gas production at the Santa Ynez Unit.

147.   Oil and gas activities at the Santa Ynez Unit have occurred and, unless the Court grants the relief requested in this Complaint, will again occur in a manner not contemplated or evaluated by these prior NEPA analyses. BSEE's failure to examine the environmental impacts of a restart of the Santa Ynez Unit deprives the public and decisionmakers of vitally important information and exacerbates the numerous risks inherent in offshore oil and gas drilling activities and elevated under these unique circumstances.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Violation of OCSLA and the APA: Unlawful National Interest Determination**

90.148.     Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 89147 of this Complaint.

91.149.     OCSLA requires that offshore oil and gas activity be "subject to environmental safeguards," and balanced "with protection of the human, marine, and coastal environments." 43 U.S.C. §§ 1332(3), 1802(2).

92.150.     OCSLA sets initial lease terms of five years, and leases last as long as they are producing oil and gas in paying quantities. *Id*. § 1337(b)(2). Non-producing leases are supposed to expire, and the oil and gas infrastructure used to produce from those leases generally must be decommissioned within one year of lease expiration. 30 C.F.R. §§ 250.180(a)(2), 250.1710, 250.1725(a).

93.151.    If production ceases on a lease that has continued beyond its primary term, the lease will expire unless production resumes or BSEE approves a suspension of operations or production before the end of the year after production ceases. *Id.* § 250.180(d). BSEE can also allow an operator more than a year to resume operations, but only when BSEE determines that "the longer period is in the National interest, and it conserves resources, prevents waste, or protects correlative rights." *Id.* § 250.180(e).

94.152.    BSEE's November 2023 determination that the lease extensions for the Santa Ynez Unit are in the national interest failed to consider relevant factors. BSEE looked only at the purported benefits of issuing the lease extensions so that ExxonMobil could resume production without considering any of the environmental harms from doing so. BSEE did not consider, for example, the risks of oil spills from aging infrastructure, the future use of well stimulations at the Santa Ynez Unit, or the climate impacts that would result from restarting drilling operations at the Santa Ynez Unit.

95.153.    BSEE's November 2023 issuance of the lease extensions for the Santa Ynez Unit violates OCSLA and its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A).

### Second Claim for Relief

**Violation of NEPA and the APA:**
**Unlawful Use of Categorical Exclusion to Approve Lease Extensions**

96.154.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 89147 of this Complaint.

97.155.     NEPA requires all federal agencies, including BSEE, to take a "hard look" at the direct, indirect, and cumulative effects of proposed major federal actions and at alternatives that could reduce or eliminate those environmental impacts. 42 U.S.C. § 4332(2)(C)(i)–(iii); 40 C.F.R. § 1502.16. An agency can take the requisite hard look at a major federal action by preparing an environmental assessment or an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.5.

98.156.     BSEE's approval of extensions for the offshore oil and gas leases in the Santa Ynez Unit constitutes a major federal action.

99.157.     Yet, in approving the extensions in November 2023, BSEE failed to take a hard look at the environmental effects of extending these federal offshore oil and gas leases. BSEE did not prepare an EIS or environmental assessment on the lease extensions. Instead, BSEE relied on a categorical exclusion. In doing so, BSEE failed to consider the direct, indirect, and cumulative effects of the lease extensions and failed to consider a reasonable range of alternatives to its action.

100.158.     BSEE's reliance on a categorical exclusion in issuing the November 2023 lease extensions for the Santa Ynez Unit is arbitrary and violates NEPA. BSEE failed to consider important aspects of the action. BSEE failed to consider the significant environmental impacts of leaving non-producing infrastructure in place; and of oil spills, water pollution, air pollution, and other harms associated with prolonging offshore drilling from aging infrastructure.

101.159.     BSEE failed to consider relevant factors and reached conclusions contrary to the evidence before the agency in determining no extraordinary circumstances apply. As one example, BSEE determined that "[a]ny

cumulative effects from ongoing future production, in the event that production is ultimately restored, have already been examined through prior NEPA analyses." But BSEE has never examined the cumulative effects of oil and gas production activities off California. As another example, BSEE determined there would be no adverse impacts to public health, ecologically critical areas, cultural resources, access to sacred sites, or endangered and threatened species because oil and gas activity would be idle during the extension period. But BSEE acknowledged in approving the lease extension that production could resume during the extension period.

