LATHAM & WATKINS LLP
Daniel P. Brunton (Bar No. 218615)
Email: daniel.brunton@lw.com
12670 High Bluff Drive
San Diego, CA 92130
Tel.: (858) 523-5400
Fax: (858) 523-5450

Benjamin J. Hanelin (Bar No. 237595)
Email: benjamin.hanelin@lw.com
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel.: (213) 485-1234
Fax: (213) 891-8763

Janice M. Schneider (*Pro Hac Vice*)
Email: janice.schneider@lw.com
Devin M. O'Connor (*Pro Hac Vice*)
Email: devin.o'connor@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Intervenor-Defendant
Sable Offshore Corp.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | CASE NO. 2:24-cv-05459-MWC-MAA |
| *Plaintiffs*, | **SABLE OFFSHORE CORP.'S RESPONSE TO FEDERAL DEFENDANTS' MOTION FOR VOLUNTARY REMAND** |
| v. | |
| DEBRA HAALAND, et al., | <u>Hearing</u> |
| *Defendants*, | Date: January 31, 2025 |
| and | Time: 1:30 p.m. |
| SABLE OFFSHORE CORP., | Judge: Hon. Michelle Williams Court |
| *Intervenor-Defendant*. | Courtroom: 6A |

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ..................................................................1

II.    LEGAL BACKGROUND ......................................................2

    A.    OCLSA ....................................................................2

    B.    National Environmental Policy Act ......................4

    C.    Administrative Procedure Act ................................5

III.    FACTUAL BACKGROUND ..................................................6

    A.    Development and Operation of the Santa Ynez Unit Was Preceded by Detailed Environmental Review .......................................6

    B.    The Santa Ynez Unit Is Subject to a Preservation Plan Approved by BSEE and OCSLA Environmental and Safety Regulations ................................................7

    C.    BSEE's 2023 Extension ..........................................9

    D.    Sable Is Diligently Working Towards a Safe Restart ........................10

    E.    Sable Has Completed Well-Reworking Operations Which Extended the Leases ...............................11

IV.    PROCEDURAL HISTORY .................................................11

V.    ARGUMENT .......................................................................12

    A.    Voluntary Remand Without Vacatur is Permissible .....................12

    B.    Remand Can Only Be Granted *Without* Vacatur ................................13

    C.    The Equities Require Remand Without Vacatur or Conditions .........................18

VI.    CONCLUSION ....................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)..................................................................15

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
  480 U.S. 531 (1987)..................................................................................4

*Bennett v. Donovan*,
  703 F.3d 582 (D.C. Cir. 2013)..................................................................21

*Cal. Cmtys. Against Toxics v. U.S. E.P.A.*,
  688 F.3d 989 (9th Cir. 2012) ...............................................13, 15, 19

*Carpenters Indus. Council v. Salazar*,
  734 F. Supp. 2d 126 (D.D.C. 2010)..........................................................14

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  No. CV 21-2507-GW-ASX, 2022 WL 4233648 (C.D. Cal. Sept.
  13, 2022) ..................................................................................................14

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*,
  843 F. App'x 77 (9th Cir. 2021) ...............................................................19

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) ..................................................................18

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ....................................................................21

*Earth Island Inst. v. Muldoon*,
  82 F.4th 624 (9th Cir. 2023) ...................................................................4, 5

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).....................................................................................5

*In re Clean Water Act Rulemaking*,
  60 F.4th 583 (9th Cir. 2023) ...............................................................13, 14

*Limnia, Inc. v. U.S. Dep't of Energy*,
   857 F.3d 379 (D.C. Cir. 2017).........................................................12, 13

*Merrion Oil & Gas Corp.*,
   169 IBLA 47 (2006) ....................................................................3

*N. Alaska Env't Ctr. v. Haaland*,
   No. 3:20-CV-00187-SLG, 2022 WL 1556028 (D. Alaska May 17,
   2022) ............................................................................12

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
   896 F.3d 520 (D.C. Cir. 2018)......................................................19

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
   587 U.S. 601 (2019)..................................................................4

*Pit River Tribe v. U.S. Forest Serv.*,
   615 F.3d 1069 (9th Cir. 2010) ......................................................20

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) .........................................................5

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011) ......................................................18

*SKF USA Inc. v. United States*,
   254 F.3d 1022 (Fed. Cir. 2001) ................................................12, 13

*Statoil Gulf of Mexico LLC ExxonMobil Corporation*,
   DIR-2010-0027, 2011 WL 2946711 (DOI, Office of Hearings &
   Appeals May 31, 2011)...........................................................4, 18

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   100 F.3d 1443 (9th Cir. 1996) ......................................................16

*United States v. Maine*,
   420 U.S. 515 (1975)...................................................................2

*Utah Env't Cong. v. Bosworth*,
   443 F.3d 732 (10th Cir. 2006) ......................................................16

*Util. Solid Waste Activities Grp. v. EPA*,
   901 F.3d 414 (D.C. Cir. 2018).......................................................12

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

iii

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S RESPONSE TO MOTION FOR
VOUNTARY REMAND

*Wild Fish Conservancy v. Quan,*
  No. 23-35322, 2024 WL 3842101 (9th Cir. Aug. 16, 2024) ..............................19

*WildEarth Guardians v. Bernhardt,*
  No. CV 20-56 (RC), 2020 WL 6255291 (D.D.C. Oct. 23, 2020) ......................14

**STATUTES**

5 U.S.C. § 706(2)(A) ...........................................................................................5

43 U.S.C.
  § 1332(1) ..................................................................................................2, 4
  § 1332(3) .........................................................................................................2
  § 1334 ..............................................................................................................2
  §§ 1334-54 ......................................................................................................2
  § 1334(a) .........................................................................................................4
  § 1337 ..............................................................................................................2
  § 1337(p)(4)(C) ..............................................................................................2
  § 1337(p)(4)(D) ..............................................................................................2
  § 1802(2)(A) ................................................................................................17
  § 1802(2)(C) ................................................................................................17

