Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
Center for Biological Diversity
1212 Broadway Suite 800
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DEBRA HAALAND, et al., <br><br> *Defendants,* <br><br> SABLE OFFSHORE CORP., <br><br> *Intervenor-Defendant.* | Case No. 2:24-cv-05459-MWC-MAA <br><br> **PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR VOLUNTARY REMAND** <br><br> Hearing Date: January 31, 2025 <br> Hearing Time: 1:30 p.m. <br> Courtroom: 6A <br><br> Honorable Michelle Williams Court <br> United States District Judge |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

LEGAL AND FACTUAL BACKGROUND .............................................................2

    I.      Outer Continental Shelf Lands Act .....................................................2

    II.     National Environmental Policy Act .....................................................4

    III.    Oil and Gas Drilling at the Santa Ynez Unit .......................................6

STANDARD OF REVIEW ....................................................................................10

ARGUMENT ..........................................................................................................11

    I.      A Remand Will Unduly Harm Plaintiffs' Interests ...........................12

    II.     BSEE's Motion Will Not Promote Judicial Efficiency .....................17

CONCLUSION ......................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*350 Mont. v. Haaland,*
  50 F.4th 1254 (9th Cir. 2022)................................................................1

*Alaska Wilderness League v. Jewell,*
  788 F.3d 1212 (9th Cir. 2015).............................................................15

*Am. Waterways Operators v. Wheeler,*
  427 F. Supp. 3d 95 (D.D.C. 2019) ................................................ 11, 18

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,*
  575 F.3d 999 (9th Cir. 2009)................................................................4

*California v. Norton,*
  311 F.3d 1162 (9th Cir. 2002)...........................................................4, 5

*Corus Staal BV v. United States,*
  29 C.I.T. 777 (2005).........................................................................10

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
  No. CV 21-2507-GW-ASx,
  2022 WL 4233648 (C.D. Cal. Sept. 13, 2022)...................................15

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
  623 F.3d 633 (9th Cir. 2010)................................................................4

*Ctr. for Sustainable Econ. v. Jewell,*
  779 F.3d 588 (D.C. Cir. 2015) ..........................................................2, 3

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
  36 F.4th 850 (9th Cir. 2022)..............................................5, 6, 12, 20

*Env't Prot. Info. Ctr. v. Carlson,*
  968 F.3d 985 (9th Cir. 2020)...........................................................4, 5

*Ford Motor Co. v. Nat'l Labor Rels. Bd.,*
  305 U.S. 364 (1939) .........................................................................10

*Friends of the Inyo v. U.S. Forest Serv.,*
  103 F.4th 543 (9th Cir. 2024)..............................................................6

*In re Clean Water Act Rulemaking*,
  60 F.4th 583 (9th Cir. 2023)............................................................ 11, 12, 17

*Keltner v. United States*,
  148 Fed. Cl. 552 (2020).................................................................. 10, 17, 18

*Limnia v. U.S. Dep't of Energy*,
  857 F.3d 379 (D.C. Cir. 2017) ..................................................................11

*Lutheran Church-Mo. Synod v. FCC*,
  141 F.3d 344 (D.C. Cir. 1998) ..................................................................17

*Metcalf v. Daley*,
  214 F.3d 1135 (9th Cir. 2000) .................................................................4, 6

*N. Alaska Env't Ctr. v. Haaland*,
  Nos. 3:20-CV-00187-SLG, 3:20-cv-00253-SLG,
  2022 WL 1556028 (D. Alaska May 17, 2022)............................................ 15, 16

*N. Coast Rivers All. v. U.S. Dep't of the Interior*,
  No. 1:16-cv-00307-LJO-MJS,
  2016 WL 8673038 (E.D. Cal. Dec. 16, 2016).........................................19

*Nat. Res. Def. Council v. EPA*,
  38 F.4th 34 (9th Cir. 2022)......................................................... 11, 16

*Nat. Res. Def. Council v. Norton*,
  No. 1:05-CV-01207-OWW-LJO,
  2007 WL 14283 (E.D. Cal. Jan. 3, 2007)..........................................17

*Or. Nat. Desert Assoc. v. Freeborn*,
  No. CV 06-1311-MO, 2007 WL 9658100 (D. Or. June 19, 2007).....................16

*Pac. Coast Fed. of Fishermen's Ass'ns v. Raimondo*,
  Nos. 1:20-cv-00431-DAD-EPG, 1:20-cv-00426-DAD-EPG,
  2022 WL 789122 (E.D. Cal. Mar. 11, 2022) ........................................16

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .....................................................................5, 12

*Sec'y of the Interior v. California*,
  464 U.S 312 (1984) ...............................................................................3

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
  711 F. Supp. 3d 522 (D. Md. Jan. 9, 2024).......................................17

iii

*SKF USA Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001) ................................................................19

*Util. Solid Waste Activities Grp. v. EPA,*
    901 F.3d 414 (D.C. Cir. 2018) ..................................................... 10, 12

