UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) | Case No. LA CV 24-05459-MWC-MAA |
| | ) | |
| Plaintiffs, | ) | Los Angeles, California |
| | ) | |
| vs. | ) | Friday, March 21, 2025 |
| | ) | |
| DEBRA HAALAND, et al., | ) | (1:28 p.m. to 2:09 p.m.) |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

TRANSCRIPT OF FEDERAL DEFENDANTS' MOTION FOR VOLUNTARY
REMAND (DKT. 37)
BEFORE THE HONORABLE MICHELLE WILLIAMS COURT
UNITED STATES DISTRICT JUDGE

Appearances:                    See next page.

Court Reporter:                 Recorded; CourtSmart

Courtroom Deputy:               T. Jackson

Transcribed by:                 L. Caldwell
                                Echo Reporting, Inc.
                                9711 Cactus Street
                                Suite B
                                Lakeside, CA 92040
                                (858) 453-7590

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:

For the Plaintiffs:                  KRISTEN A. MONSELL, ESQ.
                                     Center for Biological
                                       Diversity
                                     2100 Franklin Street
                                     Suite 375
                                     Oakland, California 94612
                                     (510) 844-7137

For the Defendants:                  DANIEL LUECKE, ESQ.
                                     Department of Justice
                                     Environmental and Natural
                                       Resources Division
                                     150 M Street, Northeast
                                     Washington, DC 20002
                                     (202) 598-7863

                                     JANICE M. SCHNEIDER, ESQ.
                                     Latham and Watkins
                                     555 Eleventh Street, Northwest
                                     Suite 1000
                                     Washington, DC 20004
                                     (202) 637-2200

                                     DANIEL P. BRUNTON, ESQ.
                                     Latham and Watkins
                                     12670 High Bluff Drive
                                     San Diego, California 92130
                                     (858) 523-5400

3

 Los Angeles, California; Friday, March 21, 2025 1:28 p.m.

--o0o--

(Call to Order)

THE CLERK:  Calling Item Number 6, LA CV 24-05459, Center for Biological Diversity versus Debra Haaland.

Counsel, please state your appearance, starting with Plaintiff.

MS. MONSELL:  Should I go to the podium?

THE COURT:  Yes.  Thank you.

MS. MONSELL:  So many microphones to choose from.

Good afternoon.  Kristen Monsell for the Plaintiff.

THE COURT:  Thank you.

MR. LUECKE:  Good afternoon.  Dan Luecke for -- with the Department of Justice, for the federal Defendants.

THE COURT:  Good afternoon.

MS. SCHNEIDER:  Good afternoon, your Honor. Janice Schneider with Latham and Watkins on behalf of Defendant Intervenor Sable Offshore Corporation.

THE COURT:  Good afternoon.

MR. BRUNTON:  Good afternoon, your Honor.  Daniel Brunton of Latham and Watkins for Sable.

THE COURT:  Good afternoon.

UNIDENTIFIED SPEAKER:  Your Honor, I'm just a client.

4

THE COURT:  Good afternoon to you, as well.

Okay.  So today we have the federal Defendants' motion to remand to the Bureau of Safety and Environmental Enforcement.  I have reviewed all of the papers that were submitted in support of and in opposition to this motion.  I want to hear oral argument this afternoon, and then we'll issue a written ruling, most likely later this afternoon, after I have a chance to digest all of the arguments that have been made.

Let's start with the federal Defendants first, since you're the moving party, and I have some specific questions for you, as well.  So I'll let you get yourself situated at the podium, and then we'll get started.  Okay.  Ready?

MR. LUECKE:  Yes.

THE COURT:  Okay.

MR. LUECKE:  Unless you want to start with the questions, I'll just start talking.

THE COURT:  I have specific questions for you.  So I'm going to ask the questions first, and then I'll give you an opportunity to argue anything else that you would like to argue.

