Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No. 2:24-cv-05459-MWC-MAA |
| *Plaintiffs*, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DOUG BURGUM, et al., | Hearing Date: July 11, 2025 |
| *Defendants*, | Hearing Time: 1:30 p.m. |
| | Courtroom: 6A |
| SABLE OFFSHORE CORP., | Honorable Michelle Williams Court |
| *Intervenor-Defendant.* | United States District Judge |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on July 11, 2025, at 1:30 p.m., or as soon thereafter as they may be heard, Plaintiffs Center for Biological Diversity and Wishtoyo Foundation

will move this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56. The hearing will take place before the Hon. Michelle Williams Court in Courtroom 6A at the U.S. District Court for the Central District of California, located at 350 West First Street in Los Angeles, California, 90012. Plaintiffs move for summary judgment because there is no genuine dispute as to any material fact, and Plaintiffs are entitled to judgment as a matter of law.[1]

Plaintiffs seek an order declaring that Defendants Doug Burgum, Secretary of the U.S. Department of the Interior; the Bureau of Safety and Environmental Enforcement; and Bruce Hesson, Pacific Regional Director of the Bureau of Safety and Environmental Enforcement (collectively, BSEE) violated the Outer Continental Shelf Lands Act, National Environmental Policy Act (NEPA), and Administrative Procedure Act in issuing lease extensions for 16 offshore oil and gas leases in the Santa Ynez Unit. Plaintiffs also seek an order declaring BSEE violated NEPA and the APA in approving two applications for permits to modify to enhance production at the Santa Ynez Unit. Because BSEE's actions are unlawful, Plaintiffs seek an order declaring these decisions unlawful, vacating these decisions, and prohibiting BSEE from issuing any authorizations that facilitate or enable a restart of offshore oil and gas drilling at the Santa Ynez Unit until BSEE conducts new analyses.

In support of this motion, Plaintiffs are concurrently filing a memorandum of points and authorities, proposed order, and the declarations of Peter Galvin, Brady Bradshaw, Blake Kopcho, Mati Waiya, and Tevin Schmitt.

---

[1] Because the Court's review is based on the administrative record, there are no material facts in dispute. Therefore, Plaintiffs have not submitted a separate "Statement of Uncontroverted Facts" and responses. Local Rule 56-1 to 56-4; *see also* April 30, 2025 Joint Stipulation to Amend Scheduling Order. Dkt. No. 67 at 2.

Respectfully submitted this 2nd day of May 2025,

/s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org

/s/ *Miyoko Sakashita*
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org

CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

LEGAL BACKGROUND .................................................................................... 2

   I.  The Outer Continental Shelf Lands Act .................................................. 2

   II. The National Environmental Policy Act .................................................. 3

FACTUAL BACKGROUND ............................................................................... 5

STANDING ........................................................................................................... 8

STANDARD OF REVIEW .................................................................................. 8

ARGUMENT ......................................................................................................... 9

   I.  BSEE Unlawfully Issued the Lease Extensions ...................................... 9

     A. BSEE's National Interest Determination Fails to Consider Highly Relevant Factors ................................................................................. 9

     B. BSEE's Categorical Exclusion Review Is Improper ......................... 11

   II. BSEE Unlawfully Issued the APMs .................................................... 14

     A. There Is No Applicable Categorical Exclusion ................................ 14

     B. Extraordinary Circumstances Preclude a Categorical Exclusion ...... 15

       1. The APMs May Significantly Impact Public Health and Safety ................. 16

       2. The APMs May Significantly Impact Ecologically Critical Areas .............. 17

       3. The APMs May Significantly Impact Endangered Species ........................ 18

       4. The APMs May Have Unique or Unknown Risks ....................................... 20

   III. BSEE's Continued Reliance on the 1975 and 1984 EISs Is Unlawful ............... 20

THE COURT SHOULD VACATE BSEE's DECISIONS ............................... 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. Plains All American Pipeline*,

    Case No. 2:15-cv-04113 (C.D. Cal. Dec. 4, 2017) ........................................6

*ANR Storage Co. v. FERC*,

    904 F.3d 1020 (D.C. Cir. 2018).....................................................................13

*Blue Mountains Biodiversity Project v. Blackwood*,

    161 F.3d 1208 (9th Cir. 1998)..................................................................23, 24

*California v. Bureau of Land Mgmt.*,

    277 F. Supp.3d 1106 (N.D. Cal. 2017)....................................................11, 25

*California v. Norton*,

    311 F.3d 1162 (9th Cir. 2002) ..........................................................12, 14, 16

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,

    481 F.Supp.2d 1059 (N.D. Cal. 2007).........................................................15

*City of Port Isabel v. FERC*,

    111 F.4th 1198 (D.C. Cir. 2024) ..................................................................22

*Conservation Cong. v. Forest Serv.*,

    No. CIV-2:12-02416 WBS KJN, 2013 WL 2457481 (E.D. Cal. June 5, 2013) ............19

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,

    538 F.3d 1172 (9th Cir. 2008) ......................................................................11

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

    591 U.S. 1 (2020) ..........................................................................................24

*Drakes Bay Oyster Co. v. Jewell*,

    747 F.3d 1073 (9th Cir. 2014).......................................................................25

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,

    36 F.4th 850 (9th Cir. 2022)..................................................4, 14, 17, 19, 20

*Env't Prot. Info. Ctr. v. Carlson* (*EPIC*),
  968 F.3d 985 (9th Cir. 2020) ........................................................3, 4, 15

*Friends of the Clearwater v. Dombeck*,
  222 F.3d 552 (9th Cir. 2000) ...........................................................21, 23

*Friends of the Earth v. Laidlaw Env't Servs.*,
  528 U.S. 167 (2000) .............................................................................8

*Friends of the Inyo v. U.S. Forest Serv.*,
  103 F.4th 543 (9th Cir. 2024) ...........................................................4, 15

*Hall v. Norton*,
  266 F.3d 969 (9th Cir. 2001) ..................................................................8

*Humane Soc'y of the U.S. v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) ...............................................................24

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) .................................................................25

*Jones v. Gordon*,
  792 F.2d 821 (9th Cir. 1986) .................................................................16

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
  373 F.Supp 2d 1069 (E.D. Cal. 2004) .....................................................19

*Marsh v. Oregon Natural Res. Council*,
  490 U.S. 377 (1989) ...............................................................21, 22, 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................9, 12

*Nat'l Family Farm Coal. v. EPA*,
  960 F.3d 1120 (9th Cir. 2020) ..........................................................24, 25

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
  241 F.3d 722 (9th Cir. 2001) .................................................................20

*Nat'l Urban League v. Ross*,

   489 F.Supp.3d 939 (N.D. Cal. 2020)..................................................................10

*Pit River Tribe v. U.S. Forest Serv.*,

   469 F.3d 768 (9th Cir. 2006) ...........................................................................25

*Pollinator Stewardship Council v. EPA*,

   806 F.3d 520 (9th Cir. 2015) .....................................................................24, 25

*Robertson v. Methow Valley Citizens Council*,

   490 U.S. 332 (1989) .............................................................................................4

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*,

   481 F.2d 1079 (D.C. Cir. 1973).........................................................................4

*Sec'y of the Interior v. California*,

   464 U.S. 312 (1984) .............................................................................................2

*Siskiyou Reg'l Educ. Proj. v. U.S. Forest Serv.*,

   565 F.3d 545 (9th Cir. 2009) ...........................................................................8

*West v. Sec'y of Transp.*,

   206 F.3d 920 (9th Cir. 2000) ...............................................12, 13, 14, 15

**Statutes**

5 U.S.C. § 706(2) ...........................................................................................................8

