1  ADAM R.F. GUSTAFSON
2  Acting Assistant Attorney General
   United States Department of Justice
3  Environment and Natural Resources Division

4  DANIEL C. LUECKE (CA Bar No. 326695)
5  Trial Attorney, Natural Resources Section
   Ben Franklin Station, P.O. Box 7611
6  Washington, D.C. 20044-7611
7  Telephone:   (202) 598-7863
   Email:       daniel.luecke@usdoj.gov
8
9  *Counsel for Federal Defendants*

10              **UNITED STATES DISTRICT COURT**
11              **CENTRAL DISTRICT CALIFORNIA**
12                  **WESTERN DIVISION**

13  _____

14  CENTER FOR BIOLOGICAL          )
    DIVERSITY; WISHTOYO            )
15  FOUNDATION,                    )   Case No. 2:24-cv-05459-MWC-
                                   )   MAA
16         *Plaintiffs*,           )
17                                 )   **NOTICE OF MOTION AND**
           v.                      )   **CROSS-MOTION FOR**
18                                 )   **SUMMARY JUDGMENT**
    DOUG BURGUM, *et al.*,         )
19                                 )   Hearing Date: July 11, 2025
           *Federal Defendants*    )   Hearing Time: 1:30 p.m.
20                                 )   Courtroom: 6A
           and                     )
21                                 )   Honorable Michelle Williams
    SABLE OFFSHORE CORP.,          )   Court
22                                 )   United States District Judge
           *Intervenor-Defendant.* )
23                                 )
                                   )
24                                 )
                                   )
25                                 )
26  _____)

27

                              1

PLEASE TAKE NOTICE that, on July 11, 2025, at 1:30 p.m., or as soon thereafter as they may be heard, Federal Defendants Doug Burgum, in his official capacity as Secretary of the United States Department of the Interior, the Bureau of Safety and Environmental Enforcement ("BSEE"), and Bobby Kurtz, in his official capacity as Acting Pacific Regional Director for BSEE ("Federal Defendants") move this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1] The hearing will take place before the Honorable Michelle Williams Court in Courtroom 6A at the U.S. District Court for the Central District of California, located at 350 West First Street in Los Angeles, California, 90012. Summary Judgment for the Federal Defendants is warranted because the Court lacks jurisdiction to resolve Plaintiffs' claims and, in the alternative, Plaintiffs' claims fail on the merits based on the administrative record.[2]

In support of this motion Federal Defendants submit the attached Memorandum of Points and Authorities, the First Declaration of Bobby Kurtz and related Exhibits, and the Second Declaration of Bobby Kurtz and Declaration of Bruce Hesson.

Respectfully submitted this 30th day of May, 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General

---

[1] Doug Burgum and Bobby Kurtz have been substituted in as a Defendants for former Secretary of the Interior Debra Haaland and former Pacific Regional Director for BSEE Bruce Hesson pursuant to Fed. R. Civ. P. 25(d).

[2] Consistent with the Court's Order Granting the Parties' Joint Stipulation to Amend the Scheduling Order, "[t]he requirements of Local Rule 56-1 to 56-4 regarding the filing of a separate 'Statement of Uncontroverted Facts' and responses thereto shall not apply to this administrative record review case." ECF No. 69.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Environment & Natural Resources Division
U.S. Department of Justice

*/s/ Daniel C. Luecke*
DANIEL C. LUECKE
Trial Attorney, Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-7863
Email:        daniel.luecke@usdoj.gov

*Counsel for Federal Defendants*

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

DANIEL C. LUECKE (CA Bar No. 326695)
Trial Attorney, Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:   (202) 598-7863
Email:       daniel.luecke@usdoj.gov

*Counsel for Federal Defendants*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT CALIFORNIA
## WESTERN DIVISION

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WISHTOYO FOUNDATION,<br><br>   *Plaintiffs,*<br><br>  v.<br><br>DOUG BURGUM, et al.,<br><br>   *Federal Defendants,*<br><br>  and<br><br>SABLE OFFSHORE CORP.,<br><br>   *Intervenor-Defendant.* | Case No. 2:24-cv-05459-MWC-MAA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Honorable Michelle Williams Court<br>United States District Judge |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND...............................................................................1

    I.    The Santa Ynez Unit ................................................................1

    II.   The 2015 Spill, Preservation Plan, Quarterly Updates, and Extensions ................................................................................2

    III.  BSEE's 2023 Extension Decision and 2024 APM Approvals ............3

    VI.  BSEE's Environmental Assessment and Affirmation of its 2023 Lease Extension Decision ........................................................5

STATUTORY BACKGROUND ..........................................................................6

    I.    The Outer Continental Shelf Lands Act.....................................6

    II.   The National Environmental Policy Act.....................................7

LEGAL STANDARD...........................................................................................7

ARGUMENT ........................................................................................................8

    I.    Plaintiffs' Claims Are Moot in Light of BSEE's 2025 Lease Extension Decision, EA, and Sable's Completion of Its Well Reworking ................................................................................8

         1.    BSEE's 2025 Decision Supersedes the 2023 Decision and Moots Plaintiffs' First Two Claims ...........................................9

         2.    Sable's Completion of Its Well Reworking and BSEE's New Analysis Moot Plaintiffs' Claims Regarding the APMs ..................................................................................12

    II.   Plaintiffs' Challenge to the 2023 Extension Decision and 2024 APM Approvals Fails...................................................................15

         1.    BSEE's 2023 National Interest Determination Is Committed to Agency Discretion ...........................................15

i

2.    BSEE's Reliance on a Categorical Exclusion in 2023 Satisfied NEPA .......................................................... 19

3.    Plaintiffs' Challenge to the 2024 APM Approvals Lacks Merit ................................................................. 19

III.    BSEE Did Not Violate NEPA By Relying on Past Analyses ............. 22

IV.    If the Court Finds a Violation, Remand Without Vacatur is the Appropriate Remedy ........................................... 24

CONCLUSION ....................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abiding Place Ministries v. Newsom,*
   465 F. Supp. 3d 1068 (S.D. Cal. 2020) ............................................................. 10

*Alaska Wilderness League v. Jewell,*
   788 F.3d 1212 (9th Cir. 2015) ......................................................................... 23

*All. for the Wild Rockies v. Savage,*
   375 F. Supp. 3d 1152 (D. Mont. 2019) ............................................................ 24

*All. for the Wild Rockies v. United States Forest Serv.,*
   907 F.3d 1105 (9th Cir. 2018) ......................................................................... 24

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ........................................................................ 25

*American Rivers v. Nat'l Marine Fisheries Serv.,*
   126 F.3d 1118 (9th Cir. 1997) .................................................................... 9, 10

*AquAlliance v. U.S. Bureau of Reclamation,*
   No. 1:20-CV-00878 JLT EPG, 2024 WL 4754018 (E.D. Cal. Nov. 12, 2024) ... 12

*Audubon Soc'y of Portland v. Haaland,*
   40 F.4th 967 (9th Cir. 2022) ............................................................................. 7

*Bartell Ranch LLC v. McCullough,*
   No. 321-CV-00080-MMD-CLB, 2023 WL 1782343 (D. Nev. Feb. 6, 2023) .... 24

*Bayer v. Neiman Marcus Grp., Inc.,*
   861 F.3d 853 (9th Cir. 2017) ........................................................................... 12

iii

*Bowen v. Hood*,

   202 F.3d 1211 (9th Cir. 2000)...................................................................11

*California v. Norton*,

   311 F.3d 1162 (9th Cir. 2002)..............................................................6, 21

*Ceballos Padilla v. Garland*,

   854 F. App'x 127 (9th Cir. 2021) ........................................................23

*Center for Biological Diversity v. National Highway Traffic Safety Administration*

