1  LATHAM & WATKINS LLP
   Daniel P. Brunton (Bar No. 218615)
2  Email: daniel.brunton@lw.com
   12670 High Bluff Drive
3  San Diego, CA 92130
   Tel.: (858) 523-5400
4  Fax: (858) 523-5450

5  Michael G. Romey (Bar No. 137993)
   Email: michael.romey@lw.com
6  355 South Grand Avenue, Suite 100
   Los Angeles, CA 90071-1560
7  Tel.: (213) 485-1234
   Fax: (213) 891-8763

8
   Janice M. Schneider (*Pro Hac Vice*)
9  Email: janice.schneider@lw.com
   Devin M. O'Connor (*Pro Hac Vice*)
10 Email: devin.o'connor@lw.com
   555 Eleventh Street, NW, Suite 1000
11 Washington, D.C. 20004-1304
   Tel.: (202) 637-2200
12 Fax: (202) 637-2201

13 *Attorneys for Intervenor-Defendant*
   *Sable Offshore Corp.*

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17                    **WESTERN DIVISION**

| | |
|---|---|
| 18 CENTER FOR BIOLOGICAL DIVERSITY, et al., | CASE NO. 2:24-cv-05459-MWC-MAA |
| 19         *Plaintiffs*, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF** |
| 20   v. | **SABLE OFFSHORE CORP.'S OPPOSITION TO PLAINTIFFS'** |
| 21 DOUG BURGUM, et al., | **MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION** |
| 22         *Defendants*, | **FOR SUMMARY JUDGMENT** |
| 23   and | <u>Hearing</u> |
| 24 SABLE OFFSHORE CORP., | Date: July 11, 2025 Time: 1:30 p.m. |
| 25         *Intervenor-Defendant*. | Judge: Hon. Michelle Williams Court Courtroom: 6A |

26

27

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................1

II.   FACTUAL BACKGROUND.........................................................2

    A.    Overview of the Santa Ynez Unit .....................................2

    B.    SYU Environmental Review ..............................................3

    C.    SYU Preservation Plan.......................................................5

    D.    BSEE's 2023 Extension .....................................................6

    E.    2024 APMs For Well-Reworking Operations ....................6

    F.    BSEE's 2025 EA and Decision...........................................7

III.  STANDARD OF REVIEW .........................................................8

IV.   ARGUMENT................................................................................8

    A.    Plaintiffs' Claims Are Moot ..............................................8

        1.    BSEE's New Decision Renders Plaintiffs' First Claim Moot .............................................................9

        2.    BSEE's EA Renders Plaintiffs' Second and Fourth Claim Moot...................................................10

        3.    Completion of Well Reworking Moots the Third Claim........................................................................10

        4.    The Court Should Find Plaintiffs' Claims Prudentially Moot ....................................................11

    B.    BSEE Complied With NEPA Through the 2023 Extension CatEx.................................................................12

    C.    BSEE's National Interest Determination Was Reasonable...............16

    D.    BSEE CatExs for the Two APMs Complied With NEPA.................18

        1.    BSEE Reasonably Concluded a CatEx Applies ......................18

        2.    BSEE Reasonably Found No Extraordinary Circumstances ..............................................................20

    E.    BSEE Is Not Required to Supplement Existing NEPA Analysis........23

    F.    Vacatur of BSEE's Decisions Is Not Warranted ..................24

V.    CONCLUSION...........................................................................25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

i

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS MOT. FOR SUMM. J.

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) ...................................................................19, 20

*ALCOA v. Adm'r, Bonneville Power Admin.*,
175 F.3d 1156 (9th Cir. 1999) ......................................................................10

*All. for the Wild Rockies v. U.S. Dep't of Agric.*,
772 F.3d 592 (9th Cir. 2014) .........................................................................10

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)...........................................................................................8

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018).....................................................................14

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) .......................................................................23

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) .........................................................................25

*California v. Bureau of Land Mgmt.*,
277 F. Supp.3d 1106 (N.D. Cal. 2017).........................................................18

*Carter v. Veterans Admin.*,
780 F.2d 1479 (9th Cir. 1986) .......................................................................10

*Colorado River Indian Tribes v. Dep't of Interior*,
No. 14-cv-02504, 2015 WL 13915982 (C.D. Cal. July 17, 2015) ..................13

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) .................................................................18, 25

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .................................................................23, 24

*Ctr. for Biological Diversity v. Zinke*,
260 F. Supp. 3d 11 (D.D.C. 2017).................................................................20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

ii

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

*Ctr. for Cmty. Action & Env't Justice v. FAA*,
    18 F.4th 592 (9th Cir. 2021) ................................................................8

*Earth Island Inst. v. Muldoon*,
    82 F.4th 624 (9th Cir. 2023) ....................................................*passim*

*Feldman v. Bomar*,
    518 F.3d 637 (9th Cir. 2008) .............................................................11

*Friends of the Clearwater v. Dombeck*,
    222 F.3d 552 (9th Cir. 2000) ..............................................................8

*Friends of the Inyo v. U.S. Forest Serv.*,
    103 F.4th 543 (9th Cir. 2024) .....................................................20, 24

*Gator.com Corp. v. L.L. Bean, Inc.*,
    398 F.3d 1125 (9th Cir. 2005) (en banc) ............................................9

*Havasupai Tribe v. Provencio*,
    906 F.3d 1155 (9th Cir. 2018) ...........................................................24

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*,
    No. 14-cv-1800, 2016 WL 498911 (W.D. Wash. Feb. 9, 2016) .......12

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
    601 F. Supp. 3d 625 (C.D. Cal. 2022) ................................................7

*Jones v. Gordon*,
    792 F.2d 821 (9th Cir. 1986) .............................................................25

*Marsh v. Oregon Nat. Res. Council*,
    490 U.S. 360 (1989) ...........................................................................23

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ...........................................................................24

*Mountain Cmtys. for Fire Safety v. Elliott*,
    No. 2:19-CV-6539, 2020 WL 2733807 (C.D. Cal. May 26, 2020),
    *aff'd,* 25 F.4th 667 (9th Cir. 2022) .............................................14, 20

*N. D. v. Reykdal*,
    102 F.4th 982 (9th Cir. 2024) ...........................................................10

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

iii

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

*Nat. Res. Def. Council v. Haaland*,
    102 F.4th 1045 (9th Cir. 2024) ...............................................................8, 16, 18

*Native Village of Nuiqsut v. Bureau of Land Mgmt.*,
    9 F.4th 1201 (9th Cir. 2021) ...............................................................11

*Native Village of Point Hope v. Salazar*,
    680 F.3d 1123 (9th Cir. 2012) ...............................................................10

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
    587 U.S. 601 (2019)...............................................................17

*Rainey v. Fed. Deposit Ins. Corp.*,
    No. 10-cv-05940, 2011 WL 13273076 (C.D. Cal. Sept. 28, 2011)....................11

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ...............................................................8

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
    100 F.4th 1039 (9th Cir. 2024) ...............................................................14, 20, 22

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
    No. 23-975, 2025 WL 1520964 (U.S. May 29, 2025)...........................13, 18, 24

*Sierra Club v. Penfold*,
    857 F.2d 1307 (9th Cir. 1988) ...............................................................11

*Solar Energy Indus. Ass'n v. FERC*,
    80 F.4th 956 (9th Cir. 2023) ...............................................................25

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    100 F.3d 1443 (9th Cir. 1996) ...............................................................13

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
    921 F.2d 232 (9th Cir. 1990) ...............................................................20

*West v. Secretary of Department of Transportation*,
    206 F.3d 920 (9th Cir. 2000) ...............................................................14

*Wild Fish Conservancy v. Quan*,
    No. 23-35322, 2024 WL 3842101 (9th Cir. Aug. 16, 2024)..........................25

*WildEarth Guardians v. Haaland*,
    No. 22-15029, 2023 WL 8613628 (9th Cir. Dec. 13, 2023) ...........................9

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

iv

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

# STATUTES

5 U.S.C. § 706(2)(A) ........................................................................................8

42 U.S.C.
   § 4332(2)(C) ...........................................................................................23
   § 4336(a)(2) ............................................................................................12
   § 4336e(1) ...............................................................................................12

