Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological
Diversity and Wishtoyo Foundation*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No. 2:24-cv-05459-MWC-MAA |
| *Plaintiffs*, | **PLAINTIFFS' OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DOUG BURGUM, et al., | |
| *Defendants*, | Hearing Date: July 11, 2025 |
| and | Hearing Time: 1:30 p.m. |
| SABLE OFFSHORE CORP., | Location: Courtroom 6A |
| *Intervenor-Defendant*. | Judge: Hon. Michelle Williams Court |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ..............................................................................................1

ARGUMENT ....................................................................................................2

    I.    Plaintiffs' Claims Are Not Moot Because Effective Relief
        Remains Available .................................................................................2

        A.    BSEE Has a Heavy Burden to Demonstrate Mootness .....................3

        B.    BSEE's Post-Hoc Decisions Do Not Moot Any of
                Plaintiffs' Claims ...........................................................................4

        C.    Completion of Work Under the APMs Does Not Moot
                Plaintiffs' Third Claim ...................................................................9

    II.    BSEE's Issuance of the Lease Extensions Is Reviewable
        and Unlawful .....................................................................................10

    III.    BSEE's Issuance of the APMs Is Unlawful ...............................................16

    IV.    BSEE's Reliance on Decades-Old NEPA Analyses Is Unlawful...............20

    V.    The Court Should Issue Declaratory Relief and Vacate
        BSEE's Decisions...............................................................................22

CONCLUSION ................................................................................................24

CERTIFICATE OF COMPLIANCE........................................................................26

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Rivers v. Nat'l Marine Fisheries Serv.*,
   126 F.3d 1118 (9th Cir. 1997) ...................................................................8

*Beno v. Shala*,
   30 F.3d 1057 (9th Cir. 1994) ...................................................................12

*Bundorf v. Jewell*,
   142 F. Supp. 3d 1138 (D. Nev. 2015)........................................................22

*Calderon v. Moore*,
   518 U.S. 149 (1996).................................................................................3

*California v. Watt*,
   683 F.2d 1253 (9th Cir. 1982) .................................................................12

*Cantrell v. City of Long Beach*,
   241 F.3d 674 (9th Cir. 2001) ..............................................................3, 10

*Cape Cod Hosp. v. Sebelius*,
   630 F.3d 203 (D.C. Cir. 2011) ...................................................................4

*Chafin v. Chafin*,
   568 U.S. 165 (2013)..................................................................................3

*Chairez v. Mayorkas*,
   734 F. Supp. 3d 1093 (D. Idaho 2024) .....................................................13

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
   481 F. Supp. 2d 1059 (N.D. Cal. 2007) ....................................................18

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971).................................................................................11

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ...................................................................3

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
   698 F.3d 1101 (9th Cir. 2012) .................................................................15

ii

*Ctr. for Biological Diversity v. Lohn*,
   511 F.3d 960 (9th Cir. 2007) ..................................................................8

*Ctr. for Biological Diversity v. Salazar*,
   706 F.3d 1085 (9th Cir. 2013) ...............................................................21

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019)..............................................................................12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020)..............................................................................7, 13

*Desert Citizens Against Pollution v. Bisson*,
   231 F.3d 1172 (9th Cir. 2000) ...............................................................24

*Diné Citizens Against Ruining Our Env't v. Jewell*,
   312 F. Supp. 3d 1031 (D.N.M. 2018)......................................................10

*Dubbs v. CIA*,
   769 F. Supp. 1113 (N.D. Cal. 1990) .......................................................14

*Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022) .................................................4, 9, 20, 21

*Forest Guardians v. Johanns*,
   450 F.3d 455 (9th Cir. 2006) ........................................................3, 8, 9

*Forsyth County v. U.S. Army Corps of Eng'rs*,
   633 F.3d 1032 (11th Cir. 2011) ..............................................................14

*Friends of the Inyo v. U.S. Forest Serv.*,
   103 F.4th 543 (9th Cir. 2024) ................................................................18

*Gen. Chem. Corp. v. United States*,
   817 F.2d 844 (D.C. Cir. 1987)................................................................16

*Heckler v. Chaney*,
   470 U.S. 821 (1985)...............................................................................13

*Keating v. FAA*,
   610 F.2d 611 (9th Cir. 1979) .................................................................11

iii

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) .................................................................21

*Mach Mining, LLC v. EEOC*,
   575 U.S. 480 (2015)..............................................................................11

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989)................................................................................2

*Massachusetts v. Andrus*,
   594 F.2d 872 (1st Cir. 1979)..................................................................12

*Massachusetts v. Clark*,
   594 F. Supp. 1373 (D. Mass. 1984) .......................................................12

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000) ........................................................passim

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................15

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ................................................................16

*Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*,
   9 F.4th 1201 (9th Cir. 2021) ............................................................7, 10

*Neighbors of Cuddy Mtn. v. Alexander*,
   303 F.3d 1059 (9th Cir. 2002) ..........................................................9, 10

*No. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ..............................................................21

*Oglala Sioux Tribe v. U.S. Nuclear Reg. Comm'n*,
   896 F.3d 520 (D.C. Cir. 2018)...............................................................23

*Or. Nat. Desert Ass'n v. Freeborn*,
   458 F. App'x 605 (9th Cir. 2011) ............................................................6

*Or. Nat. Res. Council v. Bureau of Land Mgmt.*,
   470 F.3d 818 (9th Cir. 2006) ................................................................10

*Pac. Nw. Generating Co-op v. Bonneville Power Admin.*,
    596 F.3d 1065 (9th Cir. 2020) ...................................................................... 11

*Perez v. Wolf*,
    943 F.3d 853 (9th Cir. 2019) ........................................................................ 11

*Pit River Tribe v. U.S. Forest Serv.*,
    469 F.3d 768 (9th Cir. 2006) ................................................................. passim

*Pollinator Stewardship Council v. U.S. EPA*,
    806 F.3d 520 (9th Cir. 2015) ........................................................................ 23

*Poursina v. U.S. Citizenship & Immigr. Servs.*,
    936 F.3d 868 (9th Cir. 2019) ........................................................................ 13

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
    128 F.4th 1089 (9th Cir. 2025) ....................................................................... 4

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ....................................................................................... 2

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
    100 F.4th 1039 (9th Cir. 2024) ............................................................... 18, 19

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
    No. 23-975, 2025 WL 1520964 (U.S. May 29, 2025)............................... 20, 24

*Shaughnessy v. Pedreiro*,
    349 U.S. 48 (1955) ....................................................................................... 11

*Sierra Club v. Bosworth*,
    465 F. Supp. 2d 931 (N.D. Cal. 2006) .......................................................... 22

*Texaco, Inc. v. Udall*,
    295 F. Supp. 1297 (D.D.C. 1969) ................................................................. 12

*Tribal Vill. of Akutan v. Hodel*,
    869 F.2d 1185 (9th Cir. 1988) ...................................................................... 12

*Trout Unlimited v. Pirzadeh,*
    1 F.4th 738 (9th Cir. 2021) .......................................................................... 12

*U.S. Parole Comm'n v. Geraghty*,
  445 U.S. 388 (1980) ................................................................................ 6

