Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DOUG BURGUM, et al., <br><br> *Defendants* <br><br> and <br><br> SABLE OFFSHORE CORP., <br><br> *Intervenor-Defendant.* | No. 2:24-cv-05459-MWC-MAA <br><br> **PLAINTIFFS' SUPPLEMENTAL BRIEF** <br><br> Judge: Hon. Michelle Williams Court |

1

2

**TABLE OF CONTENTS**

3   TABLE OF AUTHORITIES ................................................................................. ii

4   INTRODUCTION ............................................................................................... 1

5

6   ARGUMENT ...................................................................................................... 2

7       I.      The 2025 Decision and Environmental Assessment Are
8               Inherently Flawed ............................................................................ 2

9
        II.     The 2025 Decision and Environmental Analysis Are
10              Substantively Inadequate ................................................................. 9

11
    CONCLUSION ................................................................................................. 12
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
   No. CV 12-9861-GW(SSx), 2016 WL 4650428 (C.D. Cal. Feb. 1, 2016).......... 8

*California v. Norton*,
   311 F.3d 1162 (9th Cir. 2002)................................................................. 8

*Charter Twp. of Huron, Mich. v. Richards*,
   997 F.2d 1168 (6th Cir. 1993)................................................................. 9

*Citizens Advisory Comm. on Priv. Prisons v. U.S. Dep't of Just.*,
   197 F. Supp. 2d 226 (W.D. Penn. 2001) ................................................. 6

*Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*,
   97 F. Supp. 3d 1210 (D. Haw. 2015) ..................................................... 10

*Conservation Nw. v. Sherman*,
   715 F.3d 1181 (9th Cir. 2013)............................................................... 10

*Ctr. for Biological Diversity v. Bernhardt*,
   982 F.3d 723 (9th Cir. 2020)......................................................... 10, 11

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ............................................................... 8

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
   623 F.3d 633 (9th Cir. 2010).................................................................. 10

*Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022)......................................................... 9, 11, 12

*Greater Yellowstone Coal. v. Kimbell*,
   No. 06-CV-37, 2007 WL 9709798 (D. Wyo. Aug. 24, 2007) ........................... 7

*Greater Yellowstone Coal. v. Tidwell*,
    572 F.3d 1115 (10th Cir. 2009) ................................................................. 7

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) ................................................. 2, 3, 4, 5, 7

*Nat. Res. Def. Council v. Callaway*,
    524 F.2d 79 (2d. Cir. 1975) ...................................................................... 3

*Pit River Tribe v. U.S. Forest Serv.*,
    469 F.3d 768 (9th Cir. 2006) .............................................................. 4, 6, 9

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ................................................................................. 2

*Save the Yaak Comm. v. Block*,
    840 F.2d 714 (9th Cir. 1988) ............................................................. 2, 4, 9

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
    No. 23-975, 2025 WL 1520964 (U.S. May 29, 2025) ............................. 12

**Statutes**

43 U.S.C. § 1337(b) ..................................................................................... 5

5 U.S.C. § 706(1) ......................................................................................... 7

**Regulations**

30 C.F.R. § 250.172(d) ................................................................................ 3

30 C.F.R. § 250.180(a)(2), (d), (e) .............................................................. 5

1    Pursuant to the Court's Minute Order of July 9, 2025, Plaintiffs Center for

2    Biological Diversity and Wishtoyo Foundation (Plaintiffs) hereby submit the

3    following supplemental brief addressing how Federal Defendants the Bureau of

4    Safety and Environmental Enforcement, et al.'s (collectively, BSEE) "May 2025

5    Decision and Environmental Assessment was completed in bad faith, was

6    improperly predetermined, was unreasonably slanted, and/or was substantively

7    inadequate pursuant to the relevant case law."

8                              **INTRODUCTION**

9        BSEE's 2025 Decision and Environmental Assessment—issued less than 48-

10    hours before its cross-motion for summary judgment was due and developed

11    behind closed doors with no public input—are improperly predetermined and

12    unreasonably slanted. If anything, the impropriety of the agency's decisions is even

13    more extensive here than in other cases finding an agency's post-hoc National

14    Environmental Policy Act (NEPA) analysis did not solve its failure to conduct that

15    review in the first place.

