UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: (In Chambers) The Court DENIES Plaintiffs' motion for summary judgment (Dkt. 68) and DENIES Defendants' cross-motions for summary judgment (Dkts. 75, 76).**

    Three motions are before the Court.  First, Plaintiffs Center for Biological Diversity ("Biological Diversity") and Wishtoyo Foundation ("Wishtoyo") (collectively, "Plaintiffs") filed a motion for summary judgment.  Dkt. # 68 ("*P. MSJ*").  Second, Federal Defendants Doug Burgum, in his official capacity as Secretary of the United States Department of the Interior, the Bureau of Safety and Environmental Enforcement ("BSEE"), and Bobby Kurtz, in his official capacity as Acting Pacific Regional Director for BSEE (collectively, "Federal Defendants") filed a combined cross-motion for summary judgment and opposition to Plaintiffs' motion for summary judgment.  Dkt. # 75 ("*Fed. Ds. MSJ*").  Third, Intervenor-Defendant Sable Offshore Corporation ("Sable") filed a cross-motion for summary judgment and opposition to Plaintiffs' motion for summary judgment.  Dkt. # 76 ("*Sable MSJ*").  Plaintiff opposed Federal Defendants' and Sable's motions for summary judgment.  Dkt. # 77 ("*P. Opp.*").  Federal Defendants and Sable replied.  Dkt. # 79 ("*Fed. Ds. Reply*"); Dkt. # 80 ("*Sable Reply*").  The Court subsequently asked the parties for supplemental briefing.  Dkt. # 84.  Plaintiffs (Dkt. # 85), Sable (Dkt. # 86), and Federal Defendants (Dkt. # 87) timely responded.

    The Court finds the matters appropriate for decision without oral argument.  *See* Fed. R. Civ. P. 78; L.R. 7-15.  Having considered the papers, the Court **DENIES** Plaintiff's motion for summary judgment and **DENIES** Federal Defendants and Sable's cross-motions for summary judgment.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No.   2:24-cv-05459 MWC (MAAx)                                    Date: September 24, 2025

Title:   Center for Biological Diversity *et al.* v. Doug Burgum *et al.*

I. Factual Background

    A. Santa Ynez Unit

Between 1968 and 1982, the federal government issued sixteen oil and gas leases off the coast of Santa Barbara County, California. Dkt. # 59 ("*Answer*") ¶ 66; Dkt. # 38-2 ("*FAC*") ¶ 66. The leases all had initial terms of five years. *Answer* ¶ 66; *FAC* ¶ 66. These sixteen oil and gas leases make up the Santa Ynez Unit (the "Unit"). *Answer* ¶ 66; *FAC* ¶ 66. The Unit contains three offshore production platforms (Platform Harmony, Platform Heritage, and Platform Hondo), which have produced oil and gas since their respective installations between 1976 and 1993. *Answer* ¶ 67; FAC ¶ 67. ExxonMobil owned and operated the three platforms until Sable recently became listed owner and operator of the three platforms and the sixteen leases in the Unit. *Answer* ¶¶ 68–69; FAC ¶¶ 68–69.

    B. May 2015 Oil Spill

In May 2015, one of the pipelines owned by Plains Pipeline, L.P. failed, resulting in an oil spill of approximately 2,934 barrels of heavy crude-oil in Santa Barbara County. Dkt. # 66 ("*AR*"), AR_0015616. On June 16, 2015, all wells in the Unit were shut in. AR_0000418. In 2016, Exxon developed, and BSEE approved, a Preservation Plan to ensure the offshore facilities would be properly monitored and maintained so they would be operationally and environmentally safe during the shut-in period and would be in fit condition when production resumed. AR_0016767.

    C. Lease Extensions, CBD Letter, and November 2023 Decision

Following the oil spill, BSEE has issued annual extensions to Exxon and Sable for the leases in the Unit, enabling the lease owners to keep their leases despite the lack of oil and gas production. AR_0000422. BSEE approved these lease extensions because the lease owners continued to be unable to resume production at the Unit. *Id.*

On February 8, 2023, Plaintiff Biological Diversity sent BSEE a sixteen-page letter ("CBD Letter") detailing the harms of restarting oil and gas production at the Unit, including increased greenhouse emissions, oil spills, air pollution, and light pollution. AR_0001808–23. The CBD Letter stated that BSEE's annual approvals of lease

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

extensions failed to demonstrate that the extensions are "in the National interest" as required by 30 C.F.R. § 250.180(e) and that the "overwhelming evidence demonstrates that extending Exxon's leases is wholly antithetical to the national interest." AR_0001808.  Moreover, the CBD Letter stated that "BSEE has failed to conduct any environmental review under the National Environmental Policy Act [("NEPA")] of the environmental impacts."  *Id.*  BSEE did not respond to the CBD Letter.

