Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WISHTOYO FOUNDATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> DOUG BURGUM, Secretary of the U.S. Department of the Interior; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; BOBBY KURTZ, Acting Pacific Regional Director, Bureau of Safety and Environmental Enforcement, <br><br> *Defendants*, <br><br> SABLE OFFSHORE CORP., <br><br> *Intervenor-Defendant.* | Case No. 2:24-cv-05459-MWC-MAA <br><br> **SECOND SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF** <br><br> **(National Environmental Policy Act, 42 U.S.C. §§ 4321–4347; Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356c, 1801–1866; Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706)** |

# INTRODUCTION

1.      Plaintiffs Center for Biological Diversity and Wishtoyo Foundation (Plaintiffs) challenge the federal government's failure to conduct the meaningful reviews required by law in managing and permitting oil and gas activity in federal waters off California's coast. Specifically, Defendants Secretary of the U.S. Department of the Interior, the Bureau of Safety and Environmental Enforcement, and the Bureau's Pacific Regional Director (collectively, BSEE) failed to comply with the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356c, 1801–1866, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, 701–706, in authorizing extensions of ExxonMobil's offshore oil and gas leases on the Pacific Outer Continental Shelf. BSEE also failed to examine the environmental impacts of issuing permits to perforate oil wells and restart production at three drilling platforms in the Santa Barbara Channel (in what is known as the Santa Ynez Unit), in violation of NEPA and the APA.

2.      In May 2015, ExxonMobil shut down its oil and gas operations in the Santa Ynez Unit after a corroded onshore pipeline ruptured and spilled what is now believed to be more than 450,000 gallons of oil. The pipeline carried oil that ExxonMobil produced at the Santa Ynez Unit. The spill killed hundreds of birds and marine mammals, including dolphins and sea lions, and closed beaches and fisheries along the coast.

3.      While operations remained shut down, BSEE authorized extensions of the 16 offshore oil and gas leases in the Santa Ynez Unit. BSEE approved the latest extension on November 14, 2023.

4.      Without these extensions, each of the leases would have expired and ExxonMobil would have been required to permanently cease its oil and gas operations, plug its wells, and decommission its other infrastructure.

5.      Extending the leases for the Santa Ynez Unit prolongs the existence of aging oil and gas infrastructure, increasing the risks of oil spills and other accidents. Extending the leases for the Santa Ynez Unit also prolongs drilling off California and all the harms that come along with it.

6.      As relevant here, to approve the lease extensions, BSEE had to first determine that granting the extensions "is in the National interest." 30 C.F.R. § 250.180(e). BSEE also had to comply with NEPA. 42 U.S.C. § 4332(2)(C). BSEE did not properly comply with either requirement.

7.      First, BSEE's national interest determination failed to consider several highly relevant factors. For example, the agency ignored evidence demonstrating that extending ExxonMobil's leases is antithetical to the national interest in addressing the climate crisis, promoting public health and environmental justice, recovering endangered species, and otherwise protecting the environment given the numerous harms inherent in offshore oil and gas drilling.

8.      Second, BSEE failed to conduct any environmental review under NEPA of the environmental impacts of extending ExxonMobil's leases. Instead, BSEE deemed the lease extensions categorically excluded from NEPA and determined that no extraordinary circumstances exist that would make application

of the categorical exclusion inappropriate. In doing so, BSEE ignored the numerous harms that prolonging oil and gas activity off California perpetuates, including increased risk of oil spills and other accidents from decades-old infrastructure.

9.    Accordingly, Plaintiffs filed this lawsuit to challenge BSEE's unlawful issuance of the lease extensions under both OCSLA and NEPA.

10.    BSEE then issued two permits that facilitate the restart of oil and gas production at the Santa Ynez Unit to Sable Offshore Corp. (Sable)—which acquired the Santa Ynez Unit leases and associated infrastructure from ExxonMobil in February 2024. Sable had submitted the permit applications on September 19, 2024, and BSEE issued the permits on September 25, 2024, just four business days later. The primary purpose of the permits is to enhance production by allowing the perforation of two wells, which enables the flow of oil and gas.

11.    In authorizing these permits, BSEE had to comply with NEPA. 42 U.S.C. § 4332(2)(C). It did not.

12.    Instead, BSEE fast-tracked issuance of the permits by relying on an inapplicable categorical exclusion under NEPA and an environmental impact statement on oil and gas development and production at the Santa Ynez Unit prepared in 1984, more than 40 years ago.

13.    BSEE's reliance on a categorical exclusion to issue the permits is arbitrary. The categorical exclusion cannot reasonably be interpreted to apply to authorizing the resumption of offshore oil and gas activity from old infrastructure that has been shut down for nearly a decade due to a massive oil spill. Moreover,

BSEE also failed to consider relevant factors in determining no extraordinary circumstances exist, including the numerous harms from restarting offshore oil and gas production and the use of corroded pipelines and other infrastructure.

14.    Additionally, BSEE violated NEPA by issuing the lease extensions and APMs without supplementing any prior environmental analysis on oil and gas development and production at the Santa Ynez Unit despite a slew of new information that leaves prior analyses woefully outdated and inadequate. Since the 1984 NEPA analysis, offshore drilling platforms and other infrastructure have outlived their intended lifespans, new drilling technologies have resulted in unexamined environmental harms, and oil spills have affected local communities and ecosystems.

15.    Accordingly, Plaintiffs filed their Second Amended and Supplemental Complaint to also challenge BSEE's issuance of the permits and failure to supplement the prior environmental analysis.

16.    On May 28, 2025, just two days before BSEE's summary judgment brief on the claims at issue in Plaintiffs' Second Amended and Supplemental Complaint was due, BSEE issued an environmental assessment and finding of no significant impact (EA/FONSI) under NEPA, purporting to analyze the environmental impacts of its prior decision to issue the lease extensions. Additionally, on May 29, 2025, BSEE issued a decision purporting to re-approve the lease extensions based on a revised memorandum and the findings in the EA/FONSI.

17.    From July 2 to July 3, 2025, BSEE issued nine more APMs to Sable. These permits also facilitate the restart of oil and gas production at the Santa Ynez Unit.

18.    Then, on July 25, 2025, BSEE issued a press release stating that the agency anticipates a full restart of the Santa Ynez Unit "by the end of 2025" and boasting how the Trump administration facilitated the Unit's return "to essentially full production in just a matter of months."

19.    Plaintiffs request an order from the Court declaring that BSEE's November 2023 approval of the lease extensions violates OCSLA, NEPA, and the APA; that BSEE's approval of the September 2024 and July 2025 well perforation permits violates NEPA and the APA; and that the 2025 EA/FONSI and accompanying 2025 decision re-affirming the 2023 lease extensions are unlawful. Plaintiffs also seek an order vacating the November 2023 lease extensions, the September 2024 and July 2025 well perforation permits, the 2025 EA/FONSI, and the 2025 lease extensions decision; and an order prohibiting BSEE from issuing any future lease extensions or approving any future development and production permits for the Santa Ynez Unit unless and until BSEE complies with the law.

20.    Only with the new, comprehensive analyses required by law done pursuant to the proper process can BSEE be fully informed about how to best manage offshore oil and gas activity at the Santa Ynez Unit and not improperly predetermine and/or unreasonably slant its decision. And until BSEE completes the relevant analyses, the public will continue to be left in the dark about the full environmental impacts of restarting oil and gas operations in the area.

## JURISDICTION AND VENUE

21.    The Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises pursuant to the laws of the United States. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

22.    Venue is proper in this Court under 28 U.S.C. § 1391(e) because some of the Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

23.    Assignment to the Western Division of this Court is proper under General Order No. 24-04, Section I.B.1.a(1)(b).

### PARTIES

### <u>Plaintiffs</u>

24.    Plaintiff Center for Biological Diversity (the Center) is a national, non-profit conservation organization that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission also includes protecting air quality, water quality, and public health. The Center has over 93,000 members worldwide, including thousands in California. The Center brings this action on behalf of its members.

25.    The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, sea turtles, and fish are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the

California coastal environment from offshore oil and gas drilling activity.

26.    The Center's members regularly visit California beaches and waters—including the Gaviota coast; the Santa Barbara Channel and its islands; and the waters near offshore platforms in the Santa Ynez Unit—for vocational and recreational activities such as swimming, surfing, kayaking, hiking, fishing, diving, camping, viewing and studying wildlife, and photography. The Center's members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. The Center's members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

27.    Plaintiff Wishtoyo Foundation (Wishtoyo) is a Native-led California nonprofit public-interest organization with over 700 members primarily composed of Chumash Native Americans and residents of Santa Barbara, Ventura, and Los Angeles counties. Wishtoyo's mission is to preserve, protect, and restore Chumash culture, the culture of indigenous peoples, and the environment all peoples depend upon. The organization uses education, outreach, cultural programs, scientific study, restoration projects, advocacy, and legal action to attain this mission. Chumash tribes, bands, and clans have a long history of interaction with the marine waters of the Pacific Ocean and the Santa Barbara Channel, from Morro Bay to Malibu and out to and around the Channel Islands. Chumash people rely upon these lands and waters and their natural cultural resources to support and maintain Chumash traditional practices, ways of life, and ancestral connections. Wishtoyo's members use these lands and waters for ceremonial purposes; to connect with and celebrate their ancestors and cultural heritage; to gather natural cultural resources;

and for educational purposes, recreational use, wildlife viewing, scientific study, and environmental monitoring. Wishtoyo's members intend to continue these uses as permitted.

28.    Since time immemorial, marine, and terrestrial species have played an important role in the culture and lifeways of Chumash maritime tribes, bands, and clans. Wishtoyo's Chumash members continue to have a strong cultural and spiritual interest in the protection of species. Wishtoyo's Chumash members navigate on tomols (Chumash plank canoes) and by other means through the Santa Barbara Channel, where encountering marine species is essential to their connection with their ancestors and provides them with a spiritual echo through time and connection to the planet as they traverse between the Channel Islands (the origin of the Chumash Peoples) and the mainland. The existence and abundance of species and habitat are also critical to the maintenance of Wishtoyo's Chumash members' cultural practices, lifeways, and ceremony.

