Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org
Julie Teel Simmonds (CA Bar No. 208282)
Email: jteelsimmonds@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DOUG BURGUM, et al.,<br><br>*Defendants,*<br><br>and<br><br>SABLE OFFSHORE CORP.,<br><br>*Intervenor-Defendant.* | Case No. 2:24-cv-05459-MWC-MAA<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: Februrary 12, 2027<br>Time: 1:30pm<br>Courtroom: 6A<br><br>Honorable Michelle Williams Court<br>United States District Judge |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on February 12, 2027, at 1:30 p.m., or as soon thereafter as they may be heard, Plaintiffs Center for Biological Diversity and Wishtoyo Foundation will move this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56. The hearing will take place before the Hon. Michelle Williams Court in Courtroom 6A at the U.S. District Court for the Central District of California, located at 350 West First Street in Los Angeles, California, 90012. Plaintiffs move for summary judgment because there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law.

Plaintiffs seek an order declaring that Federal Defendants Doug Burgum, Secretary of the U.S. Department of the Interior; the Bureau of Safety and Environmental Enforcement; and the Pacific Regional Director of the Bureau of Safety and Environmental Enforcement (collectively, BSEE) unlawfully issued lease extensions for the 16 offshore oil and gas leases that constitute the Santa Ynez Unit. Plaintiffs also seek an order declaring BSEE's approval of applications for permits to modify wells at the Santa Ynez Unit in September 2024 and July 2025 unlawful. Plaintiffs also seek an order declaring that BSEE's 2025 Environmental Assessment, Finding of No Significant Impact (EA/FONSI), and accompanying decision to re-issue the Santa Ynez Unit lease extensions, were improperly predetermined and unreasonably slanted and therefore cannot cure BSEE's violations; and an order declaring BSEE's EA/FONSI substantively inadequate.

Because BSEE's actions are unlawful, Plaintiffs additionally seek an order vacating these decisions and remanding the matter to BSEE for further action consistent with the Court's summary judgment decision.

In support of this motion, Plaintiffs are concurrently filing a memorandum of points and authorities, proposed order, and the declarations of Peter Galvin, Brady Bradshaw, Blake Kopcho, Mati Waiya, and Tevin Schmitt.

Respectfully submitted this 29th day of October 2026,


/s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
kmonsell@biologicaldiversity.org

/s/ *Miyoko Sakashita*
Miyoko Sakashita (CA Bar No. 239639)
miyoko@biologicaldiversity.org

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds (CA Bar No. 208282)
jteelsimmonds@biologicaldiversity.org

Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

LEGAL BACKGROUND ..... 2

I. The National Environmental Policy Act ..... 2

II. The Outer Continental Shelf Lands Act ..... 4

FACTUAL AND PROCEDURAL BACKGROUND ..... 5

PLAINTIFFS HAVE STANDING ..... 8

STANDARD OF REVIEW ..... 8

ARGUMENT ..... 9

I. BSEE's 2025 EA/FONSI and Lease Extension Decision Are Improperly Predetermined and Unreasonably Slanted ..... 9

II. BSEE's 2025 EA/FONSI and Lease Extension Decision Are Substantively Inadequate ..... 13

A. BSEE Failed to Take a Hard Look at Oil Spills ..... 13

1. BSEE Arbitrarily Ignored the Impacts of Spills Larger than 50 Barrels by Applying the Wrong Legal Standard ..... 14

2. BSEE Arbitrarily Ignored the Impacts of Spills Larger than 50 Barrels by Ignoring Relevant Factors ..... 16

B. BSEE Failed to Examine a Reasonable Range of Alternatives ..... 20

III. BSEE Failed to Take a Hard Look at the Impacts of Issuing the July 2025 Drilling Permits ....................23

IV. BSEE's 2023 Lease Extension Decision and 2024 APMs Are Unlawful for the Reasons Stated in Plaintiffs' First Summary Judgment Brief ....................24

THE COURT SHOULD VACATE BSEE'S DECISIONS ....................24

CONCLUSION ....................25

CERTIFICATION OF COMPLIANCE ....................26

# TABLE OF AUTHORITIES

## Cases

*350 Montana v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) ........................................................................3

*Animal Legal Def. Fund v. Purdue*,
872 F.3d 602 (D.C. Cir. 2017) ......................................................................20

*AquAlliance v. U.S. Bureau of Reclamation*,
287 F. Supp. 3d 969 (E.D. Cal. 2018) ..........................................................18

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S 87 (1983) ..........................................................................................2

*Brower v. Evans*,
257 F.3d 1058 (9th Cir. 2001) ........................................................................9

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ........................................................11, 22, 23

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ........................................................ 3, 14, 23

*Ctr. for Biological Diversity v. Mattis*,
868 F.3d 803 (9th Cir. 2017) ........................................................................8

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
623 F.3d 633 (9th Cir. 2010) ........................................................................3

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
349 F.3d 1157 (9th Cir. 2003)........................................................................2

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) ........................................................................9

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ........................................................................4

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ....................24

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) .................... *passim*

*Friends of the Earth v. Laidlaw Env't Servs.*,
528 U.S. 167 (2000) ....................8

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
383 F.3d 1082 (9th Cir. 2004) ....................15

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
464 F.3d 1083 (9th Cir. 2006) ....................21

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) ....................23

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000)....................10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................9

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ....................21

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
668 F.3d 1067 (9th Cir. 2011)....................2

*Nat'l Family Farm Coal. v. EPA*,
960 F.3d 1120 (9th Cir. 2020)....................25

*Native Ecosystems Council v. U.S. Forest Serv.*,
418 F.3d 953 (9th Cir. 2005) ....................9

*New York v. Nuclear Regul. Comm'n*,
681 F.3d 471 (D.C. Cir. 2012)....................15

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) ....................13

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2010) ....................22

*Or. Nat. Res. Council Fund v. Goodman*,
505 F.3d 884 (9th Cir. 2007) ....................20

*Or. Nat. Res. Council v. Bureau of Land Mgmt.*,
470 F.3d 818 (9th Cir. 2006) ....................25

*Orutsararmiut Native Council v. U.S. Army Corps of Eng'rs*,
751 F. Supp. 3d 971 (D. Alaska 2024) .................... 13, 15, 16

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ....................3, 11, 24

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ....................2, 10

*Sable Offshore Corp. v. Cal. Coastal Comm'n*,
345 Cal. Rptr. 3d 514 (2026) ....................19

*San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*,
449 F.3d 1016 (9th Cir. 2006) .................... 15, 16

*Save the Yaak Comm. v. Block*,
840 F.2d 714 (9th Cir. 1988) ....................10

