LATHAM & WATKINS LLP
Janice M. Schneider (*Pro Hac Vice*)
Email: janice.schneider@lw.com
Devin M. O'Connor (*Pro Hac Vice*)
Email: devin.o'connor@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel.: (202) 637-2200
Fax: (202) 637-2201

Michael G. Romey (Bar No. 137993)
Email: michael.romey@lw.com
355 South Grand Avenue, Suite 400
Los Angeles, CA 90071-1560
Tel.: (213) 485-1234
Fax: (213) 891-8763

Kevin A. Homrighausen (Bar No. 329034)
Email: kevin.homrighausen@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Tel.: (714) 540-1235
Fax: (714) 755-8290

*Attorneys for Intervenor-Defendant Sable Offshore Corp.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

*Plaintiffs*,

v.

DOUG BURGUM, et al.,

*Defendants*,

and

SABLE OFFSHORE CORP.,

*Intervenor-Defendant*.

CASE NO. 2:24-cv-05459-MWC-MAA

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SABLE OFFSHORE CORP.'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Hearing

Date: February 12, 2027
Time: 1:30 PM
Judge: Hon. Michelle Williams Court
Courtroom: 6A

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1
II. FACTUAL AND PROCEDURAL BACKGROUND ........ 2
A. Overview of the Santa Ynez Unit ........ 2
B. BSEE's 2023 Extension and 2024 APMs ........ 3
C. BSEE's 2025 EA/FONSI, 2025 Decision, and 2025 APMs ........ 3
III. STANDARD OF REVIEW ........ 4
IV. ARGUMENT ........ 5
A. The Court Need Not Reach the Merits for Several Claims ........ 5
1. Most of Plaintiffs' Claims Are Moot ........ 5
2. Plaintiffs Lack Standing for Their OCSLA Claims ........ 6
3. Plaintiffs Provided Insufficient Notice Under OCSLA ........ 7
4. Plaintiffs Forfeit Several Claims ........ 7
B. Plaintiffs' Forfeited Claims Also Fail on the Merits ........ 8
1. BSEE's OCSLA Determinations Were Reasonable ........ 8
2. BSEE's CatEx for the 2023 Decision Complied With NEPA ........ 9
3. BSEE's CatExs for the 2024 APMs Complied With NEPA ........ 9
C. The 2025 EA/FONSI and 2025 Decision Comply With NEPA ........ 10
1. BSEE Adequately Considered Oil Spill Risk ........ 11
2. BSEE Adequately Considered Reasonable Alternatives ........ 16
D. The 2025 EA/FONSI and 2025 Decision Are Not Improperly Predetermined or Unreasonably Slanted ........ 20
E. BSEE's Determinations of NEPA Adequacy Were Proper ........ 24

V. REMEDY ....................................................................................25
VI. CONCLUSION..............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156 (9th Cir. 1999) ....................21

*Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176 (9th Cir. 2010) ....................20

*Bitterroot Ridge Runners Snowmobile Club v. U.S. Forest Serv.*, 329 F. Supp. 3d 1191 (D. Mont. 2018), *aff'd*, 833 F. App'x 89 (9th Cir. 2020) ....................22

*Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989 (9th Cir. 2012) ....................25

*California v. Block*, 690 F.2d 753 (9th Cir. 1982) ....................21

*Cascadia Wildlands v. Adcock*, No. 25-4161, 2026 WL 2772092 (9th Cir. Sept. 17, 2026)....................18

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869 (9th Cir. 2025) ....................10, 11, 12

*City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835 (9th Cir. 2023) ....................22

*City of Santa Clarita v. U.S. Dep't of Interior*, No. CV02-00697 DT FMOX, 2006 WL 4743970 (C.D. Cal. Jan. 30, 2006) ....................7

*Ctr. for Biological Diversity v. Burgum*, No. 2:25-CV-02840-MWC-MAA, 2026 WL 2574833 (C.D. Cal. Aug. 31, 2026) ....................1, 6, 7

*Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794 (9th Cir. 2009) ....................7

*Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012) ....................23

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) ....................................................8, 21

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) ....................................................25

*Ctr. for Cmty. Action & Env't Justice v. FAA*,
18 F.4th 592 (9th Cir. 2021) ....................................................5

*Cumberland Pharms. Inc., v. Food & Drug Admin.*,
981 F. Supp. 2d 38 (D.D.C. 2013)....................................................19

*Defs. of Wildlife v. Hall*,
807 F. Supp. 2d 972 (D. Mont. 2011)....................................................24

*Delaware Audubon Soc. v. Salazar*,
829 F. Supp. 2d 273 (D. Del. 2011)....................................................22

*Delaware Riverkeeper Network v. Pa. Dep't of Transp.*,
No. 18-4508, 2020 WL 4937263 (E.D. Pa. Aug. 20, 2020)..............................22

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)....................................................24

*Diné Citizens Against Ruining Our Env't v. Haaland*,
59 F.4th 1016 (10th Cir. 2023) ....................................................22

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ....................................................5, 8, 9

*Earth Island Inst. v. U.S. Forest Serv.*,
87 F.4th 1054 (9th Cir. 2023) ....................................................19

*Edwardsen v. U.S. Dep't of Interior*,
268 F.3d 781 (9th Cir. 2001) ....................................................13, 14

*Environmental Defense Center v. BOEM*,
36 F.4th 850 (9th Cir. 2022) ....................................................17

*Forest Guardians v. U.S. Fish & Wildlife Serv.*,
No. 06-231 WJ/KBM, 2008 WL 11361095 (D.N.M. Sept. 2, 2008).................24

*Friends of Animals v. Burgum*,
164 F.4th 738 (9th Cir. 2026) ....................................15, 16, 17, 19, 20

*Friends of the Clearwater v. Dombeck*,
222 F.3d 552 (9th Cir. 2000) ....................21

*Friends of the Wild Swan v. Weber*,
767 F.3d 936 (9th Cir. 2014) ....................10

*Gilliams v. Walker*,
No. 2:26-CV-00066-MWC-AYP, 2026 WL 2374501 (C.D. Cal. June 22, 2026) ....................8

*Havasupai Tribe v. Provencio*,
906 F.3d 1155 (9th Cir. 2018) ....................8

*Healthy Gulf v. Burgum*,
775 F. Supp. 3d 455 (D.D.C. 2025) ....................12

*Los Padres ForestWatch v. U.S. Forest Serv.*,
No. CV 22-2781-JFW (SKX), 2023 WL 5667533 (C.D. Cal. July 19, 2023), *aff'd*, No. 23-55801, 2024 WL 4750504 (9th Cir. Nov. 12, 2024) ....................10

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000) ....................21, 22

*Mountain Cmtys. for Fire Safety v. Elliott*,
No. 2:19-CV-6539, 2020 WL 2733807 (C.D. Cal. May 26, 2020), *aff'd*, 25 F.4th 667 (9th Cir. 2022) ....................9

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ....................17

*Mussarova v. Garland*,
562 F. Supp. 3d 837 (C.D. Cal. 2022) ....................5

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
136 F.4th 816 (9th Cir. 2025) ....................18

*N. D. v. Reykdal*,
102 F.4th 982 (9th Cir. 2024) ....................6

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
545 F.3d 1147 (9th Cir. 2008) ....................18

*Nat'l Parks Conservation Ass'n v. U.S. Bureau of Land Mgmt.*,
No. 2:24-CV-01434-DJC-CKD, 2025 WL 2495614 (E.D. Cal. Aug. 29, 2025) ....... 11

*Nat'l Wildlife Fed'n v. Norton*,
306 F. Supp. 2d 920 (E.D. Cal. 2004) ....... 18

*Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*,
9 F.4th 1201 (9th Cir. 2021) ....... 6, 21