102.160.    BSEE's consideration of the impacts to public health, ecologically critical areas, cultural resources, access to sacred sites, threatened and endangered species, and other factors in its extraordinary circumstances review looked only at the potential impacts during the suspension of operations—not the impacts of active oil and gas production. In contrast, both ExxonMobil's lease extension applications and BSEE's national interest determination only considered and relied on the purported benefits of production.

103.161.    BSEE's reliance on a categorical exclusion to approve the November 2023 lease extensions and its extraordinary circumstances review violate NEPA, its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. §706(2)(A). BSEE's failure to prepare an EIS or environmental assessment on the lease extensions violates NEPA, its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and

made "without observance of procedure required by law" under the APA. *Id.*
§ 706(2)(A), (D).

### Third Claim for Relief

### Violation of NEPA and the APA:
### Unlawful Reliance on Categorical Exclusion to Approve Applications for Permits to Modify

162.   Plaintiffs reallege and incorporate the allegations in Paragraph 1 through 147 of this Complaint.

163.   NEPA requires all federal agencies, including BSEE, to take a "hard look" at the direct, indirect, and cumulative effects of proposed major federal actions and at alternatives that could reduce or eliminate those environmental impacts. 42 U.S.C. § 4332(2)(C)(i)–(iii); 40 C.F.R. §§ 1502.16. An agency can take the requisite hard look at a major federal action by preparing an environmental assessment or an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.5.

164.   BSEE's approval of APMs for the Santa Ynez Unit constitutes a major federal action.

165.   Yet, in approving the APMs in September 2024, BSEE failed to take a hard look at the environmental effects of the APMs that facilitate a restart of oil and gas activity at the Santa Ynez Unit. BSEE did not prepare an EIS or environmental assessment on the APMs. Instead, BSEE relied on a categorical exclusion. In doing so, BSEE failed to consider the direct, indirect, and cumulative effects of the APMs and failed to consider a reasonable range of alternatives to its actions.

1      166.   BSEE's reliance on a categorical exclusion in issuing the APMs is

2  arbitrary and violates NEPA.

3      167.   There is no applicable categorical exclusion upon which BSEE can

4  rely. None of the existing categorical exclusions can reasonably be interpreted to

5  cover the approval of permits to facilitate the restart of oil and gas production that

6  has been shut down for nearly a decade due to a massive oil spill.

7      168.   BSEE failed to consider important aspects of its action. BSEE failed

8  to consider the significant environmental impacts of oil spills, water pollution, air

9  pollution, and prolonging offshore drilling from aging infrastructure.

10      169.   BSEE also failed to consider relevant factors and reached conclusions

11  contrary to the evidence before the agency in determining no extraordinary

12  circumstances apply. As one example, BSEE determined that "[p]ast, present, or

13  reasonably foreseeable oil and gas development in the area have been evaluated

14  and considered in previous environmental reviews." But no existing NEPA

15  analysis examines the cumulative effects of oil and gas production activities off

16  California. As another example, BSEE determined that "any effects of an oil spill

17  that may occur are well documented and have been evaluated in previous

18  environmental reviews existing analyses." But no existing NEPA analysis

19  examines the effects of a spill as large as the one that occurred in May 2015 from

20  the Santa Ynez Unit pipeline system.

21      170.   BSEE's reliance on a categorical exclusion to approve the APMs for

22  the Santa Ynez Unit violates NEPA and its implementing regulations and is

23  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

24  law" and/or made "without observance of procedure required by law" under the

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA

APA. 5 U.S.C. § 706(2)(A), (D). BSEE's failure to prepare an EIS or environmental assessment on its issuance of the APMs violates NEPA and its implementing regulations and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and made "without observance of procedure required by law" under the APA. *Id*. § 706(2)(A), (D).

### Fourth Claim for Relief

### Violation of NEPA and the APA:
### Failure to Supplement Environmental Analysis

171.   Plaintiffs reallege and incorporate the allegations in Paragraph 1 through 147 of this Complaint.

172.   NEPA requires federal agencies to take a "hard look" at the direct, indirect, and cumulative effects of major federal actions, and at alternatives to the action that could reduce or eliminate those effects. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.1(i), 1502.16.

173.   Agencies have a continuing obligation to comply with NEPA. This includes a mandatory, discrete duty to supplement an already completed analysis when "a major Federal action is incomplete or ongoing and" either "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns" or "significant new circumstances or information" arises that has bearing on the action. 40 C.F.R. § 1502.9(d)(1). An agency may only rely on a prior programmatic analysis if it reevaluates the analysis after five years and determines reliance on the analysis remains valid. 42 U.S.C. § 4336b.