**REGULATIONS**

30 C.F.R. Part 250 ...............................................................................................8

30 C.F.R.
  §§ 250.168-177 .............................................................................................3
  § 250.180 ......................................................................................................20
  § 250.180(a)(2) .........................................................................................2, 11
  § 250.180(d) .............................................................................................3, 11
  § 250.180(e) ......................................................................................3, 9, 11, 18
  § 250.800 .........................................................................................................8
  § 250.919(a) ....................................................................................................8
  § 250.1503 .......................................................................................................8
  § 256.70 ........................................................................................................20
  § 550.281(c) ....................................................................................................9

33 C.F.R. Part 146 ...............................................................................................8

40 C.F.R.
§ 1501.3(a) (2023) ............................................................................5
§ 1501.4(b) ........................................................................................5
§ 1501.4(b)(1) (2023) ......................................................................16
§ 1501.4(c) ........................................................................................5

43 C.F.R.
§ 46.205 .............................................................................................5
§ 46.215 ........................................................................................5, 16

## OTHER AUTHORITIES

39 Fed. Reg. 16910 (May 10, 1974) ..........................................................6

40 Fed. Reg. 25,241 (June 13, 1975) .........................................................6

41 Fed. Reg. 10,116 (Mar. 9, 1976) ...........................................................6

49 Fed. Reg. 30,144 (July 26, 1984) ..........................................................7

85 Fed. Reg. 43,304 (July 16, 2020) ..........................................................5

87 Fed. Reg. 23,453 (Apr. 20, 2022) .........................................................5

Dep't of Interior, Departmental Manual 516 DM 15 ...........................9, 15

## I.     INTRODUCTION

Plaintiffs' operative Complaint, Dkt. 1, raises a very narrow issue:  whether a 10-month extension of time (now entirely in the past—December 14, 2023, to October 9, 2024) to resume operations that the Bureau of Safety and Environmental Enforcement ("BSEE") granted for 16 offshore oil and gas leases held by Intervenor-Defendant Sable Offshore Corp. ("Sable") in the Santa Ynez Unit complied with the Outer Continental Shelf Lands Act ("OCSLA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA").

BSEE has moved for a voluntary remand without vacatur of that November 2023 extension decision ("2023 Extension").  Sable does not oppose remand— provided it is without vacatur as requested by the federal government, including without conditions on future activities.  Though the agency has discretion to revisit its analysis, there was no error in BSEE's decision, and a complete administrative record would show that BSEE's categorical exclusion ("CatEx") under NEPA and its determination that the 2023 Extension was in the "National interest" under OCSLA were reasonable.  BSEE's decision is supported by a comprehensive preservation plan BSEE approved when the facilities were shut in, robust quarterly reporting, comprehensive regulations for the safety and maintenance of offshore oil and gas facilities, and a detailed CatEx and National interest determination completed in 2023.  The 2023 Extension is a routine paperwork exercise that maintains the status quo and does not have environmental impacts, let alone significant ones.

Consistent with the narrow issue before the Court in Federal Defendants' motion for voluntary remand without vacatur ("Motion"), Dkt. 37,[1] the Court's review is narrow.  Under Ninth Circuit case law, a court may vacate an agency

---

[1] If Federal Defendants change the scope of their requested voluntary remand, Mot. at 10 n.3, Sable reserves the right to oppose or otherwise respond at that time.

1  decision only if it first finds the decision legally inadequate.  Here, the Court has
2  not done so, and it is far too early in the case to attempt to decide the merits of the
3  2023 Extension—the pleadings are not settled, the administrative record is
4  incomplete, and there has been no briefing on the merits.  Thus, as requested by
5  Federal Defendants, any remand must be without vacatur and without conditions.

6  **II.    LEGAL BACKGROUND**

7      **A.    OCLSA**

8      OCSLA declares that "the subsoil and seabed of the outer Continental Shelf
9  appertain to the United States and are subject to its jurisdiction, control, and power
10  of disposition." 43 U.S.C. § 1332(1).  The statute sets forth "detailed provisions for
11  the exercise of exclusive jurisdiction in the area and for the leasing and
12  development of the resources of the seabed" by the federal government.  *United*
13  *States v. Maine*, 420 U.S. 515, 527 (1975); *see also* 43 U.S.C. §§ 1334-54,
14  including specifically 43 U.S.C. §§ 1334, 1337.  In enacting OCLSA, Congress
15  found that oil and gas development on the "outer Continental Shelf is a vital
16  national resource" "which should be made available for expeditious and orderly
17  development," to support a critical "national need," consistent with OCSLA's
18  statements of policy.  43 U.S.C. § 1332(3); *cf. id.* § 1337(p)(4)(C), (D) (leasing
19  activities to be carried out in a manner that provides for, *inter alia*, "prevention of
20  waste" and "conservation of the natural resources of the outer Continental Shelf").

21      The leases issued for the Santa Ynez Unit provide Sable with the "exclusive
22  right and privilege" to develop the oil and gas resources and are for an initial term
23  of five years and as "long thereafter as oil or gas" is or may be "produced from the
24  leased area in paying quantities, or drilling or well reworking operations, as
25  approved by" the U.S. Department of the Interior ("DOI").  Declaration of Steven
26  P. Rusch in Support of Sable Offshore Corp.'s Response to Federal Defendants'
27  Motion for Voluntary Remand ("Second Rusch Decl.") ¶ 4; *see also* 30 C.F.R.

28

§ 250.180(a)(2) ("Your lease expires at the end of its primary term unless you are

conducting operations on your lease . . . . [T]he term operations means, drilling,

well-reworking, or production in paying quantities.  The objective of the drilling or

well-reworking must be to establish production in paying quantities on the lease.").

Under current regulations, if a lease is beyond its primary term and operations

cease, the leaseholder may apply to BSEE for an extension of time to resume

operations.  30 C.F.R. § 250.180(e).[2]  Such a request "must be in writing and

explain the operating conditions that warrant" granting more time to resume

operations.  *Id.*  BSEE determines whether granting the extension is "in the

National interest" and "conserves resources, prevents waste, or protects correlative

rights."  *Id.*  If BSEE grants the request, the operator must either resume operations

or request another extension or suspension before the prior one expires.  *Id.*

§ 250.180(d).