**Statutes**

42 U.S.C. § 4331(a) ...........................................................................................4

42 U.S.C. § 4332(2)(C) ......................................................................................1

43 U.S.C. §§ 1331–1356b ..................................................................................2

43 U.S.C. § 1331(a) ............................................................................................2

43 U.S.C. § 1337(b) ............................................................................................1

43 U.S.C. § 1337(b)(2) .......................................................................................3

43 U.S.C. § 1337(b)(2)(A) ..................................................................................6

43 U.S.C. § 1802(2)(B) .......................................................................................2

49 U.S.C. § 60118(d) ..........................................................................................9

**Regulations**

30 C.F.R. § 250.101 ............................................................................................3

30 C.F.R. § 250.169(a) ........................................................................................4

30 C.F.R. § 250.172(d) .................................................................................1, 14

30 C.F.R. § 250.180(a)(2) ...............................................................................3, 8

30 C.F.R. § 250.180(b) .......................................................................................8

30 C.F.R. § 250.180(d) ....................................................................................3, 8

30 C.F.R. § 250.180(e) ..................................................................................3, 4, 8

30 C.F.R. § 250.410 .........................................................................................3

30 C.F.R. § 250.465 .........................................................................................3

30 C.F.R. § 550.281(a)(1) ................................................................................3

40 C.F.R. § 1500.1(c) ......................................................................................12

43 C.F.R. § 46.205 ...........................................................................................5

43 C.F.R. § 46.205(a) .......................................................................................5

43 C.F.R. § 46.215 ...........................................................................................6

**Federal Register Notices**

85 Fed. Reg. 43,304 (July 16, 2020) ................................................................5

89 Fed. Reg. 35,442 (May 1, 2024) ..................................................................5

**INTRODUCTION**

In this case, Plaintiffs Center for Biological Diversity and Wishtoyo Foundation (Plaintiffs) challenge Federal Defendants the Bureau of Safety and Environmental Enforcement et al.'s (collectively, BSEE) approval of extensions of 16 oil and gas leases in federal waters off California, in what is known as the Santa Ynez Unit. Specifically, Plaintiffs allege that BSEE (1) approved the extensions based on a faulty determination under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1337(b), that failed to consider highly relevant factors; and (2) arbitrarily relied on a categorical exclusion to evade conducting environmental review of its action under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C).

Rather than defend its unlawful decision, BSEE now asks this Court for a do-over. *See* BSEE's Mot. for Vol. Remand, ECF No. 37 (Mot.). But agencies are not entitled to a remand simply because they want one. That is particularly true here, where BSEE's request fundamentally conflicts with NEPA's mandate that "agencies … look *before* they leap," *350 Mont. v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022) (citation omitted), and BSEE has refused to ensure that oil and gas production does not resume at the Santa Ynez Unit during the remand. To the contrary, BSEE all but admits that it will continue to permit activity at the Santa Ynez Unit during the remand despite the agency's express authority to pause activity under a lease to conduct NEPA review. *See* 30 C.F.R. § 250.172(d).

BSEE claims that in the event Sable Offshore Corp. (the lessee) submits additional permit applications for oil and gas activity, BSEE will aim to give such permits the same level of NEPA review that it applies to the lease extensions on

remand, but this is cold comfort to Plaintiffs. Indeed, the agency's recent actions signal that this promise is meaningless. Since Plaintiffs filed this case, BSEE approved two permits that facilitate the restart of oil and gas production at the Santa Ynez Unit without conducting a NEPA analysis, and instead relying on a categorical exclusion review completed in *one day.* Moreover, the agency has a history of authorizing oil and gas activity off California without complying with NEPA or other laws, *see infra* pp. 19–20, demonstrating that BSEE clearly needs the Court's guidance on the issues raised in this litigation.

In short, BSEE's motion offers nothing and commits to nothing on remand. Granting it would prejudice Plaintiffs and only lead to additional delay and judicial inefficiency. The Court should therefore deny BSEE's motion.

## LEGAL AND FACTUAL BACKGROUND

### I.    Outer Continental Shelf Lands Act

OCSLA prescribes a framework under which the Secretary of the Interior can lease areas of the outer continental shelf for purposes of developing oil and gas. 43 U.S.C. §§ 1331–1356b. The outer continental shelf generally begins three miles from shore—the outer boundary of most state waters—and extends seaward to the limits of federal jurisdiction. *Id*. § 1331(a). OCSLA mandates that offshore oil development be "balance[d] … with protection of the human, marine, and coastal environments." *Id*. § 1802(2)(B).

In 1978, Congress transformed OCLSA from "'essentially a carte blanche delegation of authority to the Secretary' … into a statute with a 'structure for every conceivable step to be taken' on the path to development of a[] … leasing site." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 594 (D.C. Cir. 2015) (citation

1  omitted). The Secretary "must undertake a four-stage process before allowing

2  development of an offshore well," with increasing specificity of analysis at each

3  stage. *Id.*

4      This process includes "(1) formulation of a five year leasing plan … ; (2)

5  lease sales; (3) exploration by the lessees; [and] (4) development and production."

6  *Sec'y of the Interior v. California*, 464 U.S 312, 337 (1984), *superseded by statute*

7  *on other grounds*, Coastal Zone Act Reauthorization Amendments of 1990, Pub. L.

8  No. 101-508, 104 Stat. 1388-307. "Each stage involves separate regulatory review

9  that may, but need not, conclude in the transfer to lease purchasers of rights to

10  conduct additional activities on the [outer continental shelf]." *Id.* Prior to drilling a

11  well, an oil company must also obtain approval of an application for permit to drill

12  or to modify. 30 C.F.R. §§ 250.410, 250.465, 550.281(a)(1).