So, like I said, I did review everything that was submitted, so there is no need to reargue.  It's already in the papers.  I have some questions, though, about the

5

evidence that was filed in support of this motion, and in opposition to the motion, and the declarations that the BSEE filed focused primarily on potentially supplementing the analysis in its decision, but not -- it doesn't -- there's no indication that the BSEE intends to seriously reconsider or review its decision.

Can you address that, please.

MR. LUECKE:  Of course, your Honor, and I'll probably -- I'll refer to it as "Bessy."  That's what we tend to call it at DOJ.  So I would call the Court's attention to paragraph 12 of the original declaration we submitted, in which Mr. Hesson says:

"Remand without vacatur will keep the
2023 extension decision in place until
an analysis on remand is completed, at
which point it would either be
reaffirmed or withdrawn."

And I think my understanding of that sentence is that, at the conclusion of BSEE's reconsideration process, you know, where it revisited this decision with the more substantial NASA under NEPA and OCSLA (phonetic) that Plaintiffs are asking the agency to do, it would revisit the ultimate decision, and either withdraw the original extension or reaffirm it.  So I do think that is on the table as part of BSEE's process.

6

THE COURT: Okay. And, Ms. Monsell, I'm going to ask you to respond to that when I get to you.

The second question I have is that, in the motion, BSEE states that it would -- that it would permit additional activity at the Santa Ynez unit during the remand period of time. The record that I have before me includes a Form 8K report that was signed in December of 2024, which states that Sable suggested to investors that it plans to restart production in the first quarter of 2025, which is where we are right now.

How is that maintaining the status quo?

MR. LUECKE: Well, your Honor, I'm aware of that piece of evidence in the record. I do think -- this hasn't been put into the record because it's more recent, but, in Sable's latest 10K filing, they've actually moved their projected start date back from Q1 to Q2. I understand this is the second time they've moved back the start date, and I do think that's related to the fact that Sable hasn't completed its repair of the pipeline. It hasn't obtained final approval from the state at this point. There is an ongoing dispute with the California Coastal Commission about whether Sable needs additional permits at this time.

So I really think the approvals that Sable needs at this point are on the state side, not the federal side, really. I think there's very little, if anything, left for

BSEE to do in terms of approvals to allow Sable to do the limited restart on, I think, the two wells that it's planning to start on, and I think counsel for Sable will obviously be better equipped to, you know, speak to some of these things than I am, but that's my understanding.

So, at this point, it does not appear that a restart would be imminent, but I think, beyond that, the question really before the Court, I think, with respect to whether to grant the motion for voluntary remand and issue a stay or not is whether doing so would prejudice Plaintiffs' position.

THE COURT:  Okay.  Before -- I told you I have questions for you.

MR. LUECKE:  Sure.  Okay.

THE COURT:  So let's stick with what I need to know for purposes of trying to set the table here and then, like I said, I'll let you continue to argue, but I don't want to get off track --

MR. LUECKE:  Understood.

THE COURT:  -- because there are certain things that I am focused on right now.

Q2 starts in 10 days.  The briefing indicates, on one hand, that "There's no prejudice, because we're going to maintain the status quo," but you just told me that the status quo not be maintained during the remand period.

*Echo Reporting, Inc.*

8

MR. LUECKE:  No, I don't -- I didn't mean to say that, if that was what I -- what you took away from it.  I don't think it's clear at all.

THE COURT:  Well, you said that the wells would be restarted in second quarter of 2025, which is in 10 days.

MR. LUECKE:  Well, at some point in the second quarter of 2025, which is three months.  Sable has already moved back the anticipated start date twice.  I don't think that that projection is by any means certain.  My understanding from BSEE is that they're aiming to complete this reconsideration project in the next three months.

THE COURT:  Which is third quarter.  So, assuming that I take at face value what you're representing today, it would be restarted before the remand period is up.

MR. LUECKE:  No, your Honor, I don't think that's -- well, three months from today, I think, would still be the second quarter.  I don't think we've gotten into the second quarter yet.  So I believe three months --

THE COURT:  The second quarter starts in 10 days.