5 U.S.C. § 706(2)(A)...................................................................................................24

5 U.S.C. § 706(2)(D)...................................................................................................24

16 U.S.C. § 410ff(6).....................................................................................................17

42 U.S.C. § 4331(a) .......................................................................................................3

42 U.S.C. § 4336b(1)......................................................................................................5

42 U.S.C. § 4336b(2)...............................................................................................5, 22

42 U.S.C. § 4336e(1)......................................................................................................4

43 U.S.C. § 1332(3) ................................................................................................2, 10

43 U.S.C. § 1332(4) .....................................................................................................10

43 U.S.C. § 1332(6) ........................................................................................... 10

43 U.S.C. § 1337(b) ............................................................................................. 3

43 U.S.C. § 1337(b)(2) ....................................................................................... 12

43 U.S.C. § 1802(2) ....................................................................................... 2, 10

43 U.S.C. §§ 1331–1356b .................................................................................... 2

**Regulations**

30 C.F.R. § 250.101 ............................................................................................. 3

30 C.F.R. § 250.1618 ........................................................................................... 2

30 C.F.R. § 250.180 ............................................................................................. 3

30 C.F.R. § 250.180(a)(2) .................................................................................... 3

30 C.F.R. § 250.180(d) ........................................................................................ 3

30 C.F.R. § 250.180(e) ........................................................................................ 3

30 C.F.R. § 250.410 ......................................................................................... 2, 3

30 C.F.R. § 250.465 ............................................................................................. 3

30 C.F.R. § 550.101 ............................................................................................. 3

30 C.F.R. § 550.281(a)(1) .................................................................................... 2

30 C.F.R. § 556.200 ............................................................................................. 3

30 C.F.R. § 556.308 ............................................................................................. 3

43 C.F.R. § 46.120(c) ..................................................................................... 5, 22

43 C.F.R. § 46.205(a) ............................................................................... 4, 14, 15

43 C.F.R. § 46.205(c)(1) .................................................................................... 16

43 C.F.R. § 46.215 ............................................................................................... 4

43 C.F.R. § 46.215(a) ............................................................................... 4, 13, 16

43 C.F.R. § 46.215(b) ..................................................................................... 4, 17

43 C.F.R. § 46.215(d) ..................................................................................... 5, 20

43 C.F.R. § 46.215(h) ..................................................................................... 4, 18

43 C.F.R. §§ 46.215(a)–(l) ................................................................................ 16

50 C.F.R. § 17.11 ...................................................................................................20

**Other Authorities**

516 DM § 15.4(C)(12) ...........................................................................................15

516 DM § 15.4(C)(6) .............................................................................................12

516 DM § 15.4(C)(7) .............................................................................................12

58 Fed. Reg. 12,864 (Mar. 5, 1993).......................................................................23

74 Fed. Reg. 1,937 (Jan. 14, 2009)........................................................................23

81 Fed. Reg. 20,058 (Apr. 6, 2016) .......................................................................23

81 Fed. Reg. 35,824 (June 3, 2016) ..................................................................16, 17

86 Fed. Reg. 21,082 (Apr. 21, 2021) .....................................................................23

89 Fed. Reg. 83,554 (Oct. 16, 2024).........................................................14, 18, 23

90 Fed. Reg. 10,610 (Feb. 25, 2025) ........................................................................4

# INTRODUCTION

Ten years ago, a pipeline carrying offshore oil ruptured, causing one of the largest oil spills in California's history. The spill fouled at least 150 miles of coastline, closed beaches and fisheries, and killed hundreds of birds and marine mammals. It also shut down drilling operations at the Santa Ynez Unit in the Santa Barbara Channel. Now Sable Offshore Corp. (Sable) is poised to resume operations, threatening our coast with yet another devastating oil spill, toxic air pollution, and many other harms inherent in offshore oil and gas drilling.

Defendants the Bureau of Safety and Environmental Enforcement, et al. (collectively, BSEE) rubber-stamped multiple decisions that enable this restart, flouting the mandates of the Outer Continental Shelf Lands Act (OCSLA) and National Environmental Policy Act (NEPA). Specifically, in November 2023, BSEE issued extensions for 16 oil and gas leases in the Santa Ynez Unit. The extensions were based on a faulty national interest determination under OCSLA and an arbitrary categorical exclusion review under NEPA. BSEE used inconsistent assumptions and failed to consider any of the environmental impacts from resuming the very oil and gas operations that the extensions facilitate.

Then, in September 2024—during the pendency of this litigation—BSEE issued two permits that allow enhanced oil production, also without conducting any environmental review under NEPA. Instead, BSEE relied on a categorical exclusion that is ill-suited to this unique situation and on NEPA analyses from 1975 and 1984, despite a slew of new information demonstrating that BSEE cannot reasonably continue to rely on these outdated, decades-old documents. Reviving the Santa Ynez Unit by patching up the corroded pipeline and restarting production warrants a robust environmental review.

BSEE has admitted that it based its decisions to issue the lease extensions on faulty analyses, and that it intends to prepare a new national interest determination under OCSLA and an environmental assessment under NEPA. Yet BSEE has refused to ensure a restart will not occur while it prepares these new analyses. This approach runs afoul of

1

both NEPA and the basic tenants of administrative law that require BSEE to examine the relevant data to reach a reasoned decision *before* an approval. BSEE also insists that issuing permits to enhance oil and gas production at this offshore platform—which has been offline for a decade following a massive oil spill—is merely a "routine" approval. But both the law and the facts show this situation is anything but.

Plaintiffs thus ask the Court to declare BSEE's actions unlawful, vacate those actions, and order the agency to prepare new analyses prior to taking further actions that enable a restart of offshore oil drilling at the Santa Ynez Unit. Only by wiping the slate clean can the agency reach an unbiased decision on how best to manage offshore oil and gas production at the Unit and avoid *post hoc* rationalizations for decisions it has already made. And until BSEE completes the required analysis, the public will continue to be left in the dark about the true dangers posed by this oil and gas operation.

## LEGAL BACKGROUND

### I.    The Outer Continental Shelf Lands Act

OCSLA establishes a framework under which the Secretary of the Interior may lease areas of the outer continental shelf for exploring and developing oil and gas deposits. 43 U.S.C. §§ 1331–1356b. OCSLA requires that oil and gas exploration and production be "subject to environmental safeguards," *id*. § 1332(3), and balanced "with protection of the human, marine, and coastal environments," *id*. § 1802(2).

OCSLA establishes four distinct stages to developing an offshore well: "(1) formulation of a 5-year leasing plan …; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). Prior to drilling a well, making modifications to an existing well, or changing a drilling plan, an oil and gas company must obtain approval of an Application for Permit to Drill or an Application for Permit to Modify (APM), respectively. 30 C.F.R. §§ 550.281(a)(1), 250.410, 250.1618.

As relevant here, an offshore lease can last beyond its initial five-year term if production occurs "in paying quantities" or an operator conducts approved drilling or

well reworking activities. 43 U.S.C. § 1337(b); 30 C.F.R. § 250.180(a)(2). Where
production has ceased on a lease that has continued beyond its primary term, the lease
will expire unless production resumes or BSEE approves a suspension of operations or
suspension of production within a year after production ceases. 30 C.F.R. § 250.180(d).
BSEE can also allow an operator more than a year to resume operations, but only when
it determines that "the longer period is in the National interest, and it conserves
resources, prevents waste, or protects correlative rights." *Id*. § 250.180(e).