   *("NHTSA")*,

   538 F.3d 1172 (9th Cir. 2008)..........................................................17, 18

*Church of Scientology of Cal. v. United States*,

   506 U.S. 9 (1992) ......................................................................9, 16, 17

*Ctr. For Biological Diversity v. Lohn*,

   511 F.3d 960 (9th Cir. 2007)..............................................................9, 13

*Ctr. for Biological Diversity v. Salazar*,

   706 F.3d 1085 (9th Cir. 2013)......................................................7, 21, 23

*Didrickson v. U.S. Dep't of Interior*,

   982 F.2d 1332 (9th Cir.1992)..............................................................8

*Doe v. Schachter*,

   804 F. Supp. 53 (N.D. Cal. 1992) .......................................................17

*Dubbs v. C.I.A.*,

   866 F.2d 1114 (9th Cir. 1989)............................................................16

*Earth Island Inst. v. Elliott*,

   290 F. Supp. 3d 1102 (E.D. Cal. 2017)..........................................19, 20

*Earth Island Inst. v. Muldoon,*
  82 F.4th 624 (9th Cir. 2023)..................................................................21

*Env't Prot. Info. Ctr. v. Carlson,*
  968 F.3d 985 (9th Cir. 2020)..................................................................20

*Forest Guardians v. U.S. Forest Serv.,*
  329 F.3d 1089 (9th Cir. 2003)................................................................11

*Forsyth Cty. V. U.S. Army Corps of Engineers,*
  633 F.3d 1032 (11th Cir. 2011)...............................................................17

*Friends of Animals v. Silvey,*
  353 F. Supp. 3d 991 (D. Nev. 2018) .........................................................8

*Friends of the Inyo v. U.S. Forest Serv.,*
  103 F.4th 543 (9th Cir. 2024).................................................................20

*Fund for Animals v. Norton,*
  390 F. Supp.2d 12 (D.D.C. 2005) ....................................................11, 13

*Heckler v. Chaney,*
  470 U.S. 821 (1985) .............................................................................15

*Los Padres ForestWatch v. U.S. Forest Serv.,*
  2024 WL 4750504 (9th Cir. Nov. 12, 2024)...............................................7

*Los Padres ForestWatch v. U.S. Forest Serv.,*
  No. CV 22-2781-JFW (SKX), 2023 WL 5667533 (C.D. Cal. July 19, 2023) ......7

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) .............................................................................10

*Marsh v. Oregon Nat. Res. Council,*

v

490 U.S. 360 (1989) .................................................................................23, 24

*McFarland v. Kempthorne,*

545 F.3d 1106 (9th Cir. 2008)..................................................................8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*

463 U.S. 29 (1983) ...................................................................................18

*Mountain Cmtys. for Fire Safety v. Elliott,*

25 F.4th 667 (9th Cir. 2022)...............................................................19, 20

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior,*

275 F. Supp. 2d 1136 (C.D. Cal. 2002)....................................................11

*Native Vill. of Nuiqsut v. Bureau of Land Mgmt.,*

9 F.4th 1201 (2021) ........................................................................9, 12, 14

*North Carolina v. Rice,*

404 U.S. 244 (1971) .................................................................................13

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*

475 F.3d 1136 (9th Cir. 2007)...................................................................8

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.,*

117 F.3d 1520 (9th Cir. 1997)...........................................................4, 5, 8

*Occidental Eng'g Co. v. I.N.S.,*

753 F.2d 766 (9th Cir. 1985).....................................................................8

*ONRC Action v. Bureau of Land Mgmt.,*

150 F.3d 1132 (9th Cir. 1998).....................................................................7

*Pollinator Stewardship Council v. U.S. E.P.A.,*

806 F.3d 520 (9th Cir. 2015)....................................................................24

vi

*Poursina v. United States Citizenship and Immigration Services*,

  936 F.3d 868 (9th Cir. 2019) ................................................................16

*Preiser v. Newkirk*,

  422 U.S. 395 (1975) ................................................................................9

*Pub. Utilities Comm'n of State of Cal. v. FERC*,

  100 F.3d 1451 (9th Cir. 1996) ..............................................................14

*Salmon River Concerned Citizens v. Robertson*,

  32 F.3d 1346 (9th Cir. 1994) ..................................................................7

*Sec'y of Interior v. California*,

  464 U.S. 312 (1984) ................................................................................6

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,

  No. 23-975, 2025 WL 1520964 (U.S. May 29, 2025) ..............7, 8, 19, 22, 25

*Sierra Club v. Penfold*,

  857 F.2d 1307 (9th Cir. 1988) ..............................................................12

*Trujillo v. General Electric Co.*,

  621 F.2d 1084 (10th Cir.1980) .............................................................11

*Vera Chairez v. Mayorkas*,

  734 F. Supp. 3d 1093 (D. Idaho 2024) ..................................................16

*W. Energy All. v. Biden*,

  No. 21-CV-13-SWS, 2022 WL 18587039 (D. Wyo. Sept. 2, 2022) .................25

*Webster v. Doe*,

  486 U.S. 592 (1988) ..............................................................................15

*Western Watersheds Project v. McCullough*,

2023 WL 4557742 (9th Cir. July 17, 2023) ........................................24

**Statutes**

42 U.S.C. § 4332(C) ........................................................................38

42 U.S.C. § 4336b ......................................................................36, 38

42 U.S.C. § 4336e(11) ....................................................................37

43 U.S.C. § 1332(3) ........................................................................27

43 U.S.C. § 1334(a)(1) ....................................................................25

43 U.S.C. § 1344(a) ........................................................................27

43 U.S.C. § 1802(2) ........................................................................27

43 U.S.C. 1337(b)(4) ........................................................................7

5 U.S.C. § 704 ................................................................................15

5 U.S.C. § 706(1) ............................................................................37

5 U.S.C. §§ 701-706 ..................................................................10, 24

5 U.S.C. §§ 702 ..............................................................................15

50 U.S.C. § 403(c) ....................................................................24, 25

**Rules**

Fed. R. Civ. P. 65(d)(1)(C) ..............................................................14

**Regulations**

30 C.F.R. § 250.180(e) ......................................................2, 4, 6, 7, 8, 26

30 C.F.R. § 556.601(a) ......................................................................7

viii

43 C.F.R § 46.215 ..................................................................................................4, 34

43 C.F.R. 46.215(c) ...................................................................................................18

43 C.F.R. Part 46 .........................................................................................................9

90 Fed. Reg. 10610–16 (Feb. 25, 2025) .....................................................................9

**INTRODUCTION**

Plaintiffs' challenge to the Bureau of Safety and Environmental Enforcement's ("BSEE") 2023 approval of a lease extension and 2024 approval of well reworking activities at the Santa Ynez Unit ("Unit") fails for multiple reasons. First, BSEE has issued a new 2025 Decision that supersedes its 2023 lease extension decision, so Plaintiffs' first two claims are moot. Second, Plaintiffs' remaining claims are also moot given that the relevant well reworking activities are complete and BSEE has completed the analysis Plaintiffs request. Third, Plaintiffs' challenge to the national interest determination supporting the 2023 lease extension fails because that decision is committed to BSEE's discretion under the Outer Continental Shelf Lands Act ("OCSLA"). Lastly, BSEE properly relied on categorical exclusions to issue the relevant decisions, so Plaintiffs' claims under the National Environmental Policy Act ("NEPA") lack merit. The Court should thus grant summary judgment to Federal Defendants and deny Plaintiffs' motion.