43 U.S.C.
   § 1332(1) .................................................................................................17
   § 1334(a) .................................................................................................17
   § 1802(1) .................................................................................................17

# RULES

Fed. R. Evid. 201(b)(2) ......................................................................................7

# REGULATIONS

30 C.F.R.
   § 250 .........................................................................................................5
   § 250.101 ................................................................................................19
   § 250.180(a)(2) ....................................................................................2, 7
   § 250.180(d) .............................................................................................7
   § 250.180(e) .......................................................................2, 6, 12, 17
   § 250.198 .................................................................................................16
   § 250.613 .................................................................................................18

33 C.F.R. § 146 .................................................................................................6

40 C.F.R.
   § 1501.4(b) (2023) .................................................................................12
   § 1501.4(b)(1) (2023) ............................................................................13

43 C.F.R.
   § 46.205 ...................................................................................................12
   § 46.205(c) ..............................................................................................12
   § 46.215 ...........................................................................................12, 13
   § 46.215(a) ..............................................................................................21
   § 46.215(b) ..............................................................................................21
   § 46.215(d) ..............................................................................................22
   § 46.215(h) ..............................................................................................21

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

v

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1

## OTHER AUTHORITIES

41 Fed. Reg. 10116 (Mar. 9, 1976).............................................................................3

75 Fed. Reg. 62418 (Oct. 8, 2010)...........................................................................20

89 Fed. Reg. 95101 (Dec. 2, 2024)..........................................................................16

90 Fed. Reg. 10,610 (Feb. 25, 2025) ......................................................................12

Dep't of Interior, Departmental Manual, 516 DM 15 ..................................12, 18, 19

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

# I.    INTRODUCTION

Consistent with Congressional mandates, the Federal Defendants conducted a thorough review of statutory considerations in approving oil and gas production at the Santa Ynez Unit ("SYU") under Outer Continental Shelf Lands Act ("OCSLA") and the National Environmental Policy Act ("NEPA"), and production began in 1981.  Based on the leases and approvals already in place, lessees invested billions of dollars to develop the SYU and produced oil and gas for decades.  Since a 2015 onshore pipeline incident required production to be paused, the SYU was carefully maintained under a preservation plan approved by the Bureau of Safety and Environmental Enforcement ("BSEE"), and the lessees continuously sought to resume production.  The approvals for the SYU are in full force and effect—and the status quo is a fully approved, operational SYU that returned certain existing facilities to production on May 15, 2025.

Plaintiffs challenge routine approvals BSEE issued—(i) a 2023 extension of time to resume operations for offshore leases ("2023 Extension") and (ii) two applications for permits to modify ("APM") for well-reworking operations at existing wells.  These were not approvals for "restart."  Rather, Sable has and relied on existing federal approvals needed for production.  Plaintiffs attempt to bootstrap their challenge to the 2023 Extension, the APMs, and associated NEPA review to undermine decades of federal policy and these long-standing decisions and scuttle billions of dollars of private investment must be rejected.

On May 28, 2025, BSEE relied on an Environmental Assessment ("EA"), and issued a Finding of No Significant Impact ("FONSI") and on May 29, 2025 BSEE issued a corresponding decision re-affirming the 2023 Extension.  Plaintiffs' first, second, and fourth claims are thus moot.  Additionally, the work under the two APMs is complete and cannot be undone, so Plaintiffs' third claim is moot.

Even if Plaintiffs' claims were not moot, BSEE properly approved the 2023

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1

1  Extension and reasonably found under OCSLA regulations this extension was in

2  the national interest.  The environmental issues are well understood.  Relying on

3  the preservation plan, under which SYU infrastructure was preserved and drained

4  of hydrocarbons, and against the backdrop of thousands of pages of prior NEPA

5  review to inform its findings that no extraordinary circumstances were present,

6  BSEE appropriately used categorial exclusions ("CatEx") to comply with NEPA in

7  approving the 2023 Extension and 2024 APMs.  BSEE has no obligation to

8  supplement its prior Environmental Impact Statement ("EIS") for the SYU because

9  there is no ongoing major federal action.  The Court should deny Plaintiffs'

10  motion, Dkt. 68 ("Mot."), and grant Sable's cross-motion for summary judgment.

11  **II.    FACTUAL BACKGROUND**

12      **A.    Overview of the Santa Ynez Unit**

13          The SYU consists of 16 oil and gas leases the federal government issued

14  between 1968 and 1982 in federal waters north of Santa Barbara.  AR_0025204-

15  36, 7140-252.  The SYU facilities include three oil platforms—Harmony, Heritage,

16  and Hondo—and related pipelines and wells.  AR_0016949.  The leases provide

17  the right to develop the oil and gas resources for five years and as "long thereafter

18  as oil or gas" is or may be "produced from the leased area in paying quantities, or

19  drilling or well reworking operations, as approved by" the Department of Interior.

20  *See, e.g.*, AR_0027140; *see also* 30 C.F.R. § 250.180(a)(2).  If a lease is beyond its

21  primary term and operations cease, the leaseholder may apply to BSEE for an

22  extension of time to resume operations.  30 C.F.R. § 250.180(e).  The leases are

23  subject to a unitization agreement ("Unit Agreement").  AR_0027047-139.  The

24  terms of all leases are expressly amended to conform to the Unit Agreement,

25  including to extend the lease terms for the life of the Unit Agreement.

26  AR_0027058-59.  The Unit Agreement and leases continue in effect "so long as

27  Unitized Substances are or can be produced and *should production cease, so long*

28  *thereafter as diligent operations are in progress for the restoration of*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

2

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1  *production*[.]"  AR_0027059 (emphasis added).  Sable purchased the assets from

2  Exxon Mobil Corporation and its affiliates (collectively, "Exxon") and became the

3  designated Unit Operator on May 22, 2024.  AR_0000082.  Sable has committed

4  close to a billion dollars in this project.  Dkt. 39-1, ¶ 16.

5      **B.    SYU Environmental Review**

6      Before development of the SYU, and at appropriate times thereafter, federal

7  agencies conducted numerous environmental reviews analyzing oil and gas

8  production on the SYU—including the issues Plaintiffs raise here.  It is against this

9  backdrop of extensive environmental review that BSEE considered the CatExs.

10      In May 1974, the United States Geological Survey ("USGS") published a

11  final environmental impact statement ("EIS") analyzing a proposed plan of

12  development for the SYU for the Hondo field.  AR_0025237-27046; *see also*

13  AR_0028878-907.  USGS prepared another EIS analyzing oil and gas production

14  in the SYU.  41 Fed. Reg. 10116 (Mar. 9, 1976).  In 1982, Exxon Company,

15  U.S.A. prepared a Development and Production Plan ("DPP") for the SYU.

16  AR_0024713-25203.  The 1982 DPP was evaluated in a June 1984 final

17  environmental impact report/EIS prepared by agencies including the United States

18  Minerals Management Service ("MMS", the predecessor agency to BSEE and the

19  Bureau of Ocean Energy Management ("BOEM")) ("1984 EIS").  AR_0019068-

20  24253.  The 1984 EIS analyzed alternatives (AR_19187-99, 19099-118),

21  cumulative impacts (AR_0019118-23), air quality (AR_0019320-56), climate

22  (AR_0019356-57), biology (AR_0019420-78), and other resource areas.

23      The DPP was amended and approved several more times, following

24  additional environmental review.  In 1985, MMS approved a DPP amendment for

25  oil to be transported by pipeline to new onshore facilities in Las Flores Canyon.

26  AR_0019016-67, 18946-47.  In 1987, Exxon revised the DPP to provide for the

27  installation of platforms Harmony and Heritage, which MMS approved after

28  environmental review.  AR_17740-8164, 29622-722.  In 1991, MMS prepared

1   another EA/FONSI assessing further details on pipeline and power cable

2   development activities.  AR_0029460-621.  In 1992, MMS reviewed and approved

3   a request by Exxon to install the topsides onto the previously installed Platform

4   Harmony and Heritage jackets.  AR_0028825-72.  In 1997, MMS approved a DPP

5   revision to install a gas pipeline from Platform Heritage to Platform Harmony and

6   other modifications.  AR_0029042-83.