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
  921 F.2d 232 (9th Cir. 1990) ................................................................ 18

*Webster v. Doe*,
  486 U.S. 592 (1988) .............................................................................. 14

*West v. Sec'y of Dep't of Transp.*,
  206 F.3d 920 (9th Cir. 2000) ................................................... 10, 17, 18

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  586 U.S. 9 (2018) ............................................................................ 11, 14

**Statutes**

42 U.S.C. § 4331 ......................................................................................... 2

42 U.S.C. § 4336b .................................................................................... 20

43 U.S.C. § 1332(3) .................................................................................. 13

43 U.S.C. § 1334(a) .................................................................................. 22

43 U.S.C. § 1334(a)(1)–(2) ................................................................. 12, 22

43 U.S.C. § 1802(2) .................................................................................. 13

**Regulations**

30 C.F.R. § 250.180(e) .............................................................................. 12

**Federal Register Notices**

62 Fed. Reg. 43,937 (Aug. 18, 1997) ....................................................... 19

74 Fed. Reg. 1937 (Jan. 14, 2009) ........................................................... 19

81 Fed. Reg. 62,259 (Sept. 8, 2016) ........................................................ 19

90 Fed. Reg. 10,610 (Feb. 25, 2025) ................................................................. 2

**Other Authorities**

U.S. Dep't of the Interior, Departmental Manual, 516 DM § 15.4(C)(12) ..................... 17

**INTRODUCTION**

Plaintiffs' opening brief explained how Federal Defendants the Bureau of Safety and Environmental Enforcement et al. (collectively, BSEE) violated the Outer Continental Shelf Lands Act (OCSLA), National Environmental Policy Act (NEPA), and Administrative Procedure Act in authorizing lease extensions and drilling permits that enable a restart of offshore oil and gas production at the Santa Ynez Unit following one of the largest oil spills in California's history. *See generally* Pls.' Mem. Supp. Summ. J., Dkt. No. 68. Rather than rebutting these claims, BSEE and Sable Offshore Corp. (Sable) primarily argue that BSEE's revised lease extensions decision and new environmental assessment (EA) and finding of no significant impact (FONSI)—issued long after the agency actions at issue and just days before their opposition briefs were due—moot Plaintiffs' claims. BSEE and Sable are incorrect.

Effective relief remains available for all of Plaintiffs' claims. BSEE's 2025 lease extensions decision cannot supersede its 2023 decision because harmful effects of that unlawful decision remain. Indeed, Sable was only able to obtain drilling permits and restart one of its three platforms in the Santa Ynez Unit because of the 2023 lease extension challenged in this case. Moreover, the Ninth Circuit has "repeatedly held that dilatory or ex post facto environmental review cannot cure an initial failure to undertake environmental review." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785–87 (9th Cir. 2006). In such situations, the proper course of action is not to dismiss the case as moot, but to declare the underlying actions unlawful, vacate those actions, and order the agency to complete a new analysis pursuant to the proper procedures. *See Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000). This is the only way to effectuate the purposes of NEPA and ensure it "will not be used to rationalize or justify decisions already made." *Pit River Tribe*, 469 F.3d at 785–86 (citations omitted).

BSEE's additional attempt to evade review of its lease extensions decision by arguing its National Interest Determination is unreviewable flies in the face of Ninth Circuit case law, standards articulated in OCSLA, and the agency's own actions in this

case. BSEE and Sable's various attempts to defend the agency's decisions on the merits likewise fail. After Plaintiffs filed this case, BSEE moved for voluntary remand of its decisions underlying Plaintiffs' first two claims for relief, identifying substantial deficiencies in its decisionmaking. BSEE cannot now legitimately claim those decisions were reasonable. Finally, BSEE and Sable's insistence that BSEE did nothing wrong in relying on a categorical exclusion and decades-old NEPA analyses to issue Sable's drilling permits fails to recognize the uniqueness of the agency's decisions, as well as a slew of new information demonstrating the risks of restarting long-dormant oil and gas production at the Santa Ynez Unit off California.

## ARGUMENT

## I.    Plaintiffs' Claims Are Not Moot Because Effective Relief Remains Available

BSEE and Sable have not satisfied their heavy burden of demonstrating that Plaintiffs' case is moot. Preparing a NEPA analysis and new lease extensions decision long *after* BSEE issued its original decision to grant the lease extensions and *after* its decision to issue Sable drilling permits (known as Application for Permits to Modify, or APMs) violates "NEPA's timing requirements" and "seriously impeded the degree to which [BSEE's] planning and decisions could reflect environmental values." *Pit River Tribe*, 469 F.3d at 785–86 (citation omitted) (cleaned up).[1] And harmful effects of

---

[1] It is irrelevant that *Pit River Tribe* and the cases cited therein relied (in part) on the now-repealed Council on Environmental Quality's NEPA regulations. *See* 90 Fed. Reg. 10,610–16 (Feb. 25, 2025). The Ninth Circuit's holdings in these decisions reflect NEPA's core principles—that agencies look before leaping and involve the public in the decisionmaking process so that their decisions can consider and incorporate environmental concerns. *See, e.g., Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." (quoting 42 U.S.C. § 4321)); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.").

2

BSEE's 2023 lease extensions remain. As such, effective relief is available in the form of declaratory relief, vacatur, and an order that BSEE complete new decisions under circumstances that provide for objective evaluations.

      A.    <u>BSEE Has a Heavy Burden to Demonstrate Mootness</u>

As the Supreme Court has explained, "a case 'becomes moot only when it is *impossible* for a court to grant *any* effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (emphases added) (citations omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id*. (citation omitted); *see also Calderon v. Moore*, 518 U.S. 149, 150 (1996) (if there exists a "partial remedy" that the court can grant—even if it is one that is not "fully satisfactory"—the court cannot dismiss a case on mootness grounds (citation omitted)). "The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). And that burden is a "heavy" one. *Id.* (citation omitted).

"[D]efendants in NEPA cases face a particularly heavy burden in establishing mootness." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001). This is because "if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities 'could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine.'" *Id.* (citation omitted). For similar reasons, a post-hoc NEPA analysis does not moot the failure to conduct a NEPA analysis prior to issuing an agency action that constitutes an irreversible commitment of resources. *Metcalf*, 214 F.3d at 1145. Any other rule would "subvert[] NEPA's goal of insuring that federal agencies infuse in project planning a thorough consideration of environmental values." *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988).

B.    BSEE's Post-Hoc Decisions Do Not Moot Any of Plaintiffs' Claims

Neither BSEE's post-hoc NEPA analysis nor its new lease extensions decision moot Plaintiffs' claims. This is because a "NEPA review cannot be used 'as a subterfuge designed to rationalize a decision already made.'" *Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (citation omitted). Rather, NEPA's "critical" timing requirement mandates that agencies "take a 'hard look' at environmental impacts *before* taking action." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1101 (9th Cir. 2025) (citation omitted) (cleaned up).