16        Here, BSEE admitted its lease extensions decision and categorical exclusion

17    review were flawed and sought remand of those actions, yet it refused to use its

18    clear authority to ensure no other activities in furtherance of a restart would occur

19    while it conducted additional review. Instead, BSEE took further action in reliance

20    on its faulty lease extensions decisions—issuing two drilling permits (known as

21    APMs) that enable a restart of production at the Santa Ynez Unit[1]—and allowed

22    production to resume at one of the Unit's three platforms. Moreover, on the day

23    this brief was due, BSEE issued a press release stating that it anticipates a full

24    restart by the end of 2025 and boasting how the Trump administration facilitated

25

26    ---

[1] BSEE has since issued nine additional APMs for wells at the Sant Ynez Unit. *See*

27    BSEE, Pacific Region Completed Applications for Permit to Modify (APM), https://www.bsee.gov/stats-facts/ocs-regions/pacific/pacific-region-completed-

28    applications-for-permit-to-modify-apm (drop down menu for 2025).

the Santa Ynez Unit's return "to essentially full production in just a matter of months," further demonstrating the improperly skewed and predetermined nature of BSEE's decisionmaking. *See* Monsell Decl., Ex. 1 at 2 (filed herewith).

The 2025 Decision and Environmental Assessment are also substantively inadequate under the relevant case law. The Environmental Assessment does not take the hard look NEPA demands. It fails to consider highly relevant evidence, is internally inconsistent, and does not properly consider the no-action alternative or denial of the lease extensions. BSEE's faulty Assessment fatally infects the agency's national interest determination in its 2025 Decision.

## ARGUMENT

### I. The 2025 Decision and Environmental Assessment Are Inherently Flawed

The process by which BSEE issued its 2025 Decision and Environmental Assessment was fundamentally flawed, rendering both decisions "demonstrably suspect" and improperly skewed toward approving Sable Offshore Corp.'s (Sable) activities. *See Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000).

The Ninth Circuit has repeatedly affirmed that "[p]roper timing is one of NEPA's central themes." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988). The statute "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). As such, a NEPA analysis must be "prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *Metcalf*, 214 F.3d at 1141–42 (citation omitted). An environmental assessment prepared after an agency decides to approve a project typically cannot cure its initial failure to comply with NEPA because such a process is "fatally defective" and "predispose[s]" the agency "to finding that the [action] w[ill] not significantly

2

1    affect the environment." *Id.* at 1146; *see also Nat. Res. Def. Council v. Callaway*,

2    524 F.2d 79, 92 (2d. Cir. 1975) (recognizing that an agency conducting a NEPA

3    analysis after issuing a decision "mak[es] a mockery of [the NEPA process]"). This

4    case is no exception.

5       Plaintiffs originally filed this case in June 2024, challenging BSEE's

6    November 2023 decision to issue extensions of the 16 offshore oil and gas leases

7    that comprise the Santa Ynez Unit. *See, e.g.*, Pls.' Summ. J. Mem. 1, Dkt. No. 68.

8    Without these extensions, drilling at the Unit would have permanently ceased. *See*

9    *id.* at 2–3, 11–12. Plaintiffs alleged that BSEE issued the lease extensions based on

10    a faulty national interest determination under the Outer Continental Shelf Lands

11    Act and an arbitrary categorical exclusion review under NEPA that used

12    inconsistent assumptions and failed to consider any of the environmental impacts

13    from resuming the very oil and gas operations that the extensions facilitate. *Id.* at

14    1–2, 9–14.