Instead, BSEE approved another lease extension, which triggered this lawsuit.  *Id.*; *see generally FAC*.  On October 19, 2023, ExxonMobil requested BSEE approve another lease extension, seeking an additional 365 days to resume operations on the Unit.  AR_0000422.  On November 14, 2023, BSEE granted ExxonMobil's request ("November 2023 Decision").  AR_0000418–21.  BSEE determined that issuing the extension was in the national interest, including the following conclusion:

> BSEE reviewed the statements made in ExxonMobil's request noting that there are sizeable additional remaining reserves in the Hondo, Pescado, and Sacate Fields and that the infrastructure needed to continue producing those reserves has been in place since 1976.  The continued development of these proven reserves from established infrastructure would help meet the Nation's energy needs without the impacts associated with new infrastructure installations or exploration and development of unproven fields.  Continued production would likewise benefit taxpayers through the continued revenue streams derived from production, including royalties and direct and indirect tax revenue to the Federal Government.  Continued production would also ensure the conservation of proven oil and gas reserves from these fields, the prevention of waste, as well as protect correlative rights of the lessee, as required by 30 CFR 250.180(e).  Accordingly, [BSEE] determine[s] that approving ExxonMobil's request is in the National interest and would conserve resources and prevent waste.

AR_0000424.

In granting ExxonMobil's request, BSEE relied on a categorical exclusion under NEPA.  AR_0000426–430.  BSEE determined that the request qualified for the categorical exclusion applicable to "[a]pproval of suspensions of operations and suspensions of production."  AR_0000426.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Case No. 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

BSEE also reviewed a list of extraordinary circumstances from 43 CFR 46.215 that, if present, would preclude BSEE from categorically excluding the proposed action from NEPA analysis. AR_0000427. The list of extraordinary circumstances included whether the proposed activities would "have significant impacts on public health or safety," to which BSEE determined: "No: Allowing the extension . . . should have no impacts on public health or safety because there will be no active oil and gas operations during the approved extension period, and BSEE will continue to require . . . the ongoing preservation plan for safe and environmentally protective maintenance and oversight of the facilities while idled." AR_0000429. As to whether the proposed activities would "have highly controversial environmental effects," BSEE answered, "No: Controversial environmental effects or unresolved conflicts over available resources are not expected . . . . The proposed action involves approving an extension of suspension of operations during which active oil and gas operations will be idled . . . ." *Id.* Because BSEE answered "No" to each extraordinary circumstance question in the list, BSEE determined the proposed extension did not fall into any category of 43 C.F.R. § 46.215 that would indicate "extraordinary circumstances." AR_0000427.

D.  Filing of Lawsuit

In early 2024, Sable became the sole leaseholder and operator of the Unit. AR_0000082. In June 2024, Plaintiffs (a conservation organization and a Native-led California public interest organization) filed this lawsuit, alleging that BSEE's November 2023 lease extension decision failed to conduct meaningful reviews as required by law. Dkt. # 1 ¶¶ 90–103. Specifically, Plaintiffs asserted that Federal Defendants failed to comply with the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356c, 1801–1866, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706. *See generally Id.* In their initial complaint, Plaintiffs brought two claims for relief: (1) violation of OCSLA and the APA for unlawful national interest determination, and (2) violation of NEPA and the APA for unlawful use of categorical exclusion. *Id.* ¶¶ 90–103. Sable filed a motion to intervene in the lawsuit, Dkt. # 18, which the Court granted, Dkt. # 35.