29.    Offshore oil and gas drilling activities degrade these habitats and threaten wildlife and the coastal environment. Offshore drilling also threatens Wishtoyo's Chumash members' ability to continue their traditional, educational, recreational, and environmental practices, ways of life, and ancestral connections. For example, offshore oil and gas activities cause oil spills. Oil spills have a wide array of lethal and sublethal impacts on marine species, both immediate and long term. Official reports document that the 2015 oil spill killed at least 558 birds and 232 mammals, including 19 dolphins (which many Chumash people consider relatives and ancestors) and 94 sea lions. The spill impacted a wide variety of nearshore fish species, including surfperch and grunion, which were spawning

when the spill occurred. The actual number of birds killed is likely to be four times the number of birds recovered. The spill also impacted a variety of coastal habitats including kelp wrack, feather boa kelp, surfgrass, and eelgrass. Additionally, the spill prevented Chumash people from participating in the annual tomol voyage across the Santa Barbara Channel to Limu, Chumash homeland in the Santa Barbara Channel Islands, and the tomol village visits up and down the coast. And an October 2021 oil spill from a pipeline connected to Platform Elly off Huntington Beach killed or injured at least 124 birds and mammals.

30.     The risk of oil spills exists from both active and inactive oil and gas wells and other infrastructure. Inactive infrastructure can become badly damaged in storms, as evidenced by the oil spill from an abandoned Taylor Energy platform in the Gulf of Mexico following Hurricane Katrina that leaked oil for 15 years.

31.     Offshore drilling activities also increase air pollution that is harmful to public health and discharge wastewater that contaminates the ocean with pollutants that are toxic to marine species. Offshore drilling also requires the shipment of equipment to oil platforms, thereby increasing port and ship traffic, which in turn increases ocean noise and the risk of vessel strikes of whales and other animals.

32.     Extending the leases for the Santa Ynez Unit prolongs the existence of the three aging drilling platforms in the Unit (Platforms Harmony, Heritage, and Hondo) and their associated wells and other infrastructure, increasing the risks of oil spills. Extending the leases for the Santa Ynez Unit extends oil and gas activity off California, and all the harmful environmental impacts such activity causes.

33.     Approving well perforation permits for the Santa Ynez Unit facilitates a restart of offshore oil and gas activities, including transiting service vessels, well

work, drilling, and production. It risks accidents such as oil spills, restarts platforms and pipelines that have been shut down, increases air and water pollution, and prolongs offshore oil and gas activities in the Santa Barbara Channel. These activities have direct, indirect, and cumulative environmental harms that injure Plaintiffs' interests.

34.    Extending the leases, approving the well perforation permits, and restarting production at the Santa Ynez Unit degrades Plaintiffs' members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of the Santa Barbara coast and waters. It harms water quality and wildlife that they study and observe, decreasing their spiritual and cultural experiences and their ability to view species that are impacted by offshore drilling activities or abandon the area because of these activities.

35.    For example, one Center member who lives in Santa Barbara regularly recreates in the area, including in coastal areas and waters near offshore oil platforms. He regularly surfs in places like Rincon and Sands Beach near Santa Barbara, Naples on the Gaviota Coast, Jalama Beach near Point Conception, and Oxnard Shores and Silver Strand in Ventura. He goes as often as possible, generally twice a week. He also hikes, sails, and scuba dives on and around the Channel Islands. While on these trips he enjoys looking for and observing wildlife in the area, including fur seals, blue whales, humpback whales, black abalone, and other animals. He derives aesthetic, emotional, and physical benefits from these activities that are essential to his well-being. Noise pollution, water pollution, vessel strikes, oil spills, and other impacts from oil and gas drilling disturb and harm the animals he enjoys and is interested in seeing and make it less likely he

1    can see these animals in the future. Oil spills that close beaches or ocean waters

2    impede his ability to enjoy recreational activities.

3        36.    The above-described aesthetic, recreational, professional, spiritual,

4    and other interests have been, are being, and will continue to be adversely affected

5    and irreparably injured by BSEE's failure to comply with OCSLA and NEPA.

6    BSEE's authorization of extensions of offshore oil and gas leases and well

7    perforation permits for the Santa Ynez Unit without proper review of the related

8    impacts on the environment means that BSEE is failing to adequately protect

9    California's ocean and coastal environment, including already imperiled wildlife,

10   and is exposing these resources to increased risk of harm.

11       37.    In addition, Plaintiffs' members are suffering procedural and

12   informational injuries resulting from BSEE's failure to conduct an adequate

13   environmental review on the effects of extending the oil and gas leases, approving

14   well perforation permits, and restarting oil and gas operations at the Santa Ynez

15   Unit.

16       38.    Plaintiffs' members have no adequate remedy at law and the requested

17   relief is proper. Relief in this case would ensure BSEE prepares a proper national

18   interest determination under OCSLA and an environmental assessment or

19   environmental impact statement under NEPA that adequately analyze the impacts

20   of oil and gas production at the Santa Ynez Unit and are done pursuant to the

21   required procedures and not improperly predetermined. The requested relief could

22   result in additional information, process, mitigation, and oversight of offshore

23   drilling that would better protect the ocean and imperiled wildlife and alleviate the

24   injuries of Plaintiffs' members. An order declaring BSEE's actions unlawful,

25

vacating BSEE's authorization of the lease extensions and well perforation permits for the Santa Ynez Unit, and prohibiting future extensions and development and production permit approvals unless and until BSEE complies with OCSLA, NEPA, and the APA would redress the injuries of Plaintiffs' members.

## **Defendants**

39.    Defendant Doug Burgum is the Secretary of the U.S. Department of the Interior and is sued in his official capacity. The Department of the Interior is responsible for managing and overseeing the development of oil and gas resources on the outer continental shelf. Secretary Burgum is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Department of the Interior and its bureaus comply with all applicable laws and regulations, including OCSLA, NEPA, and the APA.

40.    Defendant Bureau of Safety and Environmental Enforcement is a federal agency within the Department of the Interior. The Bureau of Safety and Environmental Enforcement is charged with permitting drilling in federal waters and ensuring such activities comply with safety and environmental regulations.

41.    Bobby Kurtz is the Acting Regional Director of the Pacific Region of the Bureau of Safety and Environmental Enforcement and is sued in his official capacity. Mr. Kurtz has responsibility for implementing and fulfilling the Bureau's duties under OCSLA, NEPA, and the APA.

## **STATUTORY BACKGROUND**

## **Outer Continental Shelf Lands Act**

42.    OCSLA establishes a framework under which the Secretary of the Interior may lease areas of the outer continental shelf for purposes of exploring and

developing the oil and gas deposits of the outer continental shelf submerged lands. 43 U.S.C. §§ 1331–1356c, 1801–1866. The outer continental shelf generally begins three miles from shore—the outer boundary of most state waters—and extends seaward to the limits of federal jurisdiction. *Id*. § 1331(a).

43. OCSLA specifically requires that oil production be "subject to environmental safeguards" and balanced "with protection of the human, marine, and coastal environments." *Id*. §§ 1332(3), 1802(2).

44. There are four separate stages to developing an offshore oil well: "(1) formulation of a 5-year leasing plan …; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). Each of these "stage[s] involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the [outer continental shelf]." *Id*.

45. At the second stage, the Secretary holds lease sales and can grant offshore oil and gas leases. 43 U.S.C. § 1337(a)(1). An oil and gas lease "entitle[s] the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. *Id*. § 1337(b)(4).

46. Generally, leases are for an initial period of five years, *id*. § 1337(b)(2)(A), "and as long after such initial period as oil or gas is produced from the area in paying quantities," *id*. § 1337(b)(2).

47. OCSLA authorizes the Secretary to "prescribe such rules and regulations as may be necessary" to manage oil and gas activities, including for the protection of natural resources. *Id*. § 1334(a). OCSLA specifies that such "regulations shall, as of their effective date, apply to all operations conducted

under a lease." *Id.*

48.    OCSLA also specifies that the Secretary's regulations regarding offshore oil and gas leasing must provide for "the suspension or temporary prohibition of any operation or activity, including production" in certain circumstances, including "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life) … or to the marine, coastal, or human environment." *Id.* § 1334(a)(1).

49.    The Secretary has delegated his responsibilities under OCSLA to two bureaus within the Department of the Interior. The Bureau of Ocean Energy Management is responsible for managing leasing, exploration, development, and production of oil and gas resources on the outer continental shelf. 30 C.F.R. § 550.101. BSEE is responsible for enacting and enforcing safety and environmental standards under OCSLA, as well as issuing drilling permits. *Id.* § 250.101. BSEE is also responsible for approving lease extensions. *Id.* § 250.180(e).

50.    Under the regulations and as relevant here, a lease will expire at the end of the initial five years unless production is occurring in paying quantities. *Id.* § 250.180(a)(2). If production ceases on a lease that has continued beyond its primary term, the lease will expire unless production resumes or BSEE approves a suspension of operations or suspension of production within a year after production ceases. *Id.* § 250.180(d).

51.    BSEE can also allow an operator more than a year to resume operations, but only when BSEE determines that "the longer period is in the National interest, and it conserves resources, prevents waste, or protects correlative rights." *Id.* § 250.180(e).

52.     A suspension or request for additional time to resume operations "extend[s] the term of a lease … equal to the length of time the suspension is in effect." *Id*. § 250.169(a). Accordingly, such actions "represent a significant decision to extend the life of oil … production off of California's coast, with all of the far reaching effects and perils that go along with offshore oil production." *California v. Norton*, 311 F.3d 1162, 1173 (9th Cir. 2002).

53.     Once a lease expires, BSEE regulations require an oil and gas company to "permanently plug all wells … within 1 year after the lease terminates." 30 C.F.R. § 250.1710. An oil and gas company must also "remove all platforms and other facilities within 1 year after the lease" expires unless the company "receive[s] approval to maintain the structure to conduct other activities." *Id*. § 250.1725(a).