*Sec'y of the Interior v. California*,
464 U.S. 312 (1984) ....................4

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ....................14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) ....................19

*United States v. Plains All Am. Pipeline L.P.*,
No. 2:20-cv-02415-SVW-SSC (lead), 2026 WL 2432065
(C.D. Cal. Aug. 19, 2026) ....................8

*W. Watersheds Proj. v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) .................... 19, 23

*WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Insp. Serv. Wildlife Servs.*, 135 F.4th 717 (9th Cir. 2025) ....................3

**Statutes**

5 U.S.C. § 706(2) ....................9

42 U.S.C. § 4331 ....................2

42 U.S.C. § 4332(2)(C) ....................3

42 U.S.C. § 4332(2)(C)(i) ....................14

42 U.S.C. § 4332(2)(C)(iii) ....................20

42 U.S.C. § 4332(2)(D) ....................3

42 U.S.C. § 4332(2)(E) ....................3

42 U.S.C. § 4336(b)(1) ....................3

42 U.S.C. § 4336(b)(2) ....................3

43 U.S.C. § 1332(3) ....................4

43 U.S.C. § 1337(b) ....................11

43 U.S.C. § 1802(2) ....................4

**Rules**

Fed. R. Civ. P. 56(a) ....................9

**Regulations**

30 C.F.R. § 250.101 ....................5

30 C.F.R. § 250.1618 ....................4

30 C.F.R. § 250.172(d) ........ 6, 11

30 C.F.R. § 250.180 ........ 5

30 C.F.R. § 250.180(a)(2) ........ 4, 11

30 C.F.R. § 250.180(d) ........ 4, 11

30 C.F.R. § 250.180(e) ........ 5, 11

30 C.F.R. § 250.410 ........ 4, 5

30 C.F.R. § 250.465 ........ 5

30 C.F.R. § 550.101 ........ 5

30 C.F.R. § 550.281(a)(1) ........ 4

**Federal Register Notices**

76 Fed. Reg. 64,432 (Oct. 18, 2011) ........ 5

**Other Authorities**

Compl., *People ex rel. Cal. Reg'l Water Quality Bd. v. Sable Offshore Corp.*, No. 25CV06285 (Santa Barbara Super. Ct. Oct. 3. 2025) ........ 19

Felony Compl., *People v. Sable Offshore Corp.*, No. 25CR07677 (Santa Barbara Super. Ct. Sept. 16, 2025) ........ 19

U.S. Dep't of the Interior, Secretarial Order No. 3451, Establishment of the Marine Minerals Administration (July 10, 2026), https://www.doi.gov/document-library/secretary-order/so-3451-establishment-marine-minerals-administration ........ 5

## INTRODUCTION

This case is about a federal agency's repeated efforts to keep an aging offshore oil project on life support while sidestepping the procedural safeguards that Congress enacted to help protect the public and the environment. Specifically, in 2023, following one of the largest oil spills in California's history, Defendants Bureau of Safety and Environmental Enforcement et al. (collectively, BSEE) arbitrarily approved extensions of the Santa Ynez Unit oil and gas leases. Without these extensions, the leases would have expired and oil and gas production at the Unit could not have resumed. The lease extensions were therefore a key agency action that enabled a restart of production at the Unit following a decade-long shutdown after the spill.

Yet BSEE based its decision on (1) a national interest determination under the Outer Continental Shelf Lands Act (OCSLA) that only considered the purported benefits of restarting production while ignoring the environmental costs and (2) a categorical exclusion under the National Environmental Policy Act (NEPA) that failed to consider any of the numerous harmful environmental impacts of restarting oil and gas production. While this case was pending and under the extended leases, BSEE approved two drilling permits in 2024 to enhance production from wells at the Unit.

Then in 2025—and on the eve of BSEE's response to Plaintiffs' first motion for summary judgment—BSEE issued an Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and revised lease extension decision purporting to examine the environmental impacts of allowing the Santa Ynez Unit to return to production. BSEE's post-hoc analysis is the essence of an improperly predetermined, unreasonably slanted agency action. Indeed, the record shows that BSEE issued its EA/FONSI not to truly re-evaluate its decision and its impacts, but to prevent this Court from issuing an injunction so that Sable could restart production at the Unit.

BSEE's EA/FONSI and lease extension decision are also arbitrary in other fatal ways. BSEE failed to take a hard look at the risks of oil spills and failed to consider a reasonable range of alternatives. And nine additional drilling permits that BSEE issued in 2025 are unlawful for relying on BSEE's faulty EA/FONSI.

BSEE's continued failure to grapple with the risks of restarting production at the Santa Ynez Unit is not only arbitrary and capricious but also puts California's coast, wildlife, and communities at risk of suffering yet another devastating oil spill, along with the numerous other harms inherent in offshore oil and gas drilling. BSEE's unlawful decisionmaking cannot stand.

## LEGAL BACKGROUND

### I. The National Environmental Policy Act

NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331). The statute's "purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011) (citations omitted). NEPA "emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (citation omitted). In other words, NEPA requires federal agencies to "take a 'hard look' at the environmental consequences *before*" acting. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S 87, 97 (1983) (citation omitted) (emphasis added).

Specifically, NEPA requires agencies to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(2)(C); *accord id.* § 4336(b)(1). If a proposed agency action "does not have a reasonably foreseeable significant effect … or if the significance of [the] effect is unknown," the agency may instead prepare an EA. *Id.* § 4336(b)(2). An EA must provide "a 'convincing statement of reasons' to explain why the proposed action's environmental impacts will not be significant…. Conclusory assertions about insignificant impacts will not suffice." *WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Insp. Serv. Wildlife Servs.*, 135 F.4th 717, 728 (9th Cir. 2025) (quoting *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 (9th Cir. 2022)).

NEPA's "hard look" requirement applies whether an agency prepares an environmental impact statement or an EA. *See Env't Def. Ctr.*, 36 F.4th at 872–73. "To satisfy the 'hard look' requirement, an agency must provide 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (citation omitted). This hard look requires the agency to "ensure the professional integrity, including scientific integrity, of the discussion and analysis," 42 U.S.C. § 4332(2)(D), and "make use of reliable data and resources," *id.* § 4332(2)(E).