*Native Vill. of Point Hope v. Salazar*,
680 F.3d 1123 (9th Cir. 2012) ....... 5

*Or. Wild Horse Org. v. Bureau of Land Mgmt.*,
No. 2:24-cv-01673-HL, 2025 WL 4592304 (D. Or. Dec. 19, 2025) ....... 24

*Orutsararmiut Native Council v. U.S. Army Corps of Eng'rs*,
751 F. Supp. 3d 971 (D. Alaska 2024) ....... 14

*Pac. Coast Fed'n of Fishermen's Associations v. U.S. Dep't of the Interior*,
929 F. Supp. 2d 1039 (E.D. Cal. 2013) ....... 17

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ....... 21

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
187 F.4th 1112 (9th Cir. 2026) ....... 24

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ....... 13

*Sakr v. City of Portland*,
821 F. Supp. 3d 1237 (D. Or. 2026) ....... 18

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ....... 20, 24

*San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*,
449 F.3d 1016 (9th Cir. 2006) ....... 14

*Save Our Sound OBX, Inc. v. N. Carolina Dep't of Transp.*,
914 F.3d 213 (4th Cir. 2019) ....... 22

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)........................................................ 1, 5, 10, 14, 16, 20, 24, 25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021)..........................................................................16

*Summit Lake Paiute Tribe of Nevada v. U.S. Bureau of Land Mgmt.*,
496 F. App'x 712 (9th Cir. 2012) .......................................................................25

*Swanson v. U.S. Forest Serv.*,
87 F.3d 339 (9th Cir. 1996) ..................................................................................8

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...............................................................................................6

*Tribal Vill. of Akutan v. Hodel*,
869 F.2d 1185 (9th Cir. 1988) ............................................................................13

*Wild Horse Educ. v. U.S. Dep't of Interior*,
No. 3:23CV00372-MMD-CLB, 2026 WL 483342 (D. Nev. Feb. 20, 2026) ....................................................................................................5

**STATUTES**

5 U.S.C. § 706(2)(A)...........................................................................................4

42 U.S.C.
§ 4332(2)(C)...........................................................................................8
§ 4332(2)(C)(iii)......................................................................................16
§ 4332(2)(H) ..........................................................................................16
§ 4336(a)(2) ............................................................................................9
§ 4336(b)...............................................................................................16
§ 4336(b)(2) ..........................................................................................10
§ 4336e(1) ..............................................................................................9

43 U.S.C.
§ 1334(a) ................................................................................................8
§ 1349(a)(1) ............................................................................................6
§ 1349(a)(2) ............................................................................................7
§ 1802(1)................................................................................................8
§ 1802(2)(A) ...........................................................................................8

## REGULATIONS

30 C.F.R.
§ 250.180(a)(2) .......... 2
§ 250.180(d) .......... 3
§ 250.180(e) .......... 3, 4, 6, 8
§ 250.1005(a) .......... 15

43 C.F.R.
§ 46.205 (2025) .......... 9
§ 46.305(b) (2025) .......... 21
§ 46.310(b) (2025) .......... 18

90 Fed. Reg. 10,610 (Feb. 25, 2025) .......... 11

## OTHER AUTHORITIES

U.S. Department of the Interior, Departmental Manual, 516 DM 15 (May 27, 2004) .......... 9

## I. INTRODUCTION

Plaintiffs challenge several routine approvals by the Bureau of Safety and Environmental Enforcement ("BSEE") pertaining to the Santa Ynez Unit ("SYU"), attempting to indirectly attack the SYU's existing federal approvals authorizing production not at issue in this case.[1] The National Environmental Policy Act ("NEPA") and Outer Continental Shelf Lands Act ("OCSLA") provide no basis to disturb these routine approvals in any event, and Plaintiffs are not entitled to summary judgment on any of their claims.

The crux of Plaintiffs' claims under NEPA is that they disagree with the government's approach to just two components of the updated, more detailed environmental analysis supporting BSEE's reasonable decision to approve an extension for the SYU owner to resume operations. But the Supreme Court has made clear NEPA is a "purely procedural statute," the agency's analysis is entitled to "substantial deference," and the agency's decision must be upheld if it satisfies the deferential Administrative Procedure Act ("APA") arbitrary and capricious standard. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179-85 (2025). BSEE has more than satisfied NEPA requirements in its 2025 Environmental Assessment and Finding of No Significant Impact ("2025 EA/FONSI"), including with respect to the oil spill and alternatives analyses Plaintiffs challenge. That the federal government prepared additional NEPA analysis, in part to address Plaintiffs' earlier comments, does not undermine BSEE's NEPA compliance in any way. And Plaintiffs' claims regarding earlier NEPA documents are moot or forfeited and fail on the merits regardless.

The Court need not reach the merits of Plaintiffs' OCSLA claims because Plaintiffs lack standing to challenge BSEE's discretionary national interest

---

[1] This Court already dismissed Plaintiffs' suit relating to the SYU Development and Production Plan ("DPP"). *Ctr. for Biological Diversity v. Burgum*, No. 2:25-CV-02840-MWC-MAA, 2026 WL 2574833 (C.D. Cal. Aug. 31, 2026).

determinations. And other aspects of Plaintiffs' OCSLA claims fail for additional reasons: mootness; lack of adequate statutory notice; or abandonment by failing to brief them. In any event, these OCSLA claims fail on the merits because BSEE reasonably determined that allowing additional time to resume SYU operations was in the national interest to help meet the nation's energy demands through existing, reliable infrastructure. Plaintiffs point to no valid basis in the administrative record to overturn BSEE's decisions. The Court should deny Plaintiffs' motion and grant Sable's cross-motion for summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview of the Santa Ynez Unit

The SYU consists of 16 oil and gas leases issued between 1968 and 1982 in federal waters north of Santa Barbara, AR_25204-36, 27140-252, and includes three offshore platforms—Harmony, Heritage, and Hondo—and related pipelines and wells, AR_30110-11. Federal agencies conducted numerous environmental reviews of the SYU under NEPA before its development and over the decades since then. *See, e.g.*, AR_19068-24253, 25237-27046, 29460-722. The SYU leases provide the right to develop oil and gas resources for five years and as "long thereafter as oil or gas" is or may be "produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by" the Department of the Interior ("DOI"). *See, e.g.*, AR_27140; *see also* 30 C.F.R. § 250.180(a)(2). The leases are also subject to an approved Development and Production Plan, AR_17740-18164, and a unitization agreement ("Unit Agreement"), AR_27047-139, which extends the lease terms for the life of the Unit Agreement to continue in effect "so long as Unitized Substances are or can be produced and should production cease, so long thereafter as diligent operations are in progress for the restoration of production," AR_27059. In May 2015, an onshore pipeline owned and operated by Plains All American Pipeline, L.P., transporting crude oil onshore leaked, AR_28473, and the SYU was temporarily

shut in subject to an environmentally protective preservation plan approved by BSEE, AR_16949-7044. Exxon (and then Sable) diligently pursued restoration of production, maintaining the leases. *See*, *e.g.*, AR_16676-729, AR_27876-78, AR_30111. Sable purchased the SYU assets from Exxon Mobil Corporation ("Exxon"), becoming the designated Unit Operator in May 2024. AR_82.