174.   BSEE's permitting of oil and gas activities at the Santa Ynez Unit is ongoing and incomplete; there remains a federal action to occur. And there have

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                              46

1    been both substantial changes in the proposed action and substantial new

2    circumstances and information bearing on the significance of the environmental

3    effects of oil and gas production at the Santa Ynez Unit.

4        175.   First, BSEE has made substantial changes to oil and gas production at

5    the Santa Ynez Unit since the 1975 and 1984 NEPA analyses that are relevant to

6    environmental concerns. For example, oil and gas production would have ceased

7    by now under the old analyses' assumptions, BSEE has authorized a nine-and-a-

8    half-year shut-in of the Santa Ynez Unit after a major oil spill, and the agency has

9    authorized extended reach drilling.

10        176.   Second, there are substantial new circumstances and information

11    about the significance of oil and gas production at the Santa Ynez Unit. It has been

12    nearly fifty years since completion of the EIS on oil and gas activities off

13    California (the 1975 Santa Barbara Channel EIS) and nearly four decades since

14    completion of an EIS on offshore oil and gas development and production

15    activities at the Santa Ynez Unit (the 1984 Santa Ynez Unit EIS). The information

16    and analysis in those documents are outdated. For example, the extent and damage

17    from an oil spill exceeded that considered in prior analyses, the air pollution

18    emissions from the Santa Ynez Unit exceeded that considered in prior analyses,

19    there are newly listed species under the Endangered Species Act that are adversely

20    affected by oil and gas activity at the Santa Ynez Unit, and there is a newly

21    designated Chumash National Marine Sanctuary adjacent to the Santa Ynez Unit.

22        177.   NEPA and its implementing regulations require BSEE to supplement

23    the 1975 Santa Barbara Channel EIS and the 1984 Santa Ynez Unit EIS or prepare

24    a new EIS on oil and gas activities in the Santa Ynez Unit. BSEE's failure to

1  prepare a supplemental NEPA analysis constitutes agency action that is

2  "unlawfully withheld" and/or "unreasonably delayed" under the APA. 5 U.S.C.

3  § 706(1).

4       178.   BSEE cannot continue to rely on the 1975 Santa Barbara Channel EIS

5  and the 1984 Santa Ynez Unit EIS to approve oil and gas development and

6  production at the Santa Ynez Unit without supplementing the existing NEPA

7  analyses or preparing a new NEPA analysis that comprehensively examines the

8  impacts of oil and gas development and production at the Santa Ynez Unit.

9  BSEE's reliance on outdated NEPA documents in taking such actions violates

10 NEPA and its implementing regulations and is "arbitrary, capricious, an abuse of

11 discretion, or otherwise not in accordance with law" and/or made "without

12 observance of procedure required by law" under the APA. 5 U.S.C. § 706(2)(A),

13 (D).

14                          **REQUEST FOR RELIEF**

15       Plaintiffs respectfully request that the Court grant the following relief:

16       1.    Declare that BSEE's November 2023 approval of lease extensions for

17 the Santa Ynez Unit violates OCSLA, its implementing regulations, and the APA;

18       2.    Declare that BSEE's November 2023 approval of lease extensions for

19 the Santa Ynez Unit violates NEPA, its implementing regulations, and the APA;

20       3.    Declare that BSEE's September 2024 approval of the APMs for the

21 Santa Ynez Unit violates NEPA, its implementing regulations, and the APA;

22       43.   Declare that BSEE's failure to supplement the 1975 Santa Barbara

23 Channel EIS and the 1984 Santa Ynez Unit EIS, and its continued reliance on these

24 EISs, violates NEPA, its implementing regulations, and the APA;

First Supp. and Amended Complaint for Declaratory and Other Relief,
Case No. 2:24-cv-05459-MWC-MAA                                    48

35.  Vacate and remand the November 2023 lease extensions for the Santa Ynez Unit;

6.  Vacate and remand the September 2024 APMs for the Santa Ynez Unit;

7.  Order BSEE to complete the required NEPA analysis by a date certain;

48.  Prohibit BSEE from authorizing additional lease extensions, APMs for development and production, or any other restart authorizations for the Santa Ynez Unit unless and until it complies with OCSLA, NEPA, and the APA;

59.  Award Plaintiffs their costs of this action, including reasonable attorneys' fees; and

610. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 27th3rd day of June 2024January 2025,

/s/ Kristen Monsell
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150

Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7108
Fax: (510) 844-7150

Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org

CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7100
Fax: (510) 844-7150

*Attorneys for Plaintiffs*