The lease term, however, is also expressly subject to any unitization

agreement approved by the Secretary of the Interior that affects the leased area or

any part thereof.  Like the leases, unitization agreements are contracts between the

United States and participating parties for development of an oil and gas field.

*Merrion Oil & Gas Corp.*, 169 IBLA 47, 52 (2006) ("A unit agreement is a

contract between the United States and participating parties for joint development

and operation of an oil and gas field . . . .").  The provisions of an approved

unitization agreement apply to the leased area covered by the unitization agreement

and govern if there is any inconsistency with the terms of the leases.  *E.g.*, Second

Rusch Decl., Ex. A (Lease OCS-P00180) § 1(c).  Here, the 16 leases in the Santa

Ynez Unit are subject to an active unitization agreement ("Unit Agreement")

approved by the federal government in 1970.  *Id.* ¶ 5.  Under the express terms of

the Unit Agreement, the terms, conditions and provisions of all leases related to

---

[2] Leaseholders may also apply for suspensions of operations and suspensions of
production.  30 C.F.R. §§ 250.168-177.

1  exploration, drilling, development, or operations are expressly modified and
2  amended to conform to the Unit Agreement, including to extend the term of the
3  leases as provided for the life of the Unit Agreement.  *Id.*, Ex. B (Unit Agreement)
4  § 12.  Specifically, the Santa Ynez Unit Agreement (and its associated leases)
5  continue in force and effect "so long as Unitized Substances are or can be
6  produced and *should production cease, so long thereafter as diligent operations*
7  *are in progress for the restoration of production* or discovery of new production . .
8  . ."  *Id.* § 13 (emphasis added); *see also id* § 3 (defining "Unitized Substances" as
9  oil and gas).

10      The Secretary of the Interior has broad discretion in implementing OCSLA,
11  which broadly empowers the Secretary, by its plain terms, to "administer the
12  provisions of [OCLSA] relating to the leasing of the outer Continental Shelf."
13  43 U.S.C. § 1334(a); *see also Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587
14  U.S. 601, 609 (2019) ("OCSLA gives the Federal Government complete
15  'jurisdiction, control, and power of disposition' over the OCS") (quoting 43 U.S.C.
16  § 1332(1)); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).
17  The agency likewise has discretion in determining whether the National interest is
18  met.  *See, e.g., Statoil Gulf of Mexico LLC ExxonMobil Corporation*, DIR-2010-
19  0027, 2011 WL 2946711, at *36 (DOI, Office of Hearings & Appeals May 31,
20  2011).

21      **B.    National Environmental Policy Act**

22      NEPA is a "procedural" statute that "requires federal agencies to take a hard
23  look at the environmental consequences of their actions and to explain their
24  decisions to the public."  *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 633 (9th Cir.
25  2023) (citation omitted).  BSEE assesses the appropriate level of NEPA review by
26  determining whether a proposed action:  (a) normally does not have significant
27  effects and is "categorically excluded"; (b) is not likely to have significant effects
28

or the significance of the effects is unknown and is therefore appropriate for study

in an environmental assessment; or (c) is likely to have significant effects and

therefore requires a more detailed environmental impact statement. 40 C.F.R.

§ 1501.3(a) (2023);[3] *see also* 43 C.F.R. § 46.205. If BSEE determines that a CatEx

covers a proposed action, then the agency evaluates the action for "extraordinary

circumstances." 40 C.F.R. § 1501.4(b); 43 C.F.R. § 46.215. Even if an

"extraordinary circumstance" is present, BSEE "may categorically exclude the

proposed action if the agency determines that there are circumstances that lessen

the impacts or other conditions sufficient to avoid significant effects." 40 C.F.R.

§ 1501.4(c); *see also* 43 C.F.R. § 46.215 ("Applicability of extraordinary

circumstances to categorical exclusions is determined by the Responsible

Official").

### C.    Administrative Procedure Act

Under the APA, a reviewing court may only set aside agency action,

findings, and conclusions that are found to be unlawful, such as those that are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). "[T]he arbitrary and capricious standard does not

demand perfection. As the Supreme Court has instructed, '[a court] should uphold

a decision of less than ideal clarity if the agency's path may reasonably be

discerned.'" *Earth Island Inst.*, 82 F.4th. at 637 (citing *FCC v. Fox Television

Stations, Inc.*, 556 U.S. 502, 513-14 (2009)) (cleaned up). Agency actions are

entitled to a presumption of regularity. *See, e.g., San Luis & Delta-Mendota Water

Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (official agency actions subject

to presumption of regularity).

---

[3] The applicable NEPA implementing regulations are those in effect at the time of
BSEE's November 2023 decision at issue in this case—the regulations that took
effect in 2020, as amended in 2022. *See* 85 Fed. Reg. 43,304 (July 16, 2020); 87
Fed. Reg. 23,453 (Apr. 20, 2022).

1    **III.    FACTUAL BACKGROUND**

2        **A.    Development and Operation of the Santa Ynez Unit Was**

3            **Preceded by Detailed Environmental Review**

4        The Santa Ynez Unit (or "SYU") consists of 16 leases issued by the federal

5    government between 1968 and 1982.  Dkt. 18-2, Declaration of Steve Rusch in

6    Support of Motion to Intervene ("First Rusch Decl.") ¶ 3.  The oil and gas facilities

7    within the Santa Ynez Unit include three oil platforms located five to nine miles

8    offshore in federal waters north of Santa Barbara, California, and related pipelines

9    and 112 wells.  *Id.*

10       Development of the Santa Ynez Unit was preceded by extensive

11   environmental review that multiple federal and state agencies conducted over more

12   than a decade.  In May 1974—after a public review of the draft environmental

13   impact statement and three days of public hearings—the United States Geological

14   Survey published a final environmental impact statement analyzing a proposed

15   plan of development for the Santa Ynez Unit for the Hondo field, the location of

16   one of Sable's oil platforms.  Second Rusch Decl.¶ 6; 39 Fed. Reg. 16910 (May

17   10, 1974).  Based on that analysis, in August 1974, the Acting Secretary of the

18   Interior approved the proposed plan of development for the Santa Ynez Unit for

19   the Hondo field.  Second Rusch Decl. ¶ 6.  In 1975, the United States Geological

20   Survey prepared another environmental impact statement comprehensively

21   analyzing development and production of oil and gas in the Santa Barbara Channel

22   Outer Continental Shelf, including development and production in the Santa Ynez

23   Unit.  *Id.*; 40 Fed. Reg. 25,241 (June 13, 1975); 41 Fed. Reg. 10,116 (Mar. 9,

24   1976).