13      The Secretary has delegated her responsibilities under OCSLA to two

14  bureaus within the Department of the Interior. As relevant here, BSEE is

15  responsible for enacting and enforcing safety and environmental standards under

16  OCSLA, as well as issuing drilling permits and approving lease extensions. *Id.*

17  §§ 250.101, 250.180(e).

18      A lease off California typically expires at the end of the initial five years

19  unless production is occurring in paying quantities. 43 U.S.C. § 1337(b)(2); 30

20  C.F.R. § 250.180(a)(2). If production ceases on a lease that has continued beyond

21  its primary term, the lease will expire unless production resumes or BSEE

22  approves a suspension of operations or suspension of production before the end of

23  the year after production ceases. 30 C.F.R. § 250.180(d). BSEE can also allow an

24  operator more than a year to resume operations, but only if BSEE determines that

3

1    "the longer period is in the National interest, and it conserves resources, prevents

2    waste, or protects correlative rights." *Id.* § 250.180(e).

3         Approval of a request for additional time to resume operations "extend[s] the

4    term of a lease … equal to the length of time the suspension is in effect." *Id.*

5    § 250.169(a). Accordingly, such actions "represent a significant decision to extend

6    the life of oil … production off of California's coast, with all of the far reaching

7    effects and perils that go along with offshore oil production." *California v. Norton*,

8    311 F.3d 1162, 1173 (9th Cir. 2002).

9    **II.    National Environmental Policy Act**

10         NEPA is "our basic national charter for protection of the environment." *Cal.*

11    *ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009) (citation

12    omitted). In enacting NEPA, Congress "recogniz[ed] the profound impact of man's

13    activity on the interrelations of all components of the natural environment" and set

14    out "to create and maintain conditions under which man and nature can exist in

15    productive harmony." 42 U.S.C. § 4331(a).

16         Accordingly, the statute "establishes 'action-forcing' procedures that require

17    agencies to take a 'hard look' at environmental consequences." *Ctr. for Biological*

18    *Diversity v. U.S. Dep't of the Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting

19    *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000)). Specifically, NEPA

20    "requires that federal agencies perform environmental analysis before taking any

21    'major Federal actions significantly affecting the quality of the human

22    environment.'" *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 987–88 (9th Cir.

23    2020) (citation omitted). Such requirement helps ensure that agencies take a "hard

24    look" at the environmental impacts of their actions by guaranteeing that they "will

4

have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "[I]t also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id*.

The type of analysis required depends on the action at issue and its potential impacts. First, for actions that *might* have significant impacts, an environmental impact statement—the most comprehensive review—is required. *See, e.g.*, *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878–79 (9th Cir. 2022) (citation omitted) (*EDC v. BOEM*). Second, is an environmental assessment, which is "less searching," and is often used to determine whether an environmental impact statement is required. *Env't Prot. Info. Ctr.*, 968 F.3d at 988. Third, a categorical exclusion applies to "actions which do not individually or cumulatively have a significant effect on the human environment." *California v. Norton*, 311 F.3d at 1168 (citing NEPA regulations);[1] *see also* 43 C.F.R. § 46.205 (Department of the Interior NEPA regulations defining "categorical exclusion").

To rely on a categorical exclusion, however, an agency must have previously promulgated one that covers the action at issue. *See California v. Norton*, 311 F.3d at 1168; 43 C.F.R. § 46.205(a). Moreover, an agency cannot rely on a categorical exclusion if there are "extraordinary circumstances" that indicate the action could

---

[1] The regulations implementing NEPA have undergone various amendments in recent years. 85 Fed. Reg. 43,304 (July 16, 2020); 89 Fed. Reg. 35,442 (May 1, 2024). And while the Court reviews an agency's action based on the NEPA regulations in effect at the time of the agency's decision, *EDC v. BOEM*, 36 F.4th at 879, the relevant regulations regarding categorical exclusions have remained substantively the same.

have a significant environmental effect. *Friends of the Inyo v. U.S. Forest Serv*., 103 F.4th 543, 547–48 (9th Cir. 2024) (citation omitted); *see also* 43 C.F.R. § 46.215 (Department of the Interior NEPA regulations listing the circumstances where use of an existing categorical exclusion is improper).

Notably, an activity with "largely unexplored" environmental impacts qualifies as "*terra incognita* for NEPA review." *EDC v. BOEM*, 36 F.4th at 879. And no matter the level of review, NEPA review "cannot be used 'as a subterfuge designed to rationalize a decision already made.'" *See id.* (quoting *Metcalf*, 214 F.3d at 1142).

## III.    Oil and Gas Drilling at the Santa Ynez Unit

Federal waters off California are home to 30 active oil and gas leases. *See* AR001276. Sixteen of these leases constitute the Santa Ynez Unit in the Santa Barbara Channel. *See id.*; Mot. 7. The Department of the Interior issued these leases between 1968 and 1982, AR001276, and they each had an initial term of five years, *see* 43 U.S.C. § 1337(b)(2)(A).

There are three offshore production platforms in the Santa Ynez Unit: Platforms Harmony, Heritage, and Hondo. AR001276. Platform Hondo was installed in June 1976, Platform Harmony in June 1989, and Platform Heritage in October 1989. *Id*. Production began from these platforms between April 1981 and December 1993. *Id.* The original development plan for the Santa Ynez Unit stated that recovery of the oil and gas reserves from the Unit "will take place over a period of approximately 25 to 35 years." AR000035. Because first production began in 1981, production should have ceased by 2016.