MR. LUECKE:  Right.  So it would be the tail end of the second quarter, and that's the outside point at which BSEE is anticipating finishing its reconsideration.  I think it's aiming for two to three months.  But, again, I think that, you know, in the meantime, Plaintiffs would have the ability to request relief from this Court if a restart did

9

become imminent, which, again, is highly questionable at this point.

So that is really the same position that they would be in if the Court didn't grant the motion that we're proposing, right, because the Court would still have jurisdiction.  It would still be able to consider Plaintiffs' request for emergency relief, if it needed that, and that would, in any event, be, I think, the same position that they'd be in under the status quo, because we wouldn't be able to get a merits decision on this case in the next three months.  I think that's quite unlikely, given the current stage.

THE COURT:  So it's the Government's position that, if this motion is granted, and Plaintiffs wanted to seek relief, that this Court would have jurisdiction to make an order?

MR. LUECKE:  Yes, your Honor.

THE COURT:  Okay.

MR. LUECKE:  Yes, if for no -- especially because they would still have -- we're only seeking remand of the first two claims, so there would still be, in any event, two claims that will be before the Court.  It would be stayed. The Court would still have jurisdiction.  We would not argue that they would be incapable of seeking such relief, if it was necessary.

10

THE COURT:  How can I issue an order if the case is stayed?

MR. LUECKE:  Well, I mean, I think your Honor would have the discretion to lift the stay for the purpose of addressing Plaintiffs' request for emergency relief, if that was warranted.

THE COURT:  Okay.  And the last question I have -- and I know that you want to -- there are some other issues that you want to argue, as well, but I'm -- the Court is concerned about the fact that BSEE has previously been informed of Plaintiffs' position concerning the lease extension decisions, and yet it failed to act.

For example, it is the Court's understanding that, six months prior to the November 2023 extension, that the Plaintiff in this case sent a detailed meet-and-confer letter opposing prior leasing extension decisions and pointing out that there were -- that the Plaintiff had issues with respect to the review process here.

Then, from what I understand, from Plaintiffs' -- and this is -- I'm getting this from Plaintiffs' briefs -- there was no response from BSEE, and now we're in litigation, and BSEE wants to basically redo its work to substantiate the decision that was made, despite the fact that it had six months to do so before the filing of this lawsuit.

11

MR. LUECKE:  Your Honor, that's correct.  BSEE did receive a detailed letter from Plaintiffs before this lawsuit started, and it didn't give the full consideration to the issues that Plaintiffs identified.  That's correct. I would just point out that intervening events or changes in the law aren't required for a court to grant voluntary remand.  I think --

THE COURT:  I understand what the law is.  That's why I want you to focus in on what I'm asking you.

MR. LUECKE:  Yes.

THE COURT:  I understand the case law.  Like I said, I thoroughly reviewed everything that was supplied to the Court, including the citations to the law that were included in them, but I have these specific questions.  I don't need you to tell me what the law is.

MR. LUECKE:  Understood, your Honor.  Well, like I said, you know, what you're saying is accurate.  I can't -- I wasn't involved with this process at that point.  I can't speak to why BSEE didn't address Plaintiffs' concerns at that time.  I can only speak to what BSEE is saying that it wants to do now, which is give a good faith look to the issues that Plaintiffs are identifying in their complaint, and to reconsider its 2023 extension decision, and I think we would submit that that's sufficient for the Court to grant our motion, but I can't explain away the fact that

12

BSEE received that letter and it didn't act on it.

THE COURT:  And does the Government have a position on how the Court should consider the fact that BSEE did have six months before the filing of this lawsuit to do exactly what it's saying it wants to do now, what impact that should have on the Court's consideration about whether or not this motion has been brought in good faith?