The Secretary has delegated its responsibilities under OCSLA to two bureaus
within the Department of the Interior. The Bureau of Ocean Energy Management is
responsible for issuing five-year leasing plans, holding lease sales, and managing
production of oil and gas resources on the outer continental shelf. 30 C.F.R. §§ 550.101,
556.200, 556.308. BSEE is responsible for enacting and enforcing safety and
environmental standards, issuing lease extensions, and approving drilling permits,
including APMs. *Id*. §§ 250.101, 250.180, 250.410, 250.465.

## II.    The National Environmental Policy Act

In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity
on the interrelations of all components of the natural environment" and set out "to create
and maintain conditions under which man and nature can exist in productive harmony."
42 U.S.C. § 4331(a). To accomplish these goals, NEPA "requires that federal agencies
perform environmental analysis before taking any 'major Federal actions significantly
affecting the quality of the human environment.'" *Env't Prot. Info. Ctr. v. Carlson*
(*EPIC*), 968 F.3d 985, 988 (9th Cir. 2020) (citations omitted). This requirement helps
guarantee that: (1) agencies take a "hard look" at the environmental impacts of their
actions by ensuring they "will have available, and will carefully consider, detailed
information concerning significant environmental impacts;" and (2) "the relevant
information will be made available to the larger audience that may also play a role in

1  both the decision making process and the implementation of that decision." *Robertson v.*
2  *Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).[2]

3      To comply with NEPA, an agency can, depending on the circumstances, prepare
4  an environmental impact statement (EIS) or an environmental assessment, or it can
5  invoke a categorical exclusion. *EPIC*, 968 F.3d at 988. An EIS is the most
6  comprehensive review and is required for those actions that *may* have significant
7  impacts. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878–79 (9th
8  Cir. 2022). An environmental assessment is "less searching," and is often used to
9  determine whether an EIS is required. *EPIC*, 968 F.3d at 988. In contrast, a categorical
10  exclusion waives environmental review for "a category of actions that a Federal agency
11  has determined normally does not significantly affect the quality of the human
12  environment." 42 U.S.C. § 4336e(1). An agency may only rely on a categorical
13  exclusion that explicitly covers the action at issue, *see* 43 C.F.R. § 46.205(a), and where
14  there are no "extraordinary circumstances" that indicate that the action could have a
15  significant environmental effect, *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543,
16  547–48 (9th Cir. 2024) (citation omitted).

17      The Department of the Interior's NEPA regulations (which apply to BSEE) list
18  extraordinary circumstances that, if present, preclude the use of a categorical exclusion.
19  43 C.F.R. § 46.215; AR_0000427. Those circumstances include proposed actions that
20  may have significant impacts on, *inter alia*, "public health or safety," species protected
21  by the Endangered Species Act, or "such natural resources and unique geographic
22  characteristics as historic or cultural resources ... and other ecologically significant or
23  critical areas." 43 C.F.R. § 46.215(a), (b), (h). They also include actions that may have

24  ―――――――――――――
25  [2] The Council on Environmental Quality recently issued an interim final rule rescinding
    its NEPA regulations. *See* 90 Fed. Reg. 10,610 (Feb. 25, 2025). This has no effect on this
26  case as BSEE's duty to take a hard look at the impacts of its actions comes from the
    statute. *See, e.g.*, *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d
27  1079, 1091–92 (D.C. Cir. 1973) (discussing agency's duty to issue a "statement on a
28  project and to consider environmental factors at each stage of agency decision making").

4

"highly uncertain and potentially significant environmental effects" or "involve unique or unknown environmental risks," among others. *See id.* § 46.215(d).

NEPA also specifies the circumstances in which an agency can continue to rely on a previously prepared programmatic analysis. Specifically, an agency can continue to rely on such analysis "[w]ithin 5 years and without additional review of the analysis in the programmatic environmental document, unless there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis." 42 U.S.C. § 4336b(1). The agency can continue to rely on such analysis "[a]fter 5 years, so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid." *Id.* § 4336b(2); *see also* 43 C.F.R. § 46.120(c).

## FACTUAL BACKGROUND

There are 30 active oil and gas leases in federal waters off California. BSEE Answer to First Supp. and Am. Compl., Dkt. No. 59 ¶ 65 (admitting this fact). Sixteen of these leases constitute the Santa Ynez Unit in the Santa Barbara Channel, AR_0000422, which the Department of the Interior issued between 1968 and 1982, Dkt. No. 59 ¶ 66 (admitting this fact). There are three offshore production platforms in the Santa Ynez Unit: Platform Harmony, Platform Heritage, and Platform Hondo. *See id.* ¶ 67 (admitting this fact). Platform Hondo was installed in June 1976, Platform Harmony in June 1989, and Platform Heritage in October 1989. *Id.* Production began from these platforms between April 1981 and December 1993. *Id.*; AR_0000426.

Until recently, ExxonMobil owned and operated all three platforms. AR_0001936. Sable is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all the 16 oil and gas leases in the Santa Ynez Unit. *See* AR_0000088–90. The change of ownership follows a May 20, 2015 oil spill from an onshore pipeline (then owned by a different company) that transported oil drilled at the Santa Ynez Unit.

The pipeline ruptured and spilled at least 123,228 gallons of oil. AR_0016744.[3] Official
reports found that the spill killed at least 558 birds and 232 mammals, including 19
dolphins and 52 sea lions. AR_0028472, 28615. The spill likely killed a wide variety of
nearshore fish, including surfperch and grunion, which were spawning when the spill
occurred; and impacted a variety of coastal habitats including kelp wrack, feather boa
kelp, surfgrass, and eelgrass. AR_0028565–66, 28573–74. The spill also shut down oil
and gas drilling operations at the Santa Ynez Unit. Its platforms, pipelines, and wells
have now been "shut-in" (i.e., non-operational) for almost a decade. *See* AR_0000426.

Following the spill, BSEE issued a series of extensions for the leases in the Unit
that enabled Exxon, and now Sable, to keep those leases despite the lack of production.
BSEE issued the most recent lease extensions in November 2023. AR_0000422.

BSEE concluded that the issuance of the extensions is in the national interest.
AR_0000424. In so finding, "BSEE reviewed the statements made in ExxonMobil's
request" regarding the "sizable additional reserves" in the Unit's oil fields "and that the
infrastructure needed to continue producing those reserves has been in place since
1976." *Id.* BSEE then determined that continued production from this "infrastructure
would help meet the Nation's energy needs without the impacts associated with new
infrastructure … or exploration or development in unproven fields." *Id.* BSEE also
determined that "[c]ontinued production would likely benefit taxpayers through the
continued revenue streams derived from production…." *Id.* BSEE did not consider any
of the harms or risks of restarting production from this old infrastructure. *See id.*

BSEE relied on a categorical exclusion under NEPA to issue the lease extensions.
AR_0000426–28. BSEE based its categorical exclusion review on production being shut
down and ignored the impacts from restarting production and prolonged reliance on

---

[3] An export report estimates that the spill was actually 10,750 barrels (451,500 gallons).
*See* Rebuttal Declaration of Igor Mezić, Dkt. No. 399 ¶¶ 17, 24, *Andrews v. Plains All
American Pipeline*, Case No. 2:15-cv-04113 (C.D. Cal. Dec. 4, 2017).

aging infrastructure. *See* AR_0000429–30. BSEE's categorical exclusion review also
claimed that, if production resumed, "[a]ny cumulative effects from ongoing future
production … have already been examined through prior NEPA analysis." AR_0000429.