**FACTUAL BACKGROUND**

**I.    The Santa Ynez Unit**

At issue in this case are sixteen federal oil and gas leases on the Outer Continental Shelf off the coast of Santa Barbara County in California. All sixteen leases were issued between 1968 and 1982 to Exxon Corporation (now ExxonMobil) or one of its predecessor entities. AR_0000422. The first discovery well was drilled in 1968, and in 1970, the sixteen leases were combined as a unit pursuant to the Unit Agreement. AR0027047–139. Production began in 1981 with three platforms (Hondo, Heritage, and Harmony) servicing the Unit. AR_0017086, AR_0017082, AR_0001461.

A Final Environmental Statement ("EIS") analyzing Exxon's initial proposed plan of development for the Unit was completed in 1974. AR_0025237–7046. In 1982, Exxon submitted an updated Development and Production Plan for

1

the Unit. AR_0025237-7046. An over 5,000-page EIS for that plan was completed in 1984. AR_0019068–24253. The leases in the Unit all continued beyond their primary term based on production in paying quantities, and production has occurred for decades without incident. AR_0000426.

## II.    The 2015 Spill, Preservation Plan, Quarterly Updates, and Extensions

In May 2015, one of the pipelines (Line 901) owned by Plains All-American Pipeline that transported oil from the onshore Las Flores Canyon Facility to downstream refineries ruptured and spilled approximately 2,934 barrels of oil into the surrounding area. AR_0015616. During the subsequent repairs, Line 901 and a similarly constructed downstream pipeline (Line 903) were removed from service, AR_000043, AR_0016743–53, and a federal consent decree was subsequently issued. AR_0015612–713. By June 2015, the Unit was "shut-in" (i.e., stopped producing) due to (1) the incident, (2) the pipelines going out of service, and (3) Exxon's onshore storage tanks reaching capacity. AR_0000418.

Without a means of transporting oil and gas from the Unit, Exxon was unable to resume production and requested a one-year extension under 30 C.F.R. § 250.180(e) for the Unit leases on November 19, 2015. AR_0017086–104. In December 2015, BSEE granted Exxon's extension request, supporting its decision with a categorical exclusion review under NEPA. AR0017076-78; AR0017082-85. BSEE's approval required Exxon to continue paying minimum royalties on its leases, apply for another lease extension if it appeared production would not be restored within a year, and provide BSEE with quarterly status updates on restoring production to the Unit. AR0017077. Exxon submitted timely quarterly updates to BSEE over the ensuing years. *See, e.g.*, AR_0016513, AR_0016576, AR_0016264, AR_0016237, AR_0016178, AR_0016000, AR_0015610, AR_0015491, AR_0015092, AR_0000982.

Following the 2015 extension, Exxon developed (and BSEE approved) a

Preservation Plan on February 12, 2016, to "ensure that the offshore facilities, including the wells, are properly monitored, inspected, and maintained so that they will be operationally and environmentally safe during the shut-in period and will be in fit condition when production can resume." AR_0016767; *see also* AR_0017045. BSEE conditioned its approval on both Exxon and BSEE continuing to test, inspect, and monitor the idled platforms and pipelines during the shut-in. AR_0016768–70. BSEE also required Exxon to submit quarterly reports detailing the status of the idled infrastructure. AR_0016769. Exxon timely submitted the reports over the ensuing years. *See, e.g.*, AR_0017072, AR_0016572, AR_0016229, AR_0016012, AR_0015967, AR_0015580, AR_0015139. Because Exxon continued to be unable to resume production at the Unit, BSEE approved additional annual lease extensions. AR_0015074, AR_0015142, AR_0015599, AR_0015970, AR_0016015, AR_0016247, AR_0016625, AR_0017076.

### III.    BSEE's 2023 Extension Decision and 2024 APM Approvals

As a result of the continued shut-in, Exxon requested another one-year extension of its Unit leases on October 19, 2023. AR_0000446–49. Exxon explained that the company's attempts to establish a means of transporting oil and gas produced at the Unit had so far been unsuccessful but emphasized the Unit's "sizable additional reserves." AR_0000446–49.

BSEE granted Exxon's request on November 14, 2023. AR_0000418–21. First, BSEE reviewed and concluded that the company's request met the criteria for a categorical exclusion. AR_0000418, AR_0000428. BSEE reasoned that Exxon's request qualified for the categorical exclusion applicable to "[a]pproval[s] of suspensions of operations and suspensions of production," which had also been applied in prior years. AR_0000426 (citing 516 DM 15.4 (C)(6)). And, as required, BSEE also considered whether the proposed action fell into any of the categories in 43 C.F.R § 46.215 that would indicate "extraordinary circumstances."

1  AR_0000427. BSEE's conclusion that no such circumstances existed was in large

2  part based on its conclusion that operations would remain idle and facilities would

3  be maintained pursuant to the Preservation Plan. AR_0000428–30. BSEE further

4  decided that granting the extension was "in the National interest" and would

5  "conserve[] resources, prevent[] waste, or protect[] correlative rights," as required

6  by 30 C.F.R. § 250.180(e). AR_0000420.

7        Sable became the sole leaseholder and operator on the Unit in February

8  2024. AR00000082-101. On September 19, 2024, Sable submitted two

9  Applications for Permit Modification ("APMs") that would allow it to rework two

10  of the Unit's wells by reperforating and adding new perforations to enhance future

11  production potential. AR_000023–35; *see also* AR_0000043–56. BSEE approved

12  the APMs on September 25, 2024, AR_000023–35, and, to comply with NEPA,

13  supported its decisions with categorical exclusion reviews. AR_0000037–42.

14  BSEE applied the categorical exclusion for the "[a]pproval of an Application for

15  Permit to Drill an offshore oil and gas exploration or development well, when said

16  well and appropriate mitigation measures are described in an approved exploration

17  plan, development plan, production plan, or Development Operations Coordination

18  Document." AR_0000037; AR_0000040 (citing 516 DM 15.4 (C)(12)). BSEE

19  further concluded that the proposed "[r]outine reservoir maintenance activities"

20  would not trigger extraordinary circumstances that would preclude application of

21  the categorical exclusion. AR_0000038–39; AR_0000041–42. Sable has now

22  completed the proposed well reworking activities proposed in the 2024 APMs.

23  Ex. 1 (End of Op. Reps.); First Decl. of Bobby Kurtz ("First Kurtz Decl.") ¶ 3.[3]

24

25  _____

26  [3] Because these reports and other attached documents are offered in relation to
    jurisdictional defenses, the Court may consider them here. *Nw. Env't Def. Ctr. v.*

27  *Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997).