7        In December 2018, BOEM and BSEE prepared a Programmatic

8   Environmental Assessment ("2018 PEA") "for Federally Regulated Offshore Oil

9   and Gas Activities in the Southern California Planning Area."  AR_0016018-162.

10  The 2018 PEA analyzed Platforms Hondo, Heritage, and Harmony as "currently

11  operating production platforms."  AR_0016034-35.  The 2018 PEA evaluated a

12  number of activities on existing leases, including down-hole well maintenance.

13  AR_0016029.  With respect to potential oil spills from future operations, the 2018

14  PEA explained that, due to reduced reservoir pressures "near zero", the "risk of a

15  loss of well control . . . is exceedingly small."  AR_0016071.  The analysis

16  concluded that the reasonably foreseeable effects on resources from an accidental

17  oil spill  "would be localized and temporary, and would be negligible to minor

18  overall."  AR_0016072 (noting that of the recorded oil spills between 1970 and

19  2014, only 3.4% were greater than 1 barrel, with the largest spill being 164-bbl

20  from a pipeline).  The EA also considered aging infrastructure.  AR_0016157

21  ("BSEE has a number of procedures in place to address aging platforms and

22  infrastructure," *e.g.*, annual and unannounced inspections, annual inspection

23  reports operators must submit, and an extensive regulatory program).

24       In August 2021, BOEM prepared an EA for a cathodic protection project for

25  Platforms Hondo, Heritage, and Harmony to protect the platforms from corrosion.

26  AR_0015154, 61-62.  In October 2023, BSEE, BOEM, and the Army Corps

27  prepared a Programmatic EIS ("2023 PEIS") for decommissioning activities.

28  AR_0000450-853.  The analysis explained that "[c]urrent reservoir pressures have

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

4

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

dropped to near zero in most of the fields now in production on the [Pacific] OCS" and that the risk of a catastrophic spill is "very small." AR_0000555-56 ("[t]he effects of historic oil spills . . . have been localized and have subsided over time").

### C.    SYU Preservation Plan

In May 2015, an onshore pipeline owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, "Plains"), transporting crude oil from Las Flores Canyon westward to Plains' Gaviota Pumping Station leaked. AR_0028473. "[B]y 2017 many of the resources and habitats were exhibiting signs of recovery" following the spill. AR_0016154 ("surfgrass and seaweed beds showed almost full recovery within 1 year"). Following the leak, the SYU was shut-in subject to an environmentally protective preservation plan approved by BSEE. AR_0016949-7044 ("Preservation Plan"). The Preservation Plan ensured "the integrity management of facilities in a safe and environmentally responsible manner for the duration of the outage." AR_0016949. It required that: (a) idle equipment be drained, flushed, and purged; (b) gas pipelines be depressurized and flushed with nitrogen; (c) wells be sealed with at least 3 barriers from hydrocarbon zones to surface; (d) staffing and daily inspections of the Hondo platform; (e) weekly inspections for Harmony and Heritage platforms; (f) offshore emulsion pipeline network be pigged and flushed with inhibited seawater; and (e) offshore pipeline preservation plan, including pigging, use of biocide, and pressure testing. AR_0016949-51. The Preservation Plan required quarterly reports. *E.g.,* AR_0000005-13 (Q1 2024), 385-93 (Q2 2023), 16228-36 (Q3 2018).

In addition, BSEE's regulations prescribe platform design, testing, and inspection standards. 30 C.F.R. Part 250. And they require oil and gas owners and operators to "design, install, use, maintain, and test production safety equipment in a manner to ensure the safety and protection of the human, marine, and coastal environments," which must be approved by regulators. *Id*. § 250.800. BSEE's regulations also require safety training with regulatory oversight of training

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

5

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1  materials and plans, and maintenance, including the submittal to BSEE of an

2  annual "comprehensive in-service inspection report." *Id*. §§ 250.1503, 250.919(a).

3  The U.S. Coast Guard also oversees and regulates aspects of offshore facilities,

4  including at the SYU. *See* 33 C.F.R. Part 146 (safety and reporting requirements);

5  *see also* AR_0016758 (security measures for preservation plan).

### D.    BSEE's 2023 Extension

7  While Exxon diligently pursued operations to resume production at the SYU

8  facilities, each year since the Plains incident up through 2023, Exxon requested

9  and BSEE granted an extension of time to resume operations under 30 C.F.R.

10 § 250.180(e).[1]  On October 19, 2023, Exxon again requested a one-year

11 extension.  AR_0000446-49.  On November 9, 2023, BSEE concluded that the

12 extension was subject to a CatEx and that no extraordinary circumstances were

13 present that prevented reliance on the CatEx.  AR_0000426-30.  On November 14,

14 2023, BSEE determined that the extension was "in the National interest" and

15 would "conserve[] resources, prevent[] waste, or protect[] correlative rights," as

16 required by 30 C.F.R. § 250.180(e) and approved the request.  AR_0000422-25

17 ("2023 Extension").  Like the prior extensions, the 2023 Extension involved no

18 authorization of physical work on existing facilities either topside or down-hole

19 and no operational changes.

### E.    2024 APMs For Well-Reworking Operations

21 On September 19, 2024, Sable submitted APMs to perform well-reworking

22 activities on existing wells HE-23 and HE-28 located at Platform Heritage.

23 AR_0000043-49, 50-56.  On September 20, 2024, BSEE conducted a CatEx for

24 each proposal, determining that each satisfied the "definition of the Categorical

---

[1] AR_0015074-76 (2022 Extension), 15142-44 (2021 Extension), 15599-603 (2020 Extension), 15970-72 (2019 Extension), 16015-17 (2018 Extension), 16247-49 (2017 Extension), 16625-27 (2016 Extension), 17076-78 (2015 Extension). Plaintiffs failed to object to the same process associated with any of these extensions over this seven year period and only challenged the 2023 Extension when production was on the near horizon.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

6

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1   Exclusion for 'Approval of an Application for Permit to Drill an offshore oil and

2   gas exploration or development well, when said well and appropriate mitigation

3   measures are described in an approved . . . development plan, production plan

4   . . . '" AR_0000037-42; *see also* AR_0024946-52 (DPP mitigation measures).

5   BSEE approved both APMs on September 25, 2024. AR_0000023-36.

6        Sable completed well-reworking operations for Well HE-23 on October 9,

7   2024, and Well HE-28 on December 9, 2024. Dkt. 39-1 ¶ 19; Dkt. 39-6. Thus, as

8   of October 9, 2024, the SYU leases were maintained due to the leaseholding

9   operations, rather than the 2023 Extension. Dkt. 39-1 ¶ 20; Dkt. 39-6 at 3. This

10  well-reworking maintains the leases until December 9, 2025, even without

11  production. Dkt. 39-1 ¶ 20; Dkt. 39-6 at 6; 30 C.F.R. § 250.180(a)(2), (d).

12  Similarly, the May 15, 2025 resumption of production from Platform Harmony to

13  the storage tanks at Las Flores Canyon also maintains the leases. Sable, Form 8-K

14  (May 19, 2025) at Ex. 99.1;[2] AR_0027051, 59; 30 C.F.R. § 250.180(d).

15       **F.    BSEE's 2025 EA and Decision**

16       On May 28, 2025, BOEM issued an EA assessing the environmental impacts

17  of approving the 2023 Extension, including reasonably foreseeable effects.

18  Declaration of Daniel P. Brunton in Support of Sable's Opposition to Plaintiffs'

19  Motion for Summary Judgment and Cross-Motion for Summary Judgment

20  ("Brunton Decl.") ¶ 2 & Ex. A. On May 28, 2025, BSEE relied upon the EA and

21  issued a FONSI under NEPA. *Id.* On May 29, 2025, BSEE issued a decision re-

22  approving the 2023 Extension.[3] *Id.* at ¶ 3 & Ex. B. In the FONSI, BSEE

23  _____

24  [2] Available at https://sableoffshore.com/financials/sec-filings/default.aspx.

25  [3] The EA and FONSI are available at:
    https://www.boem.gov/sites/default/files/documents/environment/environmental-
    assessment/2025_0523_SableEA%202025May28.pdf. The EA, FONSI, and

26  BSEE decision are judicially noticeable as public records "not subject to
    reasonable dispute because" they "can be accurately and readily determined from

27  sources whose accuracy cannot reasonably be questioned." Fed. R. Evid.
    201(b)(2); *see also In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F.