Here, BSEE did not look before leaping. As such, the 2025 lease extensions cannot "supersede" BSEE's 2023 lease extensions, *contra* BSEE Mem. Supp. Summ. J., Dkt. No. 75 at 9–10—particularly where BSEE took subsequent action in reliance on that 2023 decision by issuing the APMs and allowing production to restart, *see Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 210 (D.C. Cir. 2011) (holding that "a live controversy remain[ed] regarding the [plaintiffs'] objection to [a] 2007 rule" regarding Medicare payments despite a 2008 adjustment "to reverse the effect of the 2007" rule because "the 2008 rule in no way compensated for any underpayments that might have been made in 2007"). Nor can BSEE's 2025 EA and FONSI cure the agency's failure to comply with NEPA in issuing the 2023 lease extensions or APMs. *Contra* Dkt. No. 75 at 10–11; Sable Mem. Supp. Summ. J., Dkt. No. 76-1 at 10.

The Ninth Circuit has held that in situations such as this—where an agency ignored NEPA's procedural requirements and completed a NEPA analysis *after* taking an action that constitutes an irreversible commitment of resources—a court should declare the agency's actions unlawful, vacate those actions, and order preparation of a new analysis. This effective relief therefore remains for all of Plaintiffs' claims.

For example, in *Metcalf*, a federal agency entered into two written agreements with the Makah Tribe to support the Tribe's efforts to resume hunting gray whales off Washington. 214 F.3d at 1137–39. The agency prepared an EA and FONSI under NEPA, but not until over a year after entering into the second agreement with the Tribe. *Id.* at

4

1142–43. The plaintiffs sued upon the agency's issuance of the FONSI, alleging that the agency violated NEPA by "prepar[ing] the EA too late in the process." *Id.* The Ninth Circuit agreed, holding the agency's approach unlawful because "[b]y the time [the agency] completed the final EA … , the die already had been cast" precluding it from taking the true "hard look" that NEPA demands. *Id.* at 1144–45; *see also id.* at 1145 ("NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process.").

The court then ordered a remedy that it believed would "ensure that the law is respected" and that the agency's analysis would be "done under circumstances that ensure an objective evaluation"—vacating the FONSI, suspending implementation of the agency's agreements with the Tribe, and requiring a new NEPA analysis. *Id.* at 1146. In doing so, the Ninth Circuit rejected the defendants' arguments that the case was moot, concluding "the EA [was] demonstrably suspect because the process under which the EA was prepared was fatally defective." *Id.*

Similarly, in *Pit River Tribe*, the Ninth Circuit held that a federal agency violated NEPA by failing to conduct environmental review before issuing lease extensions for the development of geothermal steam on public lands in California. 469 F.3d at 772. The agency issued the leases in 1988, which provided an initial term of ten years, relying on prior NEPA analyses for geothermal development in the area prepared in the 1970s and 80s. *Id.* at 775–76. In 1995, the company submitted a proposal to build and operate a power plant, and the agency issued a final environmental impact statement (EIS) on the power plant project in 1998. *Id.* at 776–77. The agency also issued a separate decision in 1998 to extend the leases for another five years without conducting any additional environmental review; and in 2002, extended them for another 40 years, also without conducting any additional environmental review. *Id.* at 777–78.

The plaintiffs filed suit, challenging, *inter alia*, the agency's failure to conduct any NEPA analysis on the 1998 lease extensions, and the defendant-intervenor argued that the court lacked jurisdiction because the 2002 lease extensions "supplanted" the

1998 extensions. *Id.* at 779. The court rejected this argument, holding that if the court

ruled the agency failed to follow the proper procedure, it could "invalidate the leases as

of 1998, thus nullifying the 2002 extensions," and redressing the plaintiff's procedural

injury. *Id*. The court also held that the 1998 EIS could not substitute for the agency's

failure to conduct a NEPA analysis prior to issuing the lease extensions because "[b]y

the time the agencies completed the 1998 EIS, … the point of commitment to th[e]

proposal—the extension of the leases—clearly had come and gone." *Id.* at 784–87

(citation omitted) (cleaned up).[2] The Court then held that both extensions—along with

"the rest of the project approval process" that was "premised on the [company's]

possession of a valid right to develop the land"—violated NEPA and should be vacated.

*Id.* at 787–88; *see also Or. Nat. Desert Ass'n v. Freeborn*, 458 F. App'x 605, 606 (9th

Cir. 2011) (holding NEPA challenge to an agency's March 2010 decisions to authorize

grazing activity not mooted by subsequent December 2010 decisions because if the

agency "violated NEPA when it made the March 2010 decisions … , the district court

could end such authorization and thereby halt any grazing").

      The same is true here. BSEE's new EA and FONSI—prepared 1.5 years after the

agency granted the original lease extensions and 8 months after it issued the APMs—

cannot save its failure to conduct a NEPA analysis before issuing those decisions. As

with the agency actions in *Metcalf* and *Pit River Tribe*, BSEE improperly "made an

'irreversible and irretrievable commitment of resources'—i.e., by [approving the lease

extensions and APMs] before [BSEE] considered [their] environmental consequences

and prepared the EA." *Metcalf*, 214 F.3d at 1145.

---

[2] While the court was analyzing whether it could redress the plaintiff's claims in light of
the 1998 EIS, and thus whether the plaintiff had standing and not whether its claim was
moot, the decision applies here given the similarity of the standing and mootness
inquiries. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) ("[M]ootness
[is] 'the doctrine of standing set in a time frame: The requisite personal interest that
must exist at the commencement of the litigation (standing) must continue throughout
its existence (mootness).'" (citation omitted)).

That BSEE issued a new lease extensions decision after completing the EA and FONSI is immaterial. BSEE's 2025 lease extensions decision cannot supersede its unlawful 2023 decision because the harms of the 2023 lease extensions remain. Without BSEE's issuance of those extensions, Sable would not have the right to develop the Santa Ynez Unit, would not have been able to obtain the APMs, and would not have been able to restart one of its three platforms. *See Pit River Tribe*, 469 F.3d at 784; *see also* Dkt. No. 76-1 at 7 (Sable's claims that its leases are now maintained under the APMs and by the resumption of production at Platform Harmony to storage tanks at Las Flores Canyon).

This situation is therefore unlike the cases on which BSEE and Sable rely, where an agency's issuance of a new decision during the pendency of a lawsuit completely eradicated Plaintiffs' injuries stemming from the agency's old decision. *See* Dkt. No. 75 at 9–11; Dkt. No. 76-1 at 9–10. Declaring BSEE's actions unlawful and vacating the 2023 lease extensions decision and the subsequent actions BSEE took in reliance on those extensions, i.e., issuing of the APMs, would mean Sable would need to suspend production at Platform Harmony and cannot restart its other two platforms unless and until BSEE completes new analyses following the proper procedures, giving Plaintiffs effective relief. The agency's post-hoc analyses therefore do not moot any of Plaintiffs' claims. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020) ("Procedural requirements … serve[] important values of administrative law.").