15       BSEE sought voluntary remand of those decisions, admitting that it based

16    them on faulty analyses. *Id.* at 9; BSEE Mot. for Vol. Remand, Dkt. No. 37. Yet

17    BSEE refused to ensure a restart of activities would not occur at the Santa Ynez

18    Unit while it prepared revised analyses, despite its express authority to do so. *See*

19    30 C.F.R. § 250.172(d) (giving BSEE authority to pause activity under an oil and

20    gas lease "[w]hen necessary to carry out the requirements of NEPA or to conduct

21    an environmental analysis").[2]

22       Instead, BSEE did the opposite by approving additional activity at the

23    Unit—issuing two APMs to enhance production—again relying on a categorical

24    exclusion and decades-old NEPA analyses to evade conducting any further NEPA

[2] The only apparent explanation that BSEE provided for such refusal was the agency's concern over what invoking this authority could mean for Sable's bottom-line. *See* BSEE Mot. Remand Reply 7, Dkt. No. 60 (noting that "Sable has explained that a suspension of operations on the Santa Ynez Unit would have disruptive consequences and may lead to Sable's loss of the leases altogether").

1  review. Dkt. No. 68 at 1. Plaintiffs supplemented their complaint to challenge the

2  APMs, and the Court denied BSEE's motion for voluntary remand, finding the

3  agency failed to "establish an intent to seriously reconsider or re-review its

4  decision." Order Denying Remand 2, 7, Dkt. No. 61.

5         Then—just days before its deadline to file its summary judgment brief—

6  BSEE issued a revised lease extensions decision and Environmental Assessment

7  purporting to address the issues that Plaintiffs identified in their complaint and in a

8  February 2023 letter that the agency had previously ignored. *See* Pls.' Opp'n to

9  Cross Mots. Summ. J. 1, Dkt. No. 78. BSEE and Sable then argued these new

10  decisions moot all of Plaintiffs' claims. *See id*. They do not, as effective relief

11  remains available. *Id.* at 2–10.

12         As in *Save the Yaak*, *Metcalf*, and *Pit River Tribe*, the process here was

13  fatally flawed. BSEE "did not engage the NEPA process 'at the earliest possible

14  time'" and instead only "consider[ed] the potential environmental effects of the

15  proposed action[s] . . . long after" deciding to issue the lease extensions and APMs.

16  *Metcalf*, 214 F.3d at 1143. As such, "[i]t is highly likely that . . . the

17  E[nvironmnetal] A[ssessment] was slanted in favor of finding that the [extensions

18  and APMs] would not significantly affect the environment." *Id.* at 1144; *see also*

19  *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785–86 (9th Cir. 2006)

20  (recognizing that the Ninth Circuit has "repeatedly held that dilatory or ex post

21  facto environmental review cannot cure an initial failure to undertake

22  environmental review" because this approach makes it "likely that more

23  environmental harm will be tolerated" and "seriously imped[es] the degree to

24  which [agency] planning and decisions c[an] reflect environmental values"

25  (quoting *Save the Yaak*, 840 F.2d at 718–19)).

26         This notion rings particularly true here given that BSEE approved the APMs

27  and allowed a restart of one of the three platforms in the Unit to occur while it was

28  conducting its post-hoc reviews—actions that could only occur because of the

4

1   2023 decision to extend the leases, without which Sable's ability to develop the

2   Santa Ynez Unit would have expired. *See, e.g.*, Dkt. No. 68 at 2–3 (citing 43

3   U.S.C. § 1337(b); 30 C.F.R. § 250.180(a)(2), (d), (e)). In other words, like the

4   agency in *Metcalf*, BSEE never committed to withdrawing the offending decision

5   or preserving the status quo so that it could more objectively consider

6   environmental impacts. *See* 214 F.3d at 1143–44. In fact, BSEE went even further

7   by issuing additional actions in reliance on its challenged decisions, rendering its

8   2025 Decision and Environmental Assessment improperly predetermined and

9   skewed.

10         BSEE claims that *Metcalf* is inapposite because there, the agency only

11   completed its NEPA review after already having committed to taking a particular

12   action, whereas here BSEE issued the 2025 Decision affirming the 2023 decision

13   after conducting NEPA review. BSEE Reply Br. 4, Dkt. No. 79. But this is a

14   distinction without a difference. BSEE did not revoke the underlying permits

15   facilitating a restart of production or order that Sable suspend its operations while

16   the agency conducted its analyses. On the contrary, BSEE doubled down on its

17   faulty 2023 decisions—approving the two APMs at issue (and nine subsequent

18   ones) and allowing a restart to occur—which could only happen because of its

19   approval of the lease extensions in 2023.