In this Order, the Court refers to Federal Defendants and Sable collectively as "Defendants."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

E.  Applications for Permit Modification

On September 19, 2024, Sable submitted two Applications for Permit Modification ("APMs"), which would allow Sable to rework two of the Unit's wells by reperforating and adding new perforations to enhance future production potential. AR_000023–25.  BSEE determined that the proposed action of well perforations fell under a NEPA categorical exclusion: "Reperforating and adding new perforations to an existing downhole completion is considered normal well-reworking operations under 30 CFR 250.180 et seq., and is consistent with those activities considered and evaluated in the original Development and Production Plan (1982)."  AR_0000037.  BSEE stated that the approval "meets the definition of the Categorical Exclusion for 'Approval of an Application for Permit to Drill an offshore oil and gas exploration or development well, when said well and appropriate mitigation measures are described in an approved exploration plan, development plan, production plan, or Development Operations Coordination Document.'"  *Id.*

BSEE further decided that "no extraordinary circumstances were found" after analyzing each 43 C.F.R. 46.215 extraordinary circumstance.  *Id.*  For example, as to whether the proposed well perforations would have "significant impacts on public health or safety," BSEE determined, "No:  Activities will be conducted offshore under applicable safety and environmental regulations.  Routine reservoir maintenance activities such as the proposal have little to no risk of a blowout which could result in an oil spill."  AR_0000038.  As to whether the proposed perforations would have "highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks," BSEE decided, "No:  The greatest environmental concern with the proposed activity is the risk of an oil spill.  Risk of an oil spill is low for this proposal and any effects of an oil spill that may occur are well documented and have been evaluated in previous environmental reviews."  *Id.*

Plaintiffs filed a motion for leave to file a first amended complaint to include BSEE's approval of Sable's APMs.  Dkt. # 38.  The Court granted leave to amend.  Dkt. # 46.  Sable has since completed the well perforation activities proposed in the APMs.  Dkt. # 75-1 ¶ 3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

F.  2025 Developments

In December 2024, Federal Defendants filed a motion for voluntary remand, seeking to voluntarily remand this case to BSEE. Dkt. # 37. In March 2025, the Court denied the motion to remand, expressing concern that future reviews by BSEE could function as procedural formalities rather than adequate analysis. Dkt. # 61.

On May 2, 2025, Plaintiff filed its motion for summary judgment. *P. MSJ.* Shortly after, Sable began limited resumption of production at the Unit, including producing oil and gas to onshore storage tanks, as it did not have final approval to operate the onshore pipeline. Dkt. # 73. On May 29, 2025, BSEE reconsidered its November 2023 lease extension decision. Dkt. # 75-3 ("*EA*"); Dkt. # 75-4 ("*FONSI*"); Dkt. # 75-5 ("*Decision Letter*"). In coordination with the Bureau of Ocean Energy Management, BSEE prepared an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI"). *EA; FONSI.* The Court generally refers to the 2025 EA, FONSI, and decision letter as the "2025 Decision." In explaining the procedural history of the lease extension, the EA mentions the November 2023 decision and states:

> BSEE conducted a Categorical Exclusion Review (CER) of Exxon's October 2023 lease extension request to resume production. A categorial exclusion [("CE")] exists for BSEE's decision on the lease extension. CEs are appropriate for federal actions that do not normally have a significant effect on the human environment (42 USC 4336(e)(1)). However, the CBD [L]etter alleged potential impacts associated with extending Exxon's lease thus creating controversy regarding the proposed action's environmental impacts and triggering an extraordinary circumstance (43 CFR 46.215(c)). Accordingly, this Environmental Assessment serves to provide a more in-depth analysis of the environmental impacts associated with the lease extension request.

*EA* 3. The EA states in a footnote: "The lease extension at issue here is appropriate for a CE. However, BSEE is undertaking additional environmental review here." *Id.*

On May 30, 2025, shortly after the new BSEE decision, Federal Defendants and Sable filed their cross motions for summary judgment and oppositions to Plaintiffs' motion for summary judgment. *Fed. Ds. MSJ*; *Sable MSJ*. Defendants' motions focus on a mootness argument due to BSEE's new decision. *Fed. Ds. MSJ*; *Sable MSJ*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

II.      Statutory Background

      A.      National Environmental Policy Act (NEPA)

"NEPA 'is our basic national charter for protection of the environment.'" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) (quoting 40 C.F.R. § 1500.1(a)). "The purpose of NEPA is to require disclosure of relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). "To that end, 'NEPA imposes procedural requirements, but not substantive outcomes, on agency action.'" *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1111 (9th Cir. 2015) (quoting *Lands Council*, 395 F.3d at 1026). "[T]he comprehensive 'hard look' mandated by Congress and required by the statute . . . must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). "The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting 42 U.S.C. § 4332(1)). At the same time, "[a]n agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003). "Because analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies." *Id.* Ultimately, "[c]ourts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the evidence." *Id.*

            *i.*      *Environmental Impact Statement ("EIS")*

"For certain infrastructure projects that are built, funded, or approved by the Federal Government, NEPA requires federal agencies to prepare an environmental impact statement, or EIS, identifying significant environmental effects of the projects, as well as feasible alternatives. The law ensures that the agency and the public are aware of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

the environmental consequences of proposed projects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 221 L. Ed. 2d 820 (2025).