## National Environmental Policy Act

54.     NEPA is our nation's charter for environmental protection. NEPA seeks to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

55.     NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions before acting. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989) (citation omitted). In this way, NEPA ensures that federal agencies "will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that such information "will be made available to the larger [public] audience that

may also play a role in both the decisionmaking process and the implementation of th[e] decision." *Id*. at 349.

56.     To this end, NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A "major federal action" is defined as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id*. § 4336e(10)(A).

57.     An EIS must describe the "reasonably foreseeable environmental effects of the proposed agency action." *Id*. § 4332(2)(C)(i). An EIS must also examine "a reasonable range of alternatives to the proposed agency action," including the alternative of not taking the underlying proposed action. *Id*. § 4332(2)(C)(iii).

58.     To determine whether the impacts of a proposed action are significant enough to warrant preparation of an EIS, the agency may prepare a preliminary environmental inquiry known as an environmental assessment. *See* 40 C.F.R.§ 1501.5;[1] 42 U.S.C. § 4336(b). An agency must include in its environmental assessment "sufficient evidence and analysis for determining whether to prepare" an EIS, and must determine if an EIS is necessary or, if not, issue a "finding of no significant impact." 40 C.F.R. § 1501.5(c)(1). The environmental assessment must evaluate alternatives to the proposed action and the "[e]nvironmental effects of the

---

[1] The Council on Environmental Quality (CEQ) recently issued an interim final rule, effective April 11, 2025, repealing its long-standing regulations implementing NEPA. 90 Fed. Reg. 10,610 (Feb. 25, 2025). Because BSEE chose to consider the 2020 CEQ regulations in developing its EA/FONSI, Plaintiffs continue to cite the CEQ regulations here.

proposed action and alternatives." *Id*. § 1501.5(c)(2). An agency must prepare an EIS if substantial questions are raised whether a project may have a significant effect upon the environment.

59.    The only circumstances in which an agency need not prepare an EIS or environmental assessment for a major federal action is when the action is "categorically excluded" from NEPA review. *Id*. § 1501.4. Categorical exclusions are intended for small, insignificant, and routine actions and can only be invoked for actions "that normally do not have a significant effect on the human environment." *Id*. § 1501.4(a); 42 U.S.C. § 4336e(1).

60.    The Department of the Interior has a categorical exclusion for the issuance of lease extensions. U.S. Dep't of the Interior, Departmental Manual, 516 DM § 15.4(C)(7) (effective May 27, 2004).

61.    The Department of the Interior has another categorical exclusion for approving an "Application for Permit to Drill (APD)" for an offshore oil and gas well "when said well and appropriate mitigation measures are described in an approved exploration plan [or] development plan." 516 DM § 15.4(C)(12). The Department of the Interior also has a categorical exclusion for the approval of "Sundry Notices and Reports on Wells." 516 DM § 15.4(C)(14).

62.    To invoke a categorical exclusion, the exclusion must cover the relevant action at issue. 43 C.F.R. § 46.205(a). The Department of the Interior's NEPA regulations state that "[i]f a proposed action does not meet the criteria for any of the listed … categorical exclusions … then the proposed action must be analyzed in an environmental assessment or environmental impact statement." *Id*.

63.    In determining whether to rely on an existing categorical exclusion, an

1  agency must analyze whether "extraordinary circumstances" exist that preclude the

2  use of the categorical exclusion and require the preparation of an EIS or

3  environmental assessment. *Id.* § 46.205(c).

4      64.   The Department of the Interior's NEPA regulations state that

5  "[e]xtraordinary circumstances … exist for individual actions within categorical

6  exclusions that may meet any of the criteria listed" in the regulations that, if

7  present, preclude categorically excluding a proposed action from NEPA analysis.

8  *Id*. § 46.215. Those criteria include whether a proposed action may "[h]ave

9  significant impacts on public health or safety[;] … such natural resources and

10  unique geographic characteristics as historic or cultural resources; park, recreation

11  or refuge lands; … migratory birds;" and species protected under the Endangered

12  Species Act. *Id*. The criteria also include whether a proposed action has "unique or

13  unknown environmental risks … a direct relationship to other actions that

14  implicate potentially significant environmental effects[;] …" or if it

15  "[s]ignificantly limit[s] access to and ceremonial use of Indian sacred sites on

16  Federal lands by Indian religious practitioners or significantly adversely affect[s]

17  the physical integrity of such sacred sites." *Id*.

18      65.   According to BSEE, if a proposed action triggers a "yes" answer to

19  any of the criteria, then it must prepare an EIS or environmental assessment prior

20  to implementation of the proposed action.

21      66.   In preparing a NEPA analysis, an agency must "ensure the

22  professional integrity, including scientific integrity, of the discussion and analysis

23  in an environmental document," and "make use of reliable data and resources." 42

24  U.S.C. § 4332(2)(D)–(E).

25

67.    Notably, "dilatory or ex post facto environmental review cannot cure an initial failure to undertake environmental review." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785–86 (9th Cir. 2006). Any other rule would "seriously imped[e] the degree to which [agency] planning and decisions c[an] reflect environmental values," *id.* (quoting *Save the Yaak v. Block*, 840 F.2d 714, 718–19 (9th Cir. 1988)), and improperly use the NEPA process "as an exercise in form over substance, and … as a subterfuge designed to rationalize a decision already made," *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

68.    An agency's NEPA obligations do not end with the issuance of an EIS, environmental assessment and finding of no significant impact, or reliance on a categorical exclusion. An agency may only rely on a prior programmatic environmental document older than five years "so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid." 42 U.S.C. § 4336b(2).

69.    Agencies are required to prepare a supplemental NEPA analysis "if a major Federal action is incomplete or ongoing, and (i) [t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) [t]here are substantial new circumstances or information about theon the analysis." 40 C.F.R. § 1502.9(d)(1). An agency also has the discretion to prepare a supplemental EIS or environmental assessment when it "determines that the purposes of [NEPA] will be furthered by doing so." *Id*. § 1502.9(d)(2).[2]

---

[2] While these CEQ regulations regarding supplemental NEPA no longer exist, the Court looks to the regulations in place at the time the agency issued its decision. *California v. Norton*, 311 F.3d at 1167 n.2. Moreover, Interior's recently-amended

## Administrative Procedure Act

70.     The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706. Under the APA, courts "shall … hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made "without observance of procedure required by law." *Id*. § 706(2)(A), (D).

71.     Under the APA, a person may also seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

## FACTUAL BACKGROUND

## Oil and Gas Leasing in the Santa Ynez Unit off California

72.     There are currently 30 active oil and gas leases and 23 platforms on the Pacific Outer Continental Shelf from which drilling and extraction activities occur or have occurred. Twenty-two of these platforms are production platforms, while one is a processing platform. Eight platforms are located on expired leases.

73.     Most of the active oil and gas leases are organized into units. The Santa Ynez Unit is in the Santa Barbara Channel. The Unit consists of 16 leases: OCS-P 0180, 0181, 0182, 0183, 0187, 0188, 0189, 0190, 0191, 0192, 0193, 0194, 0195, 0326, 0329, and 0461. The federal government issued the leases between

---

Department Manual for implementing NEPA states that BSEE is required to prepare a supplemental NEPA analysis "if a major Federal action remains to occur, and (1) [t]he [agency] makes substantial changes to the proposed action that are relevant to environmental concerns; or (2) [t]he agency determines … that there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects." U.S. Dep't of the Interior, Departmental Manual, 516 DM 1 § 3.6 (effective July 3, 2025); *see also Marsh v. Or. Nat. Res. Def. Council*, 490 U.S. 360, 370–74 (1989) (discussing triggers for when supplemental NEPA is required).

1968 and 1982. The leases all had an initial term of five years.



*The Santa Ynez Unit. Map: Bureau of Ocean Energy Management*

74.    Oil and gas production has occurred under these leases from Platform Harmony, Platform Heritage, and Platform Hondo. Platform Harmony was installed in June 1989 and first production began in December 1993. Platform Heritage was installed in October 1989 and first production began in December 1993. Platform Hondo was installed in June 1976 and first production began in April 1981.



*Platform Hondo. Photo: Bureau of Ocean Energy Management*

75.     Until recently, ExxonMobil owned and operated all three platforms. ExxonMobil's development plan for the Santa Ynez Unit stated that recovery of the oil and gas reserves in the Unit "will take place over a period of approximately 25 to 35 years." As first production from the Unit began in 1981, production should have ceased by 2016. According to BSEE, leases within the Unit contain 80 percent of the remaining recoverable oil and gas reserves on the Pacific Outer Continental Shelf.

76.     Sable is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit.

77.     This change of ownership follows a May 20, 2015, oil spill from the Plains All American Pipeline (now owned by Sable), which ruptured and spilled

what is now believed to be more than 450,000 gallons of oil on the Santa Barbara coast. The oil spill closed beaches and killed wildlife.

78.    Federal regulators determined that the lack of effective protection against external corrosion, notably the pipeline's ineffective cathodic protection system, caused the spill. Water had entered the insulated pipeline's compromised coating (tape wrap over insulation), which thwarted the cathodic protection system's ability to prevent corrosion of the pipeline. The regulators stated that corrosion cannot be prevented on insulated lines where the coating system has been compromised.



*Oil spilled onto Refugio Beach. Photo: U.S. Coast Guard*

79.    The pipeline transported oil from seven offshore oil and gas platforms to refineries. The broken pipeline shut down production at all seven of those offshore platforms. Operators of four of the seven platforms announced plans to decommission the platforms. ExxonMobil did not.