An agency's EA must also examine a reasonable range of alternatives. *Env't Def. Ctr.*, 36 F.4th at 876. The alternatives requirement helps "guarantee[] that agency decisionmakers have before them and take into proper account all possible approaches to a particular project (*including total abandonment of the project*)." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785 (9th Cir. 2006) (citation omitted). Adequate consideration of alternatives under NEPA therefore requires a "meaningful comparison" of the environmental consequences of each alternative, *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 648 (9th Cir. 2010), including a no-action alternative, which "provide[s] a baseline against which every action alternative is evaluated," *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734–35 (9th Cir. 2020). "The existence of a viable but

unexamined alternative renders an EA inadequate." *Env't Def. Ctr.*, 36 F.4th at 876 (quoting *W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013)) (alteration omitted).

## II. The Outer Continental Shelf Lands Act

In 1978, Congress "transformed OCSLA from 'essentially a carte blanche delegation of authority to the Secretary' … into a statute with a 'structure for every conceivable step to be taken' on the path to development of a[] … leasing site." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 593–94 (D.C. Cir. 2015) (citations omitted). OCSLA requires that oil and gas exploration and production be "subject to environmental safeguards," 43 U.S.C. § 1332(3), and balanced "with protection of the human, marine, and coastal environments," *id.* § 1802(2).

OCSLA establishes four distinct stages to developing an offshore well: "(1) formulation of a 5-year leasing plan …; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). "Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities …." *Id.* Prior to drilling a well, making modifications to an existing well, or when changing a drilling plan for a well, an oil and gas company must also obtain approval of an Application for Permit to Drill or an Application for Permit to Modify (APM). 30 C.F.R. §§ 550.281(a)(1), 250.410, 250.1618.

As relevant here, an offshore lease can last beyond its initial five-year term if production occurs "in paying quantities" or an operator conducts approved drilling or well reworking activities. 43 U.S.C. § 1337(b); 30 C.F.R. § 250.180(a)(2). Where production has ceased on a lease that is beyond its primary term, the lease will expire unless production resumes or BSEE approves a suspension of operations or suspension of production within a year after production ceases. 30 C.F.R. § 250.180(d). BSEE can also allow an operator more

than a year to resume operations, but only when it determines that "the longer period is in the National interest, and it conserves resources, prevents waste, or protects correlative rights." *Id.* § 250.180(e).

The Secretary has delegated its responsibilities under OCSLA to two bureaus within the Department of the Interior.[1] The Bureau of Ocean Energy Management (BOEM) is responsible for issuing five-year leasing plans, holding lease sales, and approving exploration and development plans. *See id.* § 550.101. BSEE is responsible for enacting and enforcing safety and environmental standards, issuing lease extensions, and approving drilling permits, including APMs. *Id.* §§ 250.101, 250.180, 250.410, 250.465.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

The Santa Ynez Unit is in the Santa Barbara Channel and consists of 16 oil and gas leases that the federal government issued between 1968 and 1982. AR_0029894. Oil and gas production first began at the Unit in 1982 and was expected to take place "over a period of approximately 25 to 35 years." AR_0019168. Production continued until 2015 when the onshore pipeline transporting oil from the Unit's three offshore platforms ruptured and spilled at least 2,934 barrels (123,228 gallons) of oil. AR_0016744. The spill killed hundreds of animals, closed beaches and fisheries, AR_0028472, and also led to a decade-long shutdown of oil and gas production at the Santa Ynez Unit, AR_0029882.

---

[1] BSEE and BOEM used to exist as one agency. *See* 76 Fed. Reg. 64,432, 64,432 (Oct. 18, 2011). Following the Deepwater Horizon oil spill, the then-Secretary split the agency into BSEE and BOEM to enable better management of offshore oil and gas resources. *See id.* at 64,433. The current Secretary recently announced the agencies would be recombined again into one agency called the Marine Minerals Administration. *See* U.S. Dep't of the Interior, Secretarial Order No. 3451, Establishment of the Marine Minerals Administration (July 10, 2026), https://www.doi.gov/document-library/secretary-order/so-3451-establishment-marine-minerals-administration. Because the relevant documents refer to BSEE and BOEM, this brief does as well.

At the time of the spill, ExxonMobil owned and operated the Unit. AR_0001936. Sable Offshore Corp. (Sable) is now the lessee on all the 16 oil and gas leases in the Santa Ynez Unit and the listed owner and operator of the Unit's three platforms (Platforms Harmony, Heritage, and Hondo). *See* AR_0000088–90.

Because the Unit was no longer in production, these leases would have expired but for a series of lease extensions that BSEE issued. Plaintiffs challenged BSEE's November 2023 decision to issue the lease extensions because it was based on a faulty national interest determination under OCSLA and an arbitrary categorical exclusion review under NEPA that used inconsistent assumptions and failed to consider any of the environmental impacts from resuming the very oil and gas operations that the extensions facilitate. Pls.' Mot. Summ. J. 1–2, 9–14, Dkt. No. 68.

BSEE sought voluntary remand of its decision, admitting that it was based on faulty analyses. *Id*. at 9; BSEE Mot. Vol. Remand, Dkt. No. 37. Yet BSEE refused to ensure a restart of activities would not occur at the Santa Ynez Unit while it prepared revised analyses, despite its express authority to do so. *See* 30 C.F.R. § 250.172(d). Instead, BSEE did the opposite by issuing two APMs to "enhance production" at the Unit, again relying on a categorical exclusion and decades-old NEPA analyses without conducting any further NEPA review. *See* AR_0000023–42. Plaintiffs supplemented their complaint to challenge the APMs, and the Court denied BSEE's motion for voluntary remand, finding the agency failed to "establish an intent to seriously reconsider or re-review its decision." Order Denying Remand 2, 7, Dkt. No. 61.

Then in May 2025—two days before its summary judgment brief was due—BSEE issued an EA/FONSI and revised lease extension decision purporting to address the issues that Plaintiffs identified. *See, e.g.*, AR_0030110. BSEE based its determination that issuing the lease extensions is in the national interest largely on the findings in the EA. AR_0030116–19, 21. BSEE and Sable then argued that all

of Plaintiffs' claims were moot, while Plaintiffs argued they were not. *See* Order Denying Mots. Summ. J. 10–11, Dkt. No. 89.

The Court issued an order denying the parties' motions for summary judgment. *Id.* at 1. In doing so, the Court noted that if BSEE's EA/FONSI and re-issued lease extension decision were improperly predetermined or unreasonably slanted, then the case is not moot, but that the Court could not rule on this issue because the operative complaint did not challenge those actions. *Id.* at 15.

Plaintiffs then filed a second amended and supplemental complaint to challenge the EA/FONSI and re-issued lease extension decision, as well as nine APMs BSEE issued to Sable in July 2025. *See* 2nd Suppl. & Am. Compl. ¶¶ 192, 201–10, Dkt. No. 104. Accordingly, this motion for summary judgment challenges BSEE's EA/FONSI, revised lease extension decision, and the new APMs that rely upon them, in addition to BSEE's original unlawful decisions.