**B. BSEE's 2023 Extension and 2024 APMs**

From 2015 through 2022, while it pursued various approaches to restore production, Exxon also requested and received from BSEE an extension of time to resume operations pursuant to 30 C.F.R. § 250.180(e).[2] In October 2023, Exxon again requested a one-year extension of time to resume operations. AR_446-49. On November 9, 2023, BSEE concluded that the extension was subject to a categorical exclusion ("CatEx") under NEPA, and on November 14, 2023, approved the extension, determining it was "in the National interest" under 30 C.F.R. § 250.180(e) ("2023 Decision"). AR_422-30. After acquiring the SYU, Sable submitted applications for permits to modify ("APMs") to perform minor well-reworking activities on two existing wells at Platform Heritage. AR_43-56. BSEE conducted a CatEx review for each application and approved both APMs on September 25, 2024 ("2024 APMs"). AR_23-42. Sable completed well-reworking operations for Well HE-23 on October 9, 2024, and Well HE-28 on December 9, 2024, which further maintained the leases through December 9, 2025. AR_54556-57, 56718-19, 57285. In May 2025, Sable announced that it resumed production from Platform Harmony, which also independently maintains the leases. *See* AR_27059; 30 C.F.R. § 250.180(d).

**C. BSEE's 2025 EA/FONSI, 2025 Decision, and 2025 APMs**

Plaintiffs challenged the 2023 Decision and 2024 APMs, Dkts. 1 & 38-2, and BSEE sought remand in 2024 from this Court to "reconsider its decision" and

[2] AR_15074-76, 15142-44, 15599-603, 15970-72, 16015-17, 16247-49, 16625-27, 17076-78.

"conduct additional analysis, as warranted, under OCSLA and NEPA," Dkt. 37 at 5. On May 28, 2025, the agencies issued the 2025 EA/FONSI. This EA provided "a more in-depth analysis of the environmental impacts associated with the lease extension request," including reasonably foreseeable effects of unintentional oil spills and reasonable alternatives, and concluded that "the Proposed Action will not significantly affect . . . the quality of the human environment." AR_29881-959. On May 29, 2025, BSEE issued a decision re-approving the extension, which included additional analysis supporting its national interest determination under 30 C.F.R. § 250.180(e) ("2025 Decision"). AR_29960-63, 30110-21. In June 2025, Sable submitted nine APMs to perform well-reworking activities on nine existing wells at Platform Hondo ("2025 APMs"). AR_30040-102, 30277-95. On July 1, 2025, BSEE issued a Determination of NEPA Adequacy for each of the APMs. AR_30143-367. BSEE approved the APMs on July 2-3, 2025, and approved a revised permit for one well on July 24, 2025. AR_30040-102, 30277-95. Sable has completed the work authorized by the 2024 APMs and 2025 APMs at issue on five wells. Declaration of Steven P. Rusch in Support of Sable Offshore Corp.'s Cross-Motion for Summary Judgment ("Third Rusch Decl.") ¶¶ 4-8.[3]

Plaintiffs subsequently filed their Second Supplemental and Amended Complaint, Dkt. 104, adding claims related to the 2025 Decision, 2025 EA/FONSI, and 2025 APMs. Plaintiffs filed their Motion for Summary Judgment, Dkt. 134 ("Pls. MSJ"), and Sable timely files this cross-motion for summary judgment.

## III. STANDARD OF REVIEW

Under the APA, a reviewing court may only set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he [Federal

---

[3] On March 13, 2026, the Secretary of Energy issued an order to Sable pursuant to the Defense Production Act ("DPA Order") requiring Sable to "immediately prioritize and allocate pipeline transportation services for hydrocarbons" from the SYU through its onshore pipelines to Pentland Station. Third Rusch Decl. ¶ 9. In April 2026, Sable resumed production at Platform Heritage. *Id.* at ¶ 10.

Rule of Civil Procedure] 56 standard for summary judgment motions does not apply to cases involving judicial review under the APA because the Court is not required to resolve any facts in review of an administrative proceeding." *Mussarova v. Garland*, 562 F. Supp. 3d 837, 841 (C.D. Cal. 2022). "[W]hen an agency exercises discretion granted by a statute, judicial review is" conducted under the "deferential arbitrary-and-capricious standard." *Seven Cnty.*, 605 U.S. at 179-80. "[T]he arbitrary and capricious standard does not demand perfection" and courts "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023) (cleaned up). The "party challenging the administrative decision" bears the burden of persuasion. *Ctr. for Cmty. Action & Env't Justice v. FAA*, 18 F.4th 592, 599 (9th Cir. 2021) (citation omitted). "[T]he central principle of judicial review in NEPA cases is deference," and when an agency makes "predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Seven Cnty.*, 605 U.S. at 179, 182 (citation omitted).

## IV. ARGUMENT

### A. The Court Need Not Reach the Merits for Several Claims

#### 1. Most of Plaintiffs' Claims Are Moot

It is well established that the supersession of an agency decision moots any challenges to the original decision. *See, e.g., Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1131 (9th Cir. 2012) (revised plan mooted OCSLA claim); *Wild Horse Educ. v. U.S. Dep't of Interior*, No. 3:23CV00372-MMD-CLB, 2026 WL 483342, at *5 (D. Nev. Feb. 20, 2026) (NEPA claims regarding EA for superseded plan mooted by new plan and EA). Plaintiffs' claim that the 2023 Decision violated OCSLA, Dkt. 104 ¶¶ 169-74, is moot because the 2025 Decision superseded the 2023 Decision, AR_29960-61. Likewise, Plaintiffs' claims that BSEE violated NEPA by relying on a CatEx when it issued the 2023 Decision,

Dkt. 104 ¶¶ 175-82, and failed to prepare "an EIS or environmental assessment on the APMs," *id.* ¶ 186, are likewise moot as a result of the 2025 EA/FONSI. *See Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1210 (9th Cir. 2021) ("[W]hen the environmental report at issue 'has been superseded, and the federal agencies will rely' on a new and different report 'for the near future,' the case is moot."). Plaintiffs' claims regarding the 2024 APMs and most of the 2025 APMs, Dkt. 104 ¶¶ 183-92, are independently mooted by the fact that all work under these APMs is complete and cannot be undone. *See, e.g.*, *N. D. v. Reykdal*, 102 F.4th 982, 989-90 (9th Cir. 2024) ("[I]f the activities sought to be enjoined already have occurred, and the appellate courts cannot undo what has already been done, the action is moot, and must be dismissed.") (cleaned up); Third Rusch Decl. ¶¶ 4-8 & Ex. A; AR_54556-60 (acceptance of end of operations reports).

2. Plaintiffs Lack Standing for Their OCSLA Claims

Plaintiffs must establish standing for every claim, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), and they failed to do so for their claims that the 2023 and 2025 Decisions violated OCSLA, *see* Dkt. 104 ¶¶ 169-74. Plaintiffs cannot establish a procedural injury because 30 C.F.R. § 250.180(e) does not include "*any* procedural requirements whatsoever—either external procedures afforded to the public, or internal procedures that must occur within the Department of Interior." *Ctr. for Biological Diversity*, 2026 WL 2574833, at *11. And "[n]one of Plaintiffs' standing declarations," Dkts. 134-2 to 134-6, "demonstrate that OCSLA or its implementing regulations afford Plaintiffs a procedural right to" the national interest determination process. *Ctr. for Biological Diversity v. Burgum*, No. 2:25-CV-02840-MWC-MAA (C.D. Cal. May 14, 2026), Dkt. 71 at 15-16. Plaintiffs also cannot establish redressability because 30 C.F.R. § 250.180(e) "impose[s] duties and obligations on *Sable*"—not BSEE. *See id.* at 22. Because this determination is left to the agency's discretion, "compelling compliance" with the regulation, *see* 43 U.S.C. § 1349(a)(1), "would essentially

revert to the deference of" the agency. *See Ctr. for Biological Diversity*, 2026 WL 2574833, at *4. Plaintiffs therefore lack standing for this claim.