25       In June 1984, the United States Minerals Management Service (predecessor

26   to BSEE), the California State Lands Commission, and Santa Barbara County

27   released a final environmental impact report/final environmental impact statement

28

1    ("EIS") further studying oil and gas development and production within the Santa

2    Ynez Unit.  Second Rusch Decl. ¶ 7; 49 Fed. Reg. 30,144 (July 26, 1984).  The

3    1984 EIS analyzed alternatives, cumulative development and impacts, and impacts

4    of the project across environmental resources including air quality, climate,

5    geology, surface and groundwater, terrestrial and marine biology, and system

6    safety and reliability.  *Id.*  Activities on the Santa Ynez Unit have since been the

7    subject of various environmental reviews, as applicable and consistent with the

8    rights granted under the leases and the federally approved Unitization Agreement.

9    *Id.* ¶ 8.

10          **B.      The Santa Ynez Unit Is Subject to a Preservation Plan Approved**

11                 **by BSEE and OCSLA Environmental and Safety Regulations**

12          Offshore oil and gas facilities are highly regulated by the federal

13    government.  The Santa Ynez Unit offshore facilities are not currently producing

14    oil and gas; however, all equipment is in a near operation-ready state, with ongoing

15    function and pressure testing, inspections, upgrading and maintenance.  First Rusch

16    Decl. ¶ 6.

17          Following the onshore Plains All American Pipeline leak in 2015,[4] which

18    interrupted service and necessitated the offshore facility shutdown, the

19    infrastructure within the Santa Ynez Unit became subject to an environmentally

20    protective preservation plan that was approved by BSEE.  The preservation plan is

21    specifically designed to ensure "the integrity management of facilities in a safe and

22    environmentally responsible manner for the duration of the outage."  Second

23    Rusch Decl. ¶¶ 11-12 & Ex. C (January 21, 2016, letter, Re: SYU Preservation

24    _____

25    [4] The Plains All American Pipeline, which was also known also as Pipeline 901
      (and is now known as Pipeline 324) is located onshore and runs from the Las
26    Flores Pump Station to the Gaviota Pump Station in Santa Barbara County.  No
      Santa Ynez Unit offshore facilities were involved in this event (other than to be
27    shut-in as a result).  Second Rusch Decl. ¶ 10.  At the time of the leak, the facility
      was owned and operated by Plains All American Pipeline LP, a third party
28    unrelated to Sable.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

7

Plan at 1).  Idle equipment was drained, flushed, and purged.  *Id.* ¶ 11.  Gas pipelines were depressurized and flushed with nitrogen.  *Id.*  All wells (with the exception of one active water injection well) were sealed with at least 3 barriers in-place from the hydrocarbon zones to surface.  *Id.*  The Hondo platform is staffed and inspected daily.  *Id.* ¶ 12.  The Harmony and Heritage platforms were inspected weekly until they were re-staffed in April and daily inspections began.  *Id.*  The offshore emulsion pipeline network was pigged and flushed with inhibited seawater.  *Id.* ¶ 11.  An offshore pipeline preservation plan was also implemented, including pigging, application of biocide, and pressure testing, as appropriate.  *Id.*

In addition, BSEE's regulations prescribe platform design, testing, and inspection standards.  30 C.F.R. Part 250.  And they require oil and gas owners and operators to "design, install, use, maintain, and test production safety equipment in a manner to ensure the safety and protection of the human, marine, and coastal environments," which must be approved by regulators.  *Id.* § 250.800.  BSEE's regulations also require safety training with regulatory oversight of training materials and plans.  *Id.* § 250.1503.  Further, BSEE regulations require maintenance, including the submittal to BSEE of an annual "comprehensive in-service inspection report."  *Id.* § 250.919(a).  The U.S. Coast Guard also oversees and regulates aspects of offshore facilities, including at the Santa Ynez Unit.  *See* 33 C.F.R. Part 146 (Operations) (establishing safety and reporting requirements for Outer Continental Shelf facilities).  BSEE and the U.S. Coast Guard conduct routine inspections and drills to maintain the Santa Ynez Unit facilities in safe and good working order.  Second Rusch Decl. ¶ 13.  The preservation plan requires Sable to provide quarterly updates to BSEE.  *Id.* ¶ 12.  The extensions (discussed below) also required separate quarterly updates to BSEE when the extensions were operative.  *Id.*

### C.    BSEE's 2023 Extension

In the context of maintaining the status quo under the preservation plan until onshore pipeline repairs could be completed, the use of a categorical exclusion was and remains appropriate.  In fact, the California Coastal Commission reviewed BSEE's determination on the initial extension to resume operations and agreed that there would be "no effects" on coastal resources.  *Id.* ¶ 14.[5]  Following the 2015 Plains onshore pipeline leak, Exxon (the offshore leaseholder before Sable) sought and obtained yearly extensions from BSEE.  *Id.* ¶ 9.  Each year, BSEE authorized extensions to resume operations on the 16 offshore oil and gas leases in the Santa Ynez Unit to maintain the status quo.

On October 19, 2023, Exxon again requested a one-year extension of time to resume operations on its leases in the Santa Ynez Unit.  AR17026.   On November 9, 2023, BSEE concluded that the extension was subject to a CatEx and that no extraordinary circumstances were present that prevented reliance on the CatEx.  Second Rusch Decl., Ex. F.  BSEE appropriately relied on a CatEx under the DOI's Departmental Manual, 516 DM 15.4(C)(7), which categorically excludes, "approval of lease consolidation applications, lease assignments or transfers, operating rights, operating agreements, *lease extensions*, lease relinquishments, and bond terminations." (Emphasis added).[6]

On November 14, 2024, BSEE also decided that granting the extension was "in the National interest" and would "conserve[] resources, prevent[] waste, or protect[] correlative rights," as required by 30 C.F.R. § 250.180(e).  AR017044.