Until recently, ExxonMobil owned and operated all three platforms. Sable Offshore Corp. (Sable)—a newly formed entity—is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and their associated infrastructure; and is the lessee on all of the 16 oil and gas leases in the Santa Ynez Unit. Hesson Decl. ¶ 4, ECF No. 37-1.

The change of ownership follows a May 20, 2015, oil spill from an onshore pipeline (then owned by Plains All American Pipeline and now owned by Sable) that transported oil drilled at the Santa Ynez Unit. *Id.* ¶¶ 4, 5. The pipeline ruptured and spilled what is now estimated to be over 450,000 gallons of oil. *See* Pls.' Compl. ¶ 56, ECF No. 1. Official reports document that the spill killed at least 558 birds and 232 mammals, including 19 dolphins and 94 sea lions. *Id.* ¶ 18. The spill likely killed a wide variety of nearshore fish, including surfperch and grunion, which were spawning when the spill occurred, and impacted a variety of coastal habitats, including kelp wrack, feather boa kelp, surfgrass, and eelgrass. *Id*. It also prevented Chumash people from engaging in their annual tomol voyage. *Id*.

The spill also shut down oil and gas drilling operations at the Santa Ynez Unit. Its platforms, wells, and pipelines have now been "shut-in," meaning operations have been halted, for nearly a decade. *See* AR017036.[2] Following the

---

[2] Prior to the 2015 spill, federal records show that the Santa Ynez Unit had already experienced numerous problems. For example, on May 1, 2015, federal inspectors found "numerous corrosion issues" and components out of compliance on Platform Hondo. AR001519. Inspectors also found corrosion at Platform Hondo on April 30, 2015, and the week prior, found five failed gas detectors and a "leakage rate higher than the maximum allowable" on that platform's Well H-12U. AR001518. Platforms Harmony, Heritage, and Hondo had early-2015 gas leaks that required their crews to gather for safety reasons, including an incident on Platform Heritage

7

1    shut-in, BSEE issued a series of annual lease extensions for the 16 leases in the

2    Santa Ynez Unit. *See id.*; *see also* Mot. 8, n.2 (noting that the lessee extension

3    decision mistakenly identifies the lessee as "Freeport"). Without these extensions,

4    the leases would have expired and oil and gas production at the Santa Ynez Unit

5    would have permanently ceased. *See* 30 C.F.R. § 250.180(a)(2), (b), (d), (e).

6    Six months prior to BSEE's issuance of the most recent November 2023

7    extensions, Plaintiff Center for Biological Diversity sent the agency a letter

8    opposing its prior decisions to issue the lease extensions without any meaningful

9    review and urging the agency to deny the next lease extensions. AR001164. The

10    letter highlighted how BSEE's prior national interest determinations and

11    categorical exclusion reviews failed to consider the numerous harms of restarting

12    production at the Santa Ynez Unit, including yet more oil spills, toxic air pollution,

13    and contributions to climate change, among others. AR001164–79; *see also*

14    AR001180–16989 (supporting references).

15    BSEE ignored these concerns. Its national interest determination only

16    considered the purported benefits of resuming oil and gas production. *See*

17    AR017044. But contradictorily, it based its categorical exclusion review on

18    production being shut down and ignored the impacts from restarting production

19    and prolonged reliance on aging infrastructure. *See* AR017036–40. BSEE's

20    categorical exclusion review also concluded that, "in the event production is

21

22

23    the morning of May 19, 2015. AR001416, AR001427. Platform Hondo also had a
      gas leak on April 27, 2015, AR001380, and Platform Harmony had one on March
24    29. AR001411.

1  ultimately restored," the cumulative effects of oil and gas production "have already

2  been examined through prior NEPA analyses." AR017039.

3          Sable is now poised to restart oil and gas production at the Santa Ynez Unit.

4  It recently told investors that it plans to restart production "in the first quarter of

5  2025." Monsell Decl. Ex. 1, at 2 (Sable 8-K Report). And Sable decided not to

6  replace the original onshore pipeline that ruptured and spilled, but to instead seek a

7  state waiver from certain safety requirements, because cathodic protection systems

8  that are otherwise required to prevent pipeline corrosion are of limited

9  effectiveness on this particular pipeline. *See id*. It received that waiver on

10  December 17, 2024. *Id*.[3] The company's own analysis shows that a worst-case spill

11  from the pipeline is 41,899 barrels, which is more than 1.7 million gallons.

12  Monsell Decl. Ex. 2, at 7 (Sable's Integrated Contingency Plan); *see also id*. at 5, 6

13  (defining acronyms). And it also estimates a worst-case spill from each offshore

14  platform of up to 3,000 barrels, which is 126,000 gallons. Monsell Decl. Ex. 3, at 2

15  (Sable's Pacific Region Oil Spill Response Plan).

16          BSEE's approvals of oil and gas activity at the Santa Ynez Unit are ongoing.

17  Specifically, on September 25, 2024, BSEE approved two permit applications from

18  Sable, allowing it to perforate two wells at the Santa Ynez Unit. Monsell Decl. Ex.

19  4, at 1, 3 (Permits). The permits—categorized as permits to "[e]nhance

20  [p]roduction," *id*. at 1, 3—allow the punching of holes into the wells' steel and

21  cement casings to cause oil and gas to flow into the well. *See* Hesson Decl. ¶ 13.