MR. LUECKE:  Well, your Honor, again, I think, you know, we've submitted the declarations that we've submitted. BSEE is committed to completing an EA, which is a higher level of an EPA review than the CADEX (phonetic) had originally prepared and is consistent with what Plaintiffs are asking it to do in this lawsuit.  It said it's going to look at oil spill risk.  It's going to look at impacts on air quality.  It's going to look at potential impacts on species in protected areas, cumulative impacts.  These are the issues that Plaintiffs have identified in their lawsuit.

So I think, you know, it's -- I can't tell the Court what exact, you know, weight or consideration it should give that -- what happened before this lawsuit began. I can only say that I think, given what the agency is saying now, it's really saying that it wants to do the analysis that Plaintiffs are asking it to do.  So it's -- I think that that weighs in favor of granting the motion, but, again, you know, I recognize that there is the history that

13

there is, and the Court should give it the consideration that it's due.

THE COURT: Thank you. And I've interrupted you several times when you wanted to start arguing about other issues, and so now the floor is yours --

MR. LUECKE: Thank you, your Honor, and I wasn't trying --

THE COURT: -- if you want it.

MR. LUECKE: What?

THE COURT: If you want it.

MR. LUECKE: If I want it. Right. Well, I wasn't trying to get us off track. You know, I just have an instinct sometimes to pivot to other things that I want to talk about, but I don't think I have a ton of points that the Court hasn't already digested, you know, from the briefing. I think we've said most of what we want to say on the papers.

I guess I would just want to briefly go through the main points, which are really -- I see this as a choice between, you know, whether the -- really, what's the most efficient way forward in this case? Should we allow BSEE to complete an analysis the core of which really is addressing the potential impacts of a restart of production, which are really the animating substantive concern that Plaintiffs have in all their NEPA claims?

14

You know, they're saying consistently, "BSEE needs to update its analysis here."  Well, that's what it's trying to do right now, and I understand Plaintiffs, you know, argue that, you know, they're not satisfied that this is guaranteed to address all their concerns, but I think, in any event, even if there were a merits decision, we wouldn't be guaranteed to see an outcome on reconsideration that addressed all of Plaintiffs' concerns.

So really the question is whether we should let BSEE finish this process, which, again, I think is anticipated to conclude in three months, meet and confer, see if Plaintiffs want to continue pursuing their claims, or perhaps amend them to narrow them, and then move forward with the record on BSEE's new decision, or just continue as things are, and risk the waste of judicial and party resources that could come from continuing to litigate claims that are based on a decision that is ultimately going to be superseded.

And I think maybe there is a middle ground here. You know, I think there's also room for, perhaps, the parties to keep working towards preparing the administrative record for Plaintiffs' two new claims that would not be on remand, so that that was ready to go at the conclusion of the remand process, in the event that they did want to continue pursuing those claims.  That might get things going

15

quicker, you know, on the uptake.

I really -- so I guess I just -- I'm trying to just explain the choice, and that it's really, I think, a choice between a more efficient option of ensuring that we don't get derailed midstream briefing claims that will become superseded, or just waiting for the appropriate amount of time to ensure that that doesn't happen.  So, thank you, your Honor.

THE COURT:  Thank you.

MR. LUECKE:  I'm happy to come back if there's any response that --

THE COURT:  Well, you're the moving party, so I am going to give you the last word after I hear from everyone, which, again, it's yours to accept or deny.

MR. LUECKE:  Thank you.

THE COURT:  Okay.  Ms. Monsell.

MS. MONSELL:  Thank you, your Honor.  The issues and the questions that your Honor is raising are precisely the reasons why we're opposed to this motion.  We filed this case to protect Plaintiffs' interests, ensuring that a restart of this project that's been shut down for nearly a decade, following a massive oil spill, doesn't restart unless and until there's a comprehensive analysis of the environmental impact of doing so, and an evaluation of reasonable alternatives, and Interior has given us nothing

16

to ensure that those interests will be adequately protected during the pendency of the remand.