Then, in September 2024, BSEE approved two APMs for the Santa Ynez Unit.
The APMs allow Sable to perforate two wells, the primary purpose of which is to
"[e]nhance [p]roduction." AR_0000023, 30. BSEE approved the permits within four
business days of receiving them. *Id.* BSEE relied on a categorical exclusion to issue the
permits. AR_0000037–39, 40–42. In doing so, BSEE dismissed the potential impacts to
public health and safety by describing the activities as "[r]outine reservoir maintenance,"
and determined that the risks and effects of oil spills and any cumulative impacts from
production were evaluated "in previous environmental reviews." AR_0000038, 41. The
prior environmental review referenced was an EIS completed in 1984. AR_0000037, 40;
*see also* Dkt. No. 59 ¶ 147 (admitting BSEE continues to rely on 1975 and 1984 EISs in
approving activity).

That old 1984 EIS assumed recovery of the oil and gas reserves from the Unit
would occur "over a period of approximately 25 to 35 years." AR_0019168; *see also*
AR_0024746 (original Development and Production Plan for the Unit stating the same).
The EIS does not examine the impacts of production lasting longer than this timeframe,
including the increased risks from relying on infrastructure that has outlived its expected
lifespan. *See generally* AR_0019068–622; *see also* AR_0001881 (noting how the risk of
oil spills can increase as offshore infrastructure ages); AR_0012989 (same). Nor does the
EIS examine the harms from climate change or how drilling off California contributes to
overall greenhouse gas emissions. *See* AR_0020161 (noting that "[i]t has not been
ascertained exactly what quantitative effect [global warming] is having, if any."); *cf.*
AR_0009505 (2022 report summarizing harms from climate change); AR_0005471–73
(2016 study documenting how drilling in federal waters off California contributes to
overall greenhouse gas emissions). In other words, despite BSEE's contentions to the
contrary, no existing analysis examines the environmental impacts of (or reasonable

alternatives to) restarting production at the Santa Ynez Unit after a decade-long
shutdown following a major oil spill.

Before BSEE issued the 2023 lease extensions, Plaintiff Center for Biological
Diversity sent BSEE a letter detailing many of the harms of restarting the Santa Ynez
Unit, including increased greenhouse gas emissions that will exacerbate the climate
crisis; oil spills and the heightened risk of incidents from corroded infrastructure that has
outlived its expected lifespan; air pollution that harms local communities; light pollution
that can disorient and kill seabirds; and vessel strikes that can kill whales. AR_0001808–
23. The agency ignored the letter and all cited references in making its decisions.

## STANDING

Plaintiffs have standing to bring this case. As described in the attached
declarations, Plaintiffs' members have suffered concrete and particularized injuries that
are fairly traceable to BSEE's actions and will likely be redressed by a favorable
decision. *See Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000);
*see also Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (holding that NEPA's
procedural right reduces the burden of redressability, and a plaintiff need not show that
further analysis would result in a different conclusion). Declarations of Galvin,
Bradshaw, Kopcho, Waiya, Schmitt, Attach. 1–5.

## STANDARD OF REVIEW

The Court's review of BSEE's actions here are governed by section 706(2) of the
Administrative Procedure Act (APA). 5 U.S.C. § 706(2). Under the APA, the Court must
"hold unlawful and set aside agency action, findings, and conclusions found to be
arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," or
adopted "without observance of procedure required by law." *Id.*

The APA's standard of review "requires the court to engage in a substantial
inquiry, a thorough, probing, in-depth review." *Siskiyou Reg'l Educ. Proj. v. U.S. Forest
Serv.*, 565 F.3d 545, 554 (9th Cir. 2009) (cleaned up). An agency's decision is arbitrary
and capricious if it "relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**ARGUMENT**

## I.    BSEE Unlawfully Issued the Lease Extensions

BSEE's national interest determination and categorical exclusion review failed to consider several highly relevant factors—namely, the risks and harms from restarting production at the Santa Ynez Unit that issuance of the lease extensions directly facilitates. Indeed, BSEE admitted the flaws in its analyses in seeking to voluntarily remand these claims and cannot now defend them as reasonable. *See generally* BSEE Mot. to Vol. Remand, Dkt. No. 37.

### A.    BSEE's National Interest Determination Fails to Consider Highly Relevant Factors

BSEE's national interest determination looked only at the supposed benefits of resuming oil and gas production at the Santa Ynez Unit. *See* AR_0000424. This means that the agency ignored all the negative impacts of resuming offshore oil drilling at the Unit, thereby failing to consider highly important factors. *State Farm*, 463 U.S. at 43.

For example, despite the 2015 spill and available information indicating that another spill could occur from production at the Santa Ynez Unit, BSEE's national interest determination ignores such impacts. *See* AR_0000305 (federal agencies stating that they "anticipate that an oil spill up to 1,000 barrels [42,000 gallons] could occur" from the Santa Ynez Unit); AR_0028472 (summarizing natural resources costs of prior oil spill from pipeline transporting oil produced at the Santa Ynez Unit). BSEE also ignored the impacts from air pollution, despite evidence indicating that: before the Santa Ynez Unit shutdown, it was Santa Barbara County's largest facility source of greenhouse gas emissions, AR_0001809–10; drilling in federal waters off California contributes to overall greenhouse gas emissions, AR_0005471–73; and climate change is already

9

having, and will continue to have, harmful effects across the country, *e.g.*, AR_0013006; *see also* AR_0013093 (study noting that the U.S. has sustained 341 weather and climate disasters since 1980 that caused over $2.475 trillion in damages). Indeed, the National Intelligence Council has concluded that "climate change will increasingly exacerbate risks to US national security interests," AR_0013003, and the Department of Defense has described how "[i]ncreasing temperatures; changing precipitation patterns; and more frequent, intense, and unpredictable extreme weather conditions caused by climate change are exacerbating existing risks and creating new security challenges for U.S. interests." AR_0014159.

That the regulation does not expressly require BSEE to consider environmental harms is no excuse. "Whether an agency has overlooked an important aspect of the problem turns on what the relevant substantive statute makes important." *Nat'l Urban League v. Ross*, 489 F.Supp.3d 939, 982 (N.D. Cal. 2020) (cleaned up) (citation omitted).

Here, OCSLA makes consideration of environmental impacts an important issue. For example, OCSLA requires that BSEE ensure offshore oil and gas development is "subject to environmental safeguards," 43 U.S.C. § 1332(3), and recognizes "the need … to balance orderly energy resource development with protection of the human, marine, and coastal environments," *id.* § 1802(2). The statute also recognizes that offshore oil and gas activities "will have significant impacts on coastal and non-coastal areas of the coastal [s]tates, and on other affected [s]tates" and acknowledges "the national interest in the effective management of the marine, coastal, and human environments" in light of such impacts. *Id.* § 1332(4); *see also id*. § 1332(6) (stating that offshore oil and gas operations "should be conducted in a safe manner … to prevent or minimize the likelihood of … occurrences which may cause damage to the environment or to property, or endanger life or health.").