1    In May 2025, Sable also began a limited resumption of production at the

2    Unit. *See* Notice of Recent Developments, ECF No. 73. Sable is currently

3    producing to onshore storage tanks at its Flores Canyon facility until it gains final

4    approval to operate its onshore pipeline. *Id.*[4]

5    **VI.    BSEE's Environmental Assessment and Affirmation of its 2023 Lease**

6    **Extension Decision.**

7    Consistent with its representations to this Court, ECF Nos. 37-1 & 60-1, on

8    May 29, 2025, BSEE completed its reconsideration of the 2023 Lease Extension

9    Decision. Ex. 2 (Lease Extension Environmental Assessment ("EA")); First Kurtz

10   Decl. ¶ 4; Ex. 3 (Lease Extension Finding of No Significant Impact ("FONSI"));

11   First Kurtz Decl. ¶ 5; Ex. 4 (BSEE Decision Letter ("2025 Dec. Ltr.")); First Kurtz

12   Decl. ¶ 6. In coordination with the Bureau of Ocean Energy Management

13   ("BOEM"), BSEE prepared an Environmental Assessment ("EA") to analyze

14   potential environmental impacts of granting, denying, or taking no action on the

15   lease extension, including those related to resuming oil and gas production. EA

16   10–23. The EA evaluates: (1) greenhouse gas emissions; (2) air quality; (3) benthic

17   resources; (4) fishes and essential fish habitat; (5) marine mammals and sea turtles;

18   (6) marine and coastal birds; (7) threatened and endangered species; (8)

19   commercial fishing; and (9) water quality; (10) marine protected areas, sanctuaries,

20   and reserves, and (11) oil spill risk, *id.* at 14–20, 24–46.

21   Based on its new analysis, BSEE concluded on May 28, 2025, that the

22   proposed lease extension would not significantly affect the quality of the

23   environment. FONSI 1–4. BSEE nonetheless imposed certain mitigation measures

24   and conditions on future activities, primarily to protect endangered species and the

25   _____

26   [4] Federal Defendants submit the attached Declaration of Bruce Hesson and Second
Declaration of Bobby Kurtz to further update the Court on the circumstances of

27   Sable's limited resumption of production.

environment to the maximum extent practicable. *Id.* at 5–6. Finally, on May 29, 2025, BSEE issued a new decision letter under 30 C.F.R. § 250.180(e) after reassessing its prior analysis, including its national interest determination. 2025 Dec. Ltr. 1–2. BSEE's analysis acknowledges environmental concerns related to reestablishing production at the Unit and affirms BSEE's 2023 decision to grant the extension based on the economic, energy conservation, and national security advantages of resuming production. *Id.* at Attach. 1.

## STATUTORY BACKGROUND

## I.   The Outer Continental Shelf Lands Act.

OCSLA governs leasing, exploration, development, and production of natural resources on the Outer Continental Shelf. 43 U.S.C. 1337(b)(4); *Sec'y of Interior v. California*, 464 U.S. 312 (1984). The primary term of an OCSLA oil and gas lease ranges from five to ten years, after which "the lease continues in effect so long as oil and gas are being produced in paying quantities or drilling operations are underway." *California v. Norton*, 311 F.3d 1162, 1168 (9th Cir. 2002) (citing 43 U.S.C. § 1337(b)(2)(A) & (B)); *see also* 30 C.F.R. § 556.601(a). If a lease is beyond its primary term and operations cease, an operator may apply for an extension to preserve their lease. 30 C.F.R. § 250.180(e). BSEE must then decide if granting the extension is "in the National interest" and "conserves resources, prevents waste, or protects correlative rights." *Id.*

If BSEE grants the request, the operator must either resume operations—meaning "drilling, well-reworking, or production in paying quantities"—or request another extension before the prior one expires. *Id.* § 250.180(a)(2), (d). "Workover operations mean the work conducted on wells after the initial completion for the purpose of maintaining or restoring the productivity of a well." *Id.* § 250.601. An operator may request approval to conduct well workover operations by submitting an APM and describing the work to be performed. *Id.* § 250.613.

**II.    The National Environmental Policy Act.**

NEPA is a "purely procedural" statute that "ensures that [] agenc[ies] and the public are aware of the environmental consequences of proposed projects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, No. 23-975, 2025 WL 1520964, at *5 (U.S. May 29, 2025). "NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 979–80 (9th Cir. 2022) (internal quotation and citation omitted). An agency may satisfy NEPA by preparing an EA "to determine whether a project will have a significant effect on the environment," *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994) (citing 40 C.F.R. § 1501.4).[5] And an agency may rely on a categorical exclusion for "classes of actions that [it] has determined do not 'have a significant effect on the human environment.'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (quoting 40 C.F.R. § 1508.4).

**LEGAL STANDARD**

The Court's review of Plaintiffs' claims under OCSLA and NEPA is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998). "Th[e] court is not required to resolve any facts" when adjudicating claims under the APA. *Los Padres ForestWatch v. U.S. Forest Serv.*, No. CV 22-2781-JFW (SKX), 2023 WL 5667533, at *6 (C.D. Cal. July 19, 2023), *aff'd*, 2024 WL

---

[5] As of April 11, 2025, the Counsel on Environmental Quality ("CEQ") regulations are no longer in effect. *Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10610–16 (Feb. 25, 2025). The Department of the Interior's regulations for implementation of NEPA are located at 43 C.F.R. Part 46.

4750504 (9th Cir. Nov. 12, 2024) (cleaned up). "Instead, the court simply determines 'whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1003–04 (D. Nev. 2018) (quoting *Occidental Eng'g Co.*, 753 F.2d at 769). Courts may, however, consider extra-record evidence "to determine whether [the plaintiffs] can satisfy a prerequisite to this court's jurisdiction." *Nw. Env't Def.*, 117 F.3d at 1528 (citing *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1340 (9th Cir.1992)).

Review under this standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted). And, in the NEPA context, the Supreme Court recently emphasized that "[c]ourts should afford substantial deference and should not micromanage . . . agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty.*, 2025 WL 1520964, at *8. An agency's decision will thus be overturned

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citation and internal quotation marks omitted).

## ARGUMENT

## I.    Plaintiffs' Claims Are Moot in Light of BSEE's 2025 Lease Extension Decision, EA, and Sable's Completion of Its Well Reworking.

The Court need not reach the merits of Plaintiffs' claims because they have become moot due to BSEE's new decision and developments at the Unit. "The

exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). Federal courts lack jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citations omitted). The party asserting mootness "carries the burden of establishing mootness." *Ctr. For Biological Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007).

"If an event occurs during the pendency of the appeal that renders the case moot, [the court] lack[s] jurisdiction." *Id.* Consequently, a plaintiff's claim becomes moot when an agency issues a new decision superseding the decision challenged in the complaint. *See American Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997) (dismissing claims as moot because "the biological opinion in the present case has been superseded by" a new biological opinion). Similarly, a claim is generally also moot when the approved action has been completed and "there is no relief [the court] can provide" to the plaintiff. *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1209 (2021).

Both of these scenarios apply here. BSEE's issuance of a new EA, FONSI, and 2025 Decision supersedes the 2023 lease extension decision and related analysis that Plaintiffs challenge in their first two claims. And Plaintiffs' remaining claims are moot as well because Sable has completed the work proposed by its 2024 APMs and BSEE has completed the analysis that Plaintiffs assert should have been conducted to approve the APMs.

### 1.    BSEE's 2025 Decision Supersedes the 2023 Decision and Moots Plaintiffs' First Two Claims.

Plaintiffs' first two claims must be dismissed because the agency action they challenge has been superseded by the 2025 Decision. The APA provides for review

of "final agency action" and thus requires that a plaintiff's challenge be directed at a discrete action. 5 U.S.C. § 704; *see also* 5 U.S.C. §§ 702, 706; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-883, 890-891 (1990). The discrete action at issue in Plaintiffs' first and second claims is BSEE's 2023 decision to extend the Unit leases, which Plaintiffs allege relied on an inadequate national interest determination and categorical exclusion review. First Suppl. and Am. Compl. ("Am. Compl.") ¶ 153, ECF No. 38-2; *id.* at ¶ 161; *see also id.* at p. 48. Because BSEE has issued the 2025 Decision affirming its extension of the Unit leases based on new information and analysis and with conditions of approval, Plaintiffs' claims no longer present a live controversy. *See American Rivers*, 126 F.3d at 1123; *see also Abiding Place Ministries v. Newsom*, 465 F. Supp. 3d 1068, 1072 (S.D. Cal. 2020) (case moot where new public health guidelines superseded challenged order, and complaint lacked sufficient nexus with plaintiffs' motion for injunctive relief).