28  Supp. 3d 625, 689 (C.D. Cal. 2022). Courts can consider extra-record evidence

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

7

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1  determined that the 2023 Extension would "not significantly affect the quality of

2  the environment." *Id.*, Ex. A, FONSI at 1.  The FONSI and the decision re-

3  approving the 2023 Extension impose mitigation measures for the extension.  *Id.*,

4  Ex. A, FONSI at unnumbered page 6; *id.*, Ex. B at Enclosure 1.

5  **III.    STANDARD OF REVIEW**

6        Under the Administrative Procedure Act ("APA"), a reviewing court may

7  only set aside agency action, findings, and conclusions that are "arbitrary,

8  capricious, an abuse of discretion, or otherwise not in accordance with law."  5

9  U.S.C. § 706(2)(A).  "[T]he arbitrary and capricious standard does not demand

10  perfection.  As the Supreme Court has instructed, '[a court] should uphold a

11  decision of less than ideal clarity if the agency's path may reasonably be

12  discerned.'"  *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023)

13  (cleaned up).  Agency actions are entitled to a presumption of regularity.  *See, e.g.,*

14  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir.

15  2014).  The "party challenging the administrative decision" bears the burden of

16  persuasion.  *Ctr. for Cmty. Action & Env't Justice v. FAA*, 18 F.4th 592, 599 (9th

17  Cir. 2021) (citation omitted).  Courts "consider the whole record when reviewing

18  an agency's decision under the APA," including "everything that was before the

19  agency pertaining to the merits of its decision."  *Nat. Res. Def. Council v. Haaland*,

20  102 F.4th 1045, 1056 (9th Cir. 2024) (citation omitted).

21  **IV.    ARGUMENT**

22        **A.    Plaintiffs' Claims Are Moot**

23        "A case becomes moot . . . 'when the issues presented are no longer 'live' or

24  the parties lack a legally cognizable interest in the outcome.'"  *Already, LLC v.*

25  *Nike, Inc.*, 568 U.S. 85, 91 (2013) (citations and quotations omitted).  Recent

---

26  when developments render a controversy moot.  *See, e.g., Friends of the*

27  *Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) ("[I]f extra-record evidence shows that an agency has rectified a NEPA violation after the onset of

28  legal proceedings, that evidence is relevant to the question of whether relief should be granted.").

1  events render all of Plaintiffs' claims moot: (1) in its new decision, BSEE further

2  considered an extension of time for the leases and issued a national interest

3  determination; (2) BSEE undertook additional NEPA review analyzing the impacts

4  of granting the extension and its reasonably foreseeable effects, including

5  resumption of production, the precise relief Plaintiffs seek here, *see* Dkt. 38-2, Am.

6  Compl., Request for Relief at 48-49; and (3) work under the APMs was completed

7  many months ago and cannot be reversed. *See supra* Sections II.E-F.  Thus, there

8  is no possibility that Plaintiffs can obtain relief for their claims and this Court lacks

9  jurisdiction over those claims. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d

10  1125, 1129 (9th Cir. 2005) (en banc) (claim is moot if "changes in the

11  circumstances that prevailed at the beginning of litigation have forestalled any

12  occasion for meaningful relief").

13               1.    BSEE's New Decision Renders Plaintiffs' First Claim Moot

14        In their First Claim, Plaintiffs allege that BSEE's national interest

15  determination in the 2023 Extension was unlawful.  *See* Am. Compl. ¶¶ 148-52;

16  Mot. at 9-10.  On May 29, 2025, BSEE issued a new determination re-evaluating

17  the 2023 Extension, including to specifically address the Plaintiffs' February 2023

18  letter related to BSEE's review of that then-pending request.  Brunton Decl. Ex. B,

19  Attachment 1.  BSEE's decision evaluates California's energy needs and the

20  important contribution the SYU plays to ensure local access to domestic supplies,

21  through the use of already existing infrastructure to minimize environmental

22  impacts, and evaluates both the benefits and the risks of resuming production to

23  conclude that an extension of time to resume operations is in the national interest

24  and will conserve resources and prevent waste.  *Id*.  The new determination renders

25  Plaintiffs' First Claim moot because it addresses Plaintiffs' allegations and is a

26  new agency action that re-affirms the validity of the national interest

27  determination.  "It is well established that the supersession of an agency order

28  moots any challenges to the original order." *WildEarth Guardians v. Haaland*, No.

22-15029, 2023 WL 8613628, at *1 (9th Cir. Dec. 13, 2023) (case moot where challenged recovery plan was later superseded); *Native Village of Point Hope v. Salazar*, 680 F.3d 1123, 1131 (9th Cir. 2012) (revised plan mooted OCSLA claim).

2. <u>BSEE's EA Renders Plaintiffs' Second and Fourth Claim Moot</u>

In their Second Claim, Plaintiffs allege that BSEE unlawfully used a CatEx when approving the 2023 Extension. *See* Am. Compl. ¶¶ 154-61; Mot. at 11-14. In their Fourth Claim, Plaintiffs allege that BSEE violated NEPA by approving the 2023 Extension and APMs by relying on EISs prepared in 1975 and 1984. *See* Am. Compl. ¶¶ 171-78; Mot. at 20, 24. BSEE's 2025 EA assessed the potential environmental impacts of the 2023 Extension, and BSEE determined there is no significant impact under NEPA. *See supra* Section II.F; Brunton Decl. ¶ 2 & Ex. A. Plaintiffs' Second Claim is moot because Plaintiffs have received their requested relief: that a CatEx not be relied upon to support the 2023 Extension. *See* Am. Compl., Request for Relief at 48-49. A claim is moot where plaintiffs have received "the precise relief sought"—here, additional NEPA analysis in the form of an EA. *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014); *see ALCOA v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1163 (9th Cir. 1999) (NEPA document prepared during pendency of litigation mooted challenge; court could not grant relief to undo any work done in the interim); *supra* Section II.F. The Fourth Claim specifically demands additional "NEPA analysis by a date certain," which BSEE has now completed, mooting the Fourth Claim. Am. Compl., Request for Relief at 49; *see also Carter v. Veterans Admin.*, 780 F.2d 1479, 1481 (9th Cir. 1986) (claim moot where relief received without court intervention).

3. <u>Completion of Well Reworking Moots the Third Claim</u>

Plaintiffs' Third Claim is moot because Sable has already completed the well reworking operations authorized under the APMs and that work cannot be undone. *See, e.g.*, *N. D. v. Reykdal*, 102 F.4th 982, 989-90 (9th Cir. 2024) ("[I]f

1  the activities sought to be enjoined already have occurred, and the appellate courts

2  cannot undo what has already been done, the action is moot, and must be

3  dismissed.") (cleaned up); *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.

4  1988) (impacts were "not remediable" where the court cannot order the work to be

5  undone).  While courts "have found 'live' controversies in environmental cases

6  even after the contested . . . projects were complete" the case at bar differs because

7  "in each of those cases . . . [the court] could nonetheless remedy the alleged harm."

8  *See Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008).  Plaintiffs' Third Claim

9  "does not fall within this scenario" as the well rework cannot be undone; thus with

10 respect to the APMs "[t]hey do not face a continuous, remediable harm that

11 concretely affects their 'existing interests.'" *Id*. at 643 (citation omitted).  Instead,

12 Plaintiffs' claims are moot because "there [is] no indication that [Sable] could

13 undo drilling [or reworking] of those wells." *Native Village of Nuiqsut v. Bureau*

14 *of Land Mgmt.*, 9 F.4th 1201, 1209 (9th Cir. 2021).

15     Further, it is Plaintiffs' burden to show that mootness does not apply because

16 the challenged activity is "capable of repetition, yet evading review." *Id*.  Here

17 Plaintiffs' cannot show that exemption applies.  At the very least, the leases are

18 maintained through the Unit Agreement and production, so no extension or related

19 NEPA review would be required for at least a year.  *See supra* Sections II.A &

20 II.E.  The 2025 EA addressed Plaintiffs' Second, Third, and Fourth Claims seeking

21 additional environmental review, and Plaintiffs are free to challenge the EA in a

22 separate proceeding.