None of the other cases on which BSEE or Sable rely dictate otherwise. For example, in *Native Village of Nuiqsut v. Bureau of Land Management* (cited in Dkt. No. 75 at 9, 12, 14; Dkt. No. 76-1 at 11), the challenged exploratory drilling project had ceased, "[n]o structures remain[ed] in the [project] area," and the oil company had capped all the exploratory wells and demobilized all project equipment. *Native Vill. of Nuiqsut*, 9 F.4th 1201, 1209 (9th Cir. 2021). The court therefore found that it could not provide any effective relief to the plaintiffs because there was no ongoing activity to mitigate and no way for the oil company to un-drill its capped wells. *Id.* Here, in

contrast, Sable is seeking to restart full production at the Santa Ynez Unit by returning shut-in wells to production, has not demobilized its equipment, and its oil and gas infrastructure remains in the ocean and on land. Vacating the agency's decisions would ensure a full restart cannot occur unless the agency conducts the proper analyses.

*American Rivers v. National Marine Fisheries Service* (cited in Dkt. No. 75 at 9, 10) is also inapposite. There, the plaintiffs challenged a biological opinion analyzing the effects of ongoing dam operations in the Columbia River on endangered and threatened Snake River salmon. *Am. Rivers*, 126 F.3d 1118, 1119, 1122 (9th Cir. 1997). The agency released the biological opinion at issue not because there was a new agency action triggering its need, but because a court had held the prior one unlawful. *Id.* at 1122. Accordingly, the plaintiffs did not seek to have any underlying agency action declared unlawful or set aside—they challenged only the biological opinion itself. *See id.* at 1122, 1124. The issuance of a new biological opinion therefore mooted the plaintiffs' case because there was no effective relief the court could issue. *See id.* at 1124. Here, in contrast, Plaintiffs are challenging underlying agency actions—the lease extensions and APMs—which enable a restart of oil and gas production and, in fact, allowed Sable to restart one of the three platforms in the Santa Ynez Unit. Setting those decisions aside is therefore effective relief that remains.

None of BSEE or Sable's other cited cases involved post-hoc NEPA analyses used to justify a previously made decision. Moreover, in contrast to the cases BSEE and Sable cite, here, the Court can provide Plaintiffs effective relief by declaring that BSEE violated OCSLA, NEPA, and the Administrative Procedure Act in issuing the lease extensions and violated NEPA and the Administrative Procedure Act in issuing the APMs by relying on decades-old NEPA analyses. This alone shows that Plaintiffs' case is not moot. *See Forest Guardians*, 450 F.3d at 462 ("[I]f a declaratory judgment would … provide effective relief the action is not moot."). This is not a situation where declaratory relief "would serve no purpose," *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007), because of the ongoing nature of the project at issue and

future authorizations from BSEE, such as additional APMs, needed for operations at the

Santa Ynez Unit, or additional lease extensions if Sable does not restart full production

within a certain time. Notably, BSEE regularly issues APMs for other ongoing oil and

gas operations off California. *See* BSEE, Pacific Region Completed Applications for

Permit to Modify (APM), https://www.bsee.gov/stats-facts/ocs-regions/pacific/pacific-

region-completed-applications-for-permit-to-modify-apm (last visited June 11, 2025).

Moreover, BSEE's history of violating NEPA in approving oil and gas activity at

the Santa Ynez Unit and elsewhere on the Pacific Outer Continental Shelf—along with

its continued insistence that it did nothing wrong in taking the agency actions at issue in

this case, Dkt. No. 75 at 19–24—show that such relief is needed. *See Envt'l Def. Ctr.*, 36

F.4th at 863, 882 (noting BSEE only agreed to complete a NEPA analysis on drilling

permits for hydraulic fracturing after being sued, and holding that BSEE's subsequent

EA violated NEPA in several respects and appeared to be used "as a subterfuge designed

to rationalize a decision already made" (citation omitted)). Declaratory relief would

therefore be effective because it would "govern[] [BSEE's] actions for the remainder of"

oil and gas operations at the Santa Ynez Unit and "prohibit[] [BSEE] from continuing to

violate the law." *See Forest Guardians*, 450 F.3d at 462–63.

C.    Completion of Work Under the APMs Does Not Moot Plaintiffs'
       Third Claim

BSEE and Sable are also wrong in arguing that completion of work under the

APMs moots Plaintiffs' third and fourth claims constitutionally or prudentially. *See
Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002)

("[C]ompletion of activity is not the hallmark of mootness."). While Sable has

completed the well perforations permitted by the APMs, Dkt. No. 76-1 at 7, it has not

completed oil and gas activities at the Santa Ynez Unit. As such, several forms of relief

remain to remedy Plaintiffs' injuries, which stem not just from the act of perforating

wells, but also from the restart of and prolonged oil and gas production at the Unit.

For example, "if required to undertake additional environmental review" under

the proper procedure, BSEE "could consider alternatives to" allowing a full restart of maximum production at the Santa Ynez Unit or "develop ways to mitigate" additional environmental harm from continued production, such as increased inspection or monitoring requirements; additional wildlife mitigation or pollution controls; only allowing use of one platform; or requiring a sunset of operations by a date certain. *Cantrell*, 241 F.3d at 678–79; *see also West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925–26 (9th Cir. 2000) (holding NEPA challenge to an approval of a two-stage highway interchange project was not mooted by completion of the first phase because the court's "remedial powers would include remanding for additional environmental review and, conceivably, ordering the interchange closed or taken down"); *Neighbors of Cuddy Mtn.*, 303 F.3d at 1065–66 (similar); *Or. Nat. Res. Council v. Bureau of Land Mgmt.*, 470 F.3d 818, 821 (9th Cir. 2006) (post-logging mitigation can yield effective relief).

Sable's reliance on *Native Village of Nuiqsut* is therefore misplaced. *See* Dkt. No. 76-1 at 11. There, the challenged oil drilling project was complete, wells had been capped, and infrastructure removed, *Native Village of Nuiqsut*, 9 F.4th at 1209; here, the project is ongoing. As such, this case more closely mirrors *Diné Citizens Against Ruining Our Environment v. Jewell*, where the plaintiffs challenged the federal government's approval of drilling permits allowing hydraulic fracturing and horizontal drilling without adequate NEPA review. 312 F. Supp. 3d 1031, 1088–90 (D.N.M. 2018), *aff'd in part, rev'd in part on other grounds*, 923 F.3d 831 (10th Cir. 2019). There, although the permittees completed the drilling, the court held that the claims were not moot—except those related to permanently abandoned wells—because "increased risk of environmental harm" remained from "producing wells" and "wells that are drilled but not yet complete," and a favorable ruling could still redress that harm. *Id.* at 1089. The same is true here.

## II.    BSEE's Issuance of the Lease Extensions Is Reviewable and Unlawful

BSEE's 2023 National Interest Determination is both subject to judicial review and unlawful. *Contra* Dkt. No. 75 at 15–18. BSEE and Sable's contrary arguments fall

short—particularly since BSEE has repeatedly acknowledged the inadequacy of its decision. BSEE Mot. Vol. Remand, Dkt. No. 37; Hesson Decl., Dkt. No. 37-1 ¶ 10; *see also* Kurtz Decl. Ex. 4, Dkt. No. 75-5 at 1 (BSEE Decision Letter) (acknowledging that BSEE did not consider relevant information). Moreover, BSEE only raised its reviewability argument after the Court denied BSEE's voluntary remand motion.