20         Sable also attempts to distinguish *Metcalf* because operations at the Santa

21   Ynez Unit are ongoing and BSEE's predecessor agency issued environmental

22   analyses on these operations in the 1970s and 80s, Sable Reply Br. 2–3, Dkt. No.

23   80, but this is similarly unavailing. Those old analyses assumed production would

24   have ceased by now and did not analyze the impacts of, or alternatives to, the

25   restart of production following a 10-year shutdown after a massive oil spill. Dkt.

26   No. 68 at 7 (citing AR_0019168).

27         Moreover, while BSEE did a categorical exclusion review for its lease

28   extensions, Dkt. No. 80 at 3, that analysis assumed production would remain shut

1    down, completely evading the relevant question of the impacts of allowing restart

2    of a 50-year-old drilling project that had been offline for decade after one of the

3    largest oil spills in California's history. Dkt. No. 68 at 6–7, 11–14. And BSEE's

4    reliance on a categorical exclusion in originally issuing the lease extensions means

5    that it also avoided the critically important evaluation of alternatives to approving

6    those extensions. *See Pit River Tribe*, 469 F.3d at 785 ("The consideration of

7    alternatives requirement guarantees that agency decisionmakers have before them

8    and take into proper account all possible approaches to a particular project

9    (including total abandonment of the project) which would alter the environmental

10    impact and the cost-benefit balance." (cleaned up)). BSEE's and Sable's attempts

11    to distinguish *Pit River Tribe* fail for similar reasons. *See* Dkt. No. 79 at 3; Dkt.

12    No. 80 at 2–3.

13        The cases where courts have held a post-hoc NEPA analysis sufficed are

14    inapposite. For example, in *Citizens Advisory Committee on Private Prisons v. U.S.*

15    *Department of Justice*, the court held that the agency violated NEPA by awarding a

16    contract for the construction of a private prison and allowing construction to begin

17    without first "taking a 'hard look' at the environmental consequences of the

18    project." 197 F. Supp. 2d 226, 231 (W.D. Penn. 2001). Though the court also held

19    that the agency's subsequent environmental assessment and finding of no

20    significant impact cured this failure, it did so because the agency took several steps

21    to demonstrate "the kind of objective and good faith analysis that NEPA requires."

22    *Id.* at 252. This included the fact that the agency issued a stop-work order "as soon

23    as it determined it was violating NEPA" and "refused to proceed with the project

24    until th[e] [c]ourt determine[d] that [the agency] ha[d] satisfied NEPA's

25    requirements." *Id.* The court also pointed to "the extent to which [the agency]

26    allowed and considered public comment during the preparation of its"

27    environmental assessment, including a 30-day public comment period and a public

28    hearing. *Id.* at 235, 254.

1    Here, BSEE did none of these things. It instead refused to suspend

2  operations, permitted additional activity, did not issue a draft assessment for public

3  comment or otherwise involve the public in its decisionmaking, and then bragged

4  about how it quickly facilitated a restart of the Santa Ynez Unit. Monsell Decl., Ex.

5  1 at 2. In other words, BSEE has done nothing to demonstrate that it undertook its

6  NEPA analysis objectively or in good faith. Rather, BSEE's actions show that it

7  inappropriately used the NEPA process "as an exercise in form over substance, and

8  . . . as a subterfuge designed to rationalize a decision already made." *Metcalf*, 214

9  F.3d at 1142.

10    *Greater Yellowstone Coalition v. Tidwell* is also inapplicable. There, the

11  plaintiff challenged a federal agency's failure to conduct supplemental NEPA on

12  six elk feedgrounds under section 706(1) of the Administrative Procedure Act, *see*

13  572 F.3d 1115, 1120 (10th Cir. 2009), which requires a court to "compel agency

14  action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1); *see also*

15  *Greater Yellowstone Coal. v. Kimbell*, No. 06-CV-37, 2007 WL 9709798, at *8 (D.