   *ii.*  *Environmental Assessment (EA)*

If an agency's regulations do not categorically require the preparation of an EIS, then the agency must first prepare an EA to determine whether the action will have a significant effect on the environment. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994). The Ninth Circuit has explained:

> "The purpose of an EA is to provide the agency with sufficient evidence and analysis for determining whether to prepare an EIS or to issue a FONSI. 40 C.F.R. § 1508.9. Because the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process. In terms of timing and importance to the goals of NEPA, we see no difference between an EA and an EIS in connection with when an EA must be integrated into the calculus."

*Metcalf*, 214 F.3d at 1143. An EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact or a finding of no significant impact," and "include brief discussions of . . . the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(a)(1), (b). If, in light of the EA, the agency determines that its action will significantly affect the environment, then an EIS must be prepared; if not, then the agency issues a FONSI. *See Salmon River Concerned Citizens*, 32 F.3d at 1356.

   *iii.*  *Categorical Exclusion (CE)*

Categorical exclusions are classes of actions that an agency has determined do not "have a significant effect on the human environment." 40 C.F.R. § 1508.4. Agencies are required to use categorical exclusions for actions that have no significant effect on the environment and "which are therefore exempt from the requirements to prepare an [EIS]," to reduce excessive paperwork. *Wong v. Bush*, 542 F.3d 732, 737 (9th Cir. 2008). "Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013). Even where an action falls

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

into a categorical exclusion, an agency must nevertheless provide procedures for determining whether "extraordinary circumstances" exist, such that the action, though "normally excluded" from full NEPA analysis, "may have a significant environmental effect." *Id.*

      B.    <u>Outer Continental Shelf Lands Act (OCSLA)</u>

OCSLA establishes a framework under which the Secretary of the Interior may lease areas of the outer continental shelf for exploring and developing oil and gas deposits. 43 U.S.C. §§ 1331–1356. OCSLA requires that oil and gas exploration and production be "subject to environmental safeguards," *Id.* § 1332(3), and balanced "with protection of the human, marine, and coastal environments," *Id.* § 1802(2). OCSLA provides that the Secretary shall issue regulations that allow "for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit [] at the request of a lessee, in the national interest, to facilitate proper development of a lease or to allow for the construction or negotiation for use of transportation facilities[.]" 43 U.S.C. § 1334(a)(1). The associated BSEE-administered regulation states that, to approve a lease extension request, the Regional Supervisor "must determine that the longer period is in the national interest, and it conserves resources, prevents waste, or protects correlative rights." 30 C.F.R. § 250.180(e).

III.    <u>Legal Standard</u>

The Court's review of Plaintiffs' claims under OCSLA and NEPA is governed by the APA, 5 U.S.C. §§ 701–706. *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998). "Courts commonly decide cases subject to the APA at the summary judgment stage because, generally-speaking, they 'are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review.'" *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. CV 12-9861-GW(SSX), 2016 WL 4650428, at *54 (C.D. Cal. Feb. 1, 2016) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985)). The reviewing court generally may not conduct a *de novo* inquiry into the matter being reviewed and reach its own conclusions. *Beverly Hills Unified School District*, 2016 WL 4650428, at *54; *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) ("In general, a court reviewing agency action under the APA must limit its review to the administrative record."). "If the record before the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Beverly Hills Unified School District*, 2016 WL 4650428, at *54.

In the context of an administrative review, "[s]ummary judgment is appropriate when the pleadings and record demonstrate that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *San Luis & Delta-Mendota Water Authority*, 776 F.3d at 991 (quotation omitted). When parties file cross-motions for summary judgment, the Court must consider the evidence submitted in support of both motions before ruling on either motion. *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136–37 (9th Cir. 2001).