80.     Instead, in 2015, ExxonMobil requested an additional year to resume operations, and BSEE approved that request. Year after year since then, BSEE has extended the Santa Ynez Unit leases. On November 14, 2023, BSEE approved a lease extension through December 13, 2024. Absent BSEE's extensions, all 16 leases would have all expired. Upon expiration of the leases, all the wells would need to be permanently plugged and other infrastructure removed within one year. While Sable has asserted that the work it conducted under the APMs that BSEE approved in September 2024 and July 2025 is now the lease holding activity, Sable was only able to apply for and receive the APMs because BSEE had extended the Santa Ynez Unit leases in November 2023. In other words, all the subsequent federal permits Sable received for the Santa Ynez Unit are tainted and invalid because the original lease extension was unlawful.

## Restarting Offshore Oil and Gas Activities at the Santa Ynez Unit

81.     In February 2024, Sable acquired the Santa Ynez Unit leases, along with its associated drilling platforms, offshore and onshore pipelines, and onshore processing facilities. Sable financed the purchase with a loan from the former owner, ExxonMobil.

82.     Sable notified investors that the risks of offshore oil and gas production at the Santa Ynez Unit are heightened because most of the equipment has been "shut-in," meaning operations have been halted, since 2015.

83.     Sable plans to restart oil production, including transport, from the Santa Ynez Unit using the same onshore pipeline system that ruptured in 2015.[3] It

---

[3] On October 9, 2025, Sable filed an 8-K report with the Security and Exchange Commission, stating that it had submitted an "updated" development and production plan to the Department of the Interior. According to Sable, the plan

decided not to replace the original pipelines. Instead, Sable applied for state waivers from certain pipeline safety requirements because of the limited effectiveness on these pipelines of the otherwise required effective coating and cathodic protection systems that prevent pipeline corrosion, among other reasons.

84.    The hasty efforts to restart operations have largely evaded public processes and meaningful environmental review by state or federal regulators.

85.    Offshore, Sable pursued well-work permits (by submitting Applications for Permits to Modify or APMs) in September 2024 to perforate two wells, the primary purpose of which is to "Enhance Production." To perforate a well, a hole is punched into its steel and cement casing to cause oil and gas to flow into the well. Typically, a perforating gun is used to carry and detonate explosives to create a channel for the oil and gas to flow from the reservoir into the well. Perforating the wells that have been shut down since 2015 is a necessary step toward restarting production at the offshore oil and gas platforms in the Santa Ynez Unit.

86.    Within one day of receiving these permit applications, BSEE concluded that the well-perforating activities were categorically excluded from environmental analysis under NEPA pursuant to 516 DM § 15.4(C)(12), which covers some approvals of Applications for Permits to Drill. *See* 516 DM §

---

proposes the use of an Offshore Storage and Treating Vessel (OS&T) to process production from the Santa Ynez Unit. Produced oil would then be loaded onto oil tankers and transported on these tankers through federal waters off Santa Barbara to refineries outside of California. Under this proposal, Sable would use OS&T rather than the onshore processing facility and pipeline system. Neither Sable nor the federal government have made this proposed plan publicly available.

15.4(C)(12). BSEE also determined that there were no extraordinary circumstances that render a categorical exclusion inappropriate.

87. Even assuming the cited categorical exclusion applied to these circumstances, the categorical exclusion reviews did not consider the rare situation of restarting the Santa Ynez Unit after being shut down for nearly a decade due to a massive oil spill.

88. BSEE approved the two permit applications from Sable on September 25, 2024, within four business days of receiving them.

89. On December 20, 2024, after Plaintiffs filed this case challenging BSEE's unlawful lease extensions decision, BSEE filed a motion for voluntary remand, admitting its lease extensions decision and categorical review were deficient. BSEE, however, refused to use its authority to ensure a restart would not occur while conducting the revised analysis. On March 21, 2025, the Court denied BSEE's motion upon finding the agency had not demonstrated an intent to seriously reconsider or re-review its decision, pointing to the fact that BSEE had continued to permit activity at the Santa Ynez Unit and had suggested that it would permit additional activity during the remand period.

90. On May 19, 2025, Sable announced that it had restarted oil production at Platform Harmony, one of the three platforms in the Santa Ynez Unit. Sable's announcement stated that it had initiated the flow of oil from six wells on the Platform and was transporting the oil to storage tanks at the Las Flores Canyon, an onshore facility that processes oil produced at the Santa Ynez Unit.

91. On May 28, 2025, BSEE issued an EA/FONSI purporting to evaluate the environmental impacts of issuing the Santa Ynez Unit lease extensions. BSEE

developed the EA/FONSI behind closed doors and with no public input. On May 29, 2025, BSEE then issued a decision similarly purporting to re-evaluate its prior approval of the 2023 lease extensions decision in light of information Plaintiffs provided to BSEE in a February 2023 letter regarding the lease extensions, and information in the EA/FONSI. The 2025 decision reaffirms BSEE's 2023 lease extensions decision, concluding that granting the lease extensions is in the national interest.

92.     On July 2 and July 3, 2025, BSEE issued nine more APMs to Sable for activities at the Santa Ynez Unit. Each of these APMs were for the same type of work as the APMs BSEE issued in September 2024: to perforate wells. In contrast to the September 2024 permits, however, the permit type is listed as "Completion" rather than "Enhance Production."

93.     Then, on July 25, 2025, the Department of the Interior issued a press release, titled "Interior secures win for American Energy Dominance – safely and timely." The press release stated that BSEE anticipated a full restart of oil and gas production at the Santa Ynez Unit "by the end of 2025," noting that "[i]n just months," the Trump administration "helped bring oil back online" and that this "is an excellent testament to President Trump and Secretary Burgum's drive towards Unleashing American Energy."

94.     Onshore, Sable has undertaken construction work on the Santa Ynez Unit pipeline system that ruptured in 2015, including installing valves, excavation work, vegetation removal, grading and widening roads, and other construction and development activities. On September 27, 2024, the California Coastal Commission issued a Notice of Violation to Sable for unpermitted development in

the coastal zone in violation of the state Coastal Act. Subsequently, development activities continued in the coastal zone, and on October 4, 2024, the Commission sent a letter of its intent to issue a cease-and-desist order if necessary to halt project work. On November 12, 2024, the Commission's Executive Director issued a Cease and Desist Order that cited safety and environmental risks of the unpermitted development activities and ordered Sable to stabilize and restore sites to prevent further damage to coastal resources. According to the Commission, instead of coming to an agreement, Sable moved its operations to offshore state waters to carry out additional activities and resumed repair work on the onshore pipelines in February 2025. The Commission issued another cease-and-desist order to Sable on February 18, 2025, to halt its unpermitted onshore and offshore developmental activities. Rather than comply with this directive, Sable sued the Commission, continued its work in the coastal zone, and informed investors that its "pipeline repair operations remain unaffected." On April 10, following a public hearing, the Coastal Commission unanimously voted to issue a Cease and Desist Order, Restoration Order, and Civil Administrative Penalty Order for $18,022,500. In October 2025, a Santa Barbara County Superior Court judge ruled against Sable and in favor of the Commission, upholding the Commission's orders against Sable.

95.    Other state and local regulators have issued notices of violation of other laws to Sable. For example, on September 26, 2024, the California Geologic Energy Management Division sent Sable a letter noting that Sable was not in compliance with California bonding requirements for the Las Flores Canyon oil processing facility. Additionally, the Central Coast Regional Water Quality Board issued violation and non-compliance notices to Sable on December 13, 2024, for

unauthorized waste discharge into Santa Barbara County waterways and directed Sable to seek permit coverage for its discharges. And on December 17, 2024, the California Department of Fish and Wildlife also issued a notice to Sable of state Fish and Game Code violations concerning its activities on the department's properties.

96.    On September 16, 2025, the Santa Barbara County District Attorney filed 21 criminal charges against Sable, including 5 felonies, for violations of the state Water Code and Fish and Game Code related to Sable's extensive pipeline excavation and repair work along the pipeline that ruptured and spilled in 2015.

97.    On October 3, 2025, the California Attorney General also charged Sable with numerous violations related to unlawful wastewater discharges during its extensive pipeline excavation and repair work.

98.    Sable recently told its investors that it still expects to restart production from the Santa Ynez Unit by the end of 2025.

**The Risks of Prolonged Oil and Gas Activity at the Santa Ynez Unit**

99.    Extending the Santa Ynez Unit leases, approving well perforation permits, and restarting oil and gas activities prolongs reliance on aging infrastructure and offshore oil and gas production. Both create additional harmful environmental effects.

100.    For example, the lease extensions and well perforation permits increase the risk of oil spills. That risk exists from both the inactive wells during the suspension period and from production activities when they resume. Oil spills can lead to closures of beaches and commercial and recreational fisheries. Oil spills also harm wildlife in numerous ways. Oil can coat animals' fur, feathers, or

skin—impairing their insulation, water repellency, or breathing. For example, oil spills are deadly to sea otters whose oiled furry coats cause hypothermia. Animals can also ingest and inhale oil, causing poisoning and death, organ damage, or respiratory problems. Moreover, oil can contaminate the water column and the seafloor where prey species live, causing indirect effects on wildlife by reducing their key food sources.

101.    Exposure to crude oil also adversely affects fish at all stages. Early life stages of fish are particularly sensitive to the effects of toxic oil components such as polycyclic aromatic hydrocarbons, which can cause larval deformation and death. Adult fish exposed to oil can suffer from reduced growth, enlarged liver, changes in heart and respiration rates, fin erosion, and reproductive impairment. Additionally, fish and sharks are at risk from lethal coating of their gills with oil and declines in and contamination of their food sources. Exposure to crude oil has also been linked to long-term population effects in fish. A study based on 25 years of research demonstrated that embryonic salmon and herring exposed to very low levels of crude oil can develop heart defects that impede their later survival.

102.    Threatened and endangered species such as western snowy plovers, California least tern, blue and humpback whales, leatherback sea turtles, and the tidewater goby are susceptible to exposure to oil from the Santa Ynez Unit.

103.    Offshore oil and gas infrastructure is typically designed for a 20- to 30-year life. Prior to the 2015 oil spill, drilling had been occurring at the Santa Ynez Unit since 1981, and the last platforms were installed in 1989. The oil and gas infrastructure in the Santa Ynez Unit is beyond its intended lifespan.