BSEE's EA/FONSI and lease extension decision purport to analyze the environmental impacts of the lease extensions, including a restart of oil and gas production. In its EA, BSEE considered an oil spill an indirect effect of the lease extensions. AR_0029883. BSEE did not, however, examine the risks or impacts of another large or catastrophic oil spill. *See id.* Instead, BSEE looked at the impacts of spills of 50 barrels or less, *id.*, AR_0030118, by using the wrong legal standard and ignoring record evidence indicating a much larger spill could occur.

BSEE's EA/FONSI also only evaluated three alternatives: its preferred alternative of approving the lease extensions, AR_0029902; an alternative under which BSEE would not approve the lease extensions, AR_0029914; and an alternative under which BSEE would take no action and Sable would continue "activities on the offshore infrastructure necessary to support a return to production" (which BSEE called the no-action alternative), AR_0029915. None of these alternatives looked at the environmental benefits of not allowing production to resume, nor did BSEE examine an alternative that would allow production to

resume but require it to cease by a date certain, or other alternatives to reduce environmental impacts.[3]

## PLAINTIFFS HAVE STANDING

Plaintiffs have standing to bring this case. *See Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000). Plaintiffs' members use and enjoy the Santa Barbara Channel and its wildlife for recreational, cultural, spiritual, and other purposes. Galvin Decl., Bradshaw Decl., Kopcho Decl., Waiya Decl., Schmitt Decl. (filed herewith as Attachments 1–5). They are injured by BSEE's decision to extend the Santa Ynez Unit leases and issue drilling permits because their use and enjoyment of these areas are adversely affected by the oil and gas activities that BSEE's decisions enable. *See* declarations. A ruling in Plaintiffs' favor would redress these injuries. *See Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 818 (9th Cir. 2017).

## STANDARD OF REVIEW

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[3] Since Plaintiffs filed this case, the Trump administration has taken several additional actions to help enable Sable to restart production. After California's Office of the State Fire Marshal informed Sable that the failed onshore pipelines needed additional repairs before operations could restart, the Pipeline and Hazardous Materials Safety Administration purported to take jurisdiction over these pipelines away from California and approved Sable's restart plan for the pipelines. *See, e.g.*, *United States v. Plains All Am. Pipeline L.P.*, No. 2:20-cv-02415-SVW-SSC (lead), 2026 WL 2432065, at *2–3 (C.D. Cal. Aug. 19, 2026). Additionally, in an effort to override state law and court orders regarding these onshore pipelines, the Secretary of Energy issued an order under the Defense Production Act directing Sable to, *inter alia*, "immediately prioritize and allocate pipeline transportation services for hydrocarbons" through Sable's onshore oil pipelines. *Id.* at *3, 16. Neither of these actions have any bearing on the merits of this case, which involves BSEE's failure to examine the environmental harms from enabling a restart of offshore oil and gas production at the Santa Ynez Unit by extending its leases and issuing APMs.

a matter of law." Fed. R. Civ. P. 56(a). Section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2), governs judicial review of Plaintiffs' claims in this case, *see Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 733. As such, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have" reached the decision it did. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).

The court should "engage in a substantial inquiry—a thorough, probing, in-depth review," *Native Ecosystems Council v. U.S. Forest Serv*., 418 F.3d 953, 960 (9th Cir. 2005)—to determine whether an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Even where an agency acts "within its area of expertise," courts "need not defer to the agency when the agency's decision is without substantial basis in fact." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citation omitted); *see also Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) ("The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned."). An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

### I. BSEE's 2025 EA/FONSI and Lease Extension Decision Are Improperly Predetermined and Unreasonably Slanted

BSEE's 2025 EA/FONSI and lease extension decision are improperly predetermined and unreasonably slanted. BSEE issued these decisions only after its original 2023 decision to grant the lease extensions pursuant to a categorical exclusion and only after Plaintiffs filed this case challenging those decisions. The

record shows that BSEE issued its 2025 EA/FONSI and lease extension decision not based on the unbiased analysis NEPA demands, but because BSEE was under a political directive to re-issue its decisions by a specific date to moot Plaintiffs' case and help enable a restart of oil and gas production at the Santa Ynez Unit.

NEPA's requirement that an agency take a hard look before acting applies whether the agency prepares an EA or an environmental impact statement. *See Env't Def. Ctr.*, 36 F.4th at 872. Such a rule is the only way to "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349; *see also Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988) ("Proper timing is one of NEPA's central themes."). As such, the Ninth Circuit has held that NEPA analyses conducted only after an agency decides to take an action are "demonstrably suspect." *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000); *see also Env't Def. Ctr.*, 36 F.4th at 882 (holding BSEE's NEPA analysis appeared to be "a subterfuge designed to rationalize a decision already made" where, *inter alia*, BSEE "had already ventured down the path of allowing well stimulation treatments without environmental review until they were sued by the environmental groups" (citation omitted)).

For example, in *Metcalf v. Daly*, the Ninth Circuit held that an agency violated NEPA by preparing an EA only after an agency had already entered into agreements to support a Tribe's efforts to resume hunting gray whales off Washington. 214 F.3d at 1137–39, 1143–45. The court agreed with the plaintiffs that an EA prepared after an agency decides to approve a project is "fatally defective" as it "predispose[s]" the agency "to finding that the [action] w[ill] not significantly affect the environment." *Id.* at 1146; *see also id.* at 1145 ("NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process." (citations omitted)).

Similarly, in *Pit River Tribe*, the Ninth Circuit held that a federal agency violated NEPA by failing to conduct environmental review before issuing lease extensions for the development of geothermal steam on public lands in California, and that the agency's environmental impact statement for a geothermal plant issued four months later did not cure the agency's NEPA violation. 469 F.3d at 772, 777. In doing so, the court noted that the Ninth Circuit has "repeatedly held that dilatory or ex post facto environmental review cannot cure an initial failure to undertake environmental review," because this approach makes it "likely that more environmental harm will be tolerated" and "seriously imped[es] the degree to which [agency] planning and decisions c[an] reflect environmental values" *Id.* at 785–86 (citation omitted).