3. Plaintiffs Provided Insufficient Notice Under OCSLA

No OCSLA citizen-suit "may be commenced" unless "plaintiff has given [60 days'] notice of the alleged violation." 43 U.S.C. § 1349(a)(2). In its 2025 Decision, BSEE responded to Plaintiffs' concerns from an earlier letter, AR_29960, 30112, including detailed analysis by BSEE of environmental considerations accounted for in the national interest determination, AR_30110-21. Plaintiffs do not appear to have sent any notice challenging the 2025 Decision and never identified how or why the 2025 Decision failed to cure the alleged OCSLA defects in the 2023 Decision in a new notice letter. Plaintiffs' earlier letters are therefore insufficient because they fail to tell BSEE "precisely what it allegedly did wrong, and when." *See Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 801 (9th Cir. 2009). This claim regarding the 2025 Decision must be dismissed. *See id.* at 803-04.

4. Plaintiffs Forfeit Several Claims

"Claims not raised in a summary judgment motion should be considered abandoned and waived." *City of Santa Clarita v. U.S. Dep't of Interior*, No. CV02-00697 DT FMOX, 2006 WL 4743970, at *11 (C.D. Cal. Jan. 30, 2006). Nowhere in their brief do Plaintiffs directly argue that BSEE's 2025 Decision violated *OCSLA*, Dkt. 104 ¶ 174, and that argument is forfeited. Plaintiffs' headers (at 9, 13) and arguments related to NEPA are insufficient to preserve the OCSLA claim. Plaintiffs offer no argument to support their claims that BSEE's 2023 Decision was unlawful, that BSEE's reliance on a CatEx for the 2023 Decision was improper, that BSEE's issuance of the 2024 APMs was unlawful, or that BSEE violated its NEPA obligations in failing to supplement the prior SYU

environmental reviews.[4] Plaintiffs (at 24) attempt to incorporate their prior arguments regarding these claims by reference to their "prior motion for summary judgment." Plaintiffs' end-run around this Court's page limitations is improper, and those claims are forfeited. *Gilliams v. Walker*, No. 2:26-CV-00066-MWC-AYP, 2026 WL 2374501, at *2 (C.D. Cal. June 22, 2026) ("[R]eference to prior filings" including "incorporation by reference of legal arguments, is improper.") (cleaned up); *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996).

### B. Plaintiffs' Forfeited Claims Also Fail on the Merits

#### 1. BSEE's OCSLA Determinations Were Reasonable

The Secretary of the Interior has broad discretion to "administer the provisions of [OCSLA] relating to the leasing of the outer Continental Shelf." 43 U.S.C. § 1334(a). BSEE may "allow [the lessee] more than a year to resume operations on a lease continued beyond its primary term" if the agency determines "that the longer period is in the National interest, and it conserves resources, prevents waste, or protects correlative rights." 30 C.F.R. § 250.180(e). In its 2023 Decision, BSEE reasonably concluded the extension furthered the national interest by using existing facilities to meet the Nation's energy needs, benefitting taxpayers through royalties and taxes, and conserving known resources, AR_424, which is consistent with OCSLA's mandates. *See, e.g.*, 43 U.S.C. § 1802(1); *id.* § 1802(2)(A). In its 2025 Decision, BSEE also provided robust support for its national interest determination, including responding to Plaintiffs' 2023 letter and incorporating detailed environmental considerations. AR_30110-21. Plaintiffs fail

---

[4] No supplementation of prior NEPA analysis was required for the 2023 Decision or 2024 APMs as the agency validly relied on earlier NEPA documents in combination with a CatEx. *See Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1098 (9th Cir. 2013); *Earth Island Inst.*, 82 F.4th at 637 n.11. Resumption of production under existing approvals is not a "major Federal action[]" requiring new NEPA review, 42 U.S.C. § 4332(2)(C), particularly where the SYU's already-approved DPP has undergone thorough environmental review, AR_19068-24253, 25237-7046; *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1163 (9th Cir. 2018) (NEPA supplementation not required where "resumed [mining] did not require any additional government action").

to show BSEE's national interest determinations were arbitrary and capricious.

2. BSEE's CatEx for the 2023 Decision Complied With NEPA

A CatEx is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment." 42 U.S.C. § 4336e(1); *see also* 43 C.F.R. § 46.205 (2025).[5] In 2023, BSEE appropriately concluded the extension request was "categorically excluded from further NEPA analysis pursuant to 516 DM 15.4(C)(7)," AR_428, which identified "lease extensions" as a "designated categorical exclusion[.]"[6] BSEE evaluated each of the 12 extraordinary circumstances and found none were applicable, AR_429-30, which was reasonable given (i) the 2023 Decision involved no new authorization of any physical work on any existing facilities and no operational changes, *see* AR_422-30, and (ii) the preservation plan, under which SYU infrastructure was preserved and drained of oil, AR_16949-7044. *Mountain Cmtys. for Fire Safety v. Elliott*, No. 2:19-CV-6539, 2020 WL 2733807, at *5 (C.D. Cal. May 26, 2020) ("substantial deference" given to agency in "application of its own categorical exclusions"), *aff'd*, 25 F.4th 667 (9th Cir. 2022). Shortly before BSEE's 2023 Decision, Congress amended NEPA to clarify that "[a]n agency is not required to prepare an environmental document . . . if . . . the proposed agency action is excluded pursuant to one of the agency's categorical exclusions." 42 U.S.C. § 4336(a)(2). BSEE satisfied NEPA because "application of the exclusion[] to the facts of the particular action is not arbitrary and capricious." *Earth Island Inst.*, 82 F.4th at 633.

3. BSEE's CatExs for the 2024 APMs Complied With NEPA

BSEE appropriately concluded the 2024 APMs were "categorically excluded from further [NEPA] analysis in accordance with 516 DM 15.4(C)(12)," which

---

[5] DOI regulations and Departmental Manual cited herein are to those in effect at the time of the relevant BSEE decision.

[6] DOI's Departmental Manual, 516 DM 15 (May 27, 2004), is available at https://www.doi.gov/sites/doi.gov/files/elips/documents/516-dm-15.pdf.

covers "[a]pproval of an Application for Permit to Drill (APD) an offshore oil and gas exploration or development well[.]" AR_37-42.[7] BSEE's determination regarding no extraordinary circumstances was reasonable based on its consideration and determination that potential impacts from the well-reworking on public health and safety, ecologically critical areas, and endangered species would not be significant. AR_37-42. BSEE's "determination is entitled to deference" and Plaintiffs failed to demonstrate that the 2024 APM CatExs were arbitrary or capricious. *See Los Padres ForestWatch v. U.S. Forest Serv.*, No. CV 22-2781-JFW (SKX), 2023 WL 5667533, at *11-12, *15-17 (C.D. Cal. July 19, 2023), *aff'd*, No. 23-55801, 2024 WL 4750504 (9th Cir. Nov. 12, 2024).