---

[5] This directly supports the BSEE's determination in the CatEx as no further Coastal Commission action was required under the Coastal Zone Management Act for future extensions to resume operations.  *See* 30 C.F.R. § 550.281(c) ("APDs, and other applications for licenses, approvals, or permits to conduct activities under your approved EP, DPP, or DOCD including those identified in paragraph (a) of this section, are not subject to separate State CZMA consistency review.").

[6] DOI's Departmental Manual 516 DM 15 is available at https://www.doi.gov/sites/doi/files/elips/documents/516-dm-15.pdf.

1   BSEE determined that the "sizable additional remaining reserves in the Hondo,

2   Pescado, and Sacate Fields" would "help meet the Nation's energy needs without

3   the impacts associated with new infrastructure installations or exploration and

4   development of unproven fields."  AR017044.

5           **D.      Sable Is Diligently Working Towards a Safe Restart**

6           On February 14, 2024, three months after BSEE's 2023 Extension, Sable

7   consummated a Purchase and Sale Agreement (the "Purchase Agreement") with

8   Exxon Mobil Corporation, and now holds the 16 Santa Ynez Unit leases and other

9   assets included in the deal.  First Rusch Decl. ¶ 8.  The Santa Ynez Unit is an

10  extremely valuable asset—between 1981 and 2014, it produced over 671 million of

11  barrels of oil.  *Id.* ¶ 3.  In 2014, the Santa Ynez Unit averaged production of about

12  29,000 barrels of oil per day.  *Id.* ¶ 4.  Since acquisition of the assets, Sable has

13  been diligently investing in and upgrading the facilities at significant cost in both

14  time and resources to facilitate a restart of operations.  *Id*. ¶ 10.  Contrary to

15  Plaintiffs' allegations, the offshore assets are inspected, well maintained and in

16  good operational order.  *Id*.

17          Since the close of the Purchase Agreement, Sable's geoscience and reservoir

18  engineering management team has expended substantial resources evaluating

19  reservoir development opportunities.  *Id.* ¶ 12.  Sable estimates that over 1 billion

20  barrels of oil are still recoverable from the Santa Ynez Unit, which represents over

21  $10 billion in net contingent resources overall.  *Id.* ¶ 13.  So far, Sable has

22  committed close to $1 billion to this restart effort, including the purchase, repair,

23  maintenance, and upgrades of the Santa Ynez Unit assets.  *Id.* ¶ 9.  Under the

24  Purchase Agreement, if Sable does not successfully restart the offshore facilities

25  prior to 2026, Exxon has the option to take over the Santa Ynez Unit assets and

26  rights at no cost.  Second Rusch Decl. ¶ 18.

27

28

**E.    Sable Has Completed Well-Reworking Operations Which Extended the Leases**

On October 9, 2024, Sable completed well-reworking operations approved by BSEE.  *Id.* ¶ 19 & Ex. E (Email from Nathan Sinkula, BSEE, to Lakeisha Douglas, BOEM (Oct. 22, 2024)).  Sable completed additional BSEE-approved well-reworking operations on December 9, 2024.  *Id.* ¶ 10.  As such, in addition to the protections with respect to the ongoing lease term contained within the Unit Agreement discussed *supra* at Section II.A, due to these additional well-reworking operations, the leases are unquestionably extended due to the leaseholding operations, and are not held under the 2023 Extension pursuant to 30 C.F.R. § 250.180(e).  *Id.* ¶ 20; *see also* 30 C.F.R. § 250.180(a)(2), (d); Second Rusch Decl., Ex. B (Unit Agreement) § 12.

**IV.    PROCEDURAL HISTORY**

The case remains at an early stage in the proceedings.  On June 27, 2024, Plaintiffs filed their Complaint challenging the 2023 Extension.  Dkt. 1.  Federal Defendants filed their Answer on September 6, 2024.  Dkt. 12.  On November 8, 2024, Federal Defendants lodged the administrative record, Dkt. 31, and have now acknowledged that the administrative record is incomplete, Dkt. 37 at 8 n.2.  As a result, key information to support BSEE's challenged decision is not before the Court, as discussed *infra* Section V.B.

Sable was granted intervention on December 3, 2024, and has filed an Answer.  Dkts. 18-3, 35.  On December 20, 2024, Federal Defendants filed a Motion for voluntary remand without vacatur, Dkt. 37, to which Sable files this Response.  The pleadings are not yet settled as Plaintiffs filed a motion for leave to supplement and amend their Complaint on January 3, 2025.  Dkt. 38.  To date, there has been no briefing on the merits of Plaintiffs' claims in the Complaint.

# V.    ARGUMENT

## A.    Voluntary Remand Without Vacatur is Permissible

Sable does not oppose Federal Defendants' Motion for voluntary remand without vacatur.  The decision to grant remand is in the Court's discretion.  Courts "generally grant an agency's motion to remand so long as 'the agency intends to take further action with respect to the original agency decision on review.'"  *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018) (quoting *Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 386 (D.C. Cir. 2017)).

The Government need not and—as is the case here—did not confess error in a request for voluntary remand.  *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) ("the agency may request a remand (without confessing error) in order to reconsider its previous position," such as reconsidering "the procedures that were followed"); *see also Limnia, Inc.*, 857 F.3d at 387 (an agency need not "confess error or impropriety in order to obtain a voluntary remand" but "ordinarily does at least need to profess intention to reconsider, re-review, or modify the original agency decision that is the subject of the legal challenge").  "When an agency 'request[s] a remand (without confessing error) in order to reconsider its previous position . . . ., the reviewing court has discretion over whether to remand'" but a court will generally grant the request where "the agency has committed to revisiting" the original decision.  *N. Alaska Env't Ctr. v. Haaland*, No. 3:20-CV-00187-SLG, 2022 WL 1556028, at *2-*3 (D. Alaska May 17, 2022) (granting voluntary remand over plaintiff's opposition concerning approval of a right-of-way for road construction reasoning that the "suitability of voluntary remand hinges on whether the agency has committed to revisiting 'the original agency decision on review,' not whether the agency will address every manner in which a party claims that decision was erroneous").