22

23  ───────────────

    [3] The federal Pipeline and Hazardous Materials Safety Administration (PHMSA)
    has up to 60 days to object to the state waiver. 49 U.S.C. § 60118(d). If PHMSA

24  does not respond within 60 days, the waiver is deemed approved. *See id*.

1    BSEE approved the permits within four business days of receiving them,

2    completing a categorical exclusion review for the permits *within one day*. Monsell

3    Decl. Ex. 4, at 1–4. Sable could only apply for these permits, and BSEE could only

4    issue them, because of the lease extensions challenged in this case.

5        Plaintiffs have filed a motion to supplement and amend their Complaint in

6    this case to challenge BSEE's issuance of these permits, as well as the agency's

7    continued reliance on decades-old NEPA analyses to approve new oil and gas

8    activity at the Santa Ynez Unit. *See* Pls.' Mot. to File Suppl. and Am. Compl., ECF

9    No. 38.

**STANDARD OF REVIEW**

11       In ruling on an agency's motion for voluntary remand, a court exercises its

12   traditional, equitable authority. *See Ford Motor Co. v. Nat'l Labor Rels. Bd.*, 305

13   U.S. 364, 373 (1939). As such, a court has "substantial discretion" to grant or deny

14   such a motion, depending on the equities. *Keltner v. United States*, 148 Fed. Cl.

15   552, 563 (2020); *see also Corus Staal BV v. United States*, 29 C.I.T. 777, 783

16   (2005) (an agency "cannot simply ask for a do-over any time it wishes"), *aff'd*, 186

17   F. App'x 997 (Fed. Cir. 2006).

18       Under this "broad discretion," courts should deny remand where the

19   "remand would unduly prejudice the non-moving party." *Util. Solid Waste*

20   *Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018). A court can also reject

21   an agency's motion for voluntary remand to cure mistakes when the court

22   "suspects that [the] request … is frivolous or made in bad faith—for example,

23   because the agency does not actually intend to reconsider the challenged

24   regulation, or because the agency seeks a voluntary remand simply to forestall

judicial review." *In re Clean Water Act Rulemaking*, 60 F.4th 583, 596 (9th Cir. 2023) (citing *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 60 (9th Cir. 2022)).

Moreover, as the Ninth Circuit recently made clear, this discretion also includes the authority "to deny a voluntary remand—and thus to proceed to decide the merits of the case—if the risk of harm from indefinitely leaving an allegedly unlawful [agency action] in place outweighs considerations of judicial and administrative efficiency." *Id*. The court articulated this standard along with its holding that courts cannot vacate an agency action without first holding that action unlawful, *id*. at 595, reflecting the notion that an agency cannot both avoid vacatur *and* presumptively avoid a ruling on the merits based on an excessively stringent standard. After all, as then-Judge Kavanaugh once explained, a voluntary remand without vacatur leaves a plaintiff "stuck between a remand and a hard place," without an "opportunity to vindicate its statutory rights under the [Administrative Procedure Act] or repair" its injuries. *Limnia v. U.S. Dep't of Energy*, 857 F.3d 379, 388 (D.C. Cir. 2017).

## ARGUMENT

The Court should deny BSEE's request to give it "a second bite at the apple." *Am. Waterways Operators v. Wheeler*, 427 F. Supp. 3d 95, 98 (D.D.C. 2019). The risk of harm to Plaintiffs' interests outweighs any alleged administrative or judicial efficiency, especially where BSEE has refused to use its authority to ensure the status quo will be maintained during the remand. This, coupled with the agency's non-committal statements regarding its intentions and the fact that it rubber-stamped production permits for the Santa Ynez Unit after Plaintiffs filed this case, signals that BSEE will only repeat its legal errors and

1    seeks remand simply to avoid an adverse ruling on the merits. Granting BSEE's

2    motion will only lead to judicial inefficiency, as litigation over its decision

3    following a remand is all but certain.

4    **I.    A Remand Will Unduly Harm Plaintiffs' Interests**

5            The Court should deny BSEE's motion because it would unduly prejudice

6    Plaintiffs. *See In re Clean Water Act Rulemaking*, 60 F.4th at 596; *Util. Solid Waste*

7    *Activities Grp.*, 901 F.3d at 436. Specifically, granting BSEE's motion will harm

8    Plaintiffs' interests in ensuring that oil and gas production at the Santa Ynez Unit

9    does not resume without BSEE first conducting a careful analysis of the

10   environmental harms of (1) restarting production from the aging infrastructure on

11   which the Unit relies and (2) prolonging oil and gas drilling off California.

12           No existing analysis evaluates the environmental impacts of the lease

13   extensions and of restarting long-dormant oil and gas production at the Santa Ynez

14   Unit following a massive oil spill. *See* Mot. 7 (referencing an environmental

15   impact statement completed in 1985 for oil and gas production at the Santa Ynez

16   Unit). And while NEPA is a procedural statute, its purpose is "to foster … actions

17   that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c);

18   *Robertson*, 490 U.S. at 350 (recognizing that NEPA's "procedures are almost

19   certain to affect the agency's substantive decision"). This is why NEPA requires

20   agencies to "conduct environmental review of proposed [actions] *before*

21   approving" them. *EDC v. BOEM*, 36 F.4th at 863; *see also Robertson*, 490 U.S. at

22   349 ("NEPA ensures that important effects will not be overlooked or

23   underestimated only to be discovered after resources have been committed or the

24   die otherwise cast.").