While they have now said that they're going to be doing an environmental assessment, they've refused to use their authority to ensure that a restart does not occur while they're preparing that assessment, which shows to us that they don't have a substantial and legitimate concern with the underlying decision, and that the assessment will be just -- will be used as a mechanism to deprive us of getting the more meaningly relief that we're entitled to, and it also undermines the very purpose of the National Environmental Policy Act, which is to have agencies look before they leap so that they don't commit themselves to a particular course of action before analyzing what the impacts of that action will be, and we think it will just lead to more judicial inefficiency as well.

THE COURT:  Okay.  I don't have specific questions for you, other than what you heard me asking Mr. Luecke a little bit earlier.  So, unless you have anything else to add, I'm going to go back to him.

MS. MONSELL:  No -- actually, yes.

The one thing I would note -- and we did address this in the briefing, but I think what makes this case different than some of the cases in which courts have granted a motion for voluntary remand is that, in those

17

cases, such as the <u>Northern Alaska Center</u> case, the agency took steps to ensure that the underlying activity would not occur during the pendency of the remand, and they've refused to do so here.

THE COURT:  Right, which is why I was focused on the declarations that we have, and the other evidence that we have, because it seems to me that there is a plan to restart these projects as soon as possible, and that that makes this case very different from the other environmental cases that everyone has cited to.

MS. MONSELL:  I agree, your Honor.  And we'll just stand on everything if there's no further questions.

THE COURT:  Okay.

MS. MONSELL:  Thank you.

THE COURT:  Thank you.

Ms. Schneider, did you want to say anything before I go back to Mr. Luecke?

MS. SCHNEIDER:  If the Court permits, yes.

THE COURT:  Yes.  Go ahead.

MS. SCHNEIDER:  Thank you.  Thank you, your Honor. Your Honor, I have a number of points I'd like to share today.  First, we think that the question before the Court is a straightforward procedural one.  As the Government laid out, the question here is whether the Court should remand claims one and two only to the agency in the interests of

18

judicial efficiency and economy, when the agency has committed to doing an environmental assessment, as requested by the Plaintiffs under NEPA, and the Plaintiffs maintain all of their rights to protect all of their interests, and thus will not be prejudiced.

We think the answer to that question is yes, and that the Court should allow the agency to do the work that it has said it has committed to do, and which we understand is currently ongoing.  Sable purchased these assets in good faith, with the belief that the permits were all in good order, and has spent substantial sums of money to repair the assets.  The company has invested over a billion dollars at this point on the assets, and I want to just share what we've done to date, with the Court's permission.

Now, why the Plaintiffs have waited to the better part of 10 years to complain about these extensions to resume operations is anyone's guess, but we do believe strongly that it is far more efficient to allow the Government to do its work, and not have the parties briefing whether or not a categorical exclusion was the appropriate mechanism to be used, when the Government has already said, "We're going to do an environmental assessment," which is all that the Plaintiffs have asked for in their complaint. They've just said, "We want more NEPA review."  The Government is doing more NEPA review.

19

Now, let's talk a little bit about the status quo. We have a different perspective on what the status quo is. From our perspective, the status quo is that this is a unit that is authorized to produce.  It was producing, you know, all along, since the early '80s, and the only reason it got shut in was because there was a pipeline incident on a pipeline that, at the time, was operated by a different operator.

So Sable now has control over those assets, and is working to fix all of those assets, and make sure that they're in good working order, but with respect to the offshore, there is an already approved development and production plan in place.  There is an already approved unit agreement in place, and there is, of course, our leases that are already in place.  Our perspective is that the status quo is, we have the authorizations to resume production.  We have -- I think it's important for the Court to understand, we don't need any additional federal approvals at this point to restart production.  Okay?  And I believe -- and check with the Government, but I believe the Government agrees with us on that point.

So, from our perspective, the status quo is, we have the ability to restart.  There is no future -- there is no federal action for restart that is required, and there is no NEPA process that is required for restart.  It's just --

20

it's not like an actual, like, proposal.  Okay?  Because we have all of the authorizations.  It's important to point out that the development and production plan, the unit agreement, the leases, Plaintiffs haven't challenged any of those.  Okay?  So those are operative, and they are in place.