BSEE's decision recognizes that environmental impacts are a relevant factor for these lease extensions. As one example, BSEE concluded that resuming production at the Unit would "help meet the Nation's energy needs *without the impacts associated*

*with new infrastructure installations*" because the oil and gas would be produced from infrastructure that "has been in place since 1976." AR_0000424 (emphasis added). But the agency then ignored all of the harms from restarting production, including from relying on that nearly 50-year-old infrastructure, despite numerous scientific studies demonstrating that the risk of a spill significantly increases as infrastructure ages. *See, e.g.*, AR_0001881 (study noting the "dramatic increase in the probability of failure of a pipeline" after it reaches 20 to 25 years of age due to corrosion and that "[a]fter 20 years, the annual probability of failure rises very quickly to values in the range of 0.1 to 1."); AR_0012989 (study noting that "[m]ost of the equipment currently used in the offshore oil and gas industry is approaching the end of its useful life, and the possibility of equipment failing without significant warning is high"); *see also* AR_0002178, 2184 (listing 2015 and 2018 inspection reports of Platforms Hondo and Heritage noting widespread corrosion and other issues).

Numerous courts have held that an agency cannot look only at the benefits of a project while ignoring its costs. *See, e.g.*, *California v. Bureau of Land Mgmt.*, 277 F. Supp.3d 1106, 1122 (N.D. Cal. 2017) ("Without considering both the costs *and* the benefits of postponement of the compliance dates, the Bureau's decision failed to take this 'important aspect' of the problem into account and was therefore arbitrary."); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1181, 1198 (9th Cir. 2008) (holding that in conducting a cost-benefit analysis to establish fuel economy standards, the agency "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs of more stringent standards"). Yet that is just what BSEE has done here, rendering its national interest determination unlawful.

**B.    BSEE's Categorical Exclusion Review Is Improper**

BSEE unlawfully decided to categorically exclude the lease extensions for the Santa Ynez Unit from environmental review under NEPA. Without these extensions, the leases would have expired because they are beyond their primary five-year term and are

11

not producing oil. *See* 43 U.S.C. § 1337(b)(2); *California v. Norton*, 311 F.3d 1162, 1168 (9th Cir. 2002). BSEE's approvals thus "extend the life of oil exploration and production off of California's coast, with all of the far reaching effects and perils that go along with offshore oil production." *California v. Norton*, 311 F.3d at 1173. BSEE, however, never examined the environmental effects of restarting oil production at the Santa Ynez Unit after a decade of dormancy following a massive oil spill. Instead, BSEE's categorical exclusion review improperly assumed that the Santa Ynez Unit would remain shut down when determining that the lease extensions qualified for categorical exclusion.[4]

BSEE's assumption that the Santa Ynez Unit would remain shut down fatally flaws its categorical exclusion review. It is undisputed that BSEE's analysis "lacks sufficient discussion and support … and relies on overly conclusory statements, including regarding the infrastructure remaining idle." Hesson Decl., Dkt. No. 37-1 ¶ 9. Accordingly, BSEE's decision "entirely failed to consider an important aspect of the problem … [and] runs counter to the evidence." *State Farm*, 463 U.S. at 43; *see also West v. Sec'y of Transp.*, 206 F.3d 920, 929 (9th Cir. 2000) (noting that, in evaluating an agency's compliance with NEPA, "[t]he issue … is not just whether the [action] will cause a significant environmental impact, but whether the path taken to reach that conclusion was the right one in light of NEPA's procedural requirements").

The record shows that BSEE anticipated oil production to restart. Indeed, the entire point of the lease extensions were to give ExxonMobil "additional time in order to resume operations." AR_0000422; *see also* AR_0000866–67 (ExxonMobil's June 2023 quarterly report to BSEE describing recent restart efforts). The presumed dormant status of the Santa Ynez Unit lies in tension with the lease extension approval. BSEE's approval

---

[4] In its categorical exclusion review, BSEE flip-flops between invoking a categorical exclusion for a suspension of operations (U.S. Dep't of the Interior, Departmental Manual, 516 DM § 15.4(C)(6)) and a lease extension (516 DM § 15.4(C)(7))— presumably another clerical error. AR_0000426; *see also* Dkt. No. 37 at 8, n.2 (identifying "Freeport" as the leaseholder in a lease extension approval record).

contemplates resumed operations. The terms state that if the pipeline that ruptured in 2015 returns to service "before the expiration date of this approval, then ExxonMobil will have 60 calendar days … to restore production from the Santa Ynez Unit." AR_0000424. The shutdown assumption also contradicts BSEE's national interest determination, which relies on restarting operations and oil production. *Id*. BSEE's inconsistent position that the Santa Ynez Unit would remain shut down is arbitrary. *See e.g., West*, 206 F.3d at 929 (reversing the district court's approval of a categorical exclusion due to the contradiction that a congestion-relief highway project would have no traffic impact); *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) ("Because FERC's decision is internally inconsistent, it is arbitrary and capricious.").

BSEE's arbitrary approach to its categorical exclusion review means that it failed to ask the relevant questions about whether any extraordinary circumstances exist and ignored reasonably foreseeable harms from resuming production. For example, BSEE asserted an absence of public health impacts due to "no active oil and gas operations." AR_0000429. Yet, the lease extensions may "have significant impacts on public health," 43 C.F.R. § 46.215(a), by reactivating air pollution from the Santa Ynez Unit—formerly the county's largest facility source of greenhouse gas emissions, AR_0001810, and a source of numerous other harmful air pollutants, AR_0001144.

BSEE also concluded, by relying on the Santa Ynez Unit's inactivity, that endangered species and critical habitat would be unaffected. AR_0000430. However, record evidence shows that operations will increase vessel traffic in whale critical habitat and contribute to collisions with endangered blue and humpback whales. AR_0000309–10. Additionally, BSEE determined that the approvals have no significant effects on natural resources, cultural resources, or ecologically significant areas because "active oil and gas operations will be idled." AR_0000429–30. But offshore oil and gas activities inevitably cause oil spills that threaten wildlife. AR_0028472 (past oil spill killed hundreds of birds and marine mammals). An oil spill could also limit access to Chumash sacred sites, harm cultural resources, and damage the new Chumash Heritage National

Marine Sanctuary. AR_0028507; 89 Fed. Reg. 83,554, 83,565 (Oct. 16, 2024) (designating the sanctuary in waters off central California and noting that "oil spills from platforms and pipelines in this area … have caused significant environmental harm").

These are a few examples of how BSEE's exceptional circumstances analysis falls short. *California v. Norton*, 311 F.3d at 1178 ("concern for adequate justification of the categorical exclusion is heightened because there is substantial evidence in the record that exceptions to the categorical exclusion are applicable"). Such deficiencies likely explain why BSEE is preparing an environmental assessment that "will not assume that oil and gas operations will be idled during an extension period." Dkt. No. 37-1 ¶ 9. Yet BSEE's approach remains unlawful because NEPA requires environmental review *before* an agency acts. *See Envt'l Def. Ctr.*, 36 F.4th at 863, 882.

## II.  BSEE Unlawfully Issued the APMs

BSEE's reliance on a categorical exclusion to authorize the APMs—the purpose of which is to enhance production at the Santa Ynez Unit—violates NEPA. First, the agency's reliance on a categorical exclusion to avoid conducting an environmental analysis was improper because the categorical exclusion on which it relied does not apply to the decisions at issue. Second, even if the categorical exclusion applied to the actions at issue, the agency still illegally approved the permits in the face of extraordinary circumstances that precluded reliance on the categorical exclusion.