There is no way to construe Plaintiffs' claims challenging the 2023 extension decision in a manner that would allow for effective judicial review or relief. The alleged defects with the 2023 decision are tied to the specific analysis BSEE used to support it—analysis that is now superseded. For example, Plaintiffs fault BSEE's national interest determination for "look[ing] only at the purported benefits of issuing the lease extensions," Am. Compl. ¶ 152, and take issue with "BSEE's reliance on a categorical exclusion" that did not consider "oil spills, water pollution, air pollution, and other harms associated with prolonging offshore drilling from aging infrastructure," *id.* at ¶158. And, perhaps most importantly, Plaintiffs allege that BSEE improperly assumed that "oil and gas activity would be idle" for the duration of the extension. *Id.* at ¶ 159.

BSEE's new analysis addresses all these issues. The national interest determination supporting BSEE's decision explicitly weighs the costs and benefits of extending the Unit leases. 2025 Dec. Ltr. at Attach 1. And BSEE has now

10

prepared an EA that considers "potential environmental impacts of near-term actions necessary to support a return to production," as well as impacts from "the three [Unit] platforms fully producing oil from existing wells." EA 10. In short, the "validity of" Plaintiffs' first two claims "necessarily rises or falls with the validity of" BSEE's 2023 Extension Decision and related NEPA analysis. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1096 (9th Cir. 2003). Because BSEE's 2025 Decision and analysis "do[] not contain the assumptions" supporting the 2023 decision, Plaintiffs' claims are now moot. *Id.* (dismissing claim based on superseded biological opinion).

Finally, there can be no doubt that BSEE possesses the authority to reconsider its 2023 decision. "[A]dministrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1141 (C.D. Cal. 2002) (quoting *Trujillo v. General Electric Co.*, 621 F.2d 1084, 1086 (10th Cir.1980)). Here, upon reviewing its prior analysis, BSEE determined that Plaintiff Center for Biological Diversity's February 23, 2023, letter, AR_0001824–15009, opposing further extending the Unit leases "trigger[ed] an extraordinary circumstance" requiring a higher level of environmental analysis. EA 3 (citing 43 C.F.R. 46.215(c)).[6]

Plaintiffs may challenge BSEE's 2025 Decision if they believe it to be flawed, but they must do so in a new lawsuit. *See Fund for Animals v. Norton*, 390 F. Supp.2d 12, 15 (D.D.C. 2005) ("While plaintiffs' motion is styled as one to 'enforce' the Court's . . . 2003 Order, it is in essence a challenge to the [agency's]

---

[6] That BSEE ultimately chose to affirm its original decision after conducting additional analysis is also of no consequence. *See Bowen v. Hood*, 202 F.3d 1211, 1219 (9th Cir. 2000) ("It can hardly be doubted that an agency is free on remand to reach the same result by applying a different rationale." (cleaned up)).

1    2004 [rule] – not the 2003 [rule] that was the subject of the [Court's] 2003 Order. .

2    . .  Consequently, the proper avenue for plaintiffs' arguments is a new lawsuit

3    squarely challenging the validity of the 2004 [rule]."). Here, however, their current

4    claims challenging the 2023 lease extension decision are moot.

5        **2.    Sable's Completion of Its Well Reworking and BSEE's New**

6            **Analysis Moot Plaintiffs' Claims Regarding the APMs.**

7        Plaintiffs' remaining claims challenging BSEE's 2024 APM approvals are

8    also moot based on two developments: (1) Sable's completion of its well

9    reworking activities, and (2) BSEE's issuance of a new EA that considers the

10   effects of continued oil production at the Unit. These developments show that there

11   is "no effective relief [the] court can provide" for Plaintiffs' claims. *AquAlliance v.*

12   *U.S. Bureau of Reclamation*, No. 1:20-CV-00878 JLT EPG, 2024 WL 4754018, at

13   *3 (E.D. Cal. Nov. 12, 2024) (quoting *Bayer v. Neiman Marcus Grp., Inc.*, 861

14   F.3d 853, 862 (9th Cir. 2017)).

15       First, Plaintiffs' request for vacatur of the APMs would have no effect

16   because the work the authorized has already occurred. *See* End of Op. Reps. It is

17   simply not possible to un-perforate or un-modify the now modified portions of the

18   two relevant wells. AR_0000037; AR_0000040; *see Native Vill. of Nuiqsut*, 9

19   F.4th at 1209 ("The only lasting physical features of the 2018–2019 exploratory

20   drilling are the capped wells, but there is no indication that ConocoPhillips could

21   undo the drilling of those wells."); *Sierra Club v. Penfold*, 857 F.2d 1307, 1318

22   (9th Cir. 1988) ("The impacts of the Plan mines are not remediable since we

23   cannot order that the Plans be 'unmined.'"). Plaintiffs' request that the Court

24   vacate the APMs would thus no longer provide meaningful relief. Am. Compl. 48;

25   Pls.' Notice of Mot. and Mot. for S.J. ("Pls.' Br.") 25, ECF No. 68.

26       Second, while Plaintiffs also ask the Court to enjoin future "authorizations to

27   enable a restart until [BSEE] conducts new analyses," this also would not provide

12

1  effective relief because Plaintiffs' own condition for lifting the injunction has

2  already been satisfied.[7] Pls.' Br. 25. Plaintiffs argue that "BSEE's failure to

3  prepare an environmental assessment or EIS prior to issuing the APMs . . . renders

4  its issuance of the APMs arbitrary and capricious." *Id.* at 15. But BSEE *has* now

5  issued an EA analyzing the impacts of resuming production at the Unit, including

6  those related to future "well maintenance activities" that "require the operator to

7  submit an Application for Permit Modification (APM)." EA 13. Indeed, Plaintiffs'

8  theory for challenging the 2023 APM approvals focuses entirely on how they

9  allegedly facilitate a restart of operations and ignores the specific well reworking

10  activities Sable proposed. Pls.' Br. 16–20 (arguing that BSEE needed to consider

11  effects related to restarting oil and gas operations and production related to air

12  pollution, vessel collisions, oil spills, and other issues). The analysis contained in

13  BSEE's new EA thus addresses the issues currently before the Court arising from

14  BSEE's 2024 APM analysis. *See, e.g.*, EA 14–19 (oil spill); *id.* at 27–30 (air

15  quality); *id.* at 32–44 (marine species).

16      While Plaintiffs may urge the Court to ignore BSEE's new analysis because

17  it did not exist in 2024, this would be legal error. *See North Carolina v. Rice*, 404

18  U.S. 244, 246 (1971) (per curiam) (cognizable cases must entail "specific relief

19  through a decree of a conclusive character, as distinguished from an opinion

20  advising what the law would be upon a hypothetical state of facts") (cleaned up).

21  Even if BSEE's new analysis were irrelevant to the merits of Plaintiffs' APM

22  claims, the analysis necessarily bears on the availability of equitable relief. There

---

[7] Plaintiffs also lack standing to seek an injunction against future authorizations
related to resuming production, since such actions are not at issue in this suit. *See
W. Energy All. v. Biden*, No. 21-CV-13-SWS, 2022 WL 18587039, at *6 (D. Wyo.
Sept. 2, 2022) (rejecting claim where, "at the time [the petitioners] filed their
petitions for review, no final agency action exists in the administrative record
concerning second-quarter lease sales").