23         4.    The Court Should Find Plaintiffs' Claims Prudentially Moot

24     The Court should also find Plaintiffs' Claims prudentially moot.  "The

25 central inquiry as to prudential mootness is whether a court should exercise its

26 discretion by finding a case moot because the court cannot grant meaningful

27 relief." *Rainey v. Fed. Deposit Ins. Corp.*, No. 10-cv-05940, 2011 WL 13273076,

28 at *9 (C.D. Cal. Sept. 28, 2011) (citation omitted).  Courts have recognized

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

11

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1  prudential mootness for NEPA claims, including instances where a challenged

2  activity was complete—as is the case here for the 2024 APMs and the 2023

3  Extension—so there was no effective relief the court could grant.  *See, e.g., Idaho*

4  *Rivers United v. U.S. Army Corps of Eng'rs*, No. 14-cv-1800, 2016 WL 498911, at

5  *6 n. 9 (W.D. Wash. Feb. 9, 2016).  Accordingly, this Court should find Plaintiffs'

6  claims prudentially moot.

7  **B.    BSEE Complied With NEPA Through the 2023 Extension CatEx**

8  A CatEx is "a category of actions that a Federal agency has determined

9  normally does not significantly affect the quality of the human environment."  42

10  U.S.C. § 4336e(1); *see also* 43 C.F.R. § 46.205.  BSEE appropriately concluded

11  here that the "request for more than 180 days to resume leaseholding operations

12  under 30 C.F.R. § 250.180(e) is categorically excluded from further NEPA

13  analysis pursuant to 516 DM 15.4 (C)(7)."[4]  AR_0000428.  The SYU operated for

14  decades under its leases, approved DPP, and Unit Agreement until it was shut in

15  during 2015.  *See supra* Sections II.A-C.  The 2023 Extension maintained the

16  status quo—it did not create "new" potentially significant environmental impacts,

17  particularly because the Preservation Plan was in place.  *See supra* Sections II.C-D.

18  Under NEPA, an agency is not required to prepare an EA or EIS for a

19  proposed action that is "excluded pursuant to one of the agency's categorical

20  exclusions."  42 U.S.C. § 4336(a)(2); *see id*. § 4336e(1).  Under the regulations in

21  place when the 2023 Extension was granted, if a CatEx covers a proposed action,

22  the agency "evaluate[s] the action for extraordinary circumstances . . . [that] may

23  have a significant effect."  40 C.F.R. § 1501.4(b) (2023);[5] *see also* 43 C.F.R.

24

25  [4] In two places BSEE's CatEx contains a clerical error in referring to a different CatEx under 516 DM 15.4(C)(6) related to suspensions.  AR_0000426-27.  The correct CatEx is 516 DM 15.4(C)(7) for "lease extensions" and is thereafter

26  correctly referred to in the CatEx.  AR_0000427-28.  The Department of the Interior's Departmental Manual, 516 DM 15 (May 27, 2004), is available at

27  https://www.doi.gov/sites/doi.gov/files/elips/documents/516-dm-15.pdf.

28  [5] The Council on Environmental Quality ("CEQ") NEPA regulations have since been rescinded.  90 Fed. Reg. 10,610 (Feb. 25, 2025).

§§ 46.205(c), 46.215.  But the mere presence of an "extraordinary circumstance" does not preclude a CatEx.  *See* 40 C.F.R. § 1501.4(b)(1) (2023) (CatEx available with extraordinary circumstances if there are "conditions sufficient to avoid significant effects.").  And "agencies are permitted to refer to prior environmental analyses when invoking a [CatEx]."  *Earth Island Inst.*, 82 F.4th at 637 n.11.

BSEE's determination in this CatEx that there were no "extraordinary circumstances," AR_0000428, is entitled to deference, *see, e.g.*, 43 C.F.R. § 46.215 ("Applicability of extraordinary circumstances to categorical exclusions is determined by" BSEE); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, No. 23-975, 2025 WL 1520964, at *6 (U.S. May 29, 2025) ("the central principle of judicial review in NEPA cases is deference"); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (upholding agency determination that potential presence of protected species did not constitute "extraordinary circumstance").  Here, BSEE's use of a CatEx for its approval of the 2023 Extension was appropriate.  When an agency's "consideration of the Projects' resource impacts [is] formatted in a table" for a CatEx, as BSEE did here, "a sentence or two of explanation for the majority of the entries" is adequate. *Earth Island Inst.*, 82 F.4th at 636.  BSEE more than met that standard here.[6] AR_0000426-30.  The 2023 Extension, which maintained the status quo under Preservation Plan, *see supra* Section II.C, does not have significant environmental effects.  The agency evaluated each of the 12 extraordinary circumstances and found none were applicable.  AR_0000429-30.  This is not surprising as the 2023 Extension involved no authorization of any physical work on any existing facilities and no operational changes.  BSEE's use of a CatEx is reasonable and should be

---

[6] While BSEE acknowledged shortcomings in its analysis, perfection is not the rule.  *Colorado River Indian Tribes v. Dep't of Interior*, No. 14-cv-02504, 2015 WL 13915982, at *29 (C.D. Cal. July 17, 2015) ("even where compliance with NEPA [is] less than perfect and technical violations are identified, agency action will not be set aside where the Secretary conducted an adequate NEPA review process and any claimed deficiencies are without consequence") (cleaned up).

1   upheld. *See Mountain Cmtys. for Fire Safety v. Elliott,* No. 2:19-CV-6539, 2020

2   WL 2733807, at *5 (C.D. Cal. May 26, 2020), *aff'd,* 25 F.4th 667 (9th Cir. 2022)

3   ("substantial deference" given agency regarding "application of its own categorical

4   exclusions").

5        Plaintiffs argue that BSEE's reasoning that production would remain idle is

6   inconsistent and arbitrary. Mot. at 12. Not so. Production *did* remain idle during

7   the relevant period for the 2023 Extension, and during that time the facilities were

8   maintained under the Preservation Plan. *See supra* Section II.C (Preservation Plan

9   measures); AR_000005-22, 406-14. It was reasonable for BSEE to find no

10  extraordinary circumstances for the narrow decision before the agency. A CatEx

11  for an extension to maintain the status quo is not a vehicle for Plaintiffs to

12  bootstrap into re-evaluating previously approved and longstanding oil and gas

13  operations in the SYU. *See Earth Island Inst.*, 82 F.4th at 638-39 (rejecting

14  plaintiffs' attempt to "use [a] challenge to [the CatEx and fire management plan

15  amendments] as a backdoor means to relitigate a decision that the Agency

16  previously made" in approving the original fire plan with an EIS); *San Luis Obispo*

17  *Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 100 F.4th 1039, 1058-59 (9th

18  Cir. 2024) (CatEx for exemption to extend time for renewal application for nuclear

19  plant upheld where "[e]xemption did not alter the status quo" and plaintiffs offered

20  no "specific safety concerns" other than a "general prior acknowledgement that

21  operation after 40 years may present unique age-degradation concerns.").[7]

22       Plaintiffs aver that "BSEE's assumption that the Santa Ynez Unit would

23  remain shut down fatally flaws its categorical exclusion review" and allege

24

---

25  [7] Plaintiffs' cases (Mot. at 13) are inapposite. In *West v. Secretary of Department of Transportation*, 206 F.3d 920, 929 (9th Cir. 2000), the agency relied on a CatEx

26  for freeway interchange that was inapplicable by its terms because it violated "FHWA regulations [that] forbid the use of a categorical exclusion for projects that

27  will have 'significant impacts on travel patterns'" and project was designed to change traffic patterns. In *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C.