Agency actions are presumptively reviewable. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22–23 (2018); *see also Mach Mining, LLC v. EEOC*, 575 U.S. 480, 495 (2015) ("Judicial review of administrative action is the norm in our legal system."). Indeed, the Supreme Court has long emphasized that the Administrative Procedure Act's judicial review provision is "generous" and its "purpose was to remove obstacles to judicial review of agency action under subsequently enacted statutes." *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955). Accordingly, the exception for judicial review of actions "committed to agency discretion … is a very narrow exception" that applies only "in those rare instances … where … there is no law to apply," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (citations omitted) (cleaned up), i.e., "where 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion,'" *Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019) (citation omitted).

Consistent with these directives, the Ninth Circuit has held that when the sole standard is whether an action is "in the public interest"—a standard strikingly similar to "the national interest" one at issue—that action is not committed to agency discretion, as this standard provides sufficient law for judicial review. *Keating v. FAA*, 610 F.2d 611, 612 (9th Cir. 1979); *see also Pac. Nw. Generating Co-op v. Bonneville Power Admin.*, 596 F.3d 1065, 1077 (9th Cir. 2020) (holding the court could review "whether an action is 'consistent with sound business principles'" and noting that the Ninth Circuit has held it can review agency decisions involving "whether a particular act was 'feasible' or 'just and reasonable'" (citations omitted)). Moreover, the Ninth Circuit and other courts have regularly reviewed the reasonableness of the Department of the

11

Interior's (Interior) determination that a particular action taken under OCSLA was in the "national interest." *See e.g.*, *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1190 (9th Cir. 1988); *California v. Watt*, 683 F.2d 1253, 1268–69 (9th Cir. 1982); *Massachusetts v. Clark*, 594 F. Supp. 1373, 1387 (D. Mass. 1984).

This case is no different. This Court can review BSEE's decision because there is law to apply:  BSEE may only approve a lease extension that is "in the National interest, and … conserves resources, prevents waste, or protects correlative rights." 30 C.F.R. § 250.180(e). These are not unbounded policy judgments but concrete, reviewable criteria. Moreover, the provision in OCSLA directing the agency to prescribe leasing regulations—including those for lease extensions—requires a balance between facilitating proper lease development and protecting the environment from harm. 43 U.S.C. § 1334(a)(1)–(2); *cf. Trout Unlimited v. Pirzadeh,* 1 F.4th 738, 754 (9th Cir. 2021) (stating that if a law provided an agency could act "for any reason … then no meaningful legal standard would apply").

BSEE's attempt to fault Plaintiffs for pointing to standards in the regulations, other provisions of OCSLA, and the statute's overall purposes, Dkt. No. 75 at 16–17, is unavailing. Even where a statute grants an agency broad discretion, that agency's actions are reviewable when guided by meaningful standards found in the statute's framework or regulations. *See Dep't of Com. v. New York*, 588 U.S. 752, 771–72 (2019) (finding standards in other parts of the Census Act despite the Secretary's discretion to conduct the census "in such form and content as he may determine" (citation omitted)); *Trout Unlimited,* 1 F.4th at 757–58 (finding guidance in regulations as a whole despite apparent agency discretion).[3] Thus, 30 C.F.R. § 250.180(e)'s reference to "the National

---

[3] Courts also consider "whether the general purposes of the statute would be endangered by judicial review." *Beno v. Shala*, 30 F.3d 1057, 1066 (9th Cir. 1994) (citation omitted). OCSLA's purposes would not be endangered by judicial review, as evidenced by the "complex and detailed regulations" implementing the statute, *see id.* at 1066–67, and decades of litigation filed under the statute by states, the oil and gas industry, and

interest" must be read to conform to OCSLA's mandate to balance energy development with environmental protection. *See* 43 U.S.C. §§ 1332(3), 1802(2).

BSEE itself has acknowledged as much. BSEE's new lease extensions decision expressly admits that its National Interest Determination

> *is guided by the Congressional purposes of the Outer Continental Shelf Lands Act (OCSLA) and 43 U.S.C. § 1802 (2006)*, including to:
>
> (1) establish policies and procedures for managing the oil and natural gas resources of the OCS which are intended to result in expedited exploration and development of the OCS in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade; and,
>
> (2) preserve, protect, and develop oil and natural gas resources in the OCS in a manner which is consistent with the need (A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) *to balance orderly energy resource development with protection of the human, marine, and coastal environments*, (C) to insure the public a fair and equitable return on the resources of the OCS, and (D) to preserve and maintain free enterprise competition.

Kurtz Decl. Ex. 4, Dkt. No. 75-5 at 7 (BSEE Decision Letter) (emphasis added). And in seeking voluntary remand of its lease extensions decision, BSEE stated that the "National interest factors" include "those concerns that have been raised by the plaintiff[s] in this litigation." Hesson Decl., Dkt. No. 37-1 ¶ 12. BSEE's arguments in its brief that there are no standards by which to review its 2023 National Interest Determination directly contradict these acknowledgements.

The cases BSEE cites, Dkt. No. 75 at 15–16, fall into limited, well-established categories—none of which apply here—that courts have traditionally found to be "committed to agency discretion." *See Dep't of Homeland Sec.,* 591 U.S. at 17. These categories include non-enforcement decisions, *Heckler v. Chaney*, 470 U.S. 821 (1985); immigration cases where Congress explicitly stripped courts of jurisdiction to review

---

conservation organizations alike, *see, e.g. Texaco, Inc. v. Udall*, 295 F. Supp. 1297 (D.D.C. 1969); *Massachusetts v. Andrus*, 594 F.2d 872 (1st Cir. 1979).

national-interest waivers, *Poursina v. U.S. Citizenship & Immigr. Servs.*, 936 F.3d 868
(9th Cir. 2019); *Chairez v. Mayorkas*, 734 F. Supp. 3d 1093 (D. Idaho 2024); and
national security decisions like Central Intelligence Agency employment and security
clearances, *Webster v. Doe*, 486 U.S. 592 (1988); *Dubbs v. CIA*, 769 F. Supp. 1113 (N.D.
Cal. 1990). Extending an offshore oil and gas lease is not the type of decision that is
traditionally unreviewable. *See Weyerhaeuser*, 586 U.S. at 23–25 (rejecting agency's
position that its decision was committed to its discretion where the "case involve[d] the
sort of routine dispute that federal courts regularly review: An agency issues an order
affecting the rights of a private party, and the private party objects that the agency did
not properly justify its determination under a standard set forth in the statute").

Forsyth County v. U.S. Army Corps of Engineers* is likewise inapplicable. 633
F.3d 1032 (11th Cir. 2011). That case involved a law allowing the Corps to lease land
but requiring it to give a preference to local governments in doing so. *Id.* at 1035. A
county sued the Corps after it leased land to a nonprofit organization, claiming the
Corps failed to properly consider the preference. *Id.* at 1040. The Eleventh Circuit held
the decision unreviewable because the Corps considered the preference but decided
other statutory factors outweighed it, and the law did not specify which criteria were
paramount or how the agency should weigh the enumerated factors. *Id.* at 1041; *see also
id.* at 1042 (noting that the plaintiff "asked the district court to second guess the weight
accorded th[e] preference amidst a host of other factors" the agency considered). Here,
in contrast, Plaintiffs have not challenged how BSEE chose to weigh relevant factors,
but rather BSEE's complete omission of relevant considerations in its decision, a classic
APA claim that is squarely within the domain of reviewable agency action. *See
Weyerhaeuser*, 586 U.S. at 24–25 (holding that where a statute grants an agency
discretion to exclude land from a critical habitat designation, the agency's decision is
reviewable because the statute provided meaningful standards, such as economic and
conservation impacts, to guide that discretion).