16  Wyo. Aug. 24, 2007) (district court decision describing this claim).[3] The only relief

17  the plaintiff sought on that claim was to compel a new NEPA analysis, which the

18  agency completed during the case. *Greater Yellowstone*, 572 F.3d at 1121. As such,

19  there was nothing left for the court to do on the claim. *Id.* Conversely, Plaintiffs

20  here challenge BSEE's issuance of specific agency decisions as arbitrary and

21  capricious under section 706(2) of the Administrative Procedure Act, seeking

22  declaratory relief, vacatur, and an order that the agency issue new analyses

23  ───────────────
   [3] The court's holding in *Greater Yellowstone* that an ongoing major federal action

24  was lacking for other agency actions is also distinguishable because, while the
   federal defendants had issued a permit for an elk feedground, "the State of

25  Wyoming remain[ed] the only meaningful actor involved in the operation." 572

26  F.3d at 1123. Here, in contrast, BSEE remains involved in the management and
   authorization of activities at the Santa Ynez Unit, as exemplified by its issuance of

27  the lease extensions and two APMs at issue, as well as the nine APMs BSEE

28  issued for wells at the Unit in July 2025. *See supra* n.1.

1    pursuant to the proper procedure—which all remain effective forms of relief. Dkt.

2    No. 78 at 2–10, 22.

3    　　　Nor is *Beverly Hills Unified School District v. Federal Transit*

4    *Administration* on point. No. CV 12-9861-GW(SSx), 2016 WL 4650428 (C.D. Cal.

5    Feb. 1, 2016). In that case, which presented "a very close question," the court

6    decided that the agency's NEPA analysis was not improperly predetermined based

7    on the specific action at issue: the commitment of funding. *Id*. at *88. The court

8    contrasted that action with the more significant commitment of resources for which

9    courts have found agencies improperly predetermined the outcome of a NEPA

10   process, such as an agency signing an agreement that required it to support a

11   Tribe's proposal to hunt gray whales; issuing a decision to build a road necessary

12   for timber sales; or contractually obligating a contractor to prepare a finding of no

13   significant impact by a date certain. *See id.* (citing multiple cases).

14   　　　There should be no question that BSEE's actions fall within this latter

15   category of agency actions that constitute the type of "binding commitment or

16   irreversible commitment of resources" necessary to demonstrate improper

17   predetermination. *Id*. And BSEE has never contended otherwise throughout this

18   case. BSEE's actions enabled Exxon, and now Sable, to maintain its leases and

19   thereby facilitated the restart of oil and gas production from aging infrastructure

20   after a 10-year shutdown following a massive oil spill. *See California v. Norton*,

21   311 F.3d 1162, 1175–78 (9th Cir. 2002) (recognizing that extending offshore oil

22   and gas leases constitutes an irreversible commitment of resources). Moreover,

23   both BSEE and Sable have maintained that Sable's work under the APMs cannot

24   be undone, *see, e.g.*, Dkt. 80 at 4, further demonstrating that BSEE has

25   irretrievably committed resources "to an action that will affect the environment,"

26   *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir.

27   2009) (citation omitted).

28

And *Charter Township of Huron, Michigan v. Richards* involved the preparation of a "comprehensive" environmental impact statement, following public comment, that gave "full consideration to the environmental impact" of an agency action intended to alleviate environmental impacts by reducing noise pollution. 997 F.2d 1168, 1174–75 (6th Cir. 1993). Here, in contrast, BSEE did not prepare an environmental impact statement, did not involve the public in its decisionmaking, and its actions increase environmental harm. Moreover, this out-of-circuit decision did not consider Ninth Circuit caselaw establishing that an agency's preparation of a NEPA analysis after it issues an initial decision to approve a project is not only backwards, but demonstrably suspect as it inherently skews the entire agency decisionmaking process toward project approval. *See supra* pp. 2–3, 4 (citing cases).