IV.     Discussion

In line with their FAC, Plaintiffs' summary judgment motion argues that BSEE unlawfully issued the November 2023 lease extensions and the September 2024 APM grants. *P. MSJ*. Specifically, Plaintiffs assert that BSEE's November 2023 decision failed to consider highly relevant factors in making a national interest determination and that BSEE improperly determined the proposed lease extensions fell under a categorical exclusion review. *Id*. 9:6–14:11. Plaintiffs further assert that BSEE improperly applied a categorical exclusion to the APMs and that extraordinary circumstances would preclude categorical exclusion analysis regardless. *Id*. 14:12–20:22. Last, Plaintiffs' summary judgment motion avers that BSEE's continued reliance on outdated EISs from 1975 and 1984 is unlawful. *Id*. 20:23–24:11. BSEE requests that the Court vacate BSEE's November 2023 lease extension decision as well as BSEE's September 2024 APMs decision. *Id*. 24:12–25:23.

BSEE completed its 2025 Decision on May 30, 2025, just before Federal Defendants and Sable filed oppositions to Plaintiffs' motion and cross motions for summary judgment. *F. Def. MSJ; Sable MSJ*. Defendants therefore focused on mootness arguments. Specifically, Defendants argued that BSEE's 2025 Decision superseded the 2023 Decision and thereby mooted Plaintiffs' claims regarding the 2023 Decision. *Fed. D. MSJ* 9:24–12:4; *Sable MSJ* 8:22–10:24. Moreover, Defendants argued that BSEE's new analysis, accompanying the 2025 Decision, mooted Plaintiffs' claims regarding the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

2023 APM Decision. *Fed. D. MSJ* 12:5–15:3; *Sable MSJ* 10:25–12:6. Separately, Defendants argued that even if Plaintiffs' lawsuit was not moot, BSEE's original decisions in 2023 and 2024 were routine and properly analyzed. *Fed. D. MSJ* 15:4–14:8; Sable MSJ 12:7–24:11.

In response, Plaintiffs' opposition addressed Defendants' mootness arguments. *P. Opp.* Plaintiffs argue that the 2025 Decision cannot moot the case because BSEE only completed a NEPA analysis "after taking an action that constitutes an irreversible commitment of resources." *Id.* 4:20–24 (emphasis in original). Plaintiffs argue that BSEE's 2025 Decision cannot "save its failure to conduct a NEPA analysis" in 2023. Plaintiffs further argue that the 2023 Decision led to existing harms, including Sable's right to develop the Unit and receipt of APMs. *Id.* 7:1–7.

Courts have determined that under certain circumstances, a government agency's new analysis cannot cure earlier deficiencies. For example, in *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000), the National Oceanic and Atmospheric Administration ("NOAA") entered a written agreement with a Native American tribe. *Metcalf*, 214 F.3d at 1142. Under the agreement, NOAA agreed to make a formal request that the tribe be allowed to hunt a specific number of gray whales each year. *Id.* at 1139. NOAA presented its formal request in June 1996. A year later, an environmental organization published a letter, alleging NOAA had violated NEPA by authorizing and promoting the whale proposal without preparing any NEPA analysis. In response, NOAA prepared a draft EA. Meanwhile, in 1997, NOAA and the tribe entered a new written agreement. Four days after the new agreement was signed, NOAA issued its final EA and FONSI. The Ninth Circuit determined that NOAA violated NEPA when it first entered an agreement with the tribe without at all engaging in the NEPA process. The Ninth Circuit determined it was "highly likely that because of the Federal Defendants' prior written commitment to the [tribe] and concrete efforts on their behalf, the EA was slanted in favor of finding that the [tribe's] whaling proposal would not significantly affect the environment." *Id.* at 1144. The Ninth Circuit limited its holding to the "unusual facts and circumstances" of that case. *Id.* at 1145.

In *Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988), the Forest Service worked to reconstruct a road. *Save the Yaak Committee*, 840 F.2d at 717. The Forest Service had prepared EAs for four of the five sections of the road that the Service wished to reconstruct. However, the Forest Service began construction on the fifth section of the road in June 1982, without preparation of an EA for that section. The Forest Service did

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

not submit an EA for the fifth section of the road until two years after the Forest Service had decided to reconstruct the road. After most of the sections had been reconstructed, the Forest Service completed a biological assessment ("BA") for all the sections. The Ninth Circuit reviewed the tardy EA for the fifth segment of the road and determined it was "not prepared to examine the environmental impacts" but instead to evaluate road maintenance techniques. *Id.* at 717–18 (noting the EA only described wildlife in five brief sentences). The Ninth Circuit determined the EA was substantively inadequate. *Id*. at 718. The Forest Service also argued that the EA had been sufficiently supplemented by its biological assessment. *Id.* However, the Ninth Circuit determined that the BA only analyzed the impact of the proposed action on endangered species, not the environmental, and thus there were still gaps in the environmental analysis. *Id.* Ultimately, the Ninth Circuit held that because of both environmental documents had "substantive inadequacies" and were untimely prepared, the agency did not take the required 'hard look' at the environmental consequences of its actions." *Id.* at 719.