104.    The age of the oil and gas infrastructure in the Santa Ynez Unit

increases the risk of oil spills and other accidents. For example, the Plains All American Pipeline that ruptured in 2015 was built in 1987. The environmental analysis that the Bureau of Land Management and California State Lands Commission prepared in 1985 for the construction and operation of the pipeline acknowledged that spills happen and determined that the risk of a spill would more than double as the pipeline aged from 20 to 40 years.

105.    According to scientists, aging poses risks of corrosion, erosion, and fatigue stress to subsea pipelines. These impacts accelerate over time and can act synergistically to increase the rate of crack propagation. Marine environments are especially known to produce significant corrosion on steel surfaces, and when a steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to 15 percent. One offshore pipeline study found that after 20 years, the annual probability of pipeline failure increases rapidly, equating to a probability of failure of 10 percent to 100 percent per year. Another study covering 1996 to 2010 found that accident incident rates, including spills, increased significantly with the age of infrastructure. The Pipeline and Hazardous Materials Safety Administration's pipeline safety risk indicator places pipelines greater than 25 years of age in the "High" risk category.

106.    Older wells can also lead to oil spills or other accidents. For example, one study found that 30 percent of offshore oil wells in the Gulf of Mexico experienced well casing damage in the first five years after drilling, and damage increased over time to 50 percent after 20 years. Another study determined about five percent of oil and gas wells leak immediately, 50 percent leak after 15 years, and 60 percent leak after 30 years.

107.    Federal records show that the Santa Ynez Unit already has experienced problems. Before it shut down, federal inspectors on May 1, 2015, found "numerous corrosion issues" and components out of compliance on Platform Hondo. Just three weeks before that, they also found corrosion, five failed gas detectors, and "leakage rates higher than the maximum allowable" on that platform's Well H-12U. Platforms Harmony, Heritage, and Hondo had early-2015 gas leaks that required their crews to gather for safety reasons, including an incident on Platform Heritage the morning of May 19, 2015. Platform Hondo also had a gas leak on April 27, 2015, and Platform Harmony had one on March 29, 2015. A federal inspection of Platform Harmony on August 27, 2015, found corrosion and electrical issues throughout the platform. More recent problems have also occurred. For example, during maintenance activities on October 24, 2024, there was a leak of hydraulic fluid from an equipment line at Platform Harmony; and an electrical incident at Platform Hondo on November 19, 2024, resulted in an arch flash.

108.    Oil and gas activity off California has also entailed the use of well stimulation treatments such as hydraulic fracturing ("fracking") and acidizing. These practices cause significantly worse impacts to the environment and public health than conventional offshore oil and gas production. The harmful impacts from well stimulation treatments include the discharge of toxic wastewater; the emission of hazardous air pollutants; and increased risk of earthquakes and oil spills, among other harms. ExxonMobil has previously stated it will likely need to use well stimulation treatments to restart its platforms in the Santa Ynez Unit.

109.    Oil and gas drilling activity also releases harmful air pollutants like fine particulate matter and volatile organic compounds (VOCs). VOCs emitted during drilling activity can include the "BTEX compounds"—benzene, toluene, ethyl benzene, and xylene—which are designated as hazardous air pollutants. *See* 42 U.S.C. § 7412(b). Many of these VOCs are associated with serious short-term and long-term effects to the respiratory, nervous, and circulatory systems. Additionally, VOCs create ground-level ozone, or smog, which can contribute to asthma, premature death, stroke, heart attack, and low birth weight. Benzene is also a known carcinogen and has been detected in people living within a 10-mile radius of oil wells where fracking has occurred.

110.    Oil and gas drilling also includes the discharge of drilling muds and cuttings, produced wastewater, and well treatment and workover fluids. The federal government permits Platforms Harmony, Heritage, and Hondo to discharge more than 33.76 million gallons of produced wastewater into the ocean each year. These discharges can contain toxic chemicals like benzene, heavy metals, and radioactive materials.

111.    Prolonged drilling at the Santa Ynez Unit also increases vessel traffic through, for example, the servicing of platforms and wells and transporting materials. This increases the risk of vessel strikes of various endangered animals, including several species of whales found in the area. Vessel strikes can kill or injure large whales and other animals by causing blunt force trauma, resulting in fractures, hemorrhage, and/or blood clots. Direct propeller strikes can result in fatal blood loss, lacerations, and/or amputations. Vessel collisions are a leading threat to large whales off the U.S. West Coast.

112.    Oil and gas drilling exacerbates climate change, which is already causing more intense storms, droughts, and wildfires; sea level rise; a higher risk of extinction for many species; and numerous other harms. Scientists have determined that each barrel of federal California oil left in the ground would equate to roughly half-a-barrel reduction in net oil consumption, with associated reductions in greenhouse gas emissions. Before it shut down in 2015, the onshore facility that processed oil and gas from the Santa Ynez Unit was Santa Barbara County's largest source of greenhouse gas emissions. It contributed 55 percent of Santa Barbara County's total greenhouse gas emissions.

### **BSEE's 2023 Lease Extensions Fail to Consider Relevant Factors**

113.    On November 19, 2015, ExxonMobil sought its first request following the Plains All American Pipeline spill for an extension under 30 C.F.R. § 250.180(e) of all 16 of its oil and gas leases in the Santa Ynez Unit. BSEE approved the lease extensions on December 10, 2015. ExxonMobil has applied for, and BSEE has granted, lease extensions for its leases in the Santa Ynez Unit every year through 2023. ExxonMobil submitted its most recent application on October 19, 2023, and BSEE granted it on November 14, 2023. The extension expired at midnight on December 13, 2024.

114.    In granting the extension in November 2023, BSEE described the proposed action as "[p]er 30 CFR 250.180(e), ExxonMobil is requesting an additional 365 days beyond the original 180 (and subsequent 365-day extensions) afforded by 30 CFR 250.180(d) to resume operations on their leases that have continued beyond their primary term."

115.    In granting the extension in November 2023, as with the extensions before it, BSEE determined that "approving ExxonMobil's request is in the National interest." In reaching this conclusion, BSEE determined that "[t]he continued development of these proven reserves from established infrastructure would help meet the Nation's energy needs without the impacts associated with new infrastructure installations or exploration and development of unproven fields." It also asserted that "[c]ontinued production would likewise benefit taxpayers through the continued revenue streams derived from production, including royalties and direct and indirect tax revenue to the Federal Government."

116.    In determining that granting the extension would be in the national interest, BSEE did not consider any of the environmental harms (described above) that come with prolonging offshore oil and gas production off California. BSEE did not consider any harms associated with the continued presence of and reliance on aging infrastructure. BSEE also did not consider that ExxonMobil has previously stated that it anticipates using well stimulation treatments to restart its platforms in the Santa Ynez Unit.

117.    In granting the extension in November 2023, BSEE also acknowledged that resumption of activities is possible, stating that if the ruptured pipeline is replaced or its restart is approved before the lease extension expires, "then ExxonMobil will have 60 calendar days … to restore production from the Santa Ynez Unit."

118.    In granting the extension in November 2023, as with the extensions before it, BSEE relied on a categorical exclusion under NEPA. As a result, BSEE did not prepare either an EIS or an environmental assessment to

examine the environmental effects of its action extending the leases.

119.    BSEE determined that no extraordinary circumstances exist that would make reliance on the categorical exclusion improper.

120.    BSEE concluded that there should be no impacts on public health or safety as "there will be no active oil and gas operations during the approved extension period."

121.    BSEE concluded that there should be no impacts on "natural resources, unique geographic characteristics, or ecologically significant or critical areas" because the extension would "allow active oil and gas operations to remain idled during the approved extension period." BSEE also stated it "will oversee adherence to a preservation plan for safe and environmentally protective maintenance and oversight."

122.    BSEE concluded that there are no controversial environmental effects because the agency's "action involves approving an extension of suspension of operations during which active oil and gas operations will be idled and the facilities maintained pursuant to preservation plans to ensure safety and environmental protection."

123.    BSEE concluded that there would be no cumulatively significant effects in the event production is ultimately restored because such effects "have already been examined through prior NEPA analyses" and the extension "represents a temporary suspension in those previously examined activities."

124.    BSEE concluded that the extension would have no significant impacts on species listed under the Endangered Species Act and would not "limit access to and ceremonial uses of Indian sacred sites on Federal lands."

125.    The available information indicates that there are numerous significant environmental effects of BSEE's extensions of the Santa Ynez Unit leases. BSEE's conclusion that there are no extraordinary circumstances is incorrect and unsupported.

126.    Prior to BSEE's issuance of the November 2023 lease extensions, the Center sent BSEE a letter, in February 2023, urging the agency to consider the environmental harms from approving further lease extensions and conduct comprehensive NEPA review. BSEE did not do so. It did not respond to the letter.

### BSEE's Approvals of Applications for Permits to Modify Fail to Consider Relevant Factors

127.    On September 19, 2024, Sable submitted two Applications for Permits to Modify, or APMs, for well HE028 and well HE023. According to the permits, they are to "Enhance Production."

128.    The wells have been shut-in, meaning closed down, since 2015. The permits authorize Sable to perforate the wells. Typically for this operation, a perforating gun is lowered into the well to the depth of the oil and gas reservoir. The gun fires a powerful explosive charge that blasts a hole, or holes, in the steel casing and cement, sometimes up to several feet into the surrounding rock formation. The holes allow oil and gas to flow into the well.

129.    BSEE's approvals were major federal actions subject to NEPA's environmental review requirements. BSEE should have prepared an environmental assessment or environmental impact statement for the approval of the APMs. Instead, BSEE determined that its actions were categorically excluded from further NEPA review.