The same is true here. BSEE decided to approve the lease extensions and only issued an EA/FONSI after making that decision. If anything, BSEE's analysis was even more predetermined and unreasonably slanted than in other cases. BSEE conducted its NEPA analysis behind closed doors without any public notice and comment. *Cf. California v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982) (recognizing importance of public comment for achieving NEPA's goals). BSEE refused to use its authority to ensure a restart of production would not occur while it conducted its post-hoc analysis. *See* 30 C.F.R. § 250.172(d). Moreover, while BSEE was conducting its post-hoc review, the agency issued two APMs allowing Sable to perforate wells at the Santa Ynez Unit to enhance production when it resumed. AR_0000023, 30. The record shows that BSEE issued these permits so that Sable would not need another lease extension but could instead maintain its leases under these permits. *See* AR_57110–11, 285. BSEE's issuance of these permits, and Sable's ultimate restart of production, could only occur because of BSEE's 2023 decision to approve the lease extensions, without which the Santa Ynez Unit leases would have expired. *See* 43 U.S.C. § 1337(b); 30 C.F.R. § 250.180(a)(2), (d), (e)).

Indeed, the record shows that BSEE undertook its new analysis not to make an unbiased determination of whether to issue the lease extensions, but to moot Plaintiffs case because the restart of the Santa Ynez Unit is a Trump administration priority. *See, e.g.*, AR_0059127 (listing "Sable" as one of the "Administration Priorities" under the "Unleashing American Energy" Secretarial Order); AR_0058423–24 (responding to a request from the White House "to provide bullet points that document your Bureaus energy actions since the Inauguration" with information regarding Sable and the Santa Ynez Unit).

The Pacific Regional Director explained that the purpose of BSEE revisiting its decision was "to provide DOJ with this record" and "hopefully avoid an injuction [sic] against production from the Santa Ynez Unit." AR_0058624. BSEE planned to "use the Notice of Intent sent by CBD as a 'checklist' of sorts to guide the EA development to ensure we hit all the key points CBD raised." AR_0058990. The record also shows that the agency provided Sable with the redraft of its 2023 decision "so that they can incorporate it into their own arguments." AR_0058624; *see also* AR_0058875 (recommending certain issues be addressed in the EA "since it's all pertinent in refuting CBD's claim").

Other documents show that BSEE was under a directive to issue the EA by a self-imposed deadline, i.e., the date its opposition to Plaintiffs' first motion for summary judgement was due. *See* AR_0055432 (February 2025 email between BSEE and BOEM stating that "[d]ue to conversations to which I am not privy, the decision was made that we (BSEE/BOEM, collectively) have between two to three months to have this analysis completed"); AR_0057124 (referring to efforts to "expedite the Sable EA" and the "tight timeline" the agencies were under); AR_0059127 (noting that "National Interest Determination and Environmental Assessment drafting continues, due May 16, 2025"); AR_0058999 (noting "a freshly imposed deadline from [the Office of the Solicitor] (May 16 for a final document)"); AR_0059572 (BSEE environmental enforcement officer noting the

"dismal state" of the EA as of May 5, 2025). And the EA/FONSI itself continues to maintain that "[t]he lease extension at issue is appropriate for a [categorical exclusion,]" AR_0029896 (footnote 3), providing additional proof that its preparation was nothing but a tactic to facilitate a restart of the Santa Ynez Unit.

Moreover, after BSEE issued the EA/FONSI and nine additional APMs, AR_0030040–109, it published a press release stating that it anticipated a full restart by the end of 2025 and boasting how the Trump administration facilitated the Santa Ynez Unit's return "to essentially full production in just a matter of months," Monsell Decl. Ex. 1, at 2, Dkt. No. 85-1, further demonstrating the improperly skewed and predetermined nature of BSEE's decisionmaking.

## II. BSEE's 2025 EA/FONSI and Lease Extension Decision Are Substantively Inadequate

BSEE's 2025 EA/FONSI and lease extension decision are also substantively inadequate. In issuing these decisions, BSEE failed to examine the reasonably foreseeable impacts of oil spills larger than 50 barrels and failed to examine a reasonable range of alternatives.

### A. BSEE Failed to Take a Hard Look at Oil Spills

BSEE failed to properly consider the risks and potentially devastating impacts of an oil spill from Santa Ynez Unit operations. Such failures render BSEE's decisionmaking arbitrary and capricious. *See, e.g.*, *Orutsararmiut Native Council v. U.S. Army Corps of Eng'rs*, 751 F. Supp. 3d 971, 982 (D. Alaska 2024) (holding agency "violated NEPA by failing to consider a [larger] tailings spill" from a gold mine "and by declining to assess a catastrophic tailings spill based solely on its low probability of occurrence"); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868–69, 871 (9th Cir. 2005) (finding agency violated NEPA in approving an oil refinery dock expansion without considering increased risk of oil spills). Specifically, while BSEE determined oil spills are an effect of the

lease extensions, BSEE arbitrarily excluded spills greater than 50 barrels from its analysis by applying the wrong legal standard and by failing to consider relevant factors demonstrating the increased risk of larger spills. BSEE also arbitrarily failed to examine the impacts of the size spill it admitted could occur.

These errors are not about BSEE's choice of where to draw the line in analyzing downstream effects that are geographically and jurisdictionally divorced from the agency action at issue. *Contra Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 186–88 (2025). Rather, they are about the agency's irrational approach to evaluating one of the most substantial risks from offshore oil and gas drilling and an impact that lies at the heart of the agency's conclusion that approving the lease extensions would not have any significant impacts.

**1. BSEE Arbitrarily Ignored the Impacts of Spills Larger than 50 Barrels by Applying the Wrong Legal Standard**

BSEE applied the wrong legal standard for evaluating oil spills. In its EA/FONSI, BSEE only examined the impacts of spills of up to 50 barrels. *See* AR_0029883 ("The EA evaluated the potential impacts of small spills (50 [barrels] or less."). It did not examine the impacts of large spills—including those larger than 1,000 barrels—because BSEE deemed spills up to 50 barrels the only spills "reasonably certain to occur." AR_0029906, 28; *see also* AR_0029953 (noting the EA did not consider a worst-case discharge because it is "not reasonably certain to occur"). That is not the relevant standard. Rather, NEPA requires BSEE to examine any "reasonably foreseeable adverse environmental effects." 42 U.S.C. § 4332(2)(C)(i).