**C. The 2025 EA/FONSI and 2025 Decision Comply With NEPA**

"NEPA is a purely procedural statute," *Seven Cnty.*, 605 U.S. at 173, under which an Environmental Assessment ("EA") is appropriate for "proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment," 42 U.S.C. § 4336(b)(2). An EA is a "concise public document" that "set[s] forth the basis of such agency's finding of no significant impact," *id.*, and is "not an exhaustive examination of every possible environmental event," *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014). "[I]n determining whether a document 'complied with NEPA," a court should "defer[] to the agency regarding what level of detail is required . . . and the scope of the environmental effects that the NEPA document will address." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025). The Supreme Court's *Seven County* decision reflects a "course correction . . . to bring judicial review under NEPA back in line with the statutory text and common sense." 605 U.S. at 183-84. Plaintiffs take issue with just two components of the 2025 EA/FONSI, both of which are more than sufficient under

[7] This minor perforation work on existing wells has fewer potential impacts than drilling new wells under an APD. *See* AR_43, 50.

the deferential NEPA review standard.[8]

1. BSEE Adequately Considered Oil Spill Risk

Contrary to Plaintiffs' claims (at 13-20), BSEE took the requisite "hard look" under NEPA at the reasonably foreseeable environmental effects of granting the extension request relating to potential oil spills. *See Cascadia Wildlands*, 153 F.4th at 879. BSEE did not ignore potential oil spill risk but addressed this topic directly and reached its 2025 Decision based on the robust analysis in the 2025 EA/FONSI, including a dedicated "Appendix A" focused entirely on "oil spill risk, fate of oil, trajectory analysis, and response." AR_29948-59; *see* AR_30115-16, 30118. The 2025 EA/FONSI also includes a review of past oil spill assessments, which "examined spills ranging from 10 bbl to more than 500,000 bbl and categorized a platform blowout as spilling between 1,000 and 500,000 bbl." AR_29951-59.[9] While Plaintiffs disagree with BSEE's scientific conclusion based on oil reserve pressures that a "catastrophic oil spill event is not reasonably foreseeable to occur on the Pacific OCS," AR_29883, the record shows the 2025 EA/FONSI provides "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the 2025 Decision. *See Cascadia Wildlands*, 153 F.4th at 902 (citations omitted). No more is required.

Contrary to Plaintiffs' claims (at 14-16), BSEE applied the correct legal standard under NEPA and its determination "that a catastrophic oil spill event is not reasonably foreseeable," AR_29883, was not arbitrary or capricious.[10] The

---

[8] The Council on Environmental Quality NEPA-implementing regulations were removed on April 11, 2025, before the 2025 EA/FONSI was issued. 90 Fed. Reg. 10,610 (Feb. 25, 2025).

[9] The 2025 EA/FONSI explained how conditions at the SYU have reduced the likelihood of a significant oil spill, AR_29906-08, 29953, and BSEE was not required to redo the prior analysis already conducted in the SYU's EIS. *See Nat'l Parks Conservation Ass'n v. U.S. Bureau of Land Mgmt.*, No. 2:24-CV-01434-DJC-CKD, 2025 WL 2495614, at *9 (E.D. Cal. Aug. 29, 2025).

[10] Plaintiffs argue (at 14) BSEE did not apply the "relevant standard" because the 2025 EA/FONSI describes a worst-case oil spill as "not reasonably certain to occur," but the 2025 EA/FONSI unmistakably indicates that a "high-volume,

2025 EA/FONSI reasonably concluded oil spills are not a direct effect of the 2025 Decision "given they are neither authorized nor intended to occur" but acknowledged that smaller spills of 50 barrels or less could be an indirect effect, in light of current information and based on historical spills on the Pacific Outer Continental Shelf ("OCS"). AR_29928; *see* AR_16035. The 2025 EA/FONSI explained that "[a]ll wells at SYU have been designated as no-flow and require support from artificial lift to produce oil," AR_29905, and "[t]he risk of a loss of well control (a blowout) resulting in a spill is exceedingly small under these conditions," AR_29907. It also contextualizes these risks, noting that any small spills would be minimal compared to the active oil seeps across the Santa Barbara Channel. AR_29910, 29912. BSEE's scientific finding that a significant oil spill "is not reasonably foreseeable to occur on the Pacific OCS," AR_29883, is afforded significant deference. *See Cascadia Wildlands*, 153 F.4th at 906 (a "technical, scientific issue" is one "where deference to agency technical expertise is at its apogee"); *Healthy Gulf v. Burgum*, 775 F. Supp. 3d 455, 492 (D.D.C. 2025) (disagreement "with BOEM's determination that catastrophic oil spills . . . are 'low probability' events, . . . is 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise'") (citation omitted).

Using historic Pacific OCS oil spill data, the 2025 EA/FONSI estimated a 63% probability of one 50-to-1,000-barrel spill over the remaining economic life of the entire Southern California Planning Area, which includes more than just the SYU, and a 7% probability of a spill exceeding 1,000 barrels, but explained why a large spill is not "a reasonably foreseeable effect of the" action given the current status of the oil and gas fields being developed and produced in the region. AR_29906-08, 29948 ("probability of an oil spill occurring decreases with the decreasing amount of oil left to be produced" and "[r]eservoir pressures have

---

extended-duration oil spill" was not "a ***reasonably foreseeable effect*** of the action." AR_29983 (emphasis added); *see also* AR_29948-49 (80,900 bbl spill is "an extreme event and not reasonably foreseeable").

dropped to near zero in the majority of the fields now in production").[11] Plaintiffs' claim (at 20) that BSEE "only analyzed 'the potential impacts of small spills (50 [barrels] or less)'" is also inaccurate because the 2025 EA/FONSI included an oil spill trajectory analysis that simulated a "maximum hypothetical spill of 1,000 bbl" to "represent[] the full extent of areas that could be affected." AR_29956-58; *see also* AR_29910 (contextualizing "localized effects to contacted biological communities" from an oil spill of this size and noting that the region's natural oil seeps "may contribute 20,000 metric tons (173,200 bbl) of crude oil into the marine environment per year").

NEPA does not require the agency to treat a "worst-case" oil spill from a well blowout at Platform Heritage as a reasonably foreseeable effect, as Plaintiffs claim (at 16). *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354-56 (1989) (finding that NEPA does not require a "worst-case" analysis). The purpose of the "conservative requirement" that an operator's Oil Spill Response Plan ("OSRP") contain worst case discharge ("WCD") scenarios is not to describe "reasonably foreseeable" effects, but "to ensure that each operator has adequate . . . capabilities to respond to the largest conceivable oil spill from their facilities." AR_29953; *see Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 785 (9th Cir. 2001) (worst-case scenario oil spill trajectory analysis not required in NEPA analysis). The 2025 EA/FONSI discussed a WCD in the 2014 OSRP for Platform Heritage, as Plaintiffs (at 16) point out, AR_29953-54, but also explained why "[t]he risk of a loss of well control (a blowout) resulting in a spill is exceedingly small" given the conditions at the SYU, AR_29905-07. More recently, Sable updated its OSRP to reflect that "[t]here are no current plans for development well drilling" at Platform Heritage. AR_54198.

[11] Plaintiffs claim (at 16 n.5) that "[u]sing a different type of risk analysis" yields a higher percent chance of an oil spill, in reference to their own report, but the government identified multiple flaws in this analysis, *see* AR_53880. *See Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1192 (9th Cir. 1988) (court need only consider whether particular methodology for oil spill analysis was reasonable).

*Orutsararmiut Native Council v. United States Army Corps of Engineers*, 751 F. Supp. 3d 971, 981 (D. Alaska 2024), which Plaintiffs cite (at 13-15), is distinguishable. The Supreme Court has since made clear that courts "should not micromanage" an agency's assessment of environmental effects. *Seven Cnty.*, 605 U.S. at 169. Unlike in *Orutsararmiut*, 751 F. Supp. 3d at 982, here BSEE's conclusion was consistent with record evidence, including that the average oil spill in the region over the last 50 years is one barrel per spill. AR_29906. BSEE's conclusion was also based on long-recognized significant pressure drop across the region and that "[a]ll wells at SYU . . . require support from artificial lift to produce oil," in addition to statistical analysis. AR_29905-07.[12]

Despite Plaintiffs' claims (at 16-17), the 2025 EA/FONSI addressed the potential risk of an oil spill from a ruptured pipeline (including by anchor drag) by including historical pipeline spills in 1991 and 2021 in the data used for its risk calculation. AR_29948-50; *see also* AR_29896, 29900, 29907 ("majority of the commercial vessels . . . use . . . an internationally sanctioned set of traffic lanes established for marine safety," which lie seaward of the SYU pipelines). The 2025 EA/FONSI describes regulatory requirements for offshore pipelines, including a requirement for leak detection systems on all Pacific OCS oil pipelines and routine internal and external inspections, which reduce potential risk. AR_29903-05. That Sable's OSRP conservatively includes a WCD from a pipeline is not evidence that such a spill is reasonably foreseeable. *See Edwardsen*, 268 F.3d at 785.