Here, "BSEE is committed to reconsidering the challenged 2023 extension decision," which includes "further consider[ing] whether any of the twelve exceptions indicating extraordinary circumstances may apply" and "plans to expand its analysis of whether the requested extension was consistent with the National interest." Mot. at 13. Because BSEE wishes in good faith to undertake additional process and has "profess[ed] [an] intention to reconsider [and] re-review . . . the original agency decision," and because granting the Motion as currently requested will not prejudice Sable, BSEE may seek remand, which the Court should grant as requested by Federal Defendants to conserve judicial and party resources. *See Limnia, Inc.*, 857 F.3d at 387.[7]

## B.    Remand Can Only Be Granted *Without* Vacatur

Sable strenuously opposes any claim that remand should be with vacatur. Based on recent binding Ninth Circuit precedent, Federal Defendants are correct that "if a Court grants voluntary remand before reaching the merits, it may not simultaneously vacate the challenged action." *See* Mot. at 12. The Ninth Circuit has interpreted "the APA as foreclosing any authority of courts to vacate agency actions not first held unlawful." *In re Clean Water Act Rulemaking*, 60 F.4th 583, 595 (9th Cir. 2023). In that case, the Ninth Circuit reversed the district court for vacating an agency action before merits briefing had begun and before the court determined whether the agency action was unlawful. *Id.* at 591, 595. The court explained that this limitation on the ability to vacate agency actions is found in the text and structure of the statute:

> [T]he APA instructs courts to "set aside" (i.e., to vacate) agency actions held to be unlawful. 5 U.S.C. § 706(2) (instructing courts to "set aside" those actions "found to be," for example, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). By

---

[7] "Generally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *Cal. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *SKF USA Inc.*, 254 F.3d at 1029). There is no evidence that is the case here.

> granting courts authority to "set aside" agency actions "found to be" unlawful, *id.*, the APA not only expressly explains when a court may set aside agency action (upon a holding of unlawfulness), it also implicitly explains when a court cannot (without a holding of unlawfulness).

*Id.* Thus, the Ninth Circuit found that "the APA's text is best read as authorizing a court to vacate an agency action only when that court has first held that action unlawful." *Id*.

Courts have applied the same logic when granting voluntary remand without vacatur for challenges to NEPA reviews. In *WildEarth Guardians v. Bernhardt*, No. CV 20-56 (RC), 2020 WL 6255291, at *1 (D.D.C. Oct. 23, 2020), the court refused to vacate agency decisions with respect to oil and gas leases upon remand because the court "ha[d] not reviewed the [NEPA reviews] underlying the leasing decisions—therefore, it ha[d] no basis to vacate the agency action." *See also Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 135-36 (D.D.C. 2010) ("The Court, therefore, concludes that it lacks the authority to grant the federal defendants' request for vacatur without a determination of the merits."). The same holds true here.

This case is distinguishable from cases in which courts granted remand with vacatur. For example, in *Center for Biological Diversity v. United States Bureau of Land Management*, the federal defendants expressly acknowledged that they had not conducted adequate environmental analysis for a right-of-way issued by the agency. No. CV 21-2507-GW-ASX, 2022 WL 4233648, at *7 (C.D. Cal. Sept. 13, 2022). And based on the full administrative record and the parties' briefing on summary judgment, the court agreed that the required "statutory processes were bypassed almost entirely" by the agency. *Id.* at 10. Here, in contrast, the Court has not determined whether BSEE's decision on the extension was unlawful.

Indeed, the Court lacks sufficient information to determine whether BSEE's 2023 Extension was unlawful at this point. First, BSEE has acknowledged that the

existing record before the Court is incomplete.  Mot. at 8 n.2 (explaining the correct version of the CatEx review "was inadvertently left out of the administrative record" "as well as" "other documents that the agency considered").  For example, importantly, the preservation plan referenced in BSEE's CatEx review for the 2023 Extension was omitted from the administrative record.[8]  Sable has identified over 45 other documents that should have been included in the administrative record, and may file a motion to supplement the administrative record at the appropriate time if Federal Defendants' supplementation of the administrative record[9] does not include all the relevant documents.  Second Rusch Decl. ¶ 23.  Second, there has been no briefing on the merits.  And finally, the agency has not confessed error.  Therefore, the Court should not and cannot vacate BSEE's decision on remand.[10]

In any event, even on the incomplete record before the Court, BSEE's decision is supported—and a complete record would show even more so that BSEE did not commit error at all.  BSEE's NEPA determination is well-supported, and there was no error.  The 2023 Extension plainly qualifies for a CatEx under 516 DM 15.4 (C)(7), which categorically excludes, among other things "lease extensions."  Indeed, Plaintiffs do not allege that the CatEx is inapplicable.  *See* Dkt. 1, Compl. ¶¶ 96-103.  Instead, Plaintiffs allege that certain extraordinary circumstances preclude BSEE's reliance on the CatEx.  *Id.*  But Plaintiffs are wrong for several reasons.

---

[8] The CatEx review references an "ongoing preservation plan for safe and environmentally protective maintenance and oversight of the facilities while idled."  AR017039; Second Rusch Decl., Ex. F.  However, the preservation plan has not been included in the current administrative record.  *See* Dkt. 31-2.

[9] In their Motion, Federal Defendants state they plan to file a supplement to the administrative record.  Mot. at 8 n.2.

[10] Even where a court finds an agency action to be unlawful (a finding that cannot be made here), a federal court is not required to set that action aside.  Rather, that decision to grant or deny injunctive relief under the APA is controlled by principals of equity.  In such a circumstance, the court considers (1) the seriousness of the agency's errors, weighed against (2) the disruptive consequences of vacatur.  *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

1    As an initial matter, NEPA regulations make clear that the mere presence of

2 an "extraordinary circumstance" does not preclude use of a CatEx.  *See* 40 C.F.R.