12

A careful examination of the environmental effects of oil and gas production is critical because of the available information regarding the harms of doing so. For example, restarting production will increase dangerous air pollution. Before it shut down, the facility that processes oil and gas produced at the Santa Ynez Unit was Santa Barbara County's largest facility source of greenhouse gas emissions, contributing 55 percent of the County's emissions. AR001165–66. The facility was also the County's largest source of several harmful air pollutants, including volatile organic compounds (VOCs), fine particulate matter (PM2.5), and formaldehyde. Monsell Decl. Ex. 5, at 1 (California Air Resources Board Data 2014). Much of the VOCs came from leaks, i.e., fugitive emissions. According to ExxonMobil, these leaks likely resulted from "high vibration, operating pressures and thermal expansion/contraction that occurs during start-ups & shutdowns of the equipment," and as such, "it is relatively next to impossible to totally to prevent a recurrence." Monsell Decl. Ex. 6, at 2, 3 (Final Breakdown Report).

Restarting production also increases the risk of oil spills. Sable itself has stated that the risks of production at the Santa Ynez Unit are heightened because most of the equipment has been shut-in since 2015. Monsell Decl. Ex. 7, at 2 (Sable's Prospectus); *see also* Monsell Decl. Ex. 2, at 7 (Sable determining worst-case spill from the onshore pipeline system that transports oil produced at the Santa Ynez Unit is 1.7 million gallons (41,899 barrels)); Monsell Decl. Ex. 3, at 2 (Sable determining a worst-case spill of up to 126,000 gallons (3,000 barrels) from each platform). The age of infrastructure also increases the risk of oil spills. Scientists have determined, for example, that subsea pipeline corrosion accelerates over time, and that after a pipeline reaches 20 years of age, the annual probability of a spill

1   can be as high as 100 percent. AR001221; *see also id.* (noting the "dramatic

2   increase in the probability of failure of a [subsea] pipeline" after it reaches 20–25

3   years of age).

4          BSEE has the express authority to prevent these harms during remand. Its

5   regulations allow it to pause activity under an oil and gas lease under these precise

6   circumstances: "[w]hen necessary to carry out the requirements of NEPA or to

7   conduct an environmental analysis." 30 C.F.R. § 250.172(d). Yet BSEE has given

8   no indication that it plans to use this authority to ensure the status quo is

9   maintained until it completes its review on remand. To the contrary, BSEE's

10  motion indicates that *it would permit additional activity* at the Santa Ynez Unit

11  during the remand. The motion states, for example, that if Sable submits additional

12  permit applications during the remand, BSEE "would aim for consistency among

13  all of its NEPA analyses." Mot. 16.

14         BSEE incorrectly claims that Plaintiffs' interests would not be harmed. It

15  suggests a restart of oil and gas production at the Santa Ynez Unit is unlikely

16  during the remand due to additional steps that supposedly need to occur. *Id.* at 15–

17  16. If true, it strains credulity as to why BSEE would not then use its regulatory

18  authority to pause all activity under the leases to ensure that production does not in

19  fact resume. Moreover, BSEE's suggestion that a restart will not occur during the

20  remand is speculative at best. BSEE points to the need for Sable to obtain a waiver

21  from the State Fire Marshal as the "[m]ost notabl[e]" reason, Mot. 16, but the state

22  already issued that waiver, and, in fact, the state did so three days before BSEE

23

24

14

1    filed its motion, Monsell Decl. Ex. 1, at 2.[4] BSEE also claims that it is "likely"

2    Sable will apply for additional permits from BSEE prior to a restart, but it cites no

3    legal obligation for Sable to do so. Hesson Decl. ¶ 14.

4        In other words, this is not a case where the agency has taken steps to ensure

5    that activities will not occur during the pendency of the remand. The cases on

6    which BSEE relies are therefore inapposite. For example, in one, plaintiffs

7    challenged the issuance of right-of-way permits allowing a real estate company to

8    operate a pipeline to transport water between two locations in California. *Ctr. for

9    Biological Diversity v. Bureau of Land Mgmt.*, No. CV 21-2507-GW-ASx, 2022

10   WL 4233648, at *1 (C.D. Cal. Sept. 13, 2022). The plaintiffs alleged the agency

11   failed to comply with NEPA and other laws in issuing the rights-of-way, and the

12   agency moved for voluntary remand. *Id.* at *3. The agency's motion, however, also

13   sought vacatur of the rights-of-way it had issued, meaning the project could not

14   move forward during the remand and the agency's motion therefore did not

15   prejudice the plaintiffs' interests. *See id.* at *5.

16       Similarly, in moving for voluntary remand in a case challenging rights-of-

17   way permits to construct a road for a mine in Alaska, the agency stated its "inten[t]

18   to suspend the … permits," which the agency then did. *N. Alaska Env't Ctr. v.