Sable is committed to the safe and responsible resumption of production at the Santa Ynez unit.  They would not have invested these huge sums of money just to take a chance.  Right?  So, just a little bit of what the company has done.  On the offshore, all of the equipment -- when the categorical exclusion was done, the facilities were in a preservation state, under a preservation plan.  All of the facilities had -- you know, they had no hydrocarbons in them.  They were all taken offline -- there was nitrogen in them, seawater in them -- you know, put in a safe state.

So that's why we think it was appropriate to do the categorical exclusion when the extension to resume production occurred, but now we have been working diligently with BSEE, the Coast Guard, the offshore regulators to make sure that all of the equipment is in an operation-ready state.  There have been regular inspections with BSEE and by BSEE, upgrades, facility maintenance.  The facilities are actually in excellent working condition, and so Plaintiffs' characterization of them as "aging" is just not accurate,

21

your Honor.

The company has completed integrity inspections, leak-tested things, pressure-tested things with the pipelines. They have looked at them inside and out. So they've done continuous cathodic protection surveys. They've done side-scan surveys. They've used in-line -- you know, inside in-line inspection tools. They've also hydrotested all of the pipelines, the emulsion and gas pipelines, well above the maximum operable pressure. So things are good. Over 1,500 devices have been tested on the offshore, down to the valves, costing enormous sums of money. All are in very good working order.

Now, the questions that you're asking about restart we think it's important to sort of put into context of the case law, and I'm not going to, you know, go through the case law, because I know the Court knows it, but we believe that if the Court were to consider somehow conditioning, you know, any sort of remand to affect Sable's ability to restart, that would, from a practical perspective, be like, well, one, an impermissible injunction, where the Plaintiffs have not filed the motion that they could file at any point in time, but, for reasons of their own, have chosen not to do it.

Also, we think it's important to recognize that any conditions on Sable, particularly if it prevents

22

restart, would, for all practical purposes, be like a remand with vacatur, which, as the Court knows --

THE COURT:  Right.  I don't think anybody's -- I don't -- this is the first I'm hearing about a remand with conditions.  I don't think anybody has even -- no one has proposed that we go down that road.

MS. SCHNEIDER:  Okay.  That sounds good to me.  I mean, I think I was concerned about, you know, these issues of, you know, should restart happen?  What, if restart is happening, should we take into the reconsideration?  So, if the Court is not inclined to offer any conditions, I'm good with that.

THE COURT:  Well, my focus is, and the reason I was asking those questions is, because, in my mind, what's before the Court right now is a motion for voluntary remand, period.

MS. SCHNEIDER:  Right.

THE COURT:  Nobody has asked for relief in the alternative.  So I think there are two options.  There's remand or not remand.

MS. SCHNEIDER:  Excellent.  I'm with you 100 percent on that, your Honor, and I think, from the question, if you look at the test for remand, the real question here is, are the Plaintiffs going to be prejudiced in any way?  And, at least as I see it, there's no difference in whether

23

the Court remands, for purposes of judicial efficiency.

You're going to -- we agree that you will continue to maintain your jurisdiction, and if they were to file a motion to try to enjoin activities, they would be able to bring that motion, and we would all be here again talking about whether it was appropriate or not, but, you know, the flip side of the coin is, if we just move forward with the case, they're in the same position.  Everything is moving forward.  We have our ability to restart, and they have their ability to protect their interests.

So, when you look at the two situations, should we let BSEE do the environmental analysis that Plaintiffs have said they want, and that BSEE has committed to doing, or not?  And I think that's the Court's choice here, because there's no difference in what the Plaintiff can do in either scenario, but, from a judicial economy perspective, there will be significant savings to letting the agency do an environmental review, which is all the Plaintiffs have asked for in their amended complaint.

THE COURT:  But the assumption that is implicit in that argument is that BSEE is not going to change its conclusion on review.

MS. SCHNEIDER:  Your Honor, agencies are entitled to a presumption of regularity.