### A.    There Is No Applicable Categorical Exclusion

BSEE's reliance on a categorical exclusion to issue the APMs was unlawful because there is no applicable categorical exclusion to cover a project of this magnitude. As specified in Ninth Circuit case law, to invoke a categorical exclusion, that exclusion must exist in the first place and cover the relevant action at issue. *See West*, 206 F.3d at 927. BSEE's regulations also require an environmental assessment or EIS when an action does not meet the criteria for a listed categorical exclusion. 43 C.F.R. § 46.205(a). Such a rule makes sense because "when an agency applies [categorical exclusions] in a

way that circumvents NEPA's procedural requirements and renders the environmental impact of a proposed action unknown, the purpose of the exclusions is undermined." *Friends of the Inyo*, 103 F.4th at 556.

In evaluating BSEE's reliance on a categorical exclusion, the Court looks to its "itemized list of categorically excluded actions." *West*, 206 F.3d at 928. Where "the types of projects described" do not "approach[] the magnitude" of the project at issue, an agency's reliance on the categorical exclusion is unlawful. *Id.*; *see also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F.Supp.2d 1059, 1087 (N.D. Cal. 2007) (holding an agency's use of a categorical exclusion unlawful where it "had never before been used to justify projects of the scope or magnitude" of the action at issue).

While on their face the APMs here may fit within the categorical exclusions for the approval of an "Application for Permit to Drill" or "Sundry Notices," the exclusions cannot be read to apply to this rare situation of allowing drilling activity to restart a decade after a massive oil spill. That is particularly true considering the Development and Production Plan for the Santa Ynez Unit has no "mitigation measures," 516 DM § 15.4(C)(12), for restarting drilling activity after a 10-year shutdown following an oil spill, as such an event was not contemplated. *See generally, e.g.*, AR_0024713–25203, 17740–18164; *see also EPIC*, 968 F.3d at 991 (holding the plaintiffs were likely to succeed on their argument that an agency violated NEPA by invoking a categorical exclusion given the type and scale of the project at issue); *Friends of the Inyo*, 103 F.4th at 556–57 (rejecting an agency's attempt to combine two categorical exclusions to approve a proposed action where no one exclusion could cover the action alone).

BSEE's failure to prepare an environmental assessment or EIS prior to issuing the APMs "swallow[s] the protections of NEPA" and renders its issuance of the APMs arbitrary and capricious. *Friends of the Inyo*, 103 F.4th at 557; *see also* 43 C.F.R. § 46.205(a).

**B.    Extraordinary Circumstances Preclude a Categorical Exclusion**

Even if the permits fit within an existing categorical exclusion, the "extraordinary

circumstances" in this case preclude its use. *See California v. Norton*, 311 F.3d at 1170 ("When extraordinary circumstances are present, the agency must prepare environmental documentation despite the fact that the activity in question falls within a categorical exclusion.").

The Ninth Circuit has held that "the fact that the exceptions *may* apply is all that is required to prohibit use of the categorical exclusion." *Id*. at 1177 (emphasis added). If "*any* of the extraordinary circumstances" might apply, then "further analysis and environmental documents must be prepared for the action." *See* 43 C.F.R. § 46.205(c)(1) (emphasis added). That standard is easily met here. *See id*. § 46.215(a)–(l) (listing 12 extraordinary circumstances that preclude the use of a categorical exclusion).

BSEE's contrary conclusion cannot stand. An agency cannot avoid its NEPA obligations through mere assertions. *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) (citation omitted). Rather, the agency "must provide a reasoned explanation of its decision" that effects are insignificant. *Id.* BSEE failed to do so here, rendering its issuance of the APMs arbitrary and capricious.

> ### 1.    The APMs May Significantly Impact Public Health and Safety

Issuance of the permits may "[h]ave significant impacts on public health or safety." 43 C.F.R. § 46.215(a). Before drilling operations shut down, the onshore facilities that process oil and gas produced at the three platforms in the Santa Ynez Unit were a major source of several air pollutants, including volatile organic compounds (VOCs), carbon monoxide, and sulfur oxides. *See* AR_0001050. These pollutants cause a variety of health problems; for example, VOCs contribute to the formation of ground-level ozone (or smog), which is connected to aggravated asthma and premature death from lung and heart disease. 81 Fed. Reg. 35,824, 35,837 (June 3, 2016); *see also* AR_0012954–55 (summarizing harms of VOCs). VOCs also contain carcinogens. 81 Fed. Reg. at 35,837. Sulfur oxides such as sulfur dioxide also negatively affect public health: even short-term exposure can lead to bronchoconstriction and asthma symptoms. *Id.*

The Santa Ynez Unit was also a substantial source of Santa Barbara County's greenhouse gas emissions, contributing 55 percent of the County's facility emissions in 2014. *See* AR_0001809–10. Greenhouse gas emissions negatively harm public health and safety in numerous ways. *See, e.g.*, AR_0002021–2030 (study developing metric to "estimate[] the number of deaths caused by the emissions of one additional metric ton of [carbon dioxide]"); AR_0005329 (report describing public health impacts from climate change); 81 Fed. Reg. at 35,835 (explaining how greenhouse gas emissions "endanger public welfare."). These emissions are of particular concern given that the facility is not currently "subject to emission limits for [greenhouse gas emissions]." AR_0001050.

BSEE did not consider any of the harms from these emissions reoccurring, instead stating only that the "[a]ctivities will be conducted offshore under applicable safety and environmental regulations." AR_0000038, 41. This is insufficient.

### 2.    The APMs May Significantly Impact Ecologically Critical Areas

Issuance of the permits may also "[h]ave significant impacts on … ecologically significant or critical areas." 43 C.F.R. § 46.215(b). Indeed, the Ninth Circuit has recognized that the Santa Barbara Channel "is a unique and globally important ecosystem" with areas of "special designation, including the Channel Islands National Park and Marine Sanctuary," and "25 endangered species … present in the channel on a seasonal or permanent basis" that "rely on the entire Channel … for their survival and recovery." *Env't Def. Ctr.*, 36 F.4th at 880 (citations omitted). State and federal officials have described this area has having "one of the most diverse and abundant assemblages of marine organisms in the world." AR_0028500.

The Ninth Circuit has further recognized that the Channel "also has 'proximity to historic or cultural resources' including the submerged remains of the Chumash people" and that "Congress expressly designated the Channel Islands National Park to protect important cultural resources, including 'archaeological evidence of substantial populations of Native Americans.'" *Env't Def. Ctr.*, 36 F.4th at 880 (citing 16 U.S.C. § 410ff(6)); *see also* AR_0028507 (recognizing that "[a]long the Santa Barbara Channel,

the antiquity and density of Chumash occupation has led to a very large number of
archeological sites" and "[t]he archeological sites along the Gaviota coast demonstrate
an intimate use of coastal resources for subsistence of native people and their cultural
traditions through time."); 89 Fed. Reg. at 83,554 (recognizing that "[f]or more than
10,000 years, the productive and diverse ecosystems in the region have been essential to
the way of life of Indigenous Peoples in the region, in particular the Chumash, one of the
few ocean-going bands among the First Peoples of the Pacific Coast.").