13

is no purpose in imposing an injunction so that BSEE can complete analysis it has already done. *See Lohn*, 511 F.3d at 964 (finding case moot where declaring policy unlawful would "service no purpose").[8]

Finally, no exception to the mootness doctrine applies here. Under "exceptional circumstances," courts may decide a case that is "otherwise moot . . . if it presents an issue that is capable of repetition while evading review." *Pub. Utilities Comm'n of State of Cal. v. FERC*, 100 F.3d 1451, 1459 (9th Cir. 1996) (internal quotation omitted). This exception only applies if the plaintiff can demonstrate that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* (internal quotation and citation omitted). With respect to the second requirement, the question in NEPA cases is "whether the environmental report at issue is confined to the challenged action only, or whether the agency will use that same report in approving a future project." *Native Vill. of Nuiqsut*, 9 F.4th at 1210. In *Native Village of Nuiqsut*, which similarly involved an oil and gas drilling project, the Ninth Circuit held that the claim was not capable of repetition in large part because the agency had issued new environmental analysis and would not continue tiering to the analyses that gave rise to the lawsuit. *Id.* at 1211–14. The same reasoning applies here. Now that BSEE has issued the Unit Lease Extension

---

[8] In addition, now that BSEE has analyzed the potential effects of restarting production at the Unit, any injunction based on its 2024 APM approvals would be impermissibly vague in its requirements. *See* Fed. R. Civ. P. 65(d)(1)(C) (providing that an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"). BSEE has now issued an analysis addressing Plaintiffs' concerns in this case about restarting activity at the Unit without an EA or EIS. To the extent Plaintiffs take issue with BSEE's analysis in the EA, they must challenge that analysis in a new lawsuit.

EA, future APM reviews will incorporate or tier from this new analysis for resumed production. Plaintiffs' challenge to BSEE's past APM approvals and associated environmental reviews is therefore moot.

## II.    Plaintiffs' Challenge to the 2023 Extension Decision and 2024 APM Approvals Fails.

Even if Plaintiffs' claims were not moot, they fail on the merits.

### 1.    BSEE's 2023 National Interest Determination Is Committed to Agency Discretion.

Plaintiffs' disagreement with BSEE's 2023 determination that a lease extension was in the national interest does not amount to a viable legal challenge because the Court lacks a meaningful standard to judge BSEE's decision. The APA's grant of judicial review does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701. Consequently, "even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Courts have repeatedly recognized that statutory language calling for consideration of the national interest imparts great discretion to the executive decisionmaker. In *Webster v. Doe*, the Supreme Court held that a statutory provision "exude[d] deference," 486 U.S. 592, 600 (1988), where it allowed an employee's termination whenever the agency Director "shall *deem* such termination necessary or advisable in the interests of the United States," *id.* (quoting 50 U.S.C. § 403(c)) (emphasis in original). As the Court explained, "[s]hort of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests, we see no basis on which a reviewing court could properly assess an Agency termination decision." *Id.* The Ninth Circuit took a similar view in

*Poursina v. United States Citizenship and Immigration Services*, holding that a statute did not allow APA review because the "invocation of the 'national interest' is a core example of a consideration that lacks a judicially manageable standard of review." 936 F.3d 868, 871 (9th Cir. 2019); *see also Dubbs v. C.I.A.*, 866 F.2d 1114, 1121 (9th Cir. 1989) (Executive Order stating that "security approval of industrial employees must be 'clearly consistent with the national interest'" did not provide "any law for a court to apply").

Here, OCSLA provides that the Secretary shall issue regulations that allow "for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit . . . at the request of a lessee, in the national interest, to facilitate proper development of a lease or to allow for the construction or negotiation for use of transportation facilities." 43 U.S.C. § 1334(a)(1). The associated BSEE-administered regulation states that, to approve a lease extension request, the Regional Supervisor "must determine that the longer period is in the national interest, and it conserves resources, prevents waste, or protects correlative rights." 30 C.F.R. § 250.180(e). OCSLA and its implementing regulations provide no further standard regarding *how* BSEE must reach a decision regarding the national interest or what factors it must weigh. *See Vera Chairez v. Mayorkas*, 734 F. Supp. 3d 1093, 1099 (D. Idaho 2024) (finding statute non-reviewable where it required that a decision "must 'be in the public or national interest'" but "lack[ed] any guideline restricting the agency's decision-making"). Absent this, as in *Webster*, *Poursina*, and *Dubbs*, the Court lacks a meaningful metric by which to judge the BSEE Regional Supervisor's determination.

The Court should thus reject Plaintiffs' argument that BSEE's decision was flawed because it did not explicitly consider "negative impacts of resuming offshore oil drilling at the Unit." Pls.' Br. 9. Neither OCSLA nor the Department's regulations require the agency to consider greenhouse gas emissions, air pollution,

16

or the risk of an oil spill as part of its national interest determination for a lease
extension. *See id.* at 9–10. Plaintiffs stretch for support from broad policy
statements in OCSLA, *id.* at 10 (citing 43 U.S.C. § 1332(3)–(4)), and statements of
purpose for an entirely different chapter of the statute, *id.* (citing 43 U.S.C. §
1802(2)). But this cherry picking from disparate provisions in OCSLA cannot
provide a substantive standard to decide the *specific* question of whether BSEE
appropriately extended the Unit leases.[9]

Nor does Plaintiffs' reliance on the Department's regulation—rather than
OCSLA itself—save its claim. While regulations can provide the type of
meaningful standard missing from a statute, *see Doe v. Schachter*, 804 F. Supp. 53,
63 (N.D. Cal. 1992), they often do not. For example, in *Forsyth County v. U.S.
Army Corps of Engineers*, the Eleventh Circuit held that there was no law to apply
when both "the statutory and regulatory framework grant[ed] a preference for the
County" but "also require[ed] the Secretary of the Army to consider the public
interest" when determining who should be awarded a lease. 633 F.3d 1032, 1041
(11th Cir. 2011). The same reasoning applies here, where Plaintiffs likewise argue
that BSEE "gave no discernible weight or value" to certain issues that are not even
mentioned in the statute or regulation. *Id.* at 1040,

Plaintiffs also err by pointing to *Center for Biological Diversity v. National
Highway Traffic Safety Administration* ("*NHTSA*"), which is distinguishable from

---

[9] Plaintiffs' reliance on unrelated provisions of OCSLA also runs afoul of the
statute's structure, which precisely identifies the factors that must be considered
for specific decisions. For example, when describing the Secretary's duty to
"maintain an oil and gas leasing program," OCSLA identifies the criteria that the
Secretary "shall" consider, including the "proper balance between the potential for
environmental damage, the potential for the discovery of oil and gas, and the
potential for adverse impact on the coastal zone." 43 U.S.C. § 1344(a). This is a
sharp contrast with section 1334(a), which contains no such directive regarding
what the agency must analyze to decide if an extension is in the national interest.

1  this case. *See* 538 F.3d 1172, 1198 (9th Cir. 2008). *NHTSA* addressed whether the

2  Administration's approach to deciding the "maximum feasible average fuel

3  economy level" for rulemaking purposes was acceptable under the Energy Policy

4  and Conservation Act ("EPCA"). *Id.* at 1194. But EPCA provided specific

5  guidance by stating that "the Secretary of Transportation shall consider

6  technological feasibility, economic practicability, the effect of other motor vehicle

7  standards of the Government on fuel economy, and the need of the United States to

8  conserve energy." *Id.* This is a far cry from the language here.