28  Cir. 2018), a non-NEPA case, the agency reversed course on a market-power analysis without "reasonable justification."

environmental effects associated with the resumption of production.  Mot. at 13-14.  But BSEE's CatEx considered the "cumulative effects from ongoing future production, in the event that production is ultimately restored," AR_0000429, and the whole record on which BSEE made this finding clearly demonstrates the specific effects that Plaintiffs point to have already been analyzed.[8]  For example, BSEE extensively considered potential impacts from oil spills.  The 1984 EIS identified and classified accidental discharges of oil ranging from less than 10 barrels (negligible) to more than 500,000 barrels (disastrous).  AR_0019541.  More recent NEPA analysis—such as the 2018 PEA which was unquestionably in effect when the 2023 Extension was granted, but ignored by Plaintiffs—considered the effects of historic oil spills, including the 2015 oil spill.  *See* AR_0016153-54 (2018 PEA: on post-spill recovery); *see also* AR_0000555-56 (2023 PEIS: spill effects are "localized and have subsided").  Prior analyses also considered the effect of oil spills on cultural resources.  AR_0016072 (2018 PEA: "effects on [cultural sites and] resources from an accidental oil spill . . . would be localized and temporary, and would be negligible to minor overall"); *see also* AR_0015194 (2021 EA: analyzing impacts from maintenance project on Chumash culture).

Prior NEPA analyses also considered air quality, greenhouse gas ("GHG") emissions, and climate change.  *See, e.g.*, AR_0019320-57 (impacts of production including air quality and climate); AR_0016074-77 (air quality, including the "maximum annual downstream GHG emissions from the consumption of new oil and gas production"); AR_0015175-78 (air quality and GHG impacts associated with platform maintenance).  BSEE also considered the age of offshore

---

[8] *California v. Norton* is distinguishable because the federal defendants could "not point to any documentation in the record that would suggest that it made a categorical exclusion determination at the time the lease suspensions were approved."  311 F.3d 1162, 1175 (9th Cir. 2002).  Further, the leases at issue in *Norton* "ha[d] not yet begun producing paying quantities of oil or gas."  *Id.* at 1168.  Unlike in *Norton*, here BSEE conducted a CatEx for the 2023 Extension for leases with a well-established history of production and which explicitly analyzed the presence of all potential extraordinary circumstances, with the backdrop of numerous prior environmental analyses.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

15

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

infrastructure, but concluded that "BSEE has a number of procedures in place to address aging platforms and infrastructure" including inspections, reports for assessing existing platforms to determine the structure's fitness for purpose, and BSEE's detailed regulatory program. AR_0016156-57 (2018 PEA); *see also* 30 C.F.R. § 250.198 (requirements incorporated by reference).

Prior NEPA analysis also considered endangered species, including potential collisions with endangered whales. AR_0027470, 853 (blue whale and humpback whale); AR_00016094 (oil and gas development and production activities "are not likely to adversely affect any of the listed whales"). Lastly, with respect to "natural resources, cultural resources, or ecologically significant areas," Plaintiffs point to potential oil spills arguing they might "limit access to Chumash sacred sites" and "damage the new Chumash Heritage National Marine Sanctuary." Mot. at 13-14. The Sanctuary, however, was established over a year *after* the 2023 Extension was issued, *see* 89 Fed. Reg. 95101 (Dec. 2, 2024), so it was appropriate to not reference it in the CatEx. In any event, potential impacts to cultural resources have been extensively analyzed and mitigated. For example, the 1984 EIS included detailed mitigation measures, such as the development of cultural resource compliance programs to guide cumulative project-related cultural resource surveys, testing, and mitigation programs for Native American concerns, and archeological, historical, and architectural resources. AR_0019127-63, 19408-09. Plaintiffs' assertions are thus belied by the "whole record." *Nat. Res. Def. Council*, 102 F.4th at 1056; *Earth Island Inst.*, 82 F.4th at 637 n.11 (agency can "refer to prior environmental analyses when invoking a categorical exclusion").

## C. BSEE's National Interest Determination Was Reasonable

BSEE's national interest determination for the 2023 Extension is lawful. The BSEE Regional Supervisor may "allow [the lessee] more than a year to resume operations on a lease continued beyond its primary term" if BSEE determines "that the longer period is in the National interest, and it conserves

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

16

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

resources, prevents waste, or protects correlative rights." 30 C.F.R. § 250.180(e);
*see also* 43 U.S.C. § 1334(a). The Secretary of the Interior has broad discretion to
"administer the provisions of [OCLSA] relating to the leasing of the outer
Continental Shelf." 43 U.S.C. § 1334(a). Determining whether the 2023
Extension "is in the National interest, and it conserves resources, prevents waste,
or protects correlative rights" was in BSEE's sound discretion and should be given
deference. *See* 30 C.F.R. § 250.180(e); *see also Parker Drilling Mgmt. Servs., Ltd.
v. Newton*, 587 U.S. 601, 609 (2019) ("OCSLA gives the Federal Government
complete 'jurisdiction, control, and power of disposition' over the OCS") (quoting
43 U.S.C. § 1332(1)); *Statoil Gulf of Mexico LLC ExxonMobil Corp.*, 2011 WL
2946711, at *36 (IBLA May 31, 2011) ("Balancing . . . factors involving the
national interest is the responsibility of the Department's policy makers . . . .").

BSEE reasoned the 2023 Extension was consistent with the national interest
given (i) production would use existing facilities to meet the Nation's energy needs
without the impacts associated with new infrastructure, or exploration and
development of unproven fields; (ii) benefits to taxpayers from royalites and taxes;
and (iii) conservation of known resources from these fields which prevents waste
and protects correlative rights. AR_0000424. That reasoning is consistent with
OCSLA's mandates and the action under consideration—an extension of time to
resume already-approved operations for existing facilities subject to a Preservation
Plan. *See, e.g.*, 43 U.S.C. § 1802(1) (OCSLA "intended to result in expedited
exploration and development of the Outer Continental Shelf in order to achieve
national economic and energy policy goals"); *id*. § 1802(2)(A) (need "to make [oil
and natural gas resources in the Outer Continental Shelf ("OCS")] available to
meet the Nation's energy needs as rapidly as possible"); *supra* Section II.C.

Instead, while acknowledging that OCSLA "does not expressly require
BSEE to consider environmental harms," Plaintiffs argue BSEE's national interest
determination is unlawful because it failed to consider environmental effects of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

17

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

"restarting" oil and gas production.[9]  Mot. at 10-11.  But BSEE clearly did consider the environmental effects of the extension and oil and gas production as evidenced by the determination itself, in light of the "whole record" and the discretion granted to BSEE under OCSLA.  *See* AR_0000424 (referencing contemporaneous CatEx); *Nat. Res. Def. Council*, 102 F.4th at 1056 (Court considers whole record in APA review); *see supra* Section II.B (environmental analysis).

Plaintiffs real quarrel is not that BSEE did not consider environmental issues (it clearly did), but with BSEE's policy decision.  BSEE's national interest determination was therefore not arbitrary and capricious.

### D.   BSEE CatExs for the Two APMs Complied With NEPA

Pursuant to 30 C.F.R. § 250.613, Sable submitted the APMs to reperforate and add perforations to existing wells as part of well reworking activity.  AR_0000037-56.  BSEE properly applied a CatEx just as it has done across wells throughout the OCS.  *See id.*  The work performed under the APMs did not result in change to the footprint of the facilities, new well drilling, or well stimulation treatments.  AR_0016130-31.  Rather, the operations are "consistent with those activities considered and evaluated" in the DPP.  AR_0000037, 40.  BSEE's use of a CatEx is reasonable based on the record before the agency, and is entitled to deference.  *See Seven Cnty.*, 2025 WL 1520964, at *8.

#### 1.   BSEE Reasonably Concluded a CatEx Applies

BSEE appropriately concluded that the two APMs Sable applied for were "categorically excluded from further [NEPA] analysis in accordance with 516 DM

---

[9] Neither of Plaintiffs' cited cases discussed a national interest determination.  *See California v. Bureau of Land Mgmt.*, 277 F. Supp.3d 1106, 1112-14 (N.D. Cal. 2017) (challenge to postponement of certain compliance dates of a rule under the APA); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1181 (9th Cir. 2008) (challenge to establishment of fuel economy standards under the Energy Policy and Conservation Act and NEPA).  In any event, neither case is relevant because here BSEE *did* consider the environmental implications of the action.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

18

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

15.4(C)(12)."  AR_0000037-42.  The minor perforation work was conducted across only 181 feet of existing Well HE-23, *see* AR_0000043, and across only 115 feet of existing Well HE-28, *see* AR_0000050.  Approval of APMs for well rework to existing wells falls under 516 DM 15.4(C)(12), which provide a CatEx for "[a]pproval of an Application for Permit to Drill (APD) an offshore oil and gas exploration or development well. . . ."  Plaintiffs concede as much.  Mot. at 15; *see* AR_0000037-42.  Indeed, well reworking under an APM has fewer potential impacts than new wells under an Application for Permit to Drill ("APD").