BSEE and Sable's argument that the agency's 2023 National Interest

Determination was not arbitrary also fails. BSEE already admitted "deficiencies" with its decision that "impact[ed] the sufficiency and completeness" of its review. Hesson Decl., Dkt. No. 37-1 ¶ 8. It should therefore be undisputed that BSEE's decision was "over broad and conclusory," lacking any analysis of "how granting the extension outweighs any risks to the national interest." *Id.* ¶ 10.

BSEE cannot hide behind its "discretion" in evaluating whether a lease extension is in the national interest, *see* Dkt. No. 75 at 18, to claim a decision it previously admitted was flawed is now somehow reasonable. An agency's exercise of its discretion can still be unlawful, where, for example, it entirely failed to consider an important aspect of the problem. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That is just what happened here. *See* Dkt. No. 68 at 9–11 (explaining how BSEE failed to consider, *inter alia*, how greenhouse gas pollution from restarting oil and gas production poses a risk to the national interest given record evidence showing that climate change is a growing threat to national security). Contrary to BSEE's characterizations, the factors it failed to consider are not peripheral concerns; they go to the core of what constitutes the "national interest" under OCSLA.

BSEE's claim that the harms from the lease extensions are not relevant factors because they are not expressly enumerated in OCSLA or its implementing regulations, Dkt. No. 75 at 18, fails. In evaluating whether an agency failed to consider relevant factors, courts look to what the underlying statute makes important, Dkt. No. 68 at 10, as well as scientific studies and other information in the administrative record. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1122–23 (9th Cir. 2012). Here, both OCSLA and the administrative record show that the environmental harms from extending the leases in the Santa Ynez Unit are relevant factors for BSEE's National Interest Determination. *See* Dkt. No. 68 at 9–11.

Indeed, BSEE recognized that environmental impacts are a relevant consideration in making its National Interest Determination. *Id.* at 9–10 (citing AR_0000424). The problem for the agency is that it then failed to consider any adverse environmental

harms, focusing instead only on the purported benefits and rendering its decision the epitome of arbitrary decisionmaking.

In addition to issuing an arbitrary decision under OCSLA, BSEE's NEPA categorical exclusion review on issuing the lease extensions is also unlawful. Dkt. No. 68 at 11–14. BSEE has little to say in defense of its categorical exclusion review, instead claiming only that it was reasonable for the agency to assume operations would remain shut down given the representations ExxonMobil (the prior owner of the Santa Ynez Unit) made in its application for the lease extensions. Dkt. No. 75 at 19.

Regardless of what the applicant said, it is BSEE's job to examine the relevant factors and reach a reasonable decision in light of the available information. Deferring to the project proponent does not fulfill the agency's legal obligation—particularly when this deference led to a categorical exclusion based on an assumption that operations would remain shut down, while the lease extensions decision simultaneously assumed full production, without any explanation for this inconsistency. Dkt. No. 68 at 12–13; *see also Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (holding agency action arbitrary and capricious where the agency's analysis was "internally inconsistent and inadequately explained"); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (noting how the court was "troubled by [the agency's] selective willingness to rely upon the availability of funding sources beyond the Forest Service's direct control" for preferred alternative while rejecting other alternatives because of uncertain funding).[4]

## III. BSEE's Issuance of the APMs Is Unlawful

BSEE's reliance on a categorical exclusion to approve the APMs at issue in this case was arbitrary. Dkt. No. 68 at 14–20. Contrary to BSEE and Sable's insistence, there

---

[4] BSEE's argument also rings hollow considering its 2025 lease extensions decision and 2025 EA and FONSI examine environmental harms from restarting oil and gas production at the Santa Ynez Unit, despite being based on the same application from ExxonMobil. *See* Dkt. No. 75-5 at 1.

is nothing "normal" about the APMs that BSEE issued to Sable here. *Contra* Dkt. No.
75 at 20 (citation omitted); Dkt. 76-1 at 21 (citation omitted). Nothing in the categorical
exclusion indicates that Interior intended it to apply to this unique situation—permits
that enable the resumption of production after a 10-year shutdown following a massive
oil spill. *See* Hesson Decl., Dkt. No. 37-1 ¶¶ 5, 13 (stating the APMs "allow for
increased flow and restoration of production to levels prior to the 2015 shut-in once
production is resumed"). Indeed, BSEE and Sable appear to disagree as to whether any
additional permits are needed prior to a restart—*compare id.* ¶ 14 (stating that "[i]t is
likely that a platform restart will require Sable to submit additional APMs to BSEE
involving pump changes, which are necessary to restart production and produce fluids
from the wellbore"), *with* Dkt. No. 76-1 at 19 (Sable claiming that it did not need APMs
to restart)—demonstrating the unique nature of the situation and why it was arbitrary for
BSEE to issue the permits without further review.

BSEE and Sable's arguments that the agency's approach was reasonable because
the action fits within the plain language of the categorical exclusion is inconsistent with
both the categorical exclusion and Ninth Circuit caselaw. The categorical exclusion
BSEE invoked (which is for the approval of an "Application for Permit to Drill" and
does not expressly apply to APMs), can only apply when "appropriate mitigation
measures are described in an approved … development plan." U.S. Dep't of the Interior,
Departmental Manual, 516 DM § 15.4(C)(12). While the development plans for the
Santa Ynez Unit discuss routine operations, oil spills, and air pollution, Dkt. No. 76-1 at
19; none of them account for a restart of production after a decade-long shutdown
following a major spill, and years after the development plans expected production to
cease for good. That Sable has been conducting inspections and maintenance under
"Preservation Plans," *id.* at 22, is irrelevant: such plans do not constitute development
plans under OCSLA. *See* 43 U.S.C. § 1351 (development plan approval process).

The unique circumstances of this case also show that BSEE "selected the wrong
path" in relying on this categorical exclusion. *West*, 206 F.3d at 929. Plaintiffs' argument

17

on this issue is not "novel" as BSEE contends, Dkt. No. 75 at 20, but based on a long

line of Ninth Circuit caselaw that "[t]he arbitrary and capricious standard is applied to

an agency's determination that a particular action falls within a categorical exclusion,"

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1082 (N.D.

Cal. 2007) (citations omitted) (cleaned up); *see also West*, 206 F.3d at 929 (in reviewing

an agency's invocation of a categorical exclusion, a court must determine whether the

agency's chosen "path … was the right one in light of NEPA's procedural

requirements"); Dkt No. 68 at 14–15 (citing other cases). These cases stand for the

proposition that BSEE cannot blindly apply its categorical exclusion simply because it

may fit the activity on its face, but it must determine whether use of the exclusion is

appropriate considering the scope of the underlying the permit facilitates.