## II.    The 2025 Decision and Environmental Analysis Are Substantively Inadequate

The 2025 Decision and Environmental Assessment are substantively inadequate, which also renders them incapable of curing BSEE's failure to comply with NEPA before issuing the 2023 lease extensions and APMs at issue. *See Save the Yaak*, 840 F.2d at 718–19; *Pit River Tribe*, 469 F.3d at 786–87. Specifically, the Environmental Assessment fails to take the legally required hard look at the impacts of restarting oil and gas production by (1) failing to properly evaluate the no-action alternative and the alternative of denying the extensions, and (2) reaching conclusions about the risks and impacts of oil spills contrary to the evidence before the agency. *See Pit River Tribe*, 469 F.3d at 772 (An agency cannot comply with NEPA's hard look mandate by failing to "adequately consider[] the no-action alternative."); *Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022) (An agency violates NEPA by "'rely[ing] on incorrect assumptions or data' in arriving at its conclusion of no significant impact." (citation omitted)). Because BSEE "based [its 2025 Decision] on" the

9

1  Environmental Assessment (2025 Lease Extensions Decision 6, Dkt. No. 75-5),[4]

2  the legal flaws in its environmental analysis also doom its 2025 Decision.

3        "It is black letter law that NEPA requires a comparative analysis of the

4  environmental consequences of the alternatives before the agency." *Ctr. for*

5  *Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 645 (9th Cir. 2010).

6  Key to this analysis is the proper consideration of an alternative under which the

7  harmful effects of the agency action would not occur. As the Ninth Circuit has

8  explained, an "[a]nalysis of the 'no action alternative' is at the heart of the NEPA

9  process; thus, failure to provide a valid one casts a shadow over the process as a

10  whole." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1188 (9th Cir. 2013)

11  (citation omitted). This is because the no-action alternative "provide[s] a baseline

12  against which every action alternative is evaluated." *Ctr. for Biological Diversity v.*

13  *Bernhardt*, 982 F.3d 723, 734–35 (9th Cir. 2020).

14        Yet BSEE failed to properly evaluate both the no-action alternative and an

15  alternative of denying the lease extensions—further demonstrating how BSEE used

16  the NEPA process to reach a predetermined outcome.

17        In evaluating the no-action alternative, BSEE stated that "impacts would be

18  similar to those" from approving the lease extensions, "but likely to a lesser extent

19  depending on if Sable . . . returns to production." 2025 Environmental Assessment

20  23, Dkt. No. 75-3. By assuming the no-action alternative would also result in

21  return to production, BSEE rendered the comparison between the no-action and

22  action alternative meaningless. *See Conservation Council for Haw. v. Nat'l Marine*

23  *Fisheries Serv.*, 97 F. Supp. 3d 1210, 1236 (D. Haw. 2015) (holding that in

24  assuming the underlying activities would occur "no matter what," the agency

25  "neglect[ed] to consider what would be a true 'no action' alternative"); *Ctr. for*

26

27  [4] The pincite to the 2025 Lease Extensions Decision is to the ECF-generated page
numbers. All other pincites to prior filings in this case are to the document's

28  original page numbers, unless otherwise noted.

*Biological Diversity v. Bernhardt*, 982 F.3d at 735 (The no-action alternative analysis should be "informed and meaningful." (citation omitted)). And in evaluating the alternative of denying the lease extensions, BSEE pointed only to the impacts of decommissioning the Santa Ynez Unit infrastructure, Dkt. No. 75-3 at 22–23, without any evaluation of the environmental benefits of ending oil and gas production after several decades of activity. Such an approach fails "to 'give full and meaningful consideration' to all viable alternatives," in violation of NEPA. *Envt'l Def. Ctr.*, 36 F.4th at 878.