In *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006), the Department of the Interior issued leases for the development of geothermal steam. *Pit River Tribe*, 469 F.3d 768. Specifically in May 1998, the Bureau extended leases for five years without any environmental review. *Id.* at 777. In September 1998, the agencies issued an EIS, which determined the alternatives considered would all have significant adverse effects, but the chosen alternative had the least overall adverse effect on the environment. *Id*. The agency argued that the preparation of the 1998 EIS foreclosed relief for plaintiff. The Ninth Circuit disagreed. The Ninth Circuit determined that the agencies should have prepared an EIS at the time of the lease extensions and that a "dilatory or ex post facto environmental review cannot cure an initial failure to undertake environmental review." *Id.* at 785. The Ninth Circuit also analyzed the new 1998 EIS and determined it was substantively improper: "the tardy EIS did not address the issue that should have been addressed in 1988 and 1998: whether the land in question should be leased at all." *Id.* at 786. Because the "1998 EIS failed to take the requisite 'hard look' at whether the leases should have been extended," it could not "possibly remedy the earlier violation." *See id.* ("To allow the 1998 EIS to cure the earlier violation would mean using the EIS 'to rationalize or justify [a] decision[] already made,' although the EIS does not even address that earlier decision." (citing *Save the Yaak*, 840 F.2d at 718)).

In contrast to the above cases, courts have also determined that even when an agency's decision-making process was not initially perfect, agencies can cure

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

deficiencies with future decisions or analysis. *See, e.g.*, *Citizens Advisory Comm. on Priv. Prisons, Inc. v. U.S. Dep't of Just.*, 197 F. Supp. 2d 226, 231 (W.D. Pa. 2001), *aff'd*, 33 F. App'x 36 (3d Cir. 2002). For example, in *Citizens Advisory Committee on Private Prisons, Inc.*, 197 F. Supp. 2d 226, the Federal Bureau of Prisons awarded a proposal to a private prison without undertaking a NEPA analysis. 197 F. Supp. 2d at 231. After being sued, the Bureau halted work on the new facility and re-examined the environmental impact of the project, issuing an EA that concluded the construction would not have a significant effect on the environment. *Id.* After examining the new EA, the Court determined the EA "seriously reconsidered" the original award Bureau and that the Bureau had undertaken its NEPA analysis in good faith and with an objective and honest consideration of environmental issues. *Id.* at 256–57. The Court held that the Bureau's tardy EA had cured its earlier NEPA deficiencies. *Id.*

Moreover, in *Beverly Hills Unified Sch. Dist. v. Fed. Transit Administration*, plaintiffs argued that the FTA performed late risk analysis and studies only to bolster its previous choice of a subway station location. *Beverly Hills Unified School District*, 2016 WL 4650428, at *77–80. The Court determined that even though there was "a considerable amount of evidence demonstrating that, at a relatively early stage in the process, the Agencies' analysis was focused upon Constellation Station," and indicated the Court was "troubled by certain aspects" of the government agencies' decision-making process, the Court did not find bad faith or improper pre-determination. *See id*. at 88 ("Although the Court agrees with [plaintiff] that the analysis certainly appears to have been slanted in one direction, it is not prepared to conclude that it meets the standard necessary for a claim of improper pre-determination or bad faith.").

All of these courts analyzed the specific facts and circumstances in front of them, including the substance and merits of the government agencies' new decisions (for example, the tardy biological assessment in *Save the Yaak*) as well as whether the new decisions had been completed in bad faith or with improper pre-determination.