130.    On September 20, 2024, BSEE issued a NEPA Categorical Exclusion Review for each of the permits. It determined that each permit approval was categorically excluded from further NEPA analysis under 516 DM § 15.4(C)(12). The categorical exclusion BSEE invoked applies to approvals of Applications for Permits to Drill (or APDs) that meet certain conditions "when said well and appropriate mitigation measures are described in an approved exploration, development plan, production plan, or Development Operations Coordination Document." 516 DM § 15.4(C)(12).

131.    BSEE determined that reperforating and adding new perforations to the wells were "normal well-reworking operations" considered and evaluated in the original 1982 development and production plans.

132.    None of the development and production plans adequately describe the well perforating work that facilitates the restart of the Santa Ynez Unit. The plans have no applicable mitigation measures for restarting oil and gas production after a nearly decade-long shutdown. 516 DM § 15.4(C)(12).

133.    BSEE invoked a categorical exclusion that does not cover the permitted activities. Its approvals of Sable's APMs are not eligible for coverage under a categorical exclusion because (1) they did not approve Applications for Permits to Drill, (2) the restart activities are not adequately described in the development and production plans, and (3) there are not appropriate mitigation measures for the well perforation and restart activities.

134.    There is no applicable categorical exclusion that can be invoked for these APMs. Additionally, there are exceptional circumstances that make a categorical exclusion inapplicable.

135.   BSEE, in its categorical exclusion review for each permit, determined that no extraordinary circumstances were found that would counsel against application of a categorical exclusion for perforating wells HE023 and HE028.

136.   BSEE concluded the activities would have no significant impacts on public health or safety. It stated that "activities such as the proposal have little to no risk of a blowout which could result in an oil spill."

137.   BSEE concluded the permits would have no significant effects on natural or cultural resources, despite the proximity of the wells to the Chumash Heritage National Marine Sanctuary.

138.   BSEE concluded the permits have no highly controversial effects.

139.   BSEE concluded the permits have no uncertain or potentially significant environmental effects or involve unique or unknown environmental risks. It further acknowledged that while an oil spill is the greatest risk, such risk "is low" and that any effects of an oil spill that may occur are well documented and have been evaluated in previous environmental reviews.

140.   BSEE concluded the permits would have no significant impacts on listed threatened or endangered species or their critical habitat.

141.   BSEE concluded the permits would not have significant cumulative environmental effects.

142.   BSEE concluded the permits would not limit access to and ceremonial use of Indian sacred sites.

143.   The available information indicates there are numerous significant environmental effects of BSEE's approvals of the well perforation permits that

facilitate the restart of the Santa Ynez Unit. BSEE's conclusions that there are no extraordinary circumstances are incorrect and unsupported.

144.   From July 2 to July 3, 2025, BSEE then approved nine additional APMs for further well perforations at wells in the Santa Ynez Unit: Well H012 (approved July 2, 2025); Well H033 (approved July 2, 2025); Well H027 (approved July 2, 2025); Well H023 (approved July 2, 2025); Well H038 (approved July 2, 2025); Well H036 (approved July 2, 2025); Well H004 (approved July 2, 2025); Well H003 (approved July 2, 2025); and Well H015 (approved July 3, 2025). Additionally, on July 24, 2025, BSEE approved another APM related to the retrieval of a tool that had gotten "stuck in the hole" after a "pump-through plug was blown up-hole by higher pressure below the plug than above the plug" for work conducted on Well H033.

### No NEPA Analysis Reasonably Examines New Information and New Circumstances of Oil and Gas Activities at the Santa Ynez Unit

145.   When BSEE issued its 2023 lease extensions and 2024 APMs, there was no NEPA analysis even mentioning, let alone evaluating, the effects of the 2015 oil spill or the effects of restarting the Santa Ynez Unit after nearly ten years. No NEPA analysis examined the effects of the catastrophic oil spill in 2015 from the onshore Santa Ynez Unit pipeline system that released as much as 450,000 gallons of oil. In addition to killing hundreds of birds and marine mammals, the spill damaged 1,500 acres of shoreline and 2,200 acres of subtidal habitat. The spill also closed fisheries and likely killed a wide variety of nearshore fish, including surfperch and grunion, which were spawning when the spill occurred. No NEPA analysis examined how external pipeline corrosion caused that oil spill, due to the pipeline's design, environment, operating conditions, and ineffective cathodic

protection system, or the effect of Sable's plans to restart the same pipeline. New analyses by Sable indicate that a worst-case spill from the pipeline could be over 480,000 gallons, even after pipeline repairs and the installation of valves.

146.    No comprehensive examination of the environmental effects of federal oil and gas activities in the Santa Barbara Channel has been conducted in 50 years. In 1975, the Department of the Interior prepared an EIS for "Oil and Gas Development in the Santa Barbara Channel, Outer Continental Shelf off California." The 1975 Santa Barbara Channel EIS contemplates the "normal life of a platform" as 15 to 25 years.

147.    The development and production plans for the Santa Ynez Unit were originally prepared over 40 years ago, in 1982. The Department of the Interior issued an EIS for the Santa Ynez Unit development and production plans in 1984.

148.    In approving the well perforation permits, BSEE relied on the 1984 Santa Ynez Unit EIS. BSEE concluded that the potential environmental impacts of the permits were consistent with those considered and analyzed in that forty-year-old EIS.

149.    More recent environmental assessments on changes to the Santa Ynez Unit infrastructure have not examined the risks and harms from restarting oil and gas production or prolonged development and production activities. One assessment, completed in 2014, covered a cable-laying project and concluded it would have no significant impacts on the environment. A more recent assessment, completed in 2021, was for the installation of new "anode sleds," and it concluded the installation would have no significant impacts.

150.   The infrastructure at the Santa Ynez Unit has aged significantly: two of the three platforms were constructed more than 35 years ago and one (Hondo) was constructed nearly 50 years ago. The development plans and associated environmental analysis estimated recovery of the oil and gas reserves in the Santa Ynez Unit "will take place over a period of approximately 25 to 35 years." As first production from the Unit began in 1981, production should have ceased by 2016.

151.   Restarting the Santa Ynez Unit will increase oil production, which also causes greater-than-evaluated air and water pollution. The Santa Ynez Unit has already produced more oil and gas than was contemplated in the development and production plans. ExxonMobil planned for 300 to 400 million barrels of oil and 600 to 700 billion cubic feet of natural gas, and BSEE reports ExxonMobil has already produced more than 507.4 million barrels of oil and over 963.1 billion cubic feet of natural gas.

152.   New drilling techniques that ExxonMobil used, and that Sable indicates it plans to use, also render prior environmental analyses of oil and gas production the Santa Ynez Unit outdated, including extended reach drilling. For example, in 2010, ExxonMobil used extended reach drilling to drill one of the world's longest wells to increase production from Platform Heritage.

153.   Additionally, in October 2024, coastal Santa Barbara was designated a National Marine Sanctuary because of its importance to Chumash heritage and culture. The Santa Ynez Unit is adjacent to this newly designated sanctuary, the offshore pipelines traverse it, and a restart will adversely affect its cultural and environmental values.

154.   The old NEPA analyses do not consider significant new information about air emissions from the Santa Ynez Unit. The original development plan and NEPA documents relied on design features to minimize fugitive emissions, including essentially eliminating VOC pollution. New information indicates that there are significant fugitive emissions at the Santa Ynez Unit and, according to ExxonMobil, the emissions are "next to impossible to totally prevent." The Santa Ynez Unit's Las Flores Canyon processing facility was Santa Barbara County's largest source of VOC emissions and other air pollutants before the shutdown.

155.   The prior NEPA documents do not analyze the harms from greenhouse gas emissions from the Santa Ynez Unit, including new information demonstrating how drilling off California contributes to global greenhouse gas emissions.

156.   Since the 1984 EIS, there are newly listed and reclassified species and newly designated critical habitat under the Endangered Species Act—and the environmental impacts of offshore oil and gas activities on these species and critical habitat have yet to be examined under NEPA. Humpback whales, formerly globally listed, are now protected as distinct population segments with newly designated critical habitat. The populations off Santa Barbara are among the most imperiled. Black and white abalone, Guadalupe fur seal, oceanic white tip shark, tidewater goby, western snowy plover, and California tiger salamander were all listed after 1984. Leatherback sea turtles were reclassified from threatened to endangered because of their high risk of extinction. One of the world's most endangered whales, North Pacific right whales, have been more frequently sighted off Southern California since the prior NEPA reviews.

157.   BSEE's permitting of oil and gas activities at the Santa Ynez Unit is ongoing and incomplete, meaning it has a continuing duty to ensure these activities fully comply with NEPA. For example, Sable has indicated to investors that it plans to restart oil and gas production at the Santa Ynez Unit in 2025; BSEE has issued permits that facilitate such a restart; and BSEE will continue to issue approvals for oil and gas operations at the Santa Ynez Unit.

158.   On information and belief, BSEE continues to rely on the 1975 Santa Barbara Channel EIS and 1984 Santa Ynez Unit EIS in approving and managing oil and gas production at the Santa Ynez Unit.

159.   Oil and gas activities at the Santa Ynez Unit have occurred and, unless the Court grants the relief requested in this Complaint, will again occur in a manner not contemplated or evaluated by these prior NEPA analyses. BSEE's failure to examine the environmental impacts of a restart of the Santa Ynez Unit deprives the public and decisionmakers of vitally important information and exacerbates the numerous risks inherent in offshore oil and gas drilling activities and elevated under these unique circumstances.

**BSEE's 2025 Decisions Do Not, and Cannot, Remedy the Flaws in the Agency's Original Decisions**

160.   BSEE's 2025 EA/FONSI purports to evaluate the environmental impacts of issuing lease extensions for the Santa Ynez Unit so that production can resume. The EA states that "the lease extension at issue is appropriate for a [categorical exclusion]" but that "BSEE is undertaking additional environmental review."

161.   The process by which BSEE issued the EA/FONSI is legally flawed. BSEE issued the EA/FONSI after issuing its 2023 lease extensions decision and

after admitting its 2023 lease extensions decision and categorical exclusion review on that decision were flawed. Yet BSEE refused to use its authority to ensure a restart would not occur while it prepared the new EA/FONSI and then boasted about how quickly the agency had facilitated a restart of oil production at the Santa Ynez Unit. The 2025 EA/FONSI is thus improperly predetermined, unreasonably slanted, and/or issued in bad faith.