An effect is considered "reasonably foreseeable" if "a person of ordinary prudence would take [it] into account in reaching a decision." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 737 (citations omitted). Under this standard, an agency does not have to consider impacts that are "remote and highly speculative," such as those that have a one in a million chance of occurring. *Ground Zero Ctr. for*

*Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1089–90 (9th Cir. 2004) (citations omitted). The standard does, however, require agencies to consider "low-probability, high-consequence" events. *San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*, 449 F.3d 1016, 1031 (9th Cir. 2006) (holding an agency's failure to consider the effects of a terrorist attack on a nuclear facility following 9/11 arbitrary); *see also New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 478–79 (D.C. Cir. 2012) ("Under NEPA, an agency must look at both the probabilities of potentially harmful events and the consequences if those events come to pass." (citation omitted)). A large oil spill is certainly a high-consequence event. *See, e.g.*, AR_0052318 (summarizing environmental damage from 2015 oil spill).

BSEE's use of the incorrect standard matters because the record shows that spills larger than 50 barrels—including a large oil spill—are reasonably foreseeable. For example, BSEE acknowledges that "the probability of one or more spills occurring in the greater than 1,000 [barrel] size range is 7%." AR_0029949.[4] This means there is a 1 in 14 chance that a spill larger than 1,000 barrels will occur. "[T]hese same odds for the risk of an airplane crash would likely deter nearly anyone from flying." *Orutsararmiut Native Council*, 751 F. Supp. 3d at 981 (holding an agency violated NEPA by failing to consider the impacts of a larger tailings spill from a gold mine where the odds of such a spill were "1 in 1,000 (0.1%) in a given year or up to 2 in 100 (2%) in 20 years"). As an oil "spill larger

---

[4] While this figure is for all operations on the Pacific Outer Continental Shelf, BSEE anticipates that the Santa Ynez Unit will produce 84% of the oil and gas remaining in the Pacific Outer Continental Shelf. *See* AR_0029905 (noting that "[t]he remaining reserves available for production for the [Unit] total 0.190 billion barrels … of oil"); AR_0029951 (noting that anticipated production on the Pacific Outer Continental Shelf is 0.226 billion barrels of oil). Therefore, under BSEE's oil spill risk analysis, the Santa Ynez Unit carries the majority of this spill risk.

than [1,000 barrels] is reasonably foreseeable, [BSEE] should have considered a larger spill." *Id.* Its failure to do so was arbitrary. *See id.*[5]

BSEE's failure to consider the effects of a worst-case discharge (WCD) is similarly improper. Despite acknowledging that Platform Heritage in the Santa Ynez Unit "has the largest WCD" of any drilling operation off California, and that a WCD from a blowout at the Platform could result in a spill of up to 577,762 barrels or 5,777,620 barrels depending on whether the flow could be stopped using surface capping equipment, BSEE refused to analyze the impacts of such a spill simply because a WCD is "not reasonably certain." AR_0029953.

By automatically excluding spills larger than 50 barrels from its NEPA analysis, BSEE did precisely what the Ninth Circuit has counseled against: failed to analyze "the range of environmental impacts likely to result in the event" of a large or WCD oil spill. *Mothers for Peace*, 449 F.3d at 1034.

### 2. BSEE Arbitrarily Ignored the Impacts of Spills Larger than 50 Barrels by Ignoring Relevant Factors

BSEE's refusal to examine spills larger than 50 barrels is also arbitrary for failing to consider several highly relevant factors demonstrating that a much larger spill is reasonably foreseeable. *See, e.g.*, *Env't Def. Ctr.*, 36 F.4th at 872–74 ("To take the requisite hard look, an agency 'may not rely on incorrect assumptions or data' in arriving at its conclusion of no significant impacts" or "offer[] an analysis that r[uns] 'counter to the evidence before the agency.'" (citations omitted)).

First, BSEE failed to analyze the impacts of a larger spill based on its determination that "[t]he risk of a loss of well control (a blowout) … is exceedingly small." AR_0029907. But that is not the only possible source of an oil

---

[5] Depending on what type of risk analysis is used, the probability of a spill above 1,000 barrels increases substantially. Using a different type of risk analysis than BSEE, oil and gas production over 15 years carries a 52.9% chance of a spill larger than 1,000 barrels and a 4.9% chance of a spill larger than 100,000 barrels, or 1 in 20. AR_0054582–83.

spill. As the EA elsewhere acknowledges, spills can also result from damage to pipelines. Indeed, the EA acknowledges that a 2021 spill of 588 barrels occurred from a pipeline at the Beta Unit, which was likely caused by two container ships dragging their anchors across a pipeline. AR_0029906–07. Yet BSEE's oil spill analysis fails to consider the possibility of a spill occurring from damage to a Santa Ynez Unit pipeline, despite Sable's admission that one of its pipelines "lies in an area where there is significant vessel traffic" that "could be damaged by an anchor, which would cause a loss of containment" and that a worst-case discharge from the pipeline could result in a spill of up to 6,210 barrels and cause significant environmental impacts. AR_0054128.

Second, BSEE's analysis relies on historical data that does not account for the age of the Santa Ynez Unit infrastructure. Indeed, BSEE's risk analysis looked only at the amount of oil left to be produced, without considering the age of the infrastructure to be used or the length of drilling operations. *See, e.g.*, AR_0029907 (BSEE stating "[o]il spill occurrence is calculated as a function of the total amount of oil that could be economically produced in the Southern California Planning Area."); AR_0029948 (BSEE stating "[t]he probability of an oil spill occurring decreases with the decreasing amount of oil left to be produced."). But the record demonstrates older pipelines have an *increased* risk of spills—particularly subsea pipelines. According to scientists, aging poses risks of corrosion, erosion, and fatigue stress to subsea pipelines. *See, e.g.*, AR_0012989 ("[A]geing is a dominant life-limiting factor for any structure, and corrosion is one is of the most serious features of ageing."); AR_0013605 (listing challenges "[a]s pipelines become older"); *see also* AR_0002178–79, 2184 (listing 2015 to 2018 inspection reports of Platforms Hondo and Heritage, noting widespread corrosion and other issues).

For example, subsea pipeline corrosion accelerates over time, AR_0012992 (Table 2), and can act in conjunction with fatigue stress to increase the rate of cracks in a pipeline, AR_0013588. Marine environments are known to produce

significant corrosion on steel surfaces, and when a steel structure is at or beyond its elastic limit, the rate of corrosion increases 10 to 15%. AR_0012989–90. One offshore pipeline study found that after a pipeline reaches 20 years in age, the annual probability of pipeline failure increases rapidly, equating to a probability of failure of 10% to 100% per year. AR_0001881. And an expert report shows spill risk increases the longer drilling operations continue. *See* AR_0054571 (stating "[t]he larger the amount of exposure the higher the expected number of incidents will be" and "time in years" is an exposure variable); AR_0054572 (charts showing relationship between age and risk of spills).