Contrary to Plaintiffs' claims (at 17-18), BSEE also adequately addressed the oil spill risk associated with older infrastructure by describing the extensive regulatory requirements and "comprehensive inspections by BSEE inspectors

---

[12] *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 449 F.3d 1016, 1028 (9th Cir. 2006), where the agency "decided categorically that NEPA does not require consideration of the environmental effects of potential terrorist attacks" is likewise distinguishable. BSEE did not determine that NEPA "categorically" excludes consideration of significant oil spills but determined that a large spill is not reasonably foreseeable given the SYU's current conditions.

[that] address the potential risk associated with aging infrastructure." AR_29903-05 (including "comprehensive in-service inspection plan for all OCS platforms and structures," third-party internal and external inspections at regular intervals, and "equipment verification inspections and unannounced exercises" from BSEE); *see also* AR_29894 ("BSEE has conducted over 800 on-site inspections of all three SYU platforms and associated pipelines since the 2015 shut-in to ensure compliance with safety and operational regulations."). It was reasonable for the agency to find that mandatory "regulatory and structural inspections for the SYU . . . address the potential risk associated with aging infrastructure." *See* AR_29903; *Friends of Animals v. Burgum*, 164 F.4th 738, 750-52 (9th Cir. 2026).

Plaintiffs' allegations (at 18) regarding corrosion causing the 2015 *onshore* pipeline leak are also misplaced given BSEE's required inspections *offshore* at the SYU "include a below water verification of the cathodic protection system . . . to show if the corrosion protection system is effective," which BSEE found "in compliance" with its regulations. AR_56937, 39-40; *see also* AR_56934 (review of surveys completed in February 2025). The record also includes a summary of inspection results for the SYU pipelines from 2023 and 2024, which BSEE deemed in compliance with 30 C.F.R. § 250.1005(a). AR_56940-42. And in April 2025, "BSEE informed BOEM that all safety inspections required for the restart of Platform Harmony were complete and all regulatory requirements met." AR_53889.[13] The 2025 EA/FONSI also explained that "[t]here is no indication that age of SYU infrastructure contributed to the 2015 oil spill or has contributed to recent oil spills in the region." AR_29894.

BSEE was also not required to consider in the 2025 EA/FONSI the unrelated allegations Plaintiffs cite (at 19) against Sable and one judicial decision regarding a dispute over a state agency's jurisdiction. This is irrelevant to Sable's compliance

[13] The "inspection reports" Plaintiffs cite (at 17) from a decade ago are irrelevant, and, in any event, were considered by the agency in the administrative record in light of more recent inspections finding compliance with the requirements.

with BSEE's regulatory requirements, where the record shows "ExxonMobil and Sable have been diligent in their ongoing efforts to address the operating conditions at [the] SYU," "Sable has continued to comply with the preservation plan requirements since taking over the SYU lease," including completing required inspections, and "[t]he SYU offshore pipelines and facilities have a proven track record of safe and reliable operations and continue to adhere to all required federal regulatory standards . . . ." AR_30111, 121.[14]

2. <u>BSEE Adequately Considered Reasonable Alternatives</u>

Contrary to Plaintiffs' claims (at 20-23), the 2025 EA/FONSI adequately considered a reasonable range of alternatives. "NEPA requires a federal agency to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" *Friends of Animals*, 164 F.4th at 755 (citing 42 U.S.C. § 4332(2)(H)); *see also* 42 U.S.C. § 4332(2)(C)(iii). "'[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS,' and need only include a brief discussion of reasonable alternatives."[15] *Id.* (citation omitted). "When assessing . . . feasible alternatives . . . an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail." *Seven Cnty.*, 605 U.S. at 182-83. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.*

BSEE met its NEPA obligation to provide a "brief discussion of reasonable

[14] Plaintiffs' attempt (at 19-20) to analogize *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1046 (D.C. Cir. 2021), fails. Sable was not responsible for the 2015 spill. Plaintiffs have not shown Sable violated any OCSLA or BSEE requirements applicable to the SYU.

[15] In contrast to an EA, an environmental impact statement ("EIS") is a more detailed NEPA document required when a proposed agency action has a reasonably foreseeable significant effect on the environment. 42 U.S.C. § 4336(b).

alternatives." Under Alternative A (the Preferred Alternative), BSEE would approve the extension request and the 2025 EA/FONSI analyzed the potential environmental impacts of near-term actions necessary to support return to and full oil production. AR_29902-05. Under Alternative B, the extension would be denied, in which case the SYU owner could foreseeably commence temporary abandonment activities in preparation for permanent decommissioning. AR_29914-15. Under Alternative C (the No Action Alternative), no action would be taken on the extension request and Sable would continue maintenance and preservation activities; this alternative was used as the baseline by which to compare the potential effects of the other alternatives. AR_29914; *see Pac. Coast Fed'n of Fishermen's Associations v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1048 (E.D. Cal. 2013) ("The no action alternative is meant to provide a baseline against which the action alternative may be compared.") (cleaned up).

BSEE's Alternatives A and C are not "substantially the same." *See* Pls. MSJ at 21. The 2025 EA/FONSI explained that "[i]mpacts to environmental resources [from Alternative C] would be similar to those analyzed under Alternative A, *but likely to a lesser extent* depending on whether Sable maintains the SYU facilities in a state of preservation or returns to production." AR_29915 (emphasis added). Indeed, that makes sense here where the proposed action BSEE considered was an extension of time to resume operations, not approval of new development or production that was not already authorized. *See supra* Section II. Regardless, it is not a NEPA violation for an EA to consider two alternatives with similar impacts.[16] The Ninth Circuit has also "'repeatedly held that an agency satisfies NEPA when it

[16] *Environmental Defense Center v. BOEM*, 36 F.4th 850, 876-78 (9th Cir. 2022), is distinguishable. There, a Programmatic EA was prepared to consider the use of well stimulation treatments ("WSTs") across the entire Pacific OCS, but the EA failed to consider an alternative that imposed any limit on the number of WSTs. Here, the proposed action was much narrower, and it was reasonable to limit the range of alternatives to approving, denying, or taking no action. *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 814 (9th Cir. 1999)—an EIS case—is distinguishable based on the "lesser" "obligation to consider alternatives under an EA." *See Friends of Animals*, 164 F.4th at 755.

considers only two alternatives—action and no action.'" *Sakr v. City of Portland*, 821 F. Supp. 3d 1237, 1260 (D. Or. 2026) (citation omitted); *see also N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 827 (9th Cir. 2025) ("An EA must consider a 'no action' alternative and a 'preferred alternative'" but "[b]eyond that, there is no 'numerical floor on alternatives to be considered.'"); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154 (9th Cir. 2008) ("[a]gencies fulfilled their obligations under NEPA's alternatives provision when they considered and discussed only two alternatives" for existing project); *see also* 43 C.F.R. § 46.310(b) (2025).

The 2025 EA/FONSI also examined Alternative B (Extension Not Approved) in appropriate depth, contrary to Plaintiffs' claims (at 21-22). The 2025 EA/FONSI explained that denying the extension may foreseeably result in decommissioning of the facilities and described the anticipated impacts on benthic, fish, and marine mammal resources from the use of explosives, bottom disturbing activities, and loss of habitat on subsea structures. AR_29914-15. Plaintiffs disregard the fact that the 2025 EA/FONSI explicitly incorporated by reference the detailed NEPA analysis on decommissioning activities described in BOEM's 2023 *Programmatic Environmental Impact Statement for Oil and Gas Decommissioning Activities on the Pacific Outer Continental Shelf*. *Id.*; *see also Cascadia Wildlands v. Adcock*, No. 25-4161, 2026 WL 2772092, at *2 (9th Cir. Sept. 17, 2026) (appropriate for agency to "assess[] sensitive species in detail in a separate NEPA document" that "the EA incorporated . . . by reference").