3 § 1501.4(b)(1) (2023) ("If an extraordinary circumstance is present, the agency

4 nevertheless may categorically exclude the proposed action if the agency

5 determines that there are circumstances that lessen the impacts or other conditions

6 sufficient to avoid significant effects.").  Further, Department of the Interior

7 regulations provide that the "[a]pplicability of extraordinary circumstances to

8 categorical exclusions" is in the sound discretion of BSEE.  43 C.F.R. § 46.215.

9 Courts have recognized that mere presence of extraordinary circumstances is not

10 enough to preclude reliance on a CatEx when an agency determines the

11 circumstances do not present significant impacts.  *See, e.g.*, *Sw. Ctr. for Biological*

12 *Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) ("[T]he Ninth

13 Circuit has held that an agency may issue a categorical exclusion even where

14 threatened or endangered species are present if the agency determines that the

15 project will not impact negatively on the species."); *Utah Env't Cong. v. Bosworth*,

16 443 F.3d 732, 742 (10th Cir. 2006) (extraordinary circumstances "exists only

17 where a proposed action 'may have a *significant* environmental effect'" and so

18 "[t]his language plainly requires that an action first may produce a significant

19 effect before a federal agency engage in further analysis") (emphasis in original).

20    Here, BSEE's use of a CatEx for its approval to extend the time to resume

21 operations on the leases is appropriate.  The 2023 Extension, which simply maintains

22 the status quo under the BSEE-approved preservation plan, does not have significant

23 environmental effects (if, indeed, it has any effects at all).  And the agency evaluated

24 each of the 12 extraordinary circumstances and found they did not preclude use of a

25 CatEx.[11]    While Federal Defendants' position appears to be that additional

26

27 [11] The federal government has inadvertently not provided a correct version of the
CatEx relied upon by BSEE as part of the administrative record.  A correct version

28 is attached to the Second Rusch Declaration as Exhibit F.

1  evaluation and clarification is appropriate, in relying on a CatEx for the 2023
2  Extension, BSEE followed the procedures in the Departmental Manual, which was
3  appropriate given there are no significant environmental impacts.

4     Plaintiffs also allege that "BSEE failed to consider the significant
5  environmental impacts of leaving non-producing infrastructure in place."
6  Compl. ¶ 100.  But Plaintiffs ignore that the "non-producing infrastructure" was
7  subject to compliance with BSEE safety, inspection, maintenance, and reporting
8  regulations, as well as the preservation plan.  *See supra* Section III.B.  More
9  specifically, the "non-producing infrastructure"—which has been flushed of
10 hydrocarbons—is subject to quarterly updates to BSEE under the preservation
11 plan, and remains under appropriate regulatory oversight.  All of this was before
12 BSEE when evaluating whether the 2023 Extension qualifies for a CatEx.

13    Plaintiffs' challenge under OCSLA fares no better.  In coming to its National
14 interest determination, BSEE reasoned that continued development of "proven oil
15 and gas reserves" from established infrastructure would meet the Nation's energy
16 needs without the impacts associated with new infrastructure installations, or
17 exploration and development of unproven fields.  AR017044.  That reasoning
18 alone is sufficient and is consistent with amendments to OCSLA's Congressional
19 Purposes outlined in 43 U.S.C. § 1802(2)(A), which emphasizes the need "to make
20 [oil and gas resources in the Outer Continental Shelf] available to meet the
21 Nation's energy needs as rapidly as possible."  BSEE's reasoning that the 2023
22 Extension will benefit taxpayers through continued revenue streams and to ensure
23 the conservation of proven oil and gas reserves also aligns with the statute's
24 Congressional purposes of ensuring "a fair and equitable return on the resources of
25 the Outer Continental Shelf."  *Id.* § 1802(2)(C); *see also* AR017044.  Importantly,
26 determining whether the 2023 Extension "is in the National interest, and it
27 conserves resources, prevents waste, or protects correlative rights" is in the sound
28

1    discretion of Federal Defendants.  *See* 30 C.F.R. § 250.180(e); *cf. Statoil Gulf of*

2    *Mexico LLC ExxonMobil Corporation*, 2011 WL 2946711, at *36 (applying

3    "national interest" determination under analogous 30 C.F.R. § 250.174).

4                    **C.    The Equities Require Remand Without Vacatur or Conditions**

5            It would also be error for this Court to require a specific level of NEPA

6    review on remand, or otherwise apply conditions on activities that may be

7    undertaken by Sable on these lawfully held leases.

8            First, in their Motion, Federal Defendants state their intent to reconsider the

9    2023 Decision by taking certain procedural steps.  *See* Mot. at 12-14.  If the Court

10   grants Federal Defendants' Motion, the Court should defer to BSEE to determine

11   the level of NEPA review that may be required in its reconsideration of its 2023

12   Extension.  *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety*

13   *Admin.*, 538 F.3d 1172, 1226 (9th Cir. 2008) (after finding agency NEPA analysis

14   inadequate on the merits, declining to "order the immediate preparation of an EIS"

15   and giving "the benefit of the doubt to" the agency because the record was

16   incomplete); *cf. Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1181 (9th Cir.

17   2011) (A court "may apply only 'pragmatic judgment,'" "and may not impose

18   'upon the agency [the court's] own notion of which procedures are 'best' or most

19   likely to further some vague, undefined public good.'") (cleaned up).

20           Second, Federal Defendants' Motion does not involve future activities that

21   Sable may take pursuant to Sable's leases and the Unit Agreement, which are not

22   currently before this Court.  Sable relied on the 2023 Extension and the status of

23   the leases when it consummated the purchase of the Santa Ynez Unit assets and

24   continued to work towards restarting operations.  To date, Sable has obligated

25   close to $1 billion associated with the purchase, repair, maintenance and upgrades

26   of the necessary facilities.  First Rusch Decl. ¶ 9.  Further, in connection with the

27   purchase of the Santa Ynez Unit assets, dozens of contractors and employees

28

1  located at the Santa Ynez Unit have continued in their same capacity with Sable.