19   Haaland*, Nos. 3:20-CV-00187-SLG, 3:20-cv-00253-SLG, 2022 WL 1556028, at

20   *1 (D. Alaska May 17, 2022) (citation omitted). Moreover, the agency "assured the

21

22   ───────────────

     [4] BSEE also references the need for Sable to revise its oil spill response plan and
     for BSEE to sign off on that plan. Hesson Decl. ¶ 14. However, the Ninth Circuit
23   has held that BSEE's approval of such plans "is not subject to NEPA's
     requirements." *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir.
24   2015). Moreover, BSEE could change its mind that an updated plan is needed.

1    [c]ourt in strong terms that their suspension of the right-of-way permits and

2    position on preventing environmental harm during the reconsideration period

3    [would] avoid prejudice to [the] [p]laintiffs." *Id.* at *5.

4         And in *Oregon Natural Desert Association v. Freeborn*, the parties had

5    previously reached an agreement under which the agency would "not implement

6    several aspects of the challenged decisions." No. CV 06-1311-MO, 2007 WL

7    9658100, at *2 (D. Or. June 19, 2007); *see also Pac. Coast Fed. of Fishermen's*

8    *Ass'ns v. Raimondo*, Nos. 1:20-cv-00431-DAD-EPG, 1:20-cv-00426-DAD-EPG,

9    2022 WL 789122, at *12 (E.D. Cal. Mar. 11, 2022) (granting remand were the

10   agency did "not propos[e] to operate in the interim under the [challenged

11   decisions]," but instead "propos[ed] material modifications" to the action at issue,

12   "many of which [were] similar to modifications requested by [the plaintiffs]").[5]

13        Here, in sharp contrast, BSEE has failed to ensure oil and gas drilling cannot

14   occur during the remand (and refused to do so when Plaintiffs asked as part of the

15   meet and confer on BSEE's motion). In fact, all indications are that BSEE would

16   continue to permit activity at the Santa Ynez Unit. As such, "Plaintiffs are entitled

17   to have their complaint decided on the merits, particularly given the fact that

18   [BSEE] continue[s] to rely on the challenged [agency action] as if [it] were

19

20   _____

     [5] While the Ninth Circuit chose to leave the underlying agency action in place
21   when granting a motion for voluntary remand in *Natural Resources Defense
     Council v. Environmental Protection Agency*, it did so based on the "unusual
22   circumstances" of the case (including a relevant statutory deadline for subsequent
     action) and its determination that not remanding "could result in an outcome
23   nobody wants: more, and probably unnecessary, delay." 38 F.4th at 61. Here, in
     contrast, there are no unusual circumstances favoring remand, and a remand will
24   likely result in unnecessary delay in resolving Plaintiffs' claims.

1  lawfully enacted." *Nat. Res. Def. Council v. Norton*, No. 1:05-CV-01207-OWW-
2  LJO, 2007 WL 14283, at *16 (E.D. Cal. Jan. 3, 2007).

3  **II.    BSEE's Motion Will Not Promote Judicial Efficiency**

4         Allowing this case to proceed to the merits—rather than granting a voluntary
5  remand—would serve judicial efficiency. While BSEE asserts that it will re-
6  examine its decision in light of Plaintiffs' claims, its motion also contains several
7  non-committal statements that fail to demonstrate it has the requisite "substantial"
8  and "legitimate" concerns with its decision. *Keltner*, 148 Fed. Cl. at 565; *In re*
9  *Clean Water Act Rulemaking*, 60 F.4th at 590. For example, BSEE states that it will
10  only conduct additional analysis "as warranted." Mot. 5; *see also id.* at 14 (noting
11  that though it intends to revisit its analysis, "BSEE does not concede Plaintiffs'
12  characterizations"). Additionally, BSEE wants a remand to address "*potential*
13  deficiencies with the challenged decision." *Id.* at 12 (emphasis added). Such
14  "caveat[s] … effectively disclaim[] any commitment to addressing … [P]laintiffs'
15  concerns." *Sierra Club v. Nat'l Marine Fisheries Serv.*, 711 F. Supp. 3d 522, 537
16  (D. Md. Jan. 9, 2024); *see also Lutheran Church-Mo. Synod v. FCC*, 141 F.3d 344,
17  349 (D.C. Cir. 1998) (denying remand where the agency "could make no
18  representations to the court concerning what sort of order might be adopted" on
19  remand). And BSEE nowhere acknowledges the impropriety of its determination
20  that existing, decades-old NEPA analyses adequately considered the cumulative
21  effects of restarting oil and gas activity at the Santa Ynez Unit. *See* Compl. ¶ 101.

22         BSEE also references its desire for a voluntary remand to address "overly
23  conclusory statements" in its categorical exclusion review and the "over broad and
24  conclusory" nature of its national interest determination. Hesson Decl. ¶¶ 9, 10.

1    But a voluntary remand is not appropriate "simply so that the [agency] can bolster

2    its reasons for" issuing its decision and thereby "have a higher chance of

3    withstanding subsequent judicial scrutiny." *Keltner*, 148 Fed. Cl. at 564–65.

4         Indeed, BSEE's motion seems nothing more than a litigation tactic employed

5    "to improve … the reasoning the agency articulated for its decision," *id.*, especially

6    where Plaintiff Center for Biological Diversity raised its concerns with the agency

7    in a detailed letter submitted six months before the agency issued the challenged

8    lease extensions, *see* Mot. 8–9 (citing letter). That letter explained how BSEE's

9    prior lease extensions failed to demonstrate the extensions were consistent with

10   "the national interest in addressing the climate crisis, promoting environmental

11   justice, recovering endangered species, and otherwise protecting the environment

12   given the numerous harms inherent in offshore oil and gas drilling." AR001164.