THE COURT:  I know.  What I'm saying is that the

24

argument that you just made has an underlying assumption that there will be no change.

MS. SCHNEIDER:  Well, we hope there will be no change, but, obviously, we don't know that to be the case, and the Government has represented that they -- including in their declaration -- that they may approve the 2023 extension again, or they may deny the 2020 (sic) extension.

THE COURT:  Again, the underlying assumption is, if the -- if there is no difference between where we are today and where we would be if we remanded, then that -- the assumption is that there is no change in the decision. That's implicit in the argument that you just made.

MS. SCHNEIDER:  If I -- let me clarify, if I may, your Honor.  When I say there is no difference, what I'm talking about is no difference in the Plaintiffs' position in terms of being able to protect their interests.

THE COURT:  How so?

MS. SCHNEIDER:  Because they can file a motion for preliminary injunction in either scenario.

THE COURT:  But the basis of the decision is the approval in 2023 of these 16 leases.

MS. SCHNEIDER:  No, your Honor.  Let me just clarify, at least from our perspective.  The 2023 extension is an extension to resume operations under the leases.  It is not a lease extension.  I know the Plaintiffs

25

characterize it as that, but if the lease -- the 2023 extension to resume operations were invalidated, it doesn't invalidate the lease, and the Pit River case, as you know, is very clear about that.

THE COURT:  Okay.

MS. SCHNEIDER:  Okay.

THE COURT:  I interrupted you.  Do you have anything else?

MS. SCHNEIDER:  Yes.  I think, yes, just a couple of other points.  You know, timing obviously is very important to us.  I mean, there are a lot of equities that Sable has, as you know from our briefing.  Sable is working towards moving forward with restarting operations.  As counsel for the Government mentioned, we are still working through the process on the onshore.  We obviously will not be restarting on the offshore until we complete the process on the onshore, and there are a number of uncertainties related to that.

You know, we are still working through jurisdictional issues with the California Coastal Commission and Santa Barbara County, as well as landowner access issues.  We need to complete repairs.  We need to complete hydrotesting once the repairs are completed, and then the Office of the State Fire Marshal has to complete its review, and then, finally, approve a restart plan.

26

So all of that is going on on the onshore.  We cannot and we would not restart until we are able to safely and responsibly restart production on the offshore.  So timing is very significant to us.  Exxon Mobil can, at its option, take over the facilities at no cost to them if we don't restart before the beginning of -- before the end of the year, you know, before 2026.

So I think those are, you know, important considerations for the Court to take into consideration.  To the extent there are conditions being considered, we would suggest, if a remand is entered, that the Government be ordered to complete the environmental assessment within two to three months, so that way there is certainty around the timing of things, to minimize the potential for conflict.

THE COURT:  Again, this is the first, I think, I'm hearing about conditions.  Did anyone brief this issue?

MS. SCHNEIDER:  It has not been briefed, your Honor.

THE COURT:  Okay.  I didn't think so, but sometimes I miss things.

MS. SCHNEIDER:  No, no, no.  You're correct.

THE COURT:  Okay.

MS. SCHNEIDER:  You are correct.

THE COURT:  Okay.  I don't have any other questions.  Do you have anything else?

27

MS. SCHNEIDER:  No, I do not.  I appreciate your Honor hearing our perspective.

THE COURT:  Sure.  Thank you.

MS. SCHNEIDER:  Thank you.

THE COURT:  Information is good.

So, Mr. Luecke, before -- I did tell you I'm going to give you the last word, but I want to give Ms. Monsell an opportunity to respond to what Ms. Schneider just said, and then I'm going to give you the last word.  Okay.