The resumption of drilling at the Santa Ynez Unit could negatively impact these
important ecological and cultural areas in numerous ways, including oil spills. For
example, the 2015 oil spill injured and killed dolphins, AR_0028491, which are part of
the creation story of the Chumash people, AR_0028507–08. And an Endangered Species
Act consultation determined that continued oil and gas activity off Southern California is
likely to result in an offshore oil spill of 50–1,000 barrels (or 2,100–42,000 gallons).
AR_0000217.[5] Noise pollution from oil and gas activity can also harm these animals.
AR_0003743–44.

BSEE did not consider any of these impacts from restarting production. Instead, it
improperly asserted in an entirely conclusory manner that "[r]outine reservoir
maintenance activities … have little to no risk of a blowout which could result in an oil
spill" and will not have significant impacts on natural or cultural resources.
AR_0000038, 41.

### 3.    The APMs May Significantly Impact Endangered Species

BSEE's issuance of the APMs may also have significant impacts on species
protected under the Endangered Species Act. See 43 C.F.R. § 46.215(h). The National
Marine Fisheries Service (Service)—the agency with jurisdiction over marine species—

---

[5] This estimate assumes production of 0.226 billion barrels of oil. AR_0000217. Sable,
however, purports that it can recover up to 1 billion barrels. Sable Mot. to Intervene, Dkt.
No. 18-1 at 8. If Sable's number is correct, oil spill risk from the Santa Ynez Unit could
be substantially higher.

recently concluded that oil and gas drilling activity in federal waters off Southern California is likely to adversely affect the blue whale, fin whale, the Mexico and Central America humpback whale distinct population segments, the green sea turtle East Pacific distinct population segment, and black abalone. AR_0000122–23. The Service concluded that the adverse effects to the species would come from oil spills and collisions with oil and gas vessels. *See, e.g.*, AR_0000259 ("oil spills are likely to adversely affect … green sea turtles and black abalone."); AR_0000288, 347 ("some vessel collisions and mortalities [of whales and sea turtles] should be anticipated"). While the Service was evaluating the effects of all federal oil and gas activities off California, it is reasonable to assume at least some of these effects will be caused by activities at the Santa Ynez Unit, which comprises more than half the active leases in federal waters. Indeed, the Service determined that if a spill occurred from the Santa Ynez Unit, more than 30,300 black abalone could be injured and killed.

The finding that species protected by the Endangered Species Act are "likely to be adversely affected by oil spills" should be "*prima facie* evidence that" BSEE's reliance on a categorical exclusion was improper. *See Env't Def. Ctr.*, 36 F.4th at 879 (holding an agency's failure to prepare an EIS unlawful where the agency's environmental assessment determined protected species may be adversely affected by the action); *see also Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F.Supp 2d 1069, 1080–81 (E.D. Cal. 2004) (holding an agency's conclusion that action "may affect, is likely to adversely affect" species is "[a]t a minimum, … an important factor supporting the need for an EIS").

Courts have held an agency's use of a categorical exclusion arbitrary in situations where the agency's conclusions regarding harm to endangered species was less definitive than it is here. *See Conservation Cong. v. Forest Serv.*, No. CIV-2:12-02416 WBS KJN, 2013 WL 2457481, at *7–8 (E.D. Cal. June 5, 2013) (holding an agency's use of a categorical exclusion for a proposed project was arbitrary and capricious where the agency found the project may affect, but is not likely to adversely affect, the northern

spotted owl). AR_0000255–56; *see also* AR_0028506 (noting that the snowy plover, black abalone, and humpback whale were exposed to oil from the 2015 spill); 50 C.F.R. § 17.11 (documenting these three species as federally protected). BSEE ignored impacts to threatened and endangered species in its decision. *See* AR_0000039, 42.

### 4. The APMs May Have Unique or Unknown Risks

Issuance of the APMs also involves unique or unknown risks. *See* 43 C.F.R. § 46.215(d). Restarting an offshore oil and gas operation after a nearly 10-year shutdown following a massive oil spill is an unusual occurrence. The Ninth Circuit has held that "[a]n agency must prepare an EIS where uncertainty regarding the environmental effects of a proposed action may be resolved through further data collection." *Env't Def. Ctr.*, 36 F.4th at 880; *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001) ("lack of knowledge does not excuse the preparation of an EIS; rather it requires the [agency] to do the necessary work to obtain it.").

Yet BSEE did not identify, let alone consider, the potential complications of restarting production from long-idled wells, platforms, and pipelines that have already outlived their expected lifespan. *See* AR_0019168 (expecting "25 to 35 years" of production). Instead, BSEE stated in an entirely conclusory manner that the APMs had a low risk of oil spill and that "effects of an oil spill that may occur are well documented and have been evaluated in previous environmental reviews." AR_0000038, 41. But none of those analyses anticipated that the infrastructure would still be used beyond the expected life of the oil field or evaluated the risks and impacts of restarting following a 10-year shutdown of operations.

## III. BSEE's Continued Reliance on the 1975 and 1984 EISs Is Unlawful

BSEE not only improperly relied on categorical exclusions for its actions, it also violated NEPA by approving the lease extensions and APMs by relying on EISs prepared in 1975 and 1984 and failing to prepare any new or supplemental NEPA analysis of the impacts of restarting oil and gas activities from this old, post-spill, idled infrastructure.

For its lease extension decisions, BSEE claimed, without explanation, that any "cumulative effects from ongoing future production, in the event that production is ultimately restored, have already been examined through prior NEPA analyses." AR_0000429.[6] In its APM categorical exclusion reviews, BSEE summarily declared the activities "considered and evaluated" in the original Development and Production Plan (1982) and its 1984 EIS. The agency also asserted (without elaboration) that potentially significant environmental effects, unknown environmental risks, and cumulative impacts "have been evaluated in previous environmental reviews." AR_0000038, 41.

BSEE's reference to previous environmental reviews in its lease extension and APM decisions, and its plans to conduct an after-the-fact review of their adequacy with respect to the lease extensions, do not pass legal muster. Nor can they supplant the NEPA analysis that must occur before these actions are taken. Under NEPA, even if there is a prior EIS that may relate to the action at hand, agencies "cannot simply rest on the original document," and instead "must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval.'" *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 377, 374 (1989)).

In *Marsh*, the Supreme Court highlighted the critical informational and procedural purposes of NEPA before concluding it would be contrary to "the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action

---

[6] BSEE's reference to reviews (plural) indicates it is also relying on the even older 1975 EIS for Oil and Gas Development in the Santa Barbara Channel. *See* Dkt. No. 59 ¶ 146 (BSEE answer admitting this fact). BSEE's motion for a voluntary remand to correct the "potential deficiencies" of its analyses backtracks on its contention that effects had been examined when it committed to analyzing "the extent to which the potential impacts of resumed production may have already been analyzed under NEPA and to what extent any additional analysis is warranted." Dkt. No. 37-1 ¶ 9. This commitment comes too late.

simply because the relevant proposal has received initial approval." *Marsh*, 490 U.S. at 371. Courts "have generally required agencies to file [EISs] when the remaining governmental action would be environmentally 'significant.'" *Id.* at 372 (citations omitted). In such situations, supplementation "ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* at 371; *see also City of Port Isabel v. FERC*, 111 F.4th 1198, 1207 (D.C. Cir. 2024) (New information triggers supplemental NEPA when it "provides a seriously different picture of the environmental landscape." (citation omitted)).

These cases are consistent with the Department of the Interior's own NEPA regulations, which require that when relying on a previous NEPA analysis, the agency must determine "with appropriate supporting documentation" that the previous analysis:

> adequately assesses the environmental effects of the proposed action and reasonable alternatives. The supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.