9          Finally, even if judicial review is not precluded altogether, the broad

10  statutory and regulatory language at issue nonetheless imparts great discretion to

11  BSEE when deciding whether an extension is in the national interest. BSEE's

12  decision fell well within that discretion. In its 2023 decision, BSEE explained that

13  "continued development of these proven reserves from established infrastructure"

14  would (1) "help meet the Nation's energy needs without the impacts associated

15  with new infrastructure installations or exploration and development of unproven

16  fields," (2) "benefit taxpayers through the continued revenue streams derived from

17  production," and (3) "ensure the conservation of proven oil and gas reserves from

18  these fields." AR_0000424. BSEE thus provided multiple rational bases for its

19  determination that "approving ExxonMobil's request is in the National interest,"

20  including consideration of the environment. *Id.* While BSEE may not have

21  considered specific issues that Plaintiffs deem "highly important," Pls.' Br. 9, this

22  was not required by regulation or OCSLA. *See Motor Vehicle Mfrs. Ass'n of U.S.,*

23  *Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (observing that

24  "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a

25  court is not to substitute its judgment for that of the agency"). BSEE's national

26  interest determination therefore complied with the APA.

27

1      **2.      BSEE's Reliance on a Categorical Exclusion in 2023 Satisfied**

2      **NEPA.**

3          Although the 2023 decision has now been superseded by BSEE's 2025

4    Decision, *supra* at 9–12, BSEE's 2023 reliance on a categorical exclusion

5    nonetheless satisfied NEPA. As the Supreme Court recently explained, the Court's

6    review of an agency's NEPA analysis "should not micromanage [] agency choices

7    so long as they fall within a broad zone of reasonableness." *Seven Cnty.*, 2025 WL

8    1520964, at *8.

9          Here, Plaintiffs argue that BSEE's assumption that the Unit would remain

10   inactive "fatally flaw[ed]" its review, Pls.' Br. 12, but that conclusion was

11   supported by Exxon's submissions to the agency. In its letter requesting an

12   extension, Exxon explained in detail its difficulties establishing a transportation

13   solution for oil and gas produced at the Unit. AR_0000442–44. As a result of the

14   "extraordinary resistance" to its efforts from various organizations, Exxon stated

15   that it was "unable to commit to tangible milestones which can be achieved due to

16   the evolution of circumstances dictated by California politics." AR_0000444. It

17   was therefore reasonable for BSEE to conclude that there would be "no active oil

18   and gas operations during the approved extension period" and thus no

19   extraordinary circumstances that would warrant an EA or EIS. AR_0000429.

20     **3.      Plaintiffs' Challenge to the 2024 APM Approvals Lacks Merit.**

21         BSEE also properly relied on a categorical exclusion to approve Sable's

22   APMs in 2024. "An agency's decision to invoke a categorical exclusion to avoid

23   an EIS or EA is not arbitrary and capricious if 'the agency reasonably determined

24   that a particular activity is encompassed within the scope of a categorical

25   exclusion.'" *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 680 (9th Cir.

26   2022) (quoting *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1114 (E.D. Cal.

27   2017)). Courts look to the "plain language" of a categorical exclusion to determine

19

1  whether it "unambiguously" applies to the relevant action. *Id.* at 672.

2          Here, the categorical exclusion that BSEE invoked squarely applies to

3  Sable's proposed well reworking activities. *See* AR_0000037; AR_0000040. That

4  exclusion applies to any "[a]pproval of an Application for Permit to Drill (APD) an

5  offshore oil and gas exploration or development well, when said well and

6  appropriate mitigation measures are described in an approved exploration plan,

7  development plan, production plan, or Development Operations Coordination

8  Document." 516 DM 15.4(C)(12). As BSEE explained, "[r]eperforating and adding

9  new perforations to an existing downhole completion is considered normal well-

10 reworking operations." AR_0000037; AR_0000040. Indeed, even Plaintiffs admit

11 that "on their face" the APMs "fit within the categorical exclusions for approval of

12 an 'Application for Permit to Drill' or 'Sundry Notices.'" Pls.' Br. 15.

13         Yet, Plaintiffs raise a novel and unsupported argument that "the exclusions

14 cannot be read to apply to this rare situation of allowing drilling activity to restart a

15 decade after a massive oil spill." *Id.* Plaintiffs cite no authority for such an ill-

16 defined exception to the plain language of a categorical exclusion. *See Mountain*

17 *Cmtys.for Fire Safety*, 25 F.4th at 676 (finding that the "plain language" of

18 exclusion was "clear" and did not impose plaintiffs' asserted limitations on timber

19 thinning projects). Instead, Plaintiffs cite cases where the proposed action itself

20 conflicted with the categorical exclusion's scope, which is not the situation here.

21 *See* Pls.' Br. 15; *see also Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 990 (9th

22 Cir. 2020) (holding that exclusion for "for road repair and maintenance" was

23 "unambiguous" and did not apply to "an extensive commercial logging project"

24 involving trees far from the road); *Friends of the Inyo v. U.S. Forest Serv.*, 103

25 F.4th 543, 557 (9th Cir. 2024) (finding that agency could not "combine categorical

26 exclusions to approve a proposed action, when no single CE would cover a

27 proposed action alone"). None of these cases justify departing from the

1     unambiguous meaning of a categorical exclusion, nor is such an approach

2     necessary when the agency is already required to determine whether "extraordinary

3     circumstances" require an EA or EIS. *Ctr. for Biological Diversity v. Salazar*, 706

4     F.3d 1085, 1096 (9th Cir. 2013).

5         Plaintiffs are also incorrect that BSEE's extraordinary circumstances

6     analysis here was inadequate. Though Plaintiffs suggest BSEE was required to

7     analyze the impacts of a full restart of production at the Unit for the entirety of its

8     review, this is incorrect. "An agency satisfies NEPA if it applies its categorical

9     exclusions and determines that neither an EA nor an EIS is required, so long as the

10    application of the exclusions to the facts of the *particular action* is not arbitrary

11    and capricious." *Norton*, 311 F.3d at 1176 (emphasis added); *see also* 43 C.F.R. §

12    46.215 (requiring Interior agencies to consider whether "individual actions" may

13    have impacts that would meet the criteria for extraordinary circumstances). Here,

14    the actions at issue were the perforation of two wells to increase their productive

15    capacity, not a full restart or related operations. AR_0000037; AR_0000040. Such

16    an activity is commonplace for an oil and gas operation. AR_0000037. Requiring

17    BSEE to consider the impacts of possible future activities throughout its analysis

18    would be "inconsistent with the efficiencies that the abbreviated categorical

19    exclusion process provides." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th

20    Cir. 2023) (quoting *Salazar*, 706 F.3d at 1097).

21        Regardless, when considering whether Sable's APMs could have cumulative

22    impacts in relation to other actions, BSEE properly determined that they would not

23    because "[p]ast, present, or reasonably foreseeable oil and gas development in the

24    area have been evaluated and considered in previous environmental reviews." AR

25    0000038; AR 0000041; *see Salazar*, 706 F.3d at 1098 (concluding that "BLM's

26    use of the prior analyses in evaluating cumulative impacts of issuance of the gravel

27    permit was appropriate"). Specifically, BSEE's 1984 Unit EIS analyzed the effects

1   of production at the Unit in depth over thousands of pages. AR_0019068–24253.