Plaintiffs argue that "the exclusions cannot be read to apply to this rare situation of allowing drilling activity to restart a decade after a massive oil spill," particularly where the DPP for the SYU "has no 'mitigation measures,'" for such a circumstance.  Mot. at 15.  Plaintiffs are incorrect; the DPP has mitigation measures for operating oil and gas facilities, *e.g.*, AR_0024946-52, including mitigation measures for oil spills, *see* AR_0024947 (offshore oil spill mitigation measures), AR_0025074-77 (onshore oil spill mitigation measures), as well as measures to reduce fuel consumption and emissions through waste heat recovery, a fugitive emissions program, gas turbine NOx reduction equipment, and low NOx heat burners, AR_024946-52.  These mitigation measures are applicable for all operations under the DPP, as is BSEE's regulatory program and requirements for operations and production.  *See* 30 C.F.R. § 250.101; *id.* § 550.254; 516 DM 15.4(C)(12) (authorizing CatEx when "said well and appropriate mitigation measures are described in an approved . . . development plan").  BSEE's use of a CatEx is appropriate in light of existing mitigation measures, and because the APMs—for minor rework at Platform Heritage—were not needed to resume production which in fact began at Platform Harmony.  AR_0000037, 40; *supra* Section II.E; *see also Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 860 (9th Cir. 1999) ("[C]onditions mitigating the environmental consequences of an action may justify" CatEx) (citation omitted).

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

19

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1    Moreover, because BSEE determined that the well rework activities "to an

2    existing downhole completion [are] considered normal well-reworking

3    operations," no additional NEPA review is required.  AR_0000037, 40.  Plaintiffs'

4    mischaracterization of the nature and scope of this work—as well as any argument

5    that additional NEPA review is required—must fail.  *Id*. ("This NEPA review and

6    subsequent approval regard only the processes and procedures generally outlined

7    [in the application] . . . and shall not be construed as incorporating by reference or

8    inference any other operation(s)"); *see also Upper Snake River Chapter of Trout*

9    *Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990) (no EIS was required for

10   "routine managerial actions" where a party is "simply operating the facility in the

11   manner intended"); *Mountain Cmtys.*, 2020 WL 2733807, at *5 (CatEx decisions

12   entitled to "substantial deference").[10]  The agency's CatExs were comprehensively

13   reviewed beginning in 2010, 75 Fed. Reg. 62418 (Oct. 8, 2010), and BSEE

14   continues to routinely use this CatEx for APMs.  *See, e.g.*, *Ctr. for Biological*

15   *Diversity v. Zinke*, 260 F. Supp. 3d 11, 18-19 (D.D.C. 2017).  Accordingly, this

16   CatEx was appropriately used here.

17                     2.    BSEE Reasonably Found No Extraordinary Circumstances

18   In determining no extraordinary circumstances exist and that a CatEx is

19   appropriate for the well reworking activity, BSEE considered and determined

20   potential impacts from the well reworking on public health and safety, ecologically

21   critical areas, and endangered species would not be significant.  AR_0000037-42.

22   That determination "implicates substantial agency expertise and is entitled to

23   deference."  *Alaska Ctr. For Env't*, 189 F.3d at 859.  BSEE's determination that no

24   extraordinary circumstances precluded CatEx use is not arbitrary and capricious.

25   *See San Luis Obispo Mothers for Peace*, 100 F.4th at 1058-59.

26   _____

27   [10] Plaintiffs' cited cases are inapposite because the APMs for discrete well
     reworking squarely fit the CatEx used here.  *See* Mot. at 15; *see, e.g., Friends of*

28   *the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 553 (9th Cir. 2024) ("[t]he parties
     agree[d] that neither [CatEx] applied by the Forest Service covers the Project
     alone").

Plaintiffs argue that BSEE's CatExs lacked detailed descriptions of impacts related to alleged extraordinary circumstances. Mot. at 16-20. Plaintiffs demand more than NEPA requires, particularly given the very limited nature of the well rework conducted. *See Earth Island Inst.*, 82 F.4th at 636. The CatExs explain that the APMs "are considered normal well-reworking operations," "consistent with those activities considered and evaluated in the original Development and Production Plan" and the "potential environmental impacts of which were analyzed in" the 1984 EIS. AR_0000037, 40. And, as discussed *supra* Sections II.B & IV.B, potential health, safety, ecological, and endangered species impacts have been analyzed under prior NEPA reviews.

These impacts were also considered in the 2018 PEA, which addressed authorization of APDs and APMs. AR_0016030, 42. Plaintiffs cannot credibly argue that BSEE somehow misunderstood the nature and scope of potential effects associated with the APMs when it relied on the CatExs. The 2018 PEA previously considered exactly how these reperforation activities may affect "public health and safety," 43 C.F.R. § 46.215(a), by analyzing impacts on air quality, including the very substances that Plaintiffs point to as concerns. AR_0016074-77. Plaintiffs point to potential impacts from oil spills and noise on "ecologically . . . critical areas," 43 C.F.R. § 46.215(b), such as Chumash cultural sites, Mot. at 17-18, but the 2018 PEA analyzes those exact impacts and more. *See, e.g.*, AR_0016072 (impacts of oil spills on "environmental, economic, and cultural sites and resources"); AR_0016082-96 (impacts of noise on marine animals); AR_0016089 (impact of lighting on marine birds). Lastly, potential impacts such as oil spills and strikes on "Endangered or Threatened Species," 43 C.F.R. § 46.215(h), by reperforation activities were analyzed and consistently found to be "negligible," "extremely low and discountable." AR_0016082-96. The effects of ongoing oil and gas operations in the Pacific OCS on endangered species were also recently analyzed in a 2024 Biological Opinion before the APM decisions here, including

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

21

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1   specifically with respect to the SYU.  AR_0000146 (vessel trips); AR_0000296-

2   300 (humpback whales); AR_0000302-04 (sea turtles); AR_0000305-08 (abalone);

3   AR_0000146-47 ("Any existing or new APD or APMs associated with existing

4   DPPs are considered part of this proposed action.").

5        Plaintiffs' assertion that the well reworking under the 2024 APMs presents

6   "unique or unknown environmental risks," 43 C.F.R. § 46.215(d), is not supported

7   by the record.  Reperforation and perforation of existing wells have been used for

8   decades on the OCS and is well understood; there are no unique or unknown risks.

9   Plaintiffs claim that "BSEE did not identify, let alone consider, the potential

10  complications of restarting production from long-idled wells, platforms, and

11  pipelines that have already outlived their expected lifespan."  Mot. at 20.  But in

12  the CatExs, BSEE specifically acknowledged that "[t]he greatest environmental

13  concern . . . is risk of an oil spill."  AR_0000038, 41.  Further, the SYU Platforms

14  have been in operation for decades and risks of oil spills have been analyzed

15  extensively, *see supra* Sections II.B & IV.B.  Moreover, Plaintiffs' assertion that

16  "none of those analyses anticipated that the infrastructure would still be used

17  beyond the expected life of the oil field or evaluated the risks and impacts of

18  restarting following a 10-year shutdown of operations," Mot. at 20, fails in light of

19  the time and resources spent on preserving, maintaining, repairing, and upgrading

20  existing infrastructure, the countless inspections and tests run over the last nine

21  years, and recent environmental analysis that explicitly considered "aging

22  infrastructure," *see supra* Section II.C (detailing Preservation Plans);

23  AR_0016156-57.  Indeed, the Ninth Circuit has upheld use of CatEx in spite of

24  "age-degradation concerns" of a nuclear plant where an agency's "continuing

25  oversight authority assuages [such] safety concerns."  *San Luis Obispo Mothers for*

26  *Peace*, 100 F.4th at 1057-59.  The effects of oil and gas operations on the Pacific

27  OCS are far from uncertain, and BSEE reasonably determined that no

28  extraordinary circumstance was present here.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

22

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

### E.    BSEE Is Not Required to Supplement Existing NEPA Analysis

Plaintiffs first claim that BSEE "violated NEPA by approving the lease extensions and APMs by relying on EISs prepared in 1975 and 1984." Mot. at 20. But BSEE appropriately relied on the CatExs for its actions, *see supra* Sections IV.B & IV.D, and did not rely solely on the prior EISs. Instead, BSEE used information from prior environmental analyses to inform its decision, which is routine and permitted—and Plaintiffs do not suggest BSEE should have ignored this voluminous record.[11] *Ctr. for Biological Diversity v. Salazar* ("*Salazar*"), 706 F.3d 1085, 1098 (9th Cir. 2013) ("BLM's use of the prior analyses in evaluating cumulative impacts of issuance of the gravel permit [under a CatEx] was appropriate."); *Earth Island Inst.*, 82 F.4th at 637 n.11.