That BSEE performed a categorical exclusion review cannot save its faulty use of

the exclusion in the first place. "[T]he agency completely fail[ed] to undertake the

required environmental analysis," meaning its "conclusions about the environmental

impact of the under-evaluated project are speculation." *Friends of the Inyo v. U.S.*

*Forest Serv.*, 103 F.4th 543, 558 (9th Cir. 2024). And that is particularly true here, where

BSEE's review failed to consider highly relevant factors and reached conclusions

contrary to the evidence before the agency. Dkt. No. 68 at 16–20.

The cases on which Sable relies—where an agency took an action that simply

maintained the status quo—are inapposite. *See San Luis Obispo Mothers for Peace v.*

*U.S. Nuclear Regul. Comm'n*, 100 F.4th 1039, 1058 (9th Cir. 2024) ( "[T]he Exemption

did not alter the status quo at Diablo Canyon but simply allowed for a change in the

schedule for submission of a renewal application."); *Upper Snake River Chapter of*

*Trout Unlimited v. Hodel*, 921 F.2d 232, 234–35 (9th Cir. 1990) (holding the Bureau of

Reclamation did not have to prepare an EIS before adjusting water flows at a dam

because the agency had been operating the dam for decades and regularly adjusted flow

levels). Here, BSEE did not permit the status quo, but took action that (by its own

admission) helped facilitate a return to full production after a 10-year shutdown.

Moreover, in *Mothers for Peace*, the plaintiffs did "not present any arguments of specific safety concerns with [the project]," but instead "reference[d] [the agency's] general prior acknowledgement that operation after 40 years may present unique age-degradation concerns." 100 F.4th at 1059. This stands in stark contrast to the situation here, where one massive oil spill has already occurred, AR_0016744, and the record demonstrates increased risk of more spills and other accidents from reliance on aging subsea pipelines and other infrastructure, AR_0001881; AR_0012989, none of which BSEE considered in its categorical exclusion review, *see* AR_0000037–39, 40–42.

Nor did BSEE properly consider impacts to endangered species. Dkt. No. 68 at 18–20. BSEE points to the 1984 EIS in claiming that the agency already adequately considered the effects of oil and gas activities at the Santa Ynez Unit on "marine species," Dkt. No. 75 at 22, but numerous species were not even listed under the Endangered Species Act at the time of the 1984 EIS. *See, e.g.*, 81 Fed. Reg. 62,259 (Sept. 8, 2016) (listing the Central America distinct population segment of the humpback whale as a separate species); 74 Fed. Reg. 1937 (Jan. 14, 2009) (listing black abalone); 62 Fed. Reg. 43,937 (Aug. 18, 1997) (listing California steelhead). It is hard to see how that analysis could have taken the requisite hard look at the impacts of activities if it did not consider the vulnerable status of the species. BSEE's claim that the 40-year-old EIS adequately considered emissions from oil and gas production at the Santa Ynez Unit, Dkt. No. 75 at 22, similarly fails. That EIS concluded annual air emissions will be insignificant because they "are small in comparison with current annual omissions for Santa Barbara County." AR_0027536. But the record shows that before it shut down, the Unit was the County's largest facility source of several emissions, including greenhouse gas emissions. AR_0001809–10.

Sable's reliance on a 2018 EA cannot save the agency either. BSEE did not mention that analysis in its decision under review, AR_0000037–40, nor does it point to it in its briefing, *see* Dkt. No. 75 at 21–24. And regardless, it cannot constitute the hard look required by law given other new information demonstrates its analysis is outdated.

19

For example, the 2018 EA refers to a conclusion from the National Marine Fisheries Service that oil and gas activity off California is not likely to adversely affect black abalone. AR_0016083–84. But the Fisheries Service recently reached the opposite finding, concluding in an updated analysis that oil and gas activity *is* likely to adversely affect this species, along with the blue whale, fin whale, the Mexico and Central America humpback whale distinct population segments, and the green sea turtle East Pacific distinct population segment. AR_0000122–23; *see also Envt'l Def. Ctr.*, 36 F.4th at 879 (recognizing the Fish and Wildlife Service's determination that "the western snowy plover, the California least tern, and the southern sea otter all were likely to be adversely affected by oil spills" from drilling activities off California). BSEE has never considered these facts in a NEPA analysis.

And contrary to BSEE's characterization, this issue is not "about where to draw the line" in considering indirect effects in an EIS "separate in time and place" and over which BSEE has no control. Dkt. No. 75 at 22 (quoting *Seven Cnty. Infrastructure Coal. v. Eagle County*, No. 23-975, 2025 WL 1520964, at *8 (U.S. May 29, 2025)). Rather, this is about the agency's arbitrary reliance on a categorical exclusion, its failure to consider the numerous direct effects of its permitting of drilling activity at the Santa Ynez Unit to resume, and its failure to connect the dots between record evidence and its ultimate decision—a straightforward violation of the Administrative Procedure Act.

## IV.    BSEE's Reliance on Decades-Old NEPA Analyses Is Unlawful

Plaintiffs explained how BSEE's reliance on EISs issued in the 1970s and 80s to approve lease extensions in 2023 and APMs in 2024 is arbitrary given a myriad of new information regarding the dangers of offshore oil and gas drilling. Dkt. No. 68 at 20–24. In response, BSEE does not deny that relevant new information exists or that the agency failed to consider this new information in its decision. *See* Dkt. No. 75 at 22–24. Instead, BSEE claims that 42 U.S.C. § 4336b does not apply because the 1975 and 1984 EISs are not "programmatic" in nature and that BSEE is not engaged in an ongoing major federal action. Dkt. No. 75 at 22–24. Both arguments fail.

First, it is irrelevant whether the underlying NEPA analyses are "programmatic." Plaintiffs cited 42 U.S.C. § 4336b to emphasize that Congress, in recently amending NEPA, recognized that agencies cannot reasonably comply with NEPA by relying on outdated information. The Ninth Circuit has long recognized as much. *See, e.g.*, *No. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086–87 (9th Cir. 2011) (stating that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious" and holding that the agency's reliance "on stale data" in preparing an EIS was "faulty" and "d[id] not constitute the 'hard look' required under NEPA"); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (holding that "the lack of up-to-date evidence on [a] relevant question prevented the [agency] from making an accurate cumulative impact assessment").

Second, oil and gas activity at the Santa Ynez Unit is ongoing and incomplete such that there remains a major federal action to occur—as evidenced by BSEE's issuance of the lease extensions and APMs at issue. *See* Civil Minutes, Dkt. No. 46 at 8 (recognizing that BSEE's issuance of APMs is indication of an "ongoing federal action"). This case is therefore a far cry from *Center for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013). In that case, the court held that an agency's approval of an updated financial guarantee to cover reclamation costs of a previously approved mining operation did not constitute a major federal action where all the agency did was perform "ministerial tasks" of plugging data into a "software program" to calculate the needed bond. *Id.* at 1095–96. It analogized such tasks to "the type of monitoring and compliance activities that … do not trigger NEPA's requirements." *Id.* at 1096 (citing cases).