Additionally, BSEE failed to take a hard look by making numerous inadequate conclusions regarding the risks and impacts of oil spills. For example, BSEE's Assessment claims that a large spill is unlikely because low reservoir pressures in the majority of wells means that the risk of a blowout "is exceedingly small." Dkt. No. 75-3 at 15. But Sable's January 2025 Oil Spill Response Plan states that one of its pipelines "lies in an area where there is significant vessel traffic" that "could be damaged by an anchor, which would cause a loss of containment." Monsell Decl., Ex. 2 at 5. It explains that a worst-case discharge could result in a spill of up to 6,210 barrels (or 260,820 gallons), which "could have significant impact to many species of wildlife and waterfowl" near the pipeline and damage "environmentally sensitive areas," including "Channel Islands National Park, which contains a variety of potentially sensitive natural resources." *Id*. BSEE's NEPA analysis does not consider the risks or impacts of such an event.[5]

Additionally, the Oil Spill Risk Assessment included as Appendix A to the Environmental Assessment concludes that an oil spill of up to 1,000 barrels is likely to occur from oil and gas activities on the Pacific Outer Continental Shelf.

---

[5] Such a failure is particularly glaring considering that damage from anchors caused a spill from a pipeline in the Beta Unit off Huntington Beach in 2021. *See* Dkt. No. 75-3 at 14–15 (Environmental Assessment acknowledging this resulted in a spill of 588 barrels of oil).

1    *See* Dkt. No. 75-3 at 56 (estimating that "[i]n the 50 to 1,000 [barrel] size range . . .

2    there will be 1 spill with a 63% probability of an oil spill occurring"); *see also id.*

3    at 14 (noting the same). Yet BSEE only analyzed the impacts of small spills of 50

4    barrels or less. *See id.* at 14; Finding of No Significant Impact 4, Dkt. No. 75-4.[6]

5    Moreover, BSEE states that it based its estimates regarding the frequency and

6    extent of oil spills on the production of an additional 0.2256 billion barrels of oil in

7    federal waters off California. Dkt. No. 75-3 at 60. But Sable has claimed that it can

8    recover up to one billion barrels from the Santa Ynez Unit. Sable Mot. to Intervene

9    8, Dkt. No. 18-1. If Sable's number is correct, oil spill risk would be substantially

10   higher. Yet BSEE did not address this possibility.

11        BSEE's Environmental Assessment inappropriately "offer[s] an analysis that

12   [runs] 'counter to the evidence before the agency'" and "rel[ies] on incorrect

13   assumptions or data." *Envt'l Def. Ctr.*, 36 F.4th at 874 (citations omitted). These

14   errors are not about BSEE's choice of where to draw the line in analyzing

15   downstream effects that are geographically and jurisdictionally divorced from the

16   agency action at issue. *Contra Seven Cnty. Infrastructure Coal. v. Eagle County*,

17   No. 23-975, 2025 WL 1520964, at *10–11 (U.S. May 29, 2025). Rather, they are

18   about the agency's irrational approach to evaluating one of the most substantial

19   risks of allowing the restart of a long-dormant offshore oil and gas operation

20   following a massive oil spill, i.e., the very same event that caused operations to

21   shut down in the first place.

**CONCLUSION**

23        For the foregoing reasons, and the reasons stated in Plaintiffs' summary

24   judgment briefing, the Court should grant Plaintiffs' Motion for Summary

25   Judgment and their requested relief.

26

27

28   ───────────
[6] The pincite to BSEE's Finding of No Significant Impact is the ECF-generated page number.

1    Respectfully submitted this 25th day of July, 2025,

2
                                 */s/ Kristen Monsell*
3                                Kristen Monsell (CA Bar No. 304793)
                                 Email: kmonsell@biologicaldiversity.org
4                                Miyoko Sakashita (CA Bar No. 239639)
                                 Email: miyoko@biologicaldiversity.org
5                                Julie Teel Simmonds (CA Bar No. 208282)
                                 Email: jteelsimmonds@biologicaldiversity.org
6                                CENTER FOR BIOLOGICAL DIVERSITY
                                 2100 Franklin St., Suite 375
7                                Oakland, CA 94612
8                                Phone: (510) 844-7137
                                 Facsimile: (510) 844-7150
9

10

11                               *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28