After the instant motions for summary judgment had been briefed, the Court asked the parties to address "Plaintiffs' theory of the facts as to whether BSEE's May 2025 Decision and Environmental Assessment was completed in bad faith, was improperly predetermined, was unreasonably slanted, and/or was substantively inadequate pursuant to the relevant case law." Dkt. # 84.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

In supplemental briefing, Plaintiffs argue the BSEE's 2025 Decision and Environmental Assessment (which was issued less than 48-hours before its cross-motion for summary judgment was due) are improperly predetermined and unreasonably slanted. Dkt. # 85 (P. Supp. Br.), 1:9–12. BSEE admitted its lease extensions decision and categorical exclusion review were flawed and sought remand of those actions, yet refused to use its authority to ensure no other activities in furtherance of a restart would occur while it conducted additional review. *Id*. 1:16-19. Instead, BSEE took further action in reliance on its lease extensions decisions—issuing two drilling permits (known as APMs) that enable a restart of production at the Santa Ynez Unit—and allowed production to resume at one of the Unit's three platforms. *Id*. 1:19-22.

Moreover, on the day Plaintiff's Supplemental Brief was due, BSEE issued a press release stating that it anticipates a full restart by the end of 2025. *Id*. 1:22–24. Plaintiffs also argue the 2025 Decision and Environmental Assessment are also substantively inadequate under the relevant case law because it does not take the hard look NEPA demands, fails to consider highly relevant evidence, is internally inconsistent, and does not properly consider the no-action alternative or denial of the lease extensions. BSEE's faulty Assessment fatally infects the agency's national interest determination in its 2025 Decision. *Id*. 2:4–9.

The Federal Defendants argue BSEE's 2025 Decision and related environmental assessment are not improperly predetermined, rendered in bad faith, or substantively inadequate. Rather, BSEE's new Decision is a presumptively valid agency action that moots this case. BSEE reconsidered Exxon's 2023 request in much the same manner as it would any other extension request—by allowing the operator to maintain its rights as a leaseholder while BSEE decided whether to approve or deny the request. And the EA accompanying BSEE's decision satisfies the National Environmental Policy Act ("NEPA") by considering a reasonable range of alternatives and taking a hard look at the effects of restarting oil and gas production. Dkt. # 86 (Fed. Ds. Supp. Br.), 1:7–15.

Sable argues (1) it would be improper for the Court to reach a determination regarding the adequacy of the 2025 Decision and EA because Plaintiffs have not challenged those decisions in their Amended Complaint and there is no administrative record upon which the Court could base such a determination; (2) the 2025 Decision and EA/FONSI are entitled to a presumption of regularity and courts also presume that government actions that moot a case are taken in good faith; and (3) for mootness purposes, the relevant inquiry into the EA/FONSI and 2025 Decision is whether there

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | |
|---|---|---|
| Case No. | 2:24-cv-05459 MWC (MAAx) | Date: September 24, 2025 |
| Title: | Center for Biological Diversity *et al.* v. Doug Burgum *et al.* | |

remains any live or ongoing controversy with respect to the claims in Plaintiffs' Amended Complaint. Dkt. # 87 (Sable Supp. Br.) 1:20–2:3.

    Here, the Court agrees that if BSEE's 2025 Decision was made in bad faith, was improperly predetermined, or was unreasonably slanted, then this case is not moot. However, the operative complaint does not request the Court to make such a finding. If the 2025 Decision was undertaken in good faith and is a proper analysis, then the leases should have been extended and the APMs granted. The Court will not request BSEE to now undertake the same analysis that it has already undertaken. See *Charter Twp. of Huron, Mich. v. Richards*, 997 F.2d 1168 (6th Cir. 1993) ("While this court may have the power to order the FAA to prepare an EA with respect to the November 1989 changes, it would be foolish to do so. It is not as if the FAA has ignored the concerns of the petitioners. It has undertaken a comprehensive study in response to those concerns. We will not order a party to do that which it has already done."); *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1121 (10th Cir. 2009) ("GYC brought this action alleging the lack of environmental analyses for the six feedgrounds in question violated NEPA. GYC sought to compel the Forest Service to undertake environmental analyses of the feedgrounds . . . . The Forest Service did exactly this in its July 2008 environmental analysis. Thus, no live controversy exists with regard to these feedgrounds.").

    While relevant to this analysis, the issue of whether BSEE's 2025 Decision was made in bad faith, was improperly predetermined, or was unreasonably slanted is not before the court at this time. In fact, the 2025 Decision was issued just days before the defendant's motions for summary judgment were due. As evidenced by the arguments made in the supplemental briefing, the issuance of the 2025 Decision has created a triable issue of material fact.

V.    Conclusion

    For the foregoing reasons, the Court **DENIES** all three motions for summary judgment.
**IT IS SO ORDERED.**

| | : |
|---|---|
| | Initials of Preparer  TJ |