162.   The 2025 EA/FONSI is also substantively flawed. The EA/FONSI fails to take a hard look at the reasonably foreseeable environmental effects of the lease extensions.

163.   The EA/FONSI considers oil spills an indirect effect of the action, but the EA/FONSI employs an inadequate analysis and reaches arbitrary conclusions regarding the risks and impacts of oil spills. For example, the EA states that a large spill is unlikely because low reservoir pressures in the majority of wells means that the risk of a blowout "is exceedingly small." But Sable's January 2025 Oil Spill Response Plan states that one of its pipelines "lies in an area where there is significant vessel traffic" that "could be damaged by an anchor, which would cause a loss of containment." It explains that a worst-case discharge could result in a spill of up to 6,210 barrels (or 260,820 gallons), which "could have significant impact to many species of wildlife and waterfowl" near the pipeline and damage "environmentally sensitive areas," including "Channel Islands National Park, which contains a variety of potentially sensitive natural resources." BSEE's NEPA analysis does not consider the risks or impacts of such an event.

164.   Additionally, the Oil Spill Risk Assessment included as Appendix A to the EA concludes that an oil spill of up to 1,000 barrels is likely to occur from

oil and gas activities on the Pacific Outer Continental Shelf. Yet BSEE's EA/FONSI only analyzes the effects of a spill of 50 barrels or less. Moreover, the EA/FONSI is also based on an Oil Spill Risk Assessment that uses erroneous size specific spill rates and underestimates the worst case discharge. Further, the EA/FONSI ignores available scientific information about how the risk of oil spill increases with the age of infrastructure.

165.   The EA/FONSI's conclusions that the environmental impacts of the lease extensions are insignificant, including but not limited to the risk of oil spills, are based on Sable's compliance with various legal requirements. But, in reaching these conclusions, BSEE failed to consider the numerous notices of violation that Sable has received related to its failure to follow legal requirements in California.

166.   The EA/FONSI also fails to properly evaluate reasonable alternatives. For example, in evaluating the no-action alternative, BSEE stated that "impacts would be similar to those" from approving the lease extensions, "but likely to a lesser extent depending on if Sable … returns to production." By assuming the no-action alternative would also result in return to production, BSEE rendered the comparison between the no-action and action alternative meaningless. Additionally, in evaluating the alternative of denying the lease extensions, BSEE pointed only to the impacts of decommissioning the Santa Ynez Unit infrastructure, without any evaluation of the environmental benefits of ending oil and gas production after several decades of activity. BSEE also failed to examine an alternative under which BSEE would require Sable to cease production operations by a date certain or require increased monitoring and inspections due to the age of the infrastructure.

167.    BSEE based its 2025 decision re-affirming the 2023 lease extensions on the EA/FONSI. BSEE's failure to follow the proper procedures in issuing its 2025 lease extensions decision, as well as its failure to properly examine the environmental impacts of the lease extensions, renders its 2025 lease extensions decision arbitrary and unlawful.

168.    BSEE's failure to properly examine the environmental impacts of a restart of the Santa Ynez Unit deprives the public and decisionmakers of vitally important information and exacerbates the numerous risks inherent in offshore oil and gas drilling activities that are elevated under these unique circumstances.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Violation of OCSLA and the APA:**
**Unlawful National Interest Determination**

169.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 168 of this Complaint.

170.    OCSLA requires that offshore oil and gas activity be "subject to environmental safeguards," and balanced "with protection of the human, marine, and coastal environments." 43 U.S.C. §§ 1332(3), 1802(2).

171.    OCSLA sets initial lease terms of five years, and leases last as long as they are producing oil and gas in paying quantities. *Id*. § 1337(b)(2). Nonproducing leases are supposed to expire, and the oil and gas infrastructure used to produce from those leases generally must be decommissioned within one year of lease expiration. 30 C.F.R. §§ 250.180(a)(2), 250.1710, 250.1725(a).

172.    If production ceases on a lease that has continued beyond its primary term, the lease will expire unless production resumes or BSEE approves a

suspension of operations or production before the end of the year after production ceases. *Id.* § 250.180(d). BSEE can also allow an operator more than a year to resume operations, but only when BSEE determines that "the longer period is in the National interest, and it conserves resources, prevents waste, or protects correlative rights." *Id.* § 250.180(e).

173.    BSEE's November 2023 determination that the lease extensions for the Santa Ynez Unit are in the national interest failed to consider relevant factors. BSEE looked only at the purported benefits of issuing the lease extensions so that ExxonMobil could resume production without considering any of the environmental harms from doing so. BSEE did not consider, for example, the risks of oil spills from aging infrastructure, the future use of well stimulations at the Santa Ynez Unit, or the climate impacts that would result from restarting drilling operations at the Santa Ynez Unit.

174.    BSEE's November 2023 issuance of the lease extensions for the Santa Ynez Unit violates OCSLA and its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A). BSEE's 2025 decision re-evaluating and re-affirming its 2023 lease extensions cannot cure these violations.

## Second Claim for Relief

**Violation of NEPA and the APA:**
**Unlawful Use of Categorical Exclusion to Approve Lease Extensions**

175.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 168 of this Complaint.

176.    NEPA requires all federal agencies, including BSEE, to take a "hard look" at the direct, indirect, and cumulative effects of proposed major federal

actions and at alternatives that could reduce or eliminate those environmental impacts. 42 U.S.C. § 4332(2)(C)(i)–(iii); 40 C.F.R. § 1502.16. An agency can take the requisite hard look at a major federal action by preparing an environmental assessment or an EIS. 42 U.S.C. §§ 4332(2)(C), 4336(b); 40 C.F.R. § 1501.5.

177.    BSEE's approval of extensions for the offshore oil and gas leases in the Santa Ynez Unit constitutes a major federal action.

178.    Yet, in approving the extensions in November 2023, BSEE failed to take a hard look at the environmental effects of extending these federal offshore oil and gas leases. BSEE did not prepare an EIS or environmental assessment on the lease extensions. Instead, BSEE relied on a categorical exclusion. In doing so, BSEE failed to consider the direct, indirect, and cumulative effects of the lease extensions and failed to consider a reasonable range of alternatives to its action.

179.    BSEE's reliance on a categorical exclusion in issuing the November 2023 lease extensions for the Santa Ynez Unit is arbitrary and violates NEPA. BSEE failed to consider important aspects of the action. BSEE failed to consider the significant environmental impacts of leaving non-producing infrastructure in place; and of oil spills, water pollution, air pollution, and other harms associated with prolonging offshore drilling from aging infrastructure.

180.    BSEE failed to consider relevant factors and reached conclusions contrary to the evidence before the agency in determining no extraordinary circumstances apply. As one example, BSEE determined that "[a]ny cumulative effects from ongoing future production, in the event that production is ultimately restored, have already been examined through prior NEPA analyses." But BSEE has never examined the cumulative effects of oil and gas production activities off

California. As another example, BSEE determined there would be no adverse impacts to public health, ecologically critical areas, cultural resources, access to sacred sites, or endangered and threatened species because oil and gas activity would be idle during the extension period. But BSEE acknowledged in approving the lease extensions that production could resume during the extension period.

181.    BSEE's consideration of the impacts to public health, ecologically critical areas, cultural resources, access to sacred sites, threatened and endangered species, and other factors in its extraordinary circumstances review looked only at the potential impacts during the suspension of operations—not the impacts of active oil and gas production. In contrast, both ExxonMobil's lease extension applications and BSEE's national interest determination only considered and relied on the purported benefits of production.

182.    BSEE's reliance on a categorical exclusion to approve the November 2023 lease extensions and its extraordinary circumstances review violate NEPA, its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. §706(2)(A). BSEE's failure to prepare an EIS or environmental assessment on the lease extensions violates NEPA, its implementing regulations, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and made "without observance of procedure required by law" under the APA. *Id.* § 706(2)(A), (D). BSEE's 2025 EA/FONSI cannot cure these violations.

## **Third Claim for Relief**

### **Violation of NEPA and the APA:**
### **Unlawful Reliance on Categorical Exclusion to Approve Applications**
### **for Permits to Modify**

183.    Plaintiffs reallege and incorporate the allegations in Paragraph 1 through 168 of this Complaint.

184.    NEPA requires all federal agencies, including BSEE, to take a "hard look" at the direct, indirect, and cumulative effects of proposed major federal actions and at alternatives that could reduce or eliminate those environmental impacts. 42 U.S.C. § 4332(2)(C)(i)–(iii) 40 C.F.R. §§ 1502.16. An agency can take the requisite hard look at a major federal action by preparing an environmental assessment or an EIS. 42 U.S.C. §§ 4332(2)(C), 4336(b); 40 C.F.R. § 1501.5.

185.    BSEE's approval of APMs for the Santa Ynez Unit constitutes a major federal action.

186.    Yet, in approving the APMs in September 2024, BSEE failed to take a hard look at the environmental effects of the APMs that facilitate a restart of oil and gas activity at the Santa Ynez Unit. BSEE did not prepare an EIS or environmental assessment on the APMs. Instead, BSEE relied on a categorical exclusion. In doing so, BSEE failed to consider the direct, indirect, and cumulative effects of the APMs and failed to consider a reasonable range of alternatives to its actions.

187.    BSEE's reliance on a categorical exclusion in issuing the APMs is arbitrary and violates NEPA.

188.    There is no applicable categorical exclusion upon which BSEE can rely. None of the existing categorical exclusions can reasonably be interpreted to

cover the approval of permits to facilitate the restart of oil and gas production that has been shut down for nearly a decade due to a massive oil spill.

189.   BSEE failed to consider important aspects of its action. BSEE failed to consider the significant environmental impacts of oil spills, water pollution, air pollution, and prolonging offshore drilling from aging infrastructure.