Instead of examining how the Santa Ynez Unit's decades-old infrastructure increases spill risk, the EA states only that "[t]here is no indication that age of [the Unit] infrastructure contributed to the 2015 oil spill or has contributed to recent oil spills in the region." AR_0029894. This hardly constitutes the hard look that NEPA demands. *See AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1031 (E.D. Cal. 2018) (agency must consider relevant information in a "meaningful [and] logical way" (emphasis omitted)).

Third, the EA also arbitrarily dismisses the risk of a large oil spill by claiming that inspections and existing regulatory requirements mitigate the risk of such a spill. AR_0029903, 07. As an initial matter, BSEE's assumption that existing regulatory requirements will mitigate the risk of any spill over 50 barrels flies in the face of the 2015 spill, which spilled at least 2,934 barrels despite the inspection and pipeline safety requirements that other agencies require of onshore pipelines. *See, e.g.*, AR_0039664 (report on the spill finding "external corrosion that thinned the pipe wall to a level where it ruptured" and that "[t]he pipeline's cathodic protection … system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system").

Moreover, in dismissing the risk of larger spills, BSEE failed to consider Sable's documented track record of non-compliance with various legal

requirements in its efforts to restart production at the Santa Ynez Unit. This includes, for example, allegedly knowingly violating California's Water Code during October and November 2024 by discharging dredge or fill materials into various waterways without a permit; and violations of California's Fish and Game Code for placing material into waterways that could harm fish or other wildlife. *See* Felony Compl., *People v. Sable Offshore Corp.*, No. 25CR07677 (Santa Barbara Super. Ct. Sept. 16, 2025) (describing these violations); *see also* AR_0058354 (noting these criminal charges had been filed against Sable); Compl., *People ex rel. Cal. Reg'l Water Quality Bd. v. Sable Offshore Corp*., No. 25CV06285 (Santa Barbara Super. Ct. Oct. 3. 2025) (alleging violations of the California Water Code for failure to comply with an investigative order, failure to report waste discharges, and unpermitted discharge of waste into waters of the state in 2024). It also includes work Sable conducted in 2024 and 2025 in the coastal zone without a permit from the California Coastal Commission, including work Sable conducted after receiving cease and desist orders from the Commission. *See Sable Offshore Corp. v. Cal. Coastal Comm'n*, 345 Cal. Rptr. 3d 514, 516–17 (2026); *see also* AR_0058354 (noting the Commission's cease and desist orders and fine it had issued against Sable).

BSEE's failure to consider how Sable's track record could affect the risk of an oil spill violates NEPA's requirement that the agency's analysis include "a discussion of adverse impacts that does not improperly minimize negative side effects." *W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011) (citation omitted). For example, in a case involving a challenge to an easement for the Dakota Access Pipeline, the D.C. Circuit held an agency's NEPA analysis unlawful for failing to adequately consider a company's spill history in analyzing the environmental harms from the pipeline. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1046 (D.C. Cir. 2021) (agreeing with the district court that the agency's "decision to rely in its risk analysis on general

pipeline safety data, rather than [the] operator's specific safety record" was arbitrary); *see also Animal Legal Def. Fund v. Purdue*, 872 F.3d 602, 619–20 (D.C. Cir. 2017) (holding an agency could not simply rely on the applicant's certification that it would meet all applicable requirements in renewing its exhibitor license under the Animal Welfare Act considering the facility's history of non-compliance).

Finally, BSEE failed to examine the impacts of an oil spill that the EA admits could occur. The Oil Spill Risk Assessment (included as Appendix A to the EA) concludes that an oil spill of up to 1,000 barrels is likely to occur from oil and gas activities off California. *See* AR_0029907 (estimating that "[i]n the '50 to 1,000 [barrel]' size range … there will be one spill with a 63% probability of occurrence"); *see also* AR_0029948 (noting the same). Yet BSEE inexplicably only analyzed "the potential impacts of small spills (50 [barrels] or less)." AR_0029883. The EA therefore fails to "adequately consider[] and elaborate[] the possible consequences of the proposed action" as required by law. *Env't Def. Ctr.*, 36 F.4th at 872; *see also Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007) (holding that simply "acknowledg[ing]" an important impact without a "significant discussion" of the issue does not satisfy NEPA (citation omitted)).

In sum, BSEE inappropriately "offer[s] an analysis that [runs] 'counter to the evidence before the agency'" and "rel[ied] on incorrect assumptions or data" regarding oil spill risks, rendering its EA/FONSI and lease extension decision that relies on this analysis arbitrary and capricious. *Env't Def. Ctr.*, 36 F.4th at 874 (citations omitted).

**B. BSEE Failed to Examine a Reasonable Range of Alternatives**

BSEE also failed to examine "a reasonable range of alternatives" as required by NEPA. 42 U.S.C. § 4332(2)(C)(iii). This renders BSEE's decisions unlawful.

*Env't Def. Ctr.*, 36 F.4th at 876 (citation omitted); *see also 'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1095 (9th Cir. 2006) (noting that the alternatives requirement "is the heart of" NEPA review (citation omitted)).

Here, BSEE examined three alternatives: (A) approval of the lease extension, (B) disapproval, and (C) no action. AR_0029902–15. With only these alternatives, BSEE failed to meaningfully consider all reasonable alternatives to approving the lease extensions and a restart of oil and gas production.

First, BSEE failed to examine a reasonable range of alternatives because Alternatives A and C are substantially the same. For the no action alternative, BSEE assumed that the Santa Ynez Unit would ultimately meet the same fate as approval under Alternative A. It concluded that "impacts to environmental resources would be similar to those analyzed under Alternative A, but likely to a lesser extent depending on whether Sable maintains the [Unit's] facilities in a state of preservation or returns to production." AR_0029915.

This is improper. For example, in *Environmental Defense Center*, the Ninth Circuit held BSEE failed to examine a reasonable range of alternatives where the action alternatives the agency considered "were similar" because they all included approving the same types of well stimulations, "so the 'nature and magnitude' of any impacts will be similar." 36 F.4th at 877; *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (inadequate range of alternatives when agency considered "only a no action alternative along with two virtually identical alternatives"). The same flaw is present here. By assuming the no action alternative would also result in a return to production, BSEE crafted a meaningless comparison between the no action and action alternatives.