The cherry-picked statements Plaintiffs cite (at 22) from BSEE staff regarding the alternatives analysis methodology do not show that BSEE's review was arbitrary and capricious. "[T]he mere existence of internal disagreements between agency experts does not make the agency's decision arbitrary or capricious." *Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920, 928 n.15 (E.D. Cal. 2004) ("internal documents from Service biologists questioning the adequacy

of the mitigation ratio" did "not make the agency's decision arbitrary or capricious"); *see also Cumberland Pharms. Inc., v. Food & Drug Admin.*, 981 F. Supp. 2d 38, 52 (D.D.C. 2013) ("disagreement among agency staff during the decisionmaking process does not fatally undermine the agency's final determination, nor does it alone justify according the agency's final decision less deference than usual"). Regardless, the final 2025 EA/FONSI contained an alternatives analysis that satisfied BSEE's duty to provide "a brief discussion of reasonable alternatives." *See Friends of Animals*, 164 F.4th at 755.

BSEE was not required to consider a "partial" restart of the SYU or a "phase out" by date certain as reasonable alternatives. *See* Pls. MSJ at 22. "'[T]he nature and scope of the proposed action' dictates the range of alternatives for consideration." *Friends of Animals*, 164 F.4th at 755 (citation omitted); *see also Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) (NEPA does not "require agencies to evaluate 'mid-range' alternatives between action and no action."). Plaintiffs ignore that the leases themselves, as well as the DPP and Unit Agreement, already authorize full production from the SYU. As BSEE stated "[a]pproval of a lease extension request does not approve new activity on the lease; it offers the operator more time to conduct activities" to resume production subject to BSEE review. AR_29895. It was therefore appropriate for BSEE to consider whether to approve, deny, or take no action.

Plaintiffs propose additional alternatives but identify no authority under which BSEE could impose an expiration date on the leases or limit production to one platform. Plaintiffs' suggestion (at 22) that BSEE "only allow[] one of the three platforms to return to production" and impose new cancellation terms misconstrues the nature of the 2023 Decision, which was not an approval to restart production but an extension of time to resume operations. *See supra* Section II.B. These proposed alternatives would be inconsistent with the Unit Agreement, which keeps the leases in effect "so long as Unitized Substances are or can be produced

and should production cease, so long thereafter as diligent operations are in progress for the restoration of production[.]" AR_27058-59. Under the Unit Agreement, "[d]rilling and producing operations performed hereunder upon any tract of Unitized Land will be accepted and deemed to be performed upon and for the benefit of each and every tract of Unitized Land[.]" AR_27058. Even if BSEE did not consider Plaintiffs' preferred alternative, it "makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined . . . will have no significant environmental effects anyway." *Friends of Animals*, 164 F.4th at 757 (citation omitted). No other alternatives were required to be considered here.[17]

### D. The 2025 EA/FONSI and 2025 Decision Are Not Improperly Predetermined or Unreasonably Slanted

As an initial matter, Plaintiffs impermissibly rely on materials beyond the administrative record[18] in an attempt to show the 2025 EA/FONSI and 2025 Decision were "improperly predetermined" or "unreasonably slanted". Pls. MSJ at 9-13.[19] And even if it were valid to consider these materials, Plaintiffs still have not made that showing despite the large volumes of documents available to them. "[T]he central principle of judicial review in NEPA cases is deference." *Seven Cnty.*, 605 U.S. at 179. The 2025 EA/FONSI and 2025 Decision also "carr[y] a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). In fact, courts "presume the government is acting in good faith" when it takes an action that moots a plaintiff's claims. *Am. Cargo*

---

[17] The SYU is subject to the monitoring and inspection requirements of federal law; a separate alternative stating that is not required either. AR_29903-05.

[18] *See* Dkt. 124-1 at 2:1-5 (BSEE list of documents that "constitute the full and complete Administrative Record for this litigation"). Plaintiffs have not met their burden to show the specific documents they rely on outside this list were directly or indirectly considered by agency decision-makers. If the Court determines Plaintiffs have met their burden, Sable respectfully requests that the Court also consider Sable's citations to documents outside this list as well. *See* Dkt. 114.

[19] Plaintiffs do not argue the 2025 EA/FONSI and 2025 Decision were issued in bad faith.

*Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010).

Agencies routinely issue superseding decisions or conduct additional NEPA analysis when their prior actions are challenged. *See, e.g., Native Vill. of Nuiqsut*, 9 F.4th at 1210; *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1163 (9th Cir. 1999). Nothing precludes agencies from supplementing their NEPA analysis after litigation has commenced. *See, e.g., Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th Cir. 2000) (denying injunction where agency "prepared an additional" environmental analysis "that specifically address the significance of the new information at issue"). Contrary to Plaintiffs' claims (at 11), public participation was not required to prepare the 2025 EA/FONSI and Plaintiffs identify no provision in NEPA to the contrary. The DOI regulations in place in May 2025 provided that "[p]ublication of a 'draft' environmental assessment [was] not required." 43 C.F.R. § 46.305(b) (2025).[20]

Plaintiffs attempt to analogize BSEE's subsequent actions to those taken by agencies that made an "irreversible and irretrievable commitment of resources" before "prepar[ing] a NEPA document[]." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). But here, the decision to allow production in the SYU was made decades ago, after multiple rounds of extensive environmental review. *Supra* Section II.A. And even the 2023 Decision was made after following applicable NEPA procedures by relying on a CatEx. *See Salazar*, 706 F.3d at 1096 ("categorical exclusion . . . is a form of NEPA compliance"). Unlike here, in *Pit River Tribe v. U.S. Forest Service*, the court found that an EIS prepared for a geothermal power plant after the agency extended the leases twice could not "compensate for the nonexistent earlier review" or whether the area "should be developed for energy at all." 469 F.3d 768, 785, 787 (9th Cir. 2006); *also id.* at 786 (subsequent EIS failed to review "whether the leases should have been

---

[20] *California v. Block*, 690 F.2d 753, 769-71 (9th Cir. 1982) is inapposite, as the agency there did not circulate for public comment a supplemental draft EIS in contravention of "CEQ Guidelines in effect at the time."

extended" and thus could not remedy the earlier violation). Similarly, in *Metcalf*, the federal agency bound itself in writing to support the resumption of hunting of gray whales before any NEPA review was conducted. 214 F.3d at 1145; *cf. Save Our Sound OBX, Inc. v. N. Carolina Dep't of Transp.*, 914 F.3d 213, 226 (4th Cir. 2019) (distinguishing *Metcalf* as those contracts came before any environmental analysis whatsoever). In contrast, here the record shows that BSEE took a hard look at the potential environmental impacts of the SYU when it was approved, AR_19068-24253, prior to issuing the 2023 Decision and 2024 APMs, AR_37-42, 426-30, and when it voluntarily undertook additional analysis, AR_29881-959.

Nothing in the record demonstrates the 2025 EA/FONSI was unreasonably slanted or improperly predetermined. "The standard for predetermination is high and not met by mere partiality on the part of the agency"—predetermination occurs only when an agency "makes an irreversible and irretrievable commitment" to a plan of action "before finishing its review." *City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 848 (9th Cir. 2023) (cleaned up). Courts have rejected claims of predetermination, instead holding that agencies need not vacate existing approvals or permits during supplemental review. *E.g.*, *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1030-33 (10th Cir. 2023).