2  *Id.* ¶ 8.  Sable and its subsidiary recently onboarded and trained approximately 400

3  contractors and 100 employees.  Second Rusch Decl. ¶ 16.  Moreover, should

4  Sable fail to successfully restart the facilities prior to 2026, Exxon has the option to

5  take over the assets and rights without reimbursing Sable for any investments or

6  costs incurred.  *Id.* ¶ 18.  Even where the merits have been reached and an agency

7  action found unlawful (unlike here) the Ninth Circuit has held that economic

8  consequences amounting to "millions of dollars of losses" mandate remand *without*

9  vacatur.  *Wild Fish Conservancy v. Quan*, No. 23-35322, 2024 WL 3842101, at *2

10  (9th Cir. Aug. 16, 2024) (finding reversable error where "[t]he district court []

11  glossed over [] significant economic consequences" to fisherman relying on

12  incidental take statement in its vacatur analysis); *see also California Cmtys.*, 688

13  F.3d at 994 (remanding without vacatur because, in part, "[s]topping construction

14  [of a power plant] would [] be economically disastrous [as it] is a billion-dollar

15  venture employing 350 workers" and "vacatur would pave the road to legal

16  challenges to Sentinel's construction that could well delay a much needed power

17  plant"); *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 843

18  F. App'x 77, 80 (9th Cir. 2021) (after finding NEPA violation on the merits,

19  upholding allowance of aquaculture activities under invalidated permit while

20  applicants sought individualized permits).  And Sable's reliance is a key factor the

21  Court must consider.  *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896

22  F.3d 520, 538 (D.C. Cir. 2018) (refusing to vacate agency determination where

23  company "reasonably relied on the . . . ruling and settled practice that permitted the

24  continued effectiveness of the license" and could incur significant economic loss

25  "if the license were 'suspended, vacated, or revoked'").

26      Additionally, Sable has already undertaken lawful lease holding operations

27  through well rework as expressly provided by the leases and Unit Agreement and

28

pursuant to a new BSEE approval that supersedes and otherwise moots the challenge to the 2023 Extension.  As of October 9, 2024, Sable completed well reworking operations at Well HE-23, and as of December 9, 2024, Sable completed well reworking operations at Well HE-28.  Second Rusch Decl. ¶ 19. On October 22, 2024, BSEE confirmed that "the SYU leases are no longer held by the approved lease extension, issued under 30 CFR 250.180(e) . . . [which] was effective through December 13, 2024."  *Id.* ¶ 20 & Ex. E; *see also* 30 C.F.R. §§ 250.180, 256.70.[12]  Therefore, because the applicable period for the challenged 2023 Extension (December 14, 2023 until October 9, 2024) is now over, as a practical matter, the Court cannot grant Plaintiffs effectual relief on the claims in their Complaint, Dkt. 1, even if they prevail on the merits.[13]  Accordingly, even if there were an error (there was not), the Court cannot grant effective relief and any remand must thus be without vacatur.

Furthermore, any conditions on Sable's future actions during remand— which are not the subject of Federal Defendants' Motion or currently before the Court—would be tantamount to an impermissible injunction.  The imposition of constraints or conditions on regulatory review could have the practical effect of delaying regulatory decisions regarding the Santa Ynez Unit assets and raising

---

[12] Following completion of the well reworking operations at Well HE-28, BSEE confirmed "[i]n the absence of additional leaseholding activities or approved lease extensions, the SYU leases will expire on December 9, 2025."  Second Rusch Decl. ¶ 20 & Ex. E.

[13] To be clear, Plaintiffs do not challenge the validity of the underlying leases. Plaintiffs merely challenge the 2023 Extension approval.  Federal Defendants are correct in that even if this extension decision was vacated, the leases remain valid and BSEE would have an opportunity to reconsider granting the extension request. Mot. at 15; *see also Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1073 (9th Cir. 2010) ("[W]e hold that a successful challenge to a lease extension results only in the undoing of the extension.  The agency may properly reconsider its decision to extend the leases.").  This is particularly true in light of the Unit Agreement language which expressly provides that the lease terms remain in effect "so long as Unitized Substances are or can be produced and, should production cease, so long thereafter as diligent operations are in progress for the restoration of production or discovery of new production" as is the case here.  Second Rusch Decl., Ex. B (Unit Agreement) § 13.

1  uncertainty with respect to future regulatory actions, prejudicing Sable.  Plaintiffs
2  have not sought or come close to meeting the "heavy burden" for a preliminary
3  injunction which requires plaintiffs to show a likelihood of success on the merits—
4  but here, there has been no briefing on the merits or any injunction sought.  *See*
5  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) ("plaintiffs seeking
6  a preliminary injunction face a difficult task in proving that they are entitled to this
7  'extraordinary remedy'"); *Bennett v. Donovan*, 703 F.3d 582, 588-89 (D.C. Cir.
8  2013) (refusing to hold that agency is "required to take [a] precise series of steps"
9  on remand and noting "[a]ppellants brought a complaint under the Administrative
10 Procedure Act to set aside an unlawful agency action, and in such circumstances, it
11 is the prerogative of the agency to decide in the first instance how best to provide
12 relief").  Accordingly, the Court should grant remand *without* vacatur or
13 conditions.

14 **VI.    CONCLUSION**

15      Sable respectfully requests that this Court grant Federal Defendants' Motion
16 for Voluntary Remand *without* vacatur or conditions.

17
18
19
20
21
22
23
24
25
26
27
28

Dated:  January 10, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Daniel P. Brunton*

Daniel P. Brunton (Bar No. 218615)
Email: daniel.brunton@lw.com
12670 High Bluff Drive
San Diego, CA 92130
Tel.: (858) 523-5400
Fax: (858) 523-5450

Benjamin Hanelin (Bar No. 237595)
Email: benjamin.hanelin@lw.com
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel.: (213) 485-1234
Fax: (213) 891-8763

Janice M. Schneider
(*Pro Hac Vice*)
Email: janice.schneider@lw.com
Devin M. O'Connor
(*Pro Hac Vice*)
Email: devin.o'connor@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Intervenor-Defendant Sable Offshore Corp.*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Intervenor-Defendant Sable Offshore Corp., certifies that this brief contains 6,028 words, which complies with the word limit of L.R. 11-6.1.

Dated:  January 10, 2025                    By: /s/ *Daniel P. Brunton*
                                                Daniel P. Brunton (Bar No. 218615)