13   The letter also explained why the agency could not continue to rely on a

14   categorical exclusion in issuing the lease extensions, given the risk of oil spills, air

15   and water pollution, and harms to endangered species from continued production

16   and reliance on aging infrastructure. AR001164–79. Yet BSEE entirely ignored

17   these concerns (and the cited references) in issuing its decision. The Court should

18   not permit BSEE a second chance when "[t]he only 'new' thing before [it] is

19   Plaintiff's Complaint." *Am. Waterways Operators*, 427 F. Supp. 3d at 98.

20        BSEE's representations in its motion are a far cry from those found

21   sufficient in other cases. For example, in *Center for Biological Diversity v. Bureau

22   of Land Management*, the agency's motion admitted that its decision "violated

23   NEPA," Memorandum of Defendants at 1, No. 21-2507-GW-ASx, 2022 WL

24   4233648 (C.D. Cal. Dec. 3, 2021), ECF No. 42, that the agency's "reliance on a

1   [categorical exclusion] was improper," *id.* at 15, and that its "legal errors [were]

2   serious," *id.* at 21. In other words, the agency all but conceded it would need to do

3   an environmental assessment or environmental impact statement on remand.

4   Likewise, in *SKF USA Inc. v. United States*, the agency not only admitted error in

5   seeking a voluntary remand, but "reversed course" during the litigation, adopting

6   the appellant's litigation position in the process. 254 F.3d 1022, 1025–26 (Fed. Cir.

7   2001); *see also N. Coast Rivers All. v. U.S. Dep't of the Interior*, No. 1:16-cv-

8   00307-LJO-MJS, 2016 WL 8673038, at *5 (E.D. Cal. Dec. 16, 2016) (granting

9   remand only once the agency "acknowledged that certain aspects of the

10  [environmental assessment] cannot 'pass muster' under" a new Ninth Circuit

11  decision).

12      BSEE claims that, in the event Sable submits additional permit applications,

13  it will try to conduct the same level of NEPA review as it does for the lease

14  extension. Hesson Decl. ¶ 14. But this is an empty assurance given that, after

15  Plaintiffs filed this case, BSEE issued two production permits for the Santa Ynez

16  Unit relying on a categorical exclusion. In doing so, the agency repeated some of

17  the very same errors that Plaintiffs have alleged here, including the agency's

18  arbitrary conclusion that "previous environmental reviews" adequately address the

19  cumulative effects of oil and gas production from the Santa Ynez Unit. Monsell

20  Decl. Ex. 8, at 1, 2, 4, 5 (Categorical Exclusion Reviews).

21      Moreover, BSEE's motion is not written on a blank slate. This is not the first

22  time Plaintiffs have been forced to sue BSEE over its failure to comply with NEPA

23  in managing oil and gas activity off California. For example, in 2015, Plaintiff

24  Center for Biological and others sued BSEE for issuing permits that allowed the

1   use of offshore hydraulic fracturing ("fracking") and other well stimulation

2   treatments off California without examining the environmental impacts of doing

3   so. *See* Compl., *Ctr. for Biological Diversity v. Bureau of Ocean Energy Mgmt.,*

4   No. 15-1189 PSG (FFMx) (C.D. Cal. Feb. 19, 2015), ECF No. 1. As with this case,

5   BSEE relied on a categorical exclusion under NEPA to issue the permits. *Id.* ¶ 70.

6   That case settled and resulted in an agreement requiring BSEE to complete a

7   programmatic environmental assessment (at the least) on the use of well

8   stimulation treatments and pause issuing permits authorizing well stimulations

9   until completion of the NEPA analysis. *EDC v. BOEM*, 36 F.4th at 865–66.

10          The agency's subsequent environmental assessment contained several

11  substantial legal errors, so Plaintiffs again sued BSEE to challenge the inadequate

12  analysis, among other legal violations. *See id.* at 863, 866–67. The Ninth Circuit

13  held the environmental assessment unlawful, highlighting how it appeared to be a

14  post-hoc justification for a decision already made, failed to "give a meaningful

15  assessment of reasonable alternatives" and "disregarded necessary caution when

16  dealing with … unknown effects … and data gaps" for an activity intended "to

17  increase production and extend well life." *Id.* at 882 (holding BSEE should have

18  prepared an environmental impact statement).

19          In other words, BSEE's issuance of the Santa Ynez Unit lease extensions

20  (and its subsequent issuance of production permits after Plaintiffs filed this case) is

21  just the latest example of the agency's long-history of permitting oil and gas

22  activity off California without adequately examining the risks. Without much-

23  needed guidance from the Court on the challenged lease extensions, BSEE could

24  and almost certainly will again apply flawed analyses in its decision on remand.

This is especially true considering the remand would be conducted under a new administration that is openly hostile to environmental laws (including NEPA) and has professed an intent to implement policies enabling "[d]rill, baby drill," indicating that BSEE will only rubber-stamp its decisions once again. Monsell Decl. Ex. 9, at 1–2. Proceeding to the merits of Plaintiffs' claims would therefore serve the interests of efficiency.

## CONCLUSION

For the foregoing reasons, the Court should deny BSEE's Motion for Voluntary Remand.


Respectfully submitted this 10th day of January 2025,


/s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

21