MS. MONSELL:  Thank you, your Honor.  I appreciate that.  Just a couple of super-quick points.  I mean, I think one thing that was overlooked in the conversation just now is that we haven't just asked for additional NEPA analysis. We've asked for vacatur of the lease extension and a prohibition on any additional permitting unless and until the agency complies with the law, and, as the Pit River line of cases discussed, that when a lease extension gets vacated, so does any subsequent approvals that were made in reliance on that lease extension approval, and I think both vacatur and the declaratory relief that would come along with that are vitally important here, given the agency's history of just rubber-stamping operations at this facility and other oil and gas operations off California.

THE COURT:  Thank you.

MS. MONSELL:  Thank you.

28

THE COURT:  Okay.  Mr. Luecke gets -- you get the last word.  Excuse me.

MR. LUECKE:  Thank you.  Your Honor, I guess the only thing that I want to add as a final word is just, I note that Plaintiffs' counsel, when they were first up here, said briefly that, you know, granting the Defendants' motion would cause more judicial inefficiency, and then she kind of moved on.  She didn't really elaborate on why that is, and I just struggle to really see how that could be, because I just -- I look at the situation we're in, in which the case -- you know, Plaintiffs have moved to amend their complaint.

They've added two new claims.  We would need to lodge administrative records for those claims.  There could be litigation over the contents of those records.  I know that CBD takes the position that 7061 claims under the EPA don't require an administrative record.  The Government, as a general matter, disputes that.

So I foresee a fight over what the contents of the record for that fourth claim would be.  It's unclear how long that would take to resolve, and only then would we be able to move forward with merits briefing, which I'd imagine there would be cross, summary judgment motions from all three parties.  This being an EPA case, that's usually how they play out.  I just struggle to see any scenario in which

29

all of that gets done, or even mostly done, before BSEE finishes this reconsideration process, and if it doesn't, we're just -- we're in the situation where BSEE has a new decision, and Plaintiffs may or may not like it.

You know, they may or may not want to dismiss their claims or, you know, drop their lawsuit as a result, but it will be out there, and it will supersede that initial decision, and, you know, if we get halfway through merits briefing, or start merits briefing, it's just going to cause a big disruption if we have to file a motion to supplement the record and, you know, in order to argue that the original claims are moot now that there's a new decision. And so I just -- you know, again, I --

THE COURT:  But isn't this partly due to the litigation strategy that BSEE took in the first place by not responding to the meet-and-confer letter that was sent six months before the lawsuit?  All of this could have been avoided if they had -- if the agency had actually engaged in a meaningful meet-and-confer before the lawsuit was actually filed.

MR. LUECKE:  Your Honor, you know, that may be, and, again, I wasn't involved with the agency's process at that point.  I don't know what I would have advised them to do.  But we are where we are at, and the agency is undertaking this review.

30

So I guess I just -- you know, and, again, we're amenable to a middle-ground option in which the Court grants the motion for remand but doesn't say the case, allows the parties to keep moving towards submitting records for the new claims, something that just is the most efficient outcome for getting this case done. We just want to avoid a scenario in which we, you know, plow ahead full steam, and end up with a merits briefing process that gets derailed halfway through.

So I think I just want to make that clear, that this isn't -- we're not trying to kind of like make a bait-and-switch approach here that just sort of completely eliminates Plaintiffs' ability to get relief. We just -- we think, looking at the reality of the situation, it's just highly unlikely that they're going to get a merits decision before the reconsideration process plays out, in any event, in large part because of the fact that they've added these new claims that are going to prolong the life of the case.

THE COURT:  Okay.

MR. LUECKE:  Unless you have any more questions, that's all I have.

THE COURT:  I do not.

MR. LUECKE:  Thank you, your Honor.

THE COURT:  Okay.  Thank you all very much.  We are adjourned, and I will -- I'm going to issue a decision

31

this afternoon, so it will probably, hopefully, get posted to Pacer sometime over the weekend.  Okay?

UNIDENTIFIED SPEAKER:  Thank you.

THE COURT:  Thank you.

ALL:  Thank you, your Honor.

THE CLERK:  All rise.  This court is adjourned.

(Proceedings concluded.)

32

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/Lorraine Caldwell                    3/24/2025
Transcriber                             Date


FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.