43 C.F.R. § 46.120(c). Similarly, NEPA's 2023 amendments confirm the importance of ensuring that any analyses that are more than five years old and that an agency plans to rely on remain "valid." 42 U.S.C. § 4336b(2).

These requirements stand in stark contrast to BSEE's one-liner statements that impacts "have been evaluated in previous environmental reviews," which provide no analysis about the continued validity of these decades-old documents. AR_0000038, 41. BSEE's reliance on the 1975 and 1984 EISs is not otherwise supported by the record.

BSEE's decisions to enable the restart of oil and gas operations after a major oil spill and ten years of idled operations using a network of aged infrastructure present very different circumstances and a "seriously different picture" than decisionmakers faced in 1975 and 1984. Importantly, the "remaining governmental action" at issue here may affect, for example, oil spill risk, air quality, greenhouse gas emissions, species protected under the Endangered Species Act, cultural resources "in a significant manner or to a

significant extent not already considered," given the advanced age and compromised integrity of the infrastructure. *Friends of the Clearwater*, 222 F.3d at 557–78 (quoting *Marsh*, 490 U.S. at 374).

BSEE has never evaluated the impacts of extending the oil and gas leases beyond their expected lifespan, approving well perforation permits for expanded production, and restarting oil and gas operations at the Santa Ynez Unit ten years after an unanticipated, massive rupture of the onshore pipeline system idled the entire operation. Nor did previous analyses evaluate appropriate mitigation measures and alternatives for the well perforation and restart activities. Furthermore, the prior NEPA documents do not analyze the harms from greenhouse gas emissions from the Santa Ynez Unit, *e.g.*, AR_0009505, including new information demonstrating how drilling off California contributes to global greenhouse gas emissions. AR_0005471–73. The prior NEPA documents also do not analyze the impacts of restarting oil and gas activities on the species and critical habitats that have gained protections under the Endangered Species Act since 1984, or on the newly designated Chumash National Marine Sanctuary adjacent to the Santa Ynez Unit. *See, e.g.*, 89 Fed. Reg. at 83,554 (2023 rule designating the sanctuary); 86 Fed. Reg. 21,082 (Apr. 21, 2021) (designating critical habitat for certain humpback whale populations); 81 Fed. Reg. 20,058 (Apr. 6, 2016) (listing the East Pacific population of green sea turtle as threatened); 74 Fed. Reg. 1,937 (Jan. 14, 2009) (listing the black abalone as endangered and designating critical habitat); 58 Fed. Reg. 12,864 (Mar. 5, 1993) (listing the Pacific coast population of western snowy plover as threatened).

Even if BSEE had offered an explanation for its conclusion that an EIS conducted on a broad development plan over forty years ago covered these decisions (which it did not), the previous analyses in no way address the unique, unforeseen circumstances and impacts now at issue. In *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir. 1998), the Ninth Circuit addressed a similar situation when it held that a previously completed programmatic EIS did not "obviate[] the need for any future project-specific EIS, without regard to the nature or magnitude of a project." There, the

court found that the former EIS prepared for a Forest Plan, which contemplated logging projects, "does not, and could not, evaluate the impacts of" proposed timber salvage sales after an intervening catastrophic forest fire. *Id.* It ordered the agency to prepare a full EIS. *Id.* at 1216. The same is required here.

In sum, no previous NEPA analysis has examined the environmental impacts of restarting and prolonging oil and gas production activities at the Santa Ynez Unit after the passage of its expected lifespan and a major oil spill disaster. BSEE's failure to prepare a new (or at a minimum a supplemental) EIS on the lease extensions and APMs required for restart violates NEPA and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and made "without observance of procedure required by law" under the APA. 5 U.S.C. § 706(2)(A), (D).

### THE COURT SHOULD VACATE BSEE's DECISIONS

The Court should order the normal statutory remedy under the APA and vacate BSEE's lease extensions, APMs, and their accompanying categorical exclusion reviews. Vacatur is the presumptive remedy for agency actions held contrary to law. S*ee Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 9 (2020) (because an agency decision violated the APA, it "must be vacated").

While the Ninth Circuit has occasionally recognized exceptions to the default statutory remedy of vacatur, such exceptions are appropriate only in "rare," *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010), or "limited circumstances," *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted). To evaluate whether such rare circumstances exist, courts consider whether vacatur risks environmental harm. *See Pollinator*, 806 F.3d at 532. Courts also "'weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed.'" *Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1144 (9th Cir. 2020) (citation omitted). These factors warrant vacatur here.

First, vacatur would not cause any environmental harm. *Cf. Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (declining to vacate Endangered Species Act listing decision to prevent the "potential extinction" of a species). To the contrary, vacatur would prevent environmental harm and ensure the status quo is maintained while BSEE conducts the required analyses. *California v. Bureau of Land Mgmt.*, 277 F.Supp.3d at 1126 (vacatur warranted where it would "merely put the … parties back in the position" they were previously in).

Second, BSEE's errors are serious. The Ninth Circuit has held, for example, that an agency's "failure to comply with NEPA's timing requirements 'seriously imped[es] the degree to which [its] planning and decisions could reflect environmental values.'" *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 786 (9th Cir. 2006) (citation omitted). Given these "fundamental flaws," along with BSEE's failure to comply with OCSLA, vacatur is appropriate because it is "unlikely that the same [decision] would be adopted on remand." *Pollinator*, 806 F.3d at 532.

Any economic harm that could result from vacatur is not sufficiently disruptive to warrant remand without vacatur. *See, e.g.*, *Nat'l Family Farm Coal.*, 960 F.3d at 1145 (holding seriousness of agency's error "compel[led]" vacatur, despite resulting economic harm to innocent third-party stakeholders). While the Santa Ynez Unit leases could revert back to ExxonMobil if Sable does not restart production by a certain date, that is a situation of Sable's own making. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir. 2014) (recognizing that when a party "'anticipate[s] a pro forma result' in permitting applications, they become 'largely responsible for their own harm.'" (citation omitted)).

## CONCLUSION

BSEE's issuance of the lease extensions and APMs for the Santa Ynez Unit are arbitrary and capricious. The Court should vacate these unlawful actions and prohibit BSEE from issuing any authorizations to enable a restart until it conducts new analyses.

Dated:  May 2, 2025,                    Respectfully submitted,

                                        /s/ *Kristen Monsell*
                                        Kristen Monsell (CA Bar No. 304793)
                                        Email: kmonsell@biologicaldiversity.org

                                        /s/ *Miyoko Sakashita*
                                        Miyoko Sakashita (CA Bar No. 239639)
                                        Email: miyoko@biologicaldiversity.org

                                        /s/ *Julie Teel Simmonds*
                                        Julie Teel Simmonds (CA Bar No. 208282)
                                        Email: jteelsimmonds@biologicaldiversity.org

                                        CENTER FOR BIOLOGICAL DIVERSITY
                                        2100 Franklin St., Suite 375
                                        Oakland, CA 94612
                                        Phone: (510) 844-7137
                                        Fax: (510) 844-7150

                                        *Attorneys for Plaintiffs Center for Biological
                                        Diversity and Wishtoyo Foundation*

I, Julie Teel Simmonds, attest that all other signatories listed, and on whose behalf the
filings are submitted, concur in the filings' contents and have authorized the filings.

                            /s/ *Julie Teel Simmonds*