2       Plaintiffs' raise concerns about air quality, cultural resources, and marine

3   species. Pls.' Br. 16–20. But the Unit EIS analyzed these issues. For example, the

4   EIS considered impacts from increased emissions both from the platforms

5   themselves and at the onshore gas treatment facility for the Unit by modeling

6   emissions at the "worst case" level at both an hourly and annual scale. AR_

7   0027506–7. The EIS also contains lengthy discussions on impacts on marine life

8   from vessel collisions and noise. AR_0019463; *see also* AR_0021371–92

9   (analyzing noise pollution). And with respect to oil spill risk, the EIS analyzed the

10  effects of oil spills on species, AR_0019457–69, and the probability of oil spills of

11  varying degrees of severity, AR_0019541–43. In short, the EIS analyzes the

12  environmental effects of operations at the Unit in great detail. To the extent

13  Plaintiffs demand that BSEE's APM analysis include other future activities that

14  may or may not occur as part of resumed operations, the Supreme Court has made

15  clear that Courts "should defer to agencies' decisions about where to draw the line"

16  regarding "how far to go in considering indirect environmental effects from the

17  project at hand" and "effects from other projects separate in time or place." *Seven

18  Cnty.*, 2025 WL 1520964, at *8. Plaintiffs have thus failed to meet their burden to

19  show that BSEE's APM analysis was inadequate under NEPA.

20  **III.    BSEE Did Not Violate NEPA By Relying on Past Analyses.**

21      Finally, the Court should reject Plaintiffs' claim that BSEE's 2023 extension

22  decision and 2024 APM approvals violated NEPA by relying on the 1984 Unit

23  EIS. Plaintiffs are incorrect both that 42 U.S.C. § 4336b—which only applies to

24  "programmatic environmental document[s]"—bars consideration of the Unit EIS

25

26

27

1  and that BSEE has an obligation to complete a supplemental NEPA analysis.[10]

2      First, section 4336b does not apply to the 1984 EIS because it is not a

3  programmatic NEPA document. A programmatic environmental document is

4  defined as "an environmental impact statement or environmental assessment

5  analyzing all or some of the environmental effects of a policy, program, plan, or

6  group of related actions." 42 U.S.C. § 4336e(11). OCSLA's four-stage scheme for

7  development of offshore resources is only "programmatic" at the first stage, which

8  requires preparation of a "five-year oil and gas leasing program." *Alaska*

9  *Wilderness League v. Jewell*, 788 F.3d 1212, 1215 (9th Cir. 2015). The next three

10  stages—granting leases, submitting exploration plans, and submitting development

11  and production plans—are lease- and site-specific. *Id.* Moreover, the UNI Unit T

12  EIS does not identify itself as a programmatic EIS but refers to "site-specific"

13  impacts of the development and production plan. *See, e.g.*, AR_0019245

14  (analyzing "Site-Specific Geology"). Because the Unit EIS is not a programmatic

15  document, 42 U.S.C. § 4336b does not apply.

16      Second, BSEE is not required to supplement the Unit EIS because the action

17  associated with it—approval of the Unit Development and Production Plan—is

18  already complete, leaving no "pending decisionmaking process" or "remain[ing]

19  'major Federal action' to occur." *Marsh v. Oregon Nat. Res. Council*, 490 U.S.

20  360, 374 (1989). This case is thus similar to *Center for Biological Diversity v.*

21  *Salazar*, in which the Ninth Circuit rejected a claim that BLM was required to

22  prepare supplemental NEPA analysis for a "1988 plan of operations" for a mine

23  ────────────────

24  [10] In the Amended Complaint, Plaintiffs characterize their fourth claim under both sections 706(1) and 706(2) of the APA. Am. Compl. ¶¶ 177–78. However,

25  Plaintiffs now press their fourth claim solely under section 706(2). Pls.' Br. 24. They have thus waived any argument based on 5 U.S.C. § 706(1). *Ceballos Padilla*

26  *v. Garland*, 854 F. App'x 127, 128 (9th Cir. 2021) ("[I]ssues not specifically raised and argued in a party's opening brief are waived[.]" (citation omitted)).

27

even though new permits under the plan had been recently approved. 706 F.3d 1085, 1095 (9th Cir. 2013). Here, likewise, Exxon's submission of the Unit Development and Production Plan was the "proposal[] for . . . major Federal action[]" that triggered NEPA, 42 U.S.C. § 4332(C), and it was completed in 1985 when the Plan was approved. AR_0018946–48. The fact that Exxon (and now Sable) continued to operate under that plan is not relevant to NEPA supplementation. MMS completed the "decisionmaking process" for with the Plan years ago, *Marsh*, 490 U.S. at 374, so NEPA supplementation is not required.

## IV.    If the Court Finds a Violation, Remand Without Vacatur is the Appropriate Remedy.

In the event the Court determines Plaintiffs' claims are not moot and finds a NEPA or APA violation, the appropriate remedy would be remand without vacatur. "The decision of whether to vacate is 'controlled by principles of equity.'" *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1155 (D. Mont. 2019) (quoting *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1155 (9th Cir. 2018)). This means courts must "weigh the seriousness of the agency's errors against the disruptive consequences of vacating the [decision]." *Bartell Ranch LLC v. McCullough*, No. 321-CV-00080-MMD-CLB, 2023 WL 1782343, at *23 (D. Nev. Feb. 6, 2023) (citing *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015)), *aff'd*, 2023 WL 4557742 (9th Cir. July 17, 2023). One example where remand without vacatur is appropriate is where a court "reasonably expects the agency could reach the same result on remand but either offer better reasoning or comply with procedural rules to essentially fix the error the Court has identified in its review." *Id.* (citing *Pollinator*, 806 F.3d at 532).

Such is the case here. All of Plaintiffs' NEPA claims are based on the same theory—that BSEE could not rely on old environmental analyses to issue new decisions that could facilitate a restart at the Unit. Am. Compl. ¶¶ 148–78. But

BSEE has now issued a new EA that considers the impacts of resumed operations and addresses the issues identified in the complaint. Because BSEE has completed the new substantive analysis that Plaintiffs claim was required to approve the 2023 extension and 2024 APMs, if remand were nonetheless still necessary, BSEE would have little difficulty fixing any purported error—indeed, it has already addressed those issues through its reconsideration process. It is also reasonable to believe that BSEE would not deny the APMs on remand since the work is already completed and denial would have no effect. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) (declining to vacate where there was "at least a serious possibility that the Commission will be able to substantiate its decision on remand"); *see also Seven Cnty.*, 2025 WL 1520964, at *9 (deficient NEPA analysis may not require vacatur "absent reason to believe that the agency might disapprove the project" based on more analysis).

On the other side of the balance, Plaintiffs' requested relief—vacatur and an injunction on future authorizations, Pls.' Br. 25—would cause serious disruption. Sable has already explained the significant investments the company has made to bring the Unit back to full commercial production and the risks it faces if its efforts are interrupted. Sable Resp. to Fed. Defs.' Mot. for Voluntary Remand 18–19, ECF No. 39. Because BSEE has already addressed Plaintiffs' concerns with the challenged decisions, and assuming the court does not dismiss the case as moot, remand without vacatur would be the only appropriate remedy.

## CONCLUSION

For the above reasons, the Court should grant summary judgment to Federal Defendants and deny Plaintiffs' Motion.

Respectfully submitted this 30th day of May, 2025.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources
Division
U.S. Department of Justice

*/s/ Daniel C. Luecke*
DANIEL C. LUECKE
Trial Attorney, Natural Resources
Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-7863
Email:        daniel.luecke@usdoj.gov

*Counsel for Federal Defendants*