Plaintiffs next argue that "BSEE's failure to prepare a new (or at a minimum a supplemental) EIS on the lease extensions and APMs required for restart violates NEPA." Mot. at 24. Here, resumption of oil and gas operations is not a major federal action requiring independent NEPA review. *See* 42 U.S.C. § 4332(2)(C) (NEPA requirements only apply to "major Federal actions"). The SYU has an already-approved DPP that has undergone thorough environmental review and no further federal approvals or "remaining governmental action" are required.[12] *See supra* Section II.B. *Salazar* is controlling here. There, BLM approved a plan of operations for a uranium mine with an EA, and 17 years after a mine owner stopped mining, they informed BLM of their intent to restart production. 706 F.3d at 1088-89, 1094. The Ninth Circuit held that BLM's issuance of a gravel permit

---

[11] The record also makes clear that BSEE's decisions were informed by more recent NEPA analyses. *See, e.g.*, AR_0016018-162 (2018 PEA); AR_0015154-471 (2021 EA); AR_0000450-853 (2023 PEIS).

[12] Contrary to Plaintiffs' claims, the 1984 EIS is not "programmatic." Oil and gas production in the SYU was approved decades ago under proper environmental review and the SYU operated for many years. BSEE properly relied on a CatEx before approving the "additional, independent actions" of the 2023 Extension and APM approvals. *Salazar*, 706 F.3d at 1095. Therefore *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 379-85 (1989), and *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998), are not relevant. Mot. at 21-24.

1  under a CatEx and other minor approvals did not constitute "major Federal

2  actions" triggering supplementation of the prior environmental analysis. *Id.* at

3  1094-96 ("[t]hese additional, independent actions thus did not trigger NEPA

4  supplementation of the 1988 environmental analysis" and "none of those actions

5  affected the validity or completeness of the 1988 approval of the [] plan of

6  operations nor did they prevent [the company] from mining under that plan.").  Just

7  as in *Salazar*, there is no federal approval needed specifically for "restarting"

8  production at the SYU.[13]  Therefore, "[t]here is no ongoing 'major Federal action'

9  that could require supplementation." *Id.* at 1095 (cleaned up); *see also Havasupai*

10  *Tribe v. Provencio*, 906 F.3d 1155, 1163 (9th Cir. 2018) (no supplemental EIS

11  where "resumed [mining] did not require any additional government action").

### F.    Vacatur of BSEE's Decisions Is Not Warranted

13        Should Plaintiffs prevail on any claims, Sable respectfully requests

14  additional briefing on the appropriate remedy given the very significant interests at

15  stake and the evolving circumstances involved in this matter.  In that circumstance,

16  the Court should remand without vacatur for Federal Defendants to take into

17  consideration the Court's ruling.  The U.S. Supreme Court has made clear that

18  vacatur is not the presumptive remedy in NEPA cases. *See Seven Cnty.*, 2025 WL

19  1520964, at *9 (NEPA "deficiency may not necessarily require a court to vacate

20  the agency's ultimate approval of a project, at least absent reason to believe that

21  the agency might disapprove the project"); *cf. Monsanto Co. v. Geertson Seed*

22  *Farms*, 561 U.S. 139, 157-58 (2010) (injunction not presumptive remedy in a

23  NEPA case).  Here, where BSEE already conducted additional NEPA analysis and

24  re-affirmed its decision to approve the 2023 Extension, *see supra* Section II.F,

25  vacatur of BSEE's prior decisions that Plaintiffs seek is particularly unwarranted.

---

27  [13] Under Plaintiffs' theory, every well across the United States OCS that has been temporarily plugged would require an EIS to "restart" it, which is an absurd result.

28  *See Friends of the Inyo*, 103 F.4th at 557 ("absurd results are to be avoided") (cleaned up).

1     Moreover, if the Court rules for Plaintiffs, the "disruptive consequences" of

2 vacatur would outweigh any seriousness of the agency's errors. *Cal. Cmtys.*

3 *Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (cleaned up).  Here,

4 the disruptive financial consequences of vacating BSEE's decisions could amount

5 to nearly one billion dollars for Sable.  *See* Dkt. 39-1 ¶ 16; *Cal. Cmtys. Against*

6 *Toxics*, 688 F.3d at 994 (remanding without vacatur because "[s]topping

7 construction [of a power plant] would [] be economically disastrous [as it] is a

8 billion-dollar venture employing 350 workers"); *Wild Fish Conservancy v. Quan*,

9 No. 23-35322, 2024 WL 3842101, at *2 (9th Cir. Aug. 16, 2024).  Additionally,

10 consideration of the "seriousness of the error" (which there are none, *see supra*

11 Sections IV.B-D) takes into account "whether the agency would likely be able to

12 offer better reasoning or whether by complying with procedural rules, it could

13 adopt the same [decision] on remand . . . ."  *See Solar Energy Indus. Ass'n v.*

14 *FERC*, 80 F.4th 956, 997 (9th Cir. 2023) (cleaned up).  Again, given that BSEE

15 has already conducted additional, more detailed NEPA review in its EA and

16 reached the same decision, *see supra* Section II.F, vacatur is inappropriate.

17     Finally, if the Court determines additional NEPA analysis is required, the

18 Court should remand to Federal Defendants to determine the nature of that

19 analysis.  Deference to BSEE is required on that type of decision.  *See Ctr. for*

20 *Biological Diversity*, 538 F.3d at 1226 (declining to "order the immediate

21 preparation of an EIS" and giving "the benefit of the doubt to" the agency); *Jones*

22 *v. Gordon*, 792 F.2d 821, 829 (9th Cir. 1986) ("[W]e disagree with the district

23 court's conclusion that the [agency] must prepare [an EIS]"; agency must consider

24 the requirements of NEPA and "provide a reasoned explanation of whatever course

25 it elects to pursue.").

26 **V.    CONCLUSION**

27     Sable respectfully requests that Plaintiffs' Motion for Summary for

28 Judgment be denied and Sable's Cross-Motion for Summary Judgment be granted.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

25

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

Dated:  May 30, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Daniel P. Brunton*

Daniel P. Brunton (Bar No. 218615)
Email: daniel.brunton@lw.com
12670 High Bluff Drive
San Diego, CA 92130
Tel.: (858) 523-5400
Fax: (858) 523-5450

Michael G. Romey (Bar No. 137993)
Email: michael.romey@lw.com
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Tel.: (213) 485-1234
Fax: (213) 891-8763

Janice M. Schneider
(*Pro Hac Vice*)
Email: janice.schneider@lw.com
Devin M. O'Connor
(*Pro Hac Vice*)
Email: devin.o'connor@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Intervenor-Defendant*
*Sable Offshore Corp.*

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

26

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.

1

## CERTIFICATE OF COMPLIANCE

2    The undersigned, counsel of record for Intervenor-Defendant Sable Offshore

3  Corp., certifies that this brief contains 25 pages, which complies with the page limit

4  set by the Court's Standing Order (ECF No. 34).

5

6

7  Dated:  May 30, 2025                           By: /s/ *Daniel P. Brunton*

8                                                     Daniel P. Brunton (Bar No. 218615)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

27

CASE NO. 2:24-CV-05459-MWC-MAA
SABLE'S OPP'N TO PLS.' MOT. FOR SUMM. J.
AND CROSS-MOT. FOR SUMM. J.