Here, in contrast, BSEE's actions involved far more than ministerial tasks or monitoring activities. BSEE had the discretion to deny or condition both the lease extensions and the APMs, and BSEE did in fact include conditions on the lease extensions. AR_0000424–25; *see also Envt'l Def. Ctr.*, 36 F.4th at 864–65, 885 (recognizing that BSEE has the authority to deny drilling permits or restrict activities

under drilling permits, including for environmental protection reasons). Moreover, in contrast to the cases on which BSEE and Sably rely, Interior has broad authority over offshore oil and gas activity even after its initial approval, including over ongoing operations, and the authority to cancel a lease upon making certain findings and following certain procedures, including finding that the harms of continued production outweigh any benefits. 43 U.S.C. § 1334(a), (a)(1)–(2).

Courts have found this level of discretion sufficient to constitute "remaining federal action" giving rise to a supplemental EIS obligation. In *Sierra Club v. Bosworth*, for example, because the Forest Service retained the discretion "to unilaterally terminate the contract if its original environmental analysis has been altered by, for example, significant new information," the court held that the "approval of the contracts is not effectively final if additional information would alter the environmental analysis." 465 F. Supp. 2d 931, 939 (N.D. Cal. 2006). The court found federal action remained and ordered a supplemental EIS. *Id*. at 939, 942; *see also Bundorf v. Jewell*, 142 F. Supp. 3d 1138, 1150–51 (D. Nev. 2015) (holding that BLM retained enough discretion in finalizing an unissued right of way to constitute an ongoing major federal action, and ordering federal defendants to prepare a supplemental EIS for the entire project (not limited to the right of way)). The same result is compelled here.

## V.    The Court Should Issue Declaratory Relief and Vacate BSEE's Decisions

The Court should issue declaratory relief; vacate BSEE's lease extensions and APMs; and order BSEE to complete new decisions on the blank slate the law demands. The failure to comply with NEPA is a serious error of law that cannot be cured by post-hoc analysis, *see supra* Section I, and any disruptive consequences of vacatur do not outweigh the harm from the agency's errors, Dkt. No. 68 at 24–25. BSEE and Sable claim the agency's errors are not serious, arguing that BSEE's EA/FONSI and revised lease extensions decision show that it would reach the same result on remand. Dkt. No. 75 at 24–25; Dkt. No. 76-1 at 24–25. However, Ninth Circuit caselaw shows that the agency's self-serving decisions cannot be trusted. *See, e.g.*, *Metcalf*, 214 F.3d at 1146

1    (post-hoc NEPA taints the decisionmaking process to such an extent that it must be

2    redone); *see also Oglala Sioux Tribe v. U.S. Nuclear Reg. Comm'n*, 896 F.3d 520, 534

3    (D.C. Cir. 2018) ("If even 'significant' deficiencies in NEPA reviews are forgiven

4    because they are merely procedural, there will be nothing left to the protections that

5    Congress intended [NEPA] to provide.").

6         There is no reason to have supplemental briefing on remedy. *Contra* Dkt. No. 76-

7    1 at 24. Sable points to "evolving circumstances" regarding the Santa Ynez Unit in

8    requesting such briefing, *id.*, but those are largely of Sable's own making—including

9    the company's choice to proceed with various activities in the coastal zone in defiance

10   of cease-and-desist orders from the California Coastal Commission, *see* Pls.' First Am.

11   Compl. ¶ 83, Dkt No. 38-2; BSEE Vol. Remand Reply, Dkt. No. 60 at 6–7, and

12   restarting Platform Harmony while this lawsuit was pending, before BSEE completed

13   its NEPA analysis or new lease extensions decision, and despite not yet having approval

14   to restart the onshore pipeline that ruptured and spilled in 2015, *see* BSEE Notice, Dkt.

15   No. 73 at 1. As one California state agency put it, "[t]he willful disregard for the

16   directives of regulatory agencies does not engender trust or confidence in Sable's

17   willingness to serve as a responsible partner…." Monsell Decl. Ex. 1, at 2 (filed

18   herewith). Sable's request for additional briefing is nothing but a tactic to delay final

19   resolution of this case and meaningful relief for Plaintiffs.

20        Moreover, the disruptive consequences analysis asks whether the case is one of

21   the "limited circumstances" in which there will be harm *to the environment* from

22   vacatur. *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532–33 (9th Cir.

23   2015). The evolving circumstances to which Sable alludes are irrelevant because vacatur

24   will not result in environmental harm no matter the circumstances on the ground.

25   Rather, vacating BSEE's actions will ensure that no oil and gas production can occur

26   while BSEE conducts the unbiased analyses both NEPA and OCSLA demand. Any

27   economic harm to Sable from vacatur should carry little weight where Sable "acted at

28   [its own] peril," *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1187 (9th

Cir. 2000), by choosing to enter a contract with ExxonMobil regarding a highly contentious project that had already been the subject of several lawsuits.

Nothing in the Supreme Court's recent decision in *Seven County* changes the outcome here. *Contra* Dkt. No. 75 at 25; Dkt. No. 76-1 at 24. The Court's discussion of remedy for NEPA violations is consistent with the standard Plaintiffs cited in their opening brief. Moreover, this is not a situation where BSEE prepared a comprehensive EIS that "identified and analyzed numerous 'significant and adverse impacts that could occur'" from the underlying action (as well as "several 'minor impacts'") but chose not to address other impacts the agency deemed "'speculative' and attenuated from the project at hand." *Seven Cnty.*, 2025 WL 1520964, at *4 (citations omitted). Rather, here, BSEE unreasonably relied on categorical exclusions to avoid conducting an environmental analysis of the challenged actions, and Plaintiffs explained how this is a serious error because if BSEE had conducted its analysis pursuant to the proper procedures, it could have reached a different result. *See* Dkt. No. 68 at 25. Moreover, unlike in *Seven County*, where the agency "possesse[d] no regulatory authority over the" impacts it chose not to consider, 2025 WL 1520964, at *11, here, BSEE has direct regulatory authority over oil and gas production at the Santa Ynez Unit and the authority to deny the lease extensions and APMs based on environmental (or other) concerns.

## CONCLUSION

The Court should reject BSEE and Sable's arguments, grant Plaintiffs' motion for summary judgment, declare BSEE's actions unlawful, and vacate the agency's decisions.


Dated: June 13, 2025                    Respectfully submitted,

                                        /s/ *Kristen Monsell*
                                        Kristen Monsell (CA Bar No. 304793)
                                        Email: kmonsell@biologicaldiversity.org

/s/ *Miyoko Sakashita*
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org

Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological
Diversity and Wishtoyo Foundation*


I, Kristen Monsell, attest that all other signatories listed, and on whose behalf the

filings are submitted, concur in the filings' contents and have authorized the filings.

/s/ *Kristen Monsell*
Kristen Monsell

25

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation certifies that this brief contains 24 pages, which complies with the page limit set by the Court's Standing Order, Dkt. No. 34.

Dated: June 13, 2025                          /s/ *Kristen Monsell*
                                              Kristen Monsell