190.   BSEE also failed to consider relevant factors and reached conclusions contrary to the evidence before the agency in determining no extraordinary circumstances apply. As one example, BSEE determined that "[p]ast, present, or reasonably foreseeable oil and gas development in the area have been evaluated and considered in previous environmental reviews." But no existing NEPA analysis examines the cumulative effects of oil and gas production activities off California. As another example, BSEE determined that "any effects of an oil spill that may occur are well documented and have been evaluated in previous environmental reviews existing analyses." But no NEPA analysis examines the effects of a spill as large as the one that occurred in May 2015 from the Santa Ynez Unit pipeline system.

191.   BSEE's reliance on a categorical exclusion to approve the APMs for the Santa Ynez Unit violates NEPA and its implementing regulations and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or made "without observance of procedure required by law" under the APA. 5 U.S.C. § 706(2)(A), (D). BSEE's failure to prepare an EIS or environmental assessment on its issuance of the APMs violates NEPA and its implementing regulations and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and made "without observance of procedure

required by law" under the APA. *Id.* § 706(2)(A), (D). BSEE's 2025 EA/FONSI cannot cure these violations.

192.  The APMs BSEE issued to Sable in July 2025 are also unlawful. BSEE was only able to issue these APMs because of BSEE's unlawful lease extensions decision, and the July 2025 APMs are also therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and made "without observance of procedure required by law" under the APA. *Id.*

## **Fourth Claim for Relief**

### **Violation of NEPA and the APA:**
### **Failure to Supplement Environmental Analysis**

193.  Plaintiffs reallege and incorporate the allegations in Paragraph 1 through 168 of this Complaint.

194.  NEPA requires federal agencies to take a "hard look" at the direct, indirect, and cumulative effects of major federal actions, and at alternatives to the action that could reduce or eliminate those effects. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.1(i), 1502.16.

195.  Agencies have a continuing obligation to comply with NEPA. This includes a mandatory, discrete duty to supplement an already completed analysis when "a major Federal action is incomplete or ongoing and" either "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns" or "significant new circumstances or information" arises that has bearing on the action. 40 C.F.R. § 1502.9(d)(1). An agency may only rely on a prior programmatic analysis if it reevaluates the analysis after five years and determines reliance on the analysis remains valid. 42 U.S.C. § 4336b.

196.    BSEE's permitting of oil and gas activities at the Santa Ynez Unit is ongoing and incomplete; there remains a federal action to occur. And there have been both substantial changes in the proposed action and substantial new circumstances and information bearing on the significance of the environmental effects of oil and gas production at the Santa Ynez Unit.

197.    First, BSEE has made substantial changes to oil and gas production at the Santa Ynez Unit since the 1975 and 1984 NEPA analyses that are relevant to environmental concerns. For example, oil and gas production would have ceased by now under the old analyses' assumptions, BSEE has authorized a nine-and-a-half-year shut-in of the Santa Ynez Unit after a major oil spill, and the agency has authorized extended reach drilling.

198.    Second, there are substantial new circumstances and information about the significance of oil and gas production at the Santa Ynez Unit. It has been nearly fifty years since completion of the EIS on oil and gas activities off California (the 1975 Santa Barbara Channel EIS) and nearly four decades since completion of an EIS on offshore oil and gas development and production activities at the Santa Ynez Unit (the 1984 Santa Ynez Unit EIS). The information and analysis in those documents are outdated. For example, the extent and damage from an oil spill exceeded that considered in prior analyses, the air pollution emissions from the Santa Ynez Unit exceeded that considered in prior analyses, there are newly listed species under the Endangered Species Act that are adversely affected by oil and gas activity at the Santa Ynez Unit, and there is a newly designated Chumash National Marine Sanctuary adjacent to the Santa Ynez Unit.

199.    NEPA and its implementing regulations require BSEE to supplement

the 1975 Santa Barbara Channel EIS and the 1984 Santa Ynez Unit EIS or prepare a new EIS on oil and gas activities in the Santa Ynez Unit. BSEE's failure to prepare a supplemental NEPA analysis constitutes agency action that is "unlawfully withheld" and/or "unreasonably delayed" under the APA. 5 U.S.C. § 706(1).

200.    BSEE cannot continue to rely on the 1975 Santa Barbara Channel EIS and the 1984 Santa Ynez Unit EIS to approve oil and gas development and production at the Santa Ynez Unit without supplementing the existing NEPA analyses or preparing a new NEPA analysis that comprehensively examines the impacts of oil and gas development and production at the Santa Ynez Unit. BSEE's reliance on outdated NEPA documents in taking such actions violates NEPA and its implementing regulations and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or made "without observance of procedure required by law" under the APA. 5 U.S.C. § 706(2)(A), (D). BSEE's 2025 EA/FONSI does not purport to supplement any prior NEPA analysis and cannot cure these violations.

## Fifth Claim for Relief

### Violations of NEPA and the APA:
### Unlawful 2025 EA/FONSI and Lease Extensions Decision

201.    Plaintiffs reallege and incorporate the allegations in Paragraph 1 through 168 of this Complaint.

202.    NEPA requires that BSEE take a "hard look" at the environmental consequences of its actions in a NEPA analysis before action is taken. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97(1983). Specifically, NEPA requires that BSEE evaluate the "reasonably foreseeable environmental effects" of the

proposed action, 42 U.S.C. § 4332(2)(C), and in doing so, "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and "make use of reliable data and resources," *id*. § 4332(2)(D)–(E).

203.   BSEE must also evaluate a reasonable range of alternatives to its proposed actions. *Id.* § 4332(2)(C)(iii). The failure "to 'give full and meaningful consideration to all reasonable alternatives" renders a NEPA analysis inadequate. *Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022) (citation omitted). "Analysis of the 'no action alternative' is at the heart of the NEPA process; thus, failure to provide a valid one casts a shadow over the process as a whole." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1188 (9th Cir. 2013) (citation omitted). This is because the no-action alternative "provide[s] a baseline against which every action alternative is evaluated." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734–35 (9th Cir. 2020).

204.   The 2025 EA/FONSI fails to comply with NEPA.

205.   The process by which BSEE issued the EA/FONSI is legally flawed. BSEE issued the EA/FONSI after issuing its 2023 lease extensions decision and after admitting its 2023 lease extensions decision and categorical exclusion review on that decision were flawed. The 2025 EA/FONSI is improperly predetermined, unreasonably slanted, and made in bad faith.

206.   The 2025 EA/FONSI is also substantively flawed. The EA/FONSI fails to take a hard look at the reasonably foreseeable environmental effects of the lease extensions. For example, the EA/FONSI employs an inadequate analysis and reaches arbitrary conclusions regarding the risks and impacts of oil spills. The

EA/FONSI fails to examine oil spill risk from damage to infrastructure from anchors and fails to examine the effects of an oil spill that the Oil Spill Risk Assessment included as Appendix A to the EA admits is likely to occur.

207.    The EA/FONSI also fail to properly evaluate reasonable alternatives. For example, the EA/FONSI fail to properly evaluate the no-action alternative, rendering the comparison between the no-action and action alternative meaningless. Additionally, in evaluating the alternative of denying the lease extensions, BSEE pointed only to the impacts of decommissioning the Santa Ynez Unit infrastructure, without any evaluation of the environmental benefits of ending oil and gas production after several decades of activity. The agency's failures deprived Plaintiffs and the public of a meaningful comparison of alternatives that NEPA requires and further demonstrate how BSEE used the NEPA process to reach a predetermined outcome.

208.    The EA/FONSI otherwise fails to comply with NEPA because it is internally inconsistent, based on inadequate and absent information, and fails to produce a convincing statement of reasons establishing why the impacts of BSEE's decision to issue the lease extensions is insignificant.

209.    The EA/FONSI violates NEPA and is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "made without observance of procedure required by law" under the APA. 5 U.S.C. § 706(2)(A), (D).

210.    BSEE's 2025 decision re-affirming its 2023 lease extensions decision is based on this inadequate NEPA analysis that was not done pursuant to the proper procedure and is therefore also improperly predetermined, unreasonably slanted,

and/or issued in bad faith. It is also substantively inadequate for failing to properly examine the environmental effects of the lease extensions. The 2025 lease extensions decision is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "made without observance of procedure required by law" under the APA. *Id*.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

1.  Declare that BSEE's November 2023 approval of lease extensions for the Santa Ynez Unit violates OCSLA, its implementing regulations, and the APA;

2.  Declare that BSEE's November 2023 approval of lease extensions for the Santa Ynez Unit violates NEPA, its implementing regulations, and the APA;

3.  Declare that BSEE's September 2024 and July 2025 approvals of the APMs for the Santa Ynez Unit violates NEPA, its implementing regulations, and the APA;

4.  Declare that BSEE's failure to supplement the 1975 Santa Barbara Channel EIS and the 1984 Santa Ynez Unit EIS, and its continued reliance on these EISs, violates NEPA, its implementing regulations, and the APA;

5.  Vacate and remand the November 2023 lease extensions for the Santa Ynez Unit;

6.  Vacate and remand the September 2024 APMs and July 2025 APMs for the Santa Ynez Unit;

7.  Vacate and remand the 2025 EA/FONSI and 2025 decision re-affirming the 2023 lease extensions;

8.  Order BSEE to complete the required NEPA analysis by a date certain;

9.  Prohibit BSEE from authorizing additional lease extensions, APMs for development and production, or any other restart authorizations for the Santa Ynez Unit unless and until it complies with OCSLA, NEPA, and the APA;

10.  Award Plaintiffs their costs of this action, including reasonable attorneys' fees; and

11.  Grant such other relief as this Court deems just and proper.

Respectfully submitted this 10th day of November 2025,

/s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St. Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150

Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St. Suite 375
Oakland, CA 94612
Phone: (510) 844-7108
Fax: (510) 844-7150

Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St. Suite 375
Oakland, CA 94612
Phone: (510) 844-7100
Fax: (510) 844-7150

*Attorneys for Plaintiffs*