Second, BSEE arbitrarily examined only the approval alternative in depth. For the disapproval alternative, BSEE devoted a mere five sentences to the harms of decommissioning the Santa Ynez Unit's infrastructure and ignored the benefits of ending oil production. AR_0029915. In a cursory paragraph, BSEE focused on

harms from severing platforms with explosives, impaired water quality, and loss of seafloor habitat. *Id*. BSEE entirely omitted a description of how lease termination avoids the harms of oil and gas production—reducing the risks of air pollution, oil spills, vessel collisions with wildlife, and greenhouse gas emissions—and requires that the area be restored to its natural condition. *See id.*; *see also* AR_0001808–23 (letter from Plaintiffs describing the adverse effects of approval); *California v. Block*, 690 F.2d at 763–64 (finding a NEPA review deficient where it failed to properly assess how development would affect wilderness areas). Indeed, BSEE officials even recognized deficiencies in the alternatives analysis, acknowledging (on May 15, 2025) that "a complete impact analysis [was] not performed for Alternatives B and C" because BSEE was "informed" it "'[didn't] have the time' to perform a complete analysis." AR_0059588. Five days later, BSEE's Regional Environmental Officer questioned whether the EA was truly final or whether the agency was "just gonna give up on trying to" have a proper alternatives analysis. BSEE_AR_0059191.

Third, BSEE also failed to consider an action alternative that would reduce the environmental harms from a return to production. For example, BSEE failed to consider an approval with conditions such as only allowing one of three platforms to return to production, increased monitoring and inspections given the age of the infrastructure, or a phase out of production by a date certain. These alternatives were available and feasible. BSEE's purpose for the action was to ensure "orderly development of the [outer continental shelf] with effective management of the marine, coastal, and human environment." AR_0029898. Thus, an alternative that offers greater environmental benefits would fit the agency's purpose and need. BSEE's failure to evaluate these alternatives, or at least some sort of meaningfully different alternative, frustrates the purpose of NEPA and means that the EA is inadequate and unlawful. *See Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1123–24 (9th Cir. 2010) (holding agency's alternatives analysis

inadequate where it failed to consider an alternative that would close more forest to off-road vehicle use); *W. Watersheds Proj.*, 719 F.3d at 1053 (holding agency violated NEPA in failing to examine an alternative that would reduce the amount of acreage open to grazing); *California v. Block*, 690 F.2d at 767–68 (rejecting alternatives analysis because agency failed to consider an option with less development in wilderness).

In short, BSEE's failure to examine a reasonable range of alternatives renders its EA/FONSI and revised lease extension decision that relies on this analysis arbitrary and capricious.

## III. BSEE Failed to Take a Hard Look at the Impacts of Issuing the July 2025 Drilling Permits

BSEE's issuance of nine APMs to Sable in July 2025 is also unlawful. The permits grant Sable the ability to conduct "well workover operations intended to improve production on numerous wells within [the Santa Ynez Unit]." AR_0030146. BSEE determined it need not prepare any new NEPA analysis before issuing these APMs, asserting "the proposed activities have been contemplated within … the recent Lease Extension EA" and the impacts were "analyzed at length in existing NEPA analyses for the Santa Ynez Unit." AR_0030146; *see also* AR_0030147 (noting the EA/FONSI "discusses potential impacts identified with a return to production" and "is sufficient and valid" to cover issuance of the APMs).

But the EA/FONSI fails to comply with NEPA for the reasons described above. As such, BSEE's reliance on it in issuing the APMs was improper. *See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt*., 387 F.3d 989, 997–98 (9th Cir. 2004) (agency cannot rely on prior NEPA analysis that fails to sufficiently analyze an issue); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 751 (vacating BOEM's approval of a development plan for, *inter alia*, failing to comply with NEPA).

### IV. BSEE's 2023 Lease Extension Decision and 2024 APMs Are Unlawful for the Reasons Stated in Plaintiffs' First Summary Judgment Brief

Plaintiffs' prior motion for summary judgment explained how BSEE's 2023 lease extension decision, including its national interest determination and reliance on a categorical exclusion, were arbitrary and capricious. Dkt. No. 68 at 9–14. Plaintiffs also explained how BSEE's issuance of two APMs to Sable in September 2024 and the agency's failure to supplement decades-old environmental analyses violated BSEE's NEPA obligations. *Id.* at 14–24.

The agency's new EA/FONSI—prepared 1.5 years after the agency granted the original lease extensions and 8 months after it issued the APMs—cannot save its failure to conduct a NEPA analysis before issuing those decisions. As in *Pit River*, "by the time the agencies completed the [2025 EA/FONSI], … the point of commitment to th[e] proposal—the extension of the leases—clearly had come and gone." 469 F.3d at 784–87 (citation modified). As such, the lease extensions—along with "[t]he rest of the project approval process" that was "premised on [Sable's] possession of a valid right to develop the [Santa Ynez Unit]"—violate NEPA and should be vacated. *Id.* at 787–88.

## THE COURT SHOULD VACATE BSEE'S DECISIONS

The Court should declare BSEE's EA/FONSI, lease extension decisions, and APMs unlawful and vacate and remand those decisions. Vacatur is the presumptive remedy for agency actions held contrary to law under the Administrative Procedure Act. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 9 (2020) (because an agency decision violated the Administrative Procedure Act, it "must be vacated"). There is no reason to depart from this standard remedy here, particularly given the predetermined and unreasonably slanted nature of BSEE's decisions "seriously impeded the degree to which [the agency's] planning and decisions could reflect environmental values." *Pit River*, 469 F.3d at 786 (citation modified); *see also Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1145 (9th Cir.

2020) (holding seriousness of agency's error "compel[led]" vacatur, despite resulting economic harm to innocent third-party stakeholders).

Any argument that the Court cannot order relief because production has restarted and work under the APMs is complete would fail, particularly where the harms from Santa Ynez Unit oil and gas production are ongoing, but could be mitigated following additional NEPA review. *See Or. Nat. Res. Council v. Bureau of Land Mgmt.*, 470 F.3d 818, 820–21 (9th Cir. 2006).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment, declare BSEE's actions unlawful, vacate those actions, and order BSEE to issue a new decision that complies with its legal obligations.

Respectfully submitted this 29th day of October 2026,

/s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org

/s/ *Miyoko Sakashita*
Miyoko Sakashita (CA Bar No. 239639)
Email: miyoko@biologicaldiversity.org

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds (CA Bar No. 208282)
Email:
jteelsimmonds@biologicaldiversity.org

CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St. Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150

*Attorneys for Plaintiffs*

## CERTIFICATION OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Center for Biological Diversity and Wishtoyo Foundation, certifies that this brief does not exceed 25 pages, in compliance with the page limit set by this Court's Standing Order, Section 6.c, dated April 15, 2025 (Dkt. No. 34).

Dated: October 29, 2026

/s/ *Kristen Monsell*
Kristen Monsell