In analyzing claims of predetermination or slant, courts look to the sufficiency of the environmental analysis itself, not cherry-picked statements from the environmental review process. *See, e.g.*, *Bitterroot Ridge Runners Snowmobile Club v. U.S. Forest Serv.*, 329 F. Supp. 3d 1191, 1199-1200 (D. Mont. 2018) (finding "sentences cited in emails from Forest Service personnel" insufficient to prove predetermination where the "record is replete with evidence that the Forest Service conducted a thorough NEPA analysis"), *aff'd*, 833 F. App'x 89 (9th Cir. 2020); *Delaware Audubon Soc. v. Salazar*, 829 F. Supp. 2d 273, 287-88 (D. Del. 2011) (denying predetermination claim, crediting EA itself rather than "a handful of statements by agency officials cherry-picked from the record"); *Delaware*

*Riverkeeper Network v. Pa. Dep't of Transp.*, No. 18-4508, 2020 WL 4937263, at *19-22 (E.D. Pa. Aug. 20, 2020). An EA is "less exhaustive" and need only "briefly provide sufficient evidence and analysis for determining whether to prepare an EIS." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) (cleaned up). Here, BSEE took the requisite hard look by analyzing potential impacts across numerous resource areas, including greenhouse gas lifecycle emissions, air quality, benthic resources, fish and essential fish habitat, marine mammals and sea turtles, marine and coastal birds, threatened and endangered species, and commercial fishing. AR_29916-37.

Plaintiffs cherry-pick and mischaracterize statements to claim predetermination, but these communications, in context, are innocuous and instead show agency staff working diligently to improve their analysis. *See* AR_58875 ("aspects of structural integrity and related inspections" were "pertinent" to Plaintiffs' claims and should "be included in the EA"); AR_59572-87 (emails discussing ways to improve the draft EA); AR_59191 (same); AR_58990 (Plaintiffs' claims considered to help "guide the EA development"). Staff communications do not show that the 2025 EA/FONSI was prepared as a litigation tactic. *See* AR_57110–11 (staff characterization about change in status of the lease holding activities and not evidencing an intent to prolong the leases); AR_57285 (same and noting APMs are "considered routine for oil and gas operations on the OCS"); AR_58624 (2025 Decision was drafted to "further explain BSEE's determination" and "directly address the claims raised by the plaintiffs"); *id.* (merely noting that 2025 Decision would ultimately be issued to Sable).

BSEE's intention to conduct additional NEPA review was communicated during the Biden administration, and responding to inquiries regarding administration priorities or describing the benefits of resuming production is also not evidence of an unreasonably slanted analysis. *See also* AR_58423-24; AR_59127 (identifying 2025 Decision and EA/FONSI as a "project" consistent

with Secretary's Order 3418, "Unleashing American Energy"); *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 187 F.4th 1112, 1140 (9th Cir. 2026) ("[T]he fact that [agency] acted pursuant to these high-level directives [in Executive Orders] is not evidence that [agency] acted with an improper purpose . . . .").[21] Nor is adherence to internal timelines evidence of improper motivation, *see* AR_55432; AR_57124; AR_58999, especially when the three-month period to prepare an EA/FONSI covering a previously approved project is reasonable and consistent with agency practice, *see* AR_57084 (describing "past expedited EAs" including a "3 month conductor removal EA"); *Defs. of Wildlife v. Hall*, 807 F. Supp. 2d 972, 985 (D. Mont. 2011) ("Setting internal deadlines" did not indicate the agency "predetermined the result of the environmental assessment").[22]

At bottom, the communications Plaintiffs cite amount to mere internal dialogue and fall well short of meeting the high bar of proving predetermination or "slant" to the EA. *See Seven Cnty.*, 605 U.S. at 185 ("The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference."); *Forest Guardians v. U.S. Fish & Wildlife Serv.*, No. 06-231 WJ/KBM, 2008 WL 11361095, at *12 n.7, *19 (D.N.M. Sept. 2, 2008) (internal comments, including email calling the rule "a done deal," did not prove predetermination); *Or. Wild Horse Org. v. Bureau of Land Mgmt.*, No. 2:24-cv-01673-HL, 2025 WL 4592304, at *7 (D. Or. Dec. 19, 2025) (internal disagreements reflected "frank and independent discussions," not a bad-faith effort to predetermine the result).

**E. BSEE's Determinations of NEPA Adequacy Were Proper**

---

[21] Exhibit 1 to the Monsell Declaration, Dkt. 85-1, is impermissible extra-record material that post-dates the 2025 EA/FONSI. *See Locke*, 776 F.3d at 993.

[22] In fact, when the 2025 EA/FONSI was issued, DOI policy was to prepare EAs for National Energy Emergency projects in 14 days. DOI Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply (Apr. 23, 2025), available at https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic.

Plaintiffs' challenge (at 24) to the 2025 APMs is derivative of their challenge to the 2025 EA/FONSI and fails for the same reasons. *See supra* Section IV.C. BSEE appropriately issued Determinations of NEPA Adequacy explaining the well workover activities proposed on existing wells were "consistent with the scope of the activities analyzed" in the 2025 EA/FONSI and other previous reviews and could proceed with "no further NEPA analysis." AR_30143-47; *supra* Section II.C; *see, e.g., Summit Lake Paiute Tribe of Nevada v. U.S. Bureau of Land Mgmt.*, 496 F. App'x 712, 715-16 (9th Cir. 2012) (determinations of NEPA adequacy "will only be set aside if they are arbitrary and capricious").

## V. REMEDY

If Plaintiffs prevail on any claims (they should not), Sable respectfully requests additional briefing on the appropriate remedy given the significant interests at stake and the evolving circumstances in this matter. The Supreme Court made clear that vacatur is not the presumptive remedy in NEPA cases. *See Seven Cnty.*, 605 U.S. at 185; *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1015-16 (9th Cir. 2025) (remand without vacatur was appropriate for "procedural" NEPA violation where disrupting oil and gas venture would be "economically disastrous"). Vacatur is unwarranted here where there are no fundamental flaws and "disruptive consequences" could be severe. *See Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012).[23]

## VI. CONCLUSION

Sable respectfully requests that Plaintiffs' Motion for Summary Judgment be denied and Sable's Cross-Motion for Summary Judgment be granted.

Dated: November 20, 2026 Respectfully submitted,

---

[23] Sable disputes Plaintiffs' claim (at 8 n.3) that the DPA Order has no bearing on this case. While Sable maintains that vacatur of the challenged actions in this case would not restrict Sable's ability to produce under its existing and independently maintained leases, if Plaintiffs prevail on any of their claims, additional briefing would be warranted to ensure the scope of relief avoids any disruptive consequences inconsistent with the DPA Order.

LATHAM & WATKINS LLP

By: /s/ *Janice M. Schneider*
Janice M. Schneider
(*Pro Hac Vice*)
Email: janice.schneider@lw.com
Devin M. O'Connor
(*Pro Hac Vice*)
Email: devin.o'connor@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel.: (202) 637-2200
Fax: (202) 637-2201

Michael G. Romey (Bar No. 137993)
Email: michael.romey@lw.com
355 South Grand Avenue, Suite 400
Los Angeles, CA 90071-1560
Tel.: (213) 485-1234
Fax: (213) 891-8763

Kevin A. Homrighausen
(Bar No. 329034)
Email: kevin.homrighausen@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Tel.: (714) 540-1235
Fax: (714) 755-8290

*Attorneys for Intervenor-Defendant Sable Offshore Corp.*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Intervenor-Defendant Sable Offshore Corp., certifies that this brief contains 25 pages, which complies with the page limit set by the Court's Standing Order.

Dated: November 20, 2026

By: /s/ *Janice M. Schneider*
Janice M. Schneider (